1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3  _____
                              )
4  UNITED STATES OF AMERICA,  )      No. 14-CR-00129 WJ
                              )
5            Plaintiff,        )
                              )
6       vs.                   )      Bonito Courtroom
                              )      Albuquerque, New Mexico
7  MICHAEL DAMEON BLACKBURN,  )      Tuesday, October 6, 2015
                              )      9:30 A.M.
8            Defendant.        )
   _____)

9

10              TRANSCRIPT OF PROCEEDINGS
          MOTION TO SUPPRESS HEARING, VOLUME I
11      BEFORE THE HONORABLE WILLIAM P. JOHNSON
             UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:

14  For the Plaintiff:   MARISA A. LIZARRAGA
                         SHAMMARA HENDERSON
15                       UNITED STATES ATTORNEY'S OFFICE
                         District of New Mexico
16                       201 Third Street, N.W.
                         Albuquerque, New Mexico   87102

17

18  For the Defendant:   MARGARET A. KATZE
                         FEDERAL PUBLIC DEFENDER
19                       District of New Mexico
                         111 Lomas Blvd., NW, Suite 501
20                       Albuquerque, New Mexico  87102

21  REPORTED BY:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                         United States Court Reporter
22                       333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102
23                       Phone:  (505)348-2334
                         Email:  Mary_Loughran@nmcourt.fed.us

24

25      Proceedings recorded by mechanical stenography;
   transcript produced by computer.

```
1                    I N D E X                          Page

2  PRELIMINARY MATTERS ...................................3

3

4               WITNESSES FOR THE PLAINTIFF

5  SPECIAL AGENT RYAN BREEN
       DIRECT EXAMINATION BY MS. HENDERSON ..............18
6      DIRECT EXAMINATION CONTINUED BY MS. HENDERSON ....115
       CROSS-EXAMINATION BY MS. KATZE ...................127
7
   KEIFER CARL ORFIELD
8      DIRECT EXAMINATION BY MS. LIZARRAGA ..............150
       CROSS-EXAMINATION BY MS. KATZE ...................170
9      QUESTIONS BY THE COURT ...........................187
       REDIRECT EXAMINATION BY MS. LIZARRAGA ............188
10

11              WITNESSES FOR THE DEFENDANT

12 VIVIAN ABELES
       DIRECT EXAMINATION BY MS. KATZE ...................73
13     CROSS-EXAMINATION BY MS. LIZARRAGA ................87
       QUESTIONS BY THE COURT ...........................109
14     REDIRECT EXAMINATION BY MS. KATZE ................112

15

16 EXHIBITS                                 FORMALLY ADMITTED

17 Government's Exhibits:                              Page

18 1 - 26  Photographs of 5601 Wyoming                 14

19 48      Photograph (sealed)                         24

20 49      Photograph (sealed)                         29

21 36 - 37 DVDs of interview of Defendant Blackburn    50

22 38      Interview transcript of Defendant Blackburn 50

23 28      Statement of Rights Form                    56

24 39 - 47 Photographs                                 120

25 31 - 35 E-mails with screen shot attachments        125
```

1   (In Open Court at 9:38 A.M.)

2           THE COURT:  This is the case of United States vs.

3   Michael Blackburn, 14-CR-129.  Would counsel enter their

4   appearances for the record, please.

5           MS. LIZARRAGA:  Good morning, your Honor.  Marisa

6   Lizarraga on behalf of the United States.

7           MS. HENDERSON:  And Shammara Henderson on behalf

8   of the United States.  Also sitting at counsel table is

9   Special Agent Ryan Breen.  And we also have, just so the

10  Court is aware, Neoshia Roemer, who is an extern with the

11  U.S. Attorney's Office present in the court, your Honor.

12          MS. KATZE:  Good morning, your Honor.  Margaret

13  Katze for Mr. Blackburn, and this is Stephanie Porter.

14  She is a new paralegal in our office.  She just started

15  yesterday, so I recruited her to come over here today.

16          THE COURT:  Welcome to both your paralegal and

17  the extern this morning.

18          This is on the docket for a Motion to Suppress.

19  I have reviewed the briefing in this.  So how do Counsel

20  wish to proceed?  With the testimony now?

21          MS. LIZARRAGA:  Yes, your Honor.  There's just a

22  couple of preliminary matters that we would like to bring

23  up with the Court.

24          Just so the Court is aware, the United States is

25  planning on calling five witnesses in this case.  It's my

1   understanding that Ms. Katze's witness will be here at

2   2:00, and so what we would like to do is, whatever witness

3   is on the stand around that time, as soon as that witness

4   gets off, Ms. Katze can call her witness.

5            THE COURT:  That's fine.

6            MS. LIZARRAGA:  I'd also like to inform the Court

7   that originally we were planning on calling Franque Hatten

8   to be here.  She is one of the individuals that was

9   present at the residence on December 17, 2013.  Myself and

10  Special Agent Breen met with her on July 27, 2015, and

11  went over some of the stuff that we would have planned on

12  getting out through her.  At that time, she said she

13  wouldn't have any problem coming here to testify.

14           Since then, she has kind of gone MIA.  We've

15  heard from her family that she's now living in Idaho.

16  Special Agent Breen made several attempts to locate her,

17  but he was not able to do so.  I informed Ms. Katze of

18  that on September 22nd.

19           And so what we would like to do is introduce into

20  evidence an ROI detailing our interview with her on

21  July 27th.  I believe Ms. Katze is going to have an

22  objection to that, but just so the Court is aware, that's

23  our plan.

24           I also wanted to bring to the Court's attention,

25  we did file an exhibit list last night.  I have an exhibit

1    binder for the Court, so I don't know if the Court wants

2    it or if you'd like me to give it to your Law Clerk.

3            THE COURT:  Let me go ahead and have it up here.

4            MS. LIZARRAGA:  And also in our exhibit list, we

5    have Government's Exhibit 38, a transcript of the

6    interview.  We had attached a transcript to our original

7    pleading, but there were some edits.  So I have an extra

8    copy of the new edited transcript for the Court, as well.

9    There's a copy in that notebook, but I don't know if maybe

10   you --

11           THE COURT:  Yes, that would be great.

12           MS. LIZARRAGA:  Your Honor, with regard to some

13   of our exhibits, Ms. Katze and I spoke briefly.  It's my

14   understanding she has an objection to a number of our

15   exhibits.  I would bring the Court's -- I did want to let

16   the Court know that we do have some actual child

17   pornography exhibits.  What we've done is we have placed

18   Post-Its on top of the portions of the exhibits that show

19   any type of sexually explicit conduct or any lascivious

20   displayed.  So in that exhibit notebook are copies of the

21   exhibits, but they're redacted.

22           The reason why we are intending to use those

23   exhibits during this hearing is because during the

24   Defendant's interview, he was actually shown copies of

25   these exhibits, and he wrote on them.  So our position is

1  that it's necessary to show them because it shows that the

2  Defendant actually understood what was going on during the

3  hearing.  He's able to write and complete sentences of

4  what's going on in the exhibits.  So that's our position

5  as to why they are necessary.  I do believe that Ms. Katze

6  has an objection to them.

7       Regarding the names of the victims, we do plan on

8  just using their full names during the hearing.  I don't

9  believe anyone is here, but if we do catch that anyone is

10 here from the media, we will certainly ask them to respect

11 the privacy of the victims and not use their names, and we

12 will be moving the Court to seal the Minutes so that the

13 victims' names are not in the public record.

14      And we would additionally request that the Court

15 refer to the victims in any memorandum as Jane Doe No. 1

16 and Jane Doe No. 2 -- John Doe; excuse me.  John Doe No. 1

17 and Jane Doe No. 1, in order to respect their privacy.

18      THE COURT:  If there's a transcription of this,

19 is there any objection to the Court Reporter using, for

20 purposes of the official transcript, John Doe No. 1 and

21 Jane Doe No. 1?

22      MS. KATZE:  No, I don't have an objection to

23 that.

24      THE COURT:  All right, then that's fine.  There's

25 nobody present, so if there is a transcription of it, then

1    the Court Reporter, instead of using the actual names, can

2    use John Doe No. 1 and Jane Doe No. 1.

3            MS. LIZARRAGA:  Thank you, your Honor.  We would

4    like to pre-admit as many exhibits as possible.  I don't

5    know if Ms. Katze has an objection to Government's

6    Exhibits 1 through 26.  Those are simply photographs of

7    5601 Wyoming in Albuquerque that were taken on

8    December 17, 2013.  In order to give the Court an

9    understanding of the witnesses' testimony, we believe that

10   they would aid the Court in understanding kind of what

11   happened and where it happened.

12           THE COURT:  Do you object to 1 through 26?

13           MS. KATZE:  Can I start at the beginning first?

14           THE COURT:  Sure.

15           MS. KATZE:  May my client have at least one hand

16   unhandcuffed so he can write, if there's something --

17           THE COURT:  Sure.  Is he right-handed?  Can you

18   undue his right hand so he could write?

19           MS. KATZE:  Thank you.  So first, let me go

20   backwards.  Let me address the Government's request to

21   admit the report from Franque Hatten.  I would object to

22   that.  First of all, from her report it's clear what she

23   has to say is cumulative.  She says the same thing as

24   Keifer Orfield, who is going to be called, and I believe

25   the Case Agent.  So it's cumulative.

 1          But in addition to that, I think admitting that

 2    report at this point -- two things.  I think that it

 3    violates Crawford and the confrontation clause, that I

 4    should be entitled to be able to talk to her.  As the

 5    Government knows, we did reach out and try to talk to her,

 6    and the Government called and asked us not to contact to

 7    her, that she had indicated that she didn't want to speak

 8    to us.  So I've had no opportunity to speak to her

 9    whatsoever, let alone on the stand.

10          I think that under the confrontation clause

11    argument, the issue that what she has to say is unreliable

12    hearsay then goes to the issue related to her.  She

13    apparently is a drug addict who previously was addicted to

14    drugs.  I think it's methamphetamine, but the Government

15    can correct me if I'm wrong.  But that the reason that

16    she's refusing to come down now is that she is again using

17    drugs.

18          I think she was under pressure at the time that

19    she was searched, patted down.  She wanted to avoid

20    trouble.  And my argument would be that she would say

21    whatever she needed to to ingratiate herself with law

22    enforcement.  And I can't say that without having a

23    witness there.

24          And as far as -- again, it is hearsay, and

25    hearsay is allowed at a suppression hearing.  However,

1  there still has to be a modicum of reliability to the

2  hearsay if it is admitted.  And I think the cases that

3  I've read indicate that unreliable hearsay, or hearsay

4  concerning when there are serious doubts about the

5  truthfulness, are not admissible.

6          So because of her drug addiction and the other

7  circumstances, I think that that's going to be a problem

8  with the hearsay, and that her statements -- again, her

9  statements violate Crawford, so I don't think those should

10  be allowed.  And if the Court is going to allow those in,

11  then I think -- so maybe the Court would rule on that

12  first.

13          THE COURT:  Let me ask you this:  Because this is

14  a suppression hearing, the rules, the hearsay rules,

15  aren't per se applicable.

16          MS. KATZE:  Right.

17          THE COURT:  So we're not dealing with a jury

18  hearing this.  Why wouldn't it be appropriate to admit it,

19  and then really the issues that you've raised go to the

20  weight, if any, to be given to the statement?

21          MS. KATZE:  I think if the Court admits it, then,

22  yes, under 806, I can bring in information through any

23  witness or through any other evidence that would impeach

24  her.  But what I'm suggesting is, you're right, there

25  aren't --

1      THE COURT:  I mean, when Counsel indicated that

2 the United States had attempted to locate her and she's

3 missing in action, I mean, the first thought that went

4 through my mind is, well, I wonder if she's a drug addict,

5 because that's not uncommon.  If someone relapses, they

6 just want to drop off the face of the earth.  And sure

7 enough, you confirmed what I initially suspected.

8      In other words, it's not like I've never had to

9 deal with the weight to be given to testimony of someone

10 who is, sadly, you know, a drug addict.

11      MS. KATZE:  And I understand that, and I

12 certainly understand that the Court has the ability to

13 weigh the credibility.

14      I guess although the Rules of Evidence don't

15 necessarily apply in a suppression hearing, it's also not

16 a free-for-all.  We don't just let anything in because

17 it's out there.  And I think in this circumstance, the

18 Government wasn't able to get a witness to come in, a

19 witness who is using drugs.

20      Like I said, the witness is cumulative of other

21 witnesses that the Government is calling, because we have

22 already received the other witnesses' statements, and I

23 think that there is a Crawford issue, and I think even in

24 a suppression hearing I'm entitled to a client's

25 confrontation rights, that I'm entitled to exercise those.

1          I think combining that with the fact that because

2    of the drug addiction and other issues that I think will

3    come out -- I understand the Case Agent is testifying

4    first, and so under the Case Agent, that the witness is

5    sort of beholden to law enforcement.  I think the

6    combination of those factors make this hearsay unreliable.

7    So although hearsay is admissible, it has to be reliable,

8    and so I would ask that the Court not admit that report.

9          THE COURT:  Let me ask you this:  In terms of the

10   representations Ms. Lizarraga made about the efforts the

11   United States made to bring Ms. Hatten here, to Subpoena

12   her, do you wish to have a record made on that by

13   questioning the Case Agent on the efforts that were made

14   to locate her and get her here for this hearing?

15         MS. KATZE:  I think if Ms. Lizarraga can put on

16   the record what efforts were made, that's fine with me.

17         THE COURT:  All right.  Why don't you go ahead

18   and state that.  But also, what's your response to the

19   Crawford issue that Ms. Katze has raised?

20         MS. LIZARRAGE:  Well, your Honor, I think that

21   Crawford is a trial right, and I think that this is a

22   suppression hearing.  So our position is that Crawford

23   absolutely does not apply.

24         And if I could maybe alleviate some of this, just

25   for the purposes of moving it along, we're fine moving

1  ahead and not actually admitting the report, but we would

2  like to be able to question the Case Agent about that

3  meeting on July 27th.

4          I don't believe that what Ms. Hatten said is

5  cumulative, because what she told us at the time is that

6  she didn't feel that the police were being coercive or

7  acting inappropriately in any way.  That's kind of the

8  whole crux of Ms. Katze's argument.  So I think the more

9  witnesses, especially the more non-law enforcement

10 witnesses we can put on to bolster the claim by us that

11 there was no inappropriate action by law enforcement, I

12 think it goes directly to the heart of the issue in this

13 case.

14          My guess is that Ms. Katze is also going to have

15 a problem with us simply asking the Case Agent about the

16 meeting, but what I can tell you is that I, myself, met

17 with Ms. Hatten that day, and I'm not someone who is

18 trained to observe people that are under the influence of

19 drugs, but we did question her about her drug use that

20 day, and I don't believe she was using any drugs that day.

21 And we questioned her about her drug use on December 17,

22 2013, and she told us that she wasn't using drugs that

23 day.

24          Of course, I think that she does have a history

25 of abusing drugs.  So insofar as you can rely on that, I

1    think that the Case Agent can give the Court a good idea

2    of how she appeared to be on July 27, 2015, and why in his

3    experience as a law enforcement agent who does deal

4    frequently with individuals who abuse drugs, he believed

5    that she was not using any drugs on that day.

6            The efforts that were made by the agent -- can I

7    simply have Special Agent Ryan Breen tell the Court

8    directly?

9            THE COURT:  Well, when you call him.  Why don't

10   you just do it that way.  Is he going to be the first

11   witness?

12           MS. LIZARRAGA:  Yes, your Honor.

13           THE COURT:  Then why don't we go ahead and cover

14   it then.  And I'll reserve ruling on the transcript until

15   later on in the hearing.

16           MS. LIZARRAGA:  Thank you, your Honor.

17           MS. KATZE:  It sort of sounds like maybe

18   Ms. Lizarraga was a witness and sort of testifying as a

19   witness to what happened during that interview.  That's a

20   separate issue.

21           So with respect to the rest of the Government's

22   exhibit list, I had an objection to some of the pictures

23   in 1 through 26, just merely that they weren't relevant.

24   But I talked to Ms. Lizarraga, and she has represented to

25   me that they're just being shown so that witnesses can

1    describe where they are in the house.  So I won't make an

2    objection to those.

3            THE COURT:  All right.  Then for purposes of this

4    hearing, I'll admit Exhibits 1 through 26.

5        (Government's Exhibits No. 1 - 26 admitted.)

6            MS. KATZE:  I don't have -- okay.  So then we get

7    to Exhibit 29, which is a letter that my client apparently

8    made during the course of the interrogation, and I'm going

9    to object to its admission.  I think that it's irrelevant.

10           My allegation with respect to that -- I've made

11   two allegations, or two motions, two issues for

12   suppression.  One is a Fourth Amendment issue that the

13   entry and search of the home was illegal, and then my

14   second is that law enforcement failed to properly or at

15   all advise my client of his Constitutional rights under

16   the Miranda decision.  So anything after that part of the

17   interrogation I don't think is relevant, because that's

18   the whole issue, that they did not inform him of that.

19           I have alleged not that my client is illiterate,

20   but that my client has a more limited reading

21   comprehension level, and my witness will testify to that

22   this afternoon.  So I have not alleged that he is

23   illiterate.

24           In any case, I'm going to make the same

25   objection, sort of generally, to 29, the letter, and the

1    e-mails, 31 through 35, and then the pictures, 39 through

2    49.  They're simply inflammatory and I think presented

3    just to be prejudicial.  I don't think there is a

4    legitimate substantive reason.

5         The fact that he could put a word on a picture or

6    put together some sentences I don't think has -- it

7    doesn't refute my argument that he was not given his

8    Miranda warnings.  There is a tape of the interrogation.

9    In fact, the tape shows him sitting for over three hours

10   before the agents get in, and then there are small clips.

11        So I know that the Government -- one of their

12   exhibits is 36, a DVD of the interview of my client.  It's

13   the full -- it shows the whole time, like over three hours

14   where he's sitting there in the room before he gets

15   interviewed.  And then No. 37 is just the part of the

16   interrogation for when the agents come in, all the way to

17   the end, and that's a couple of hours.

18        I don't really think that's all relevant.  I

19   think the inquiry and what the Government has the burden

20   of responding to is, was he, in fact, give his Miranda

21   warnings.  Was there a violation of Miranda.

22        So I think it's an effort to put before the

23   Court, to exploit prejudicial information which may be

24   relevant eventually in a trial situation, but I don't

25   think is relevant in a suppression hearing.  I think it's

1    inappropriate and prejudicial.  So I would oppose the

2    introduction of those items.

3            And then maybe when we're done on that

4    conversations, maybe we can talk about how to handle --

5    how we're going to actually see or watch the video.  I

6    don't have a problem with the Court watching the entire

7    video.  I don't have a problem with the Court watching --

8            THE COURT:  You're not proposing that I watch the

9    three hours that --

10           MS. KATZE:  If the Court wants to, I don't have a

11   problem with that.

12           THE COURT:  In other words, I'll accept your

13   representation on that.

14           MS. KATZE:  I'm proposing that we all don't watch

15   that.

16           THE COURT:  That's acceptable to me.

17           MS. KATZE:  And I think the interrogation lasted

18   over two hours.  And again, I don't have a problem with

19   the Court and the Court staff watching it, but I'm

20   proposing that we don't have to sit here and watch it,

21   because my argument is, we have a clip that's just a

22   couple of minutes long, and that's the relevant inquiry

23   that we have.  So that's my second issue after my first

24   issue opposing the introduction of those items.

25           THE COURT:  Why don't we do this.  It will help

1  me understand better the context.  Let's just proceed, and

2  then lay the -- I've admitted 1 through 26, and then the

3  ones afterwards, offer those at the time you wish and I'll

4  take a specific objection on the exhibit.

5        MS. LIZARRAGA:  Yes, your Honor.  And just so the

6  Court is aware, we are planning on showing the entire

7  video today.  And the reason for that is, I do believe

8  it's highly relevant.  Ms. Katze is asking the Court to

9  suppress all of the evidence in this case.  That includes

10 evidence that we derived from two e-mail accounts that we

11 learned about during the course of this interview.

12        And so I think even if the Court, which our

13 position is that the Defendant was properly Mirandized,

14 but even if the Court finds that there is a Miranda

15 deficiency, our position is that the fruit of the

16 poisonous tree is a Fourth Amendment remedy and not a

17 Fifth Amendment remedy.  So as long as there is no

18 coercion throughout the interview, then we can still use

19 evidence that we learned from the Defendant to go find

20 other evidence.

21        So we're not trying to draw this out any longer

22 than it has to be, but again, I think it goes right to the

23 heart of the issue in this case.  And I think that the

24 only way for the Court to be able to properly assess

25 whether there was any coercive action by the police during

1  the course of the interview is to actually see the

2  interview.

3          THE COURT:  Okay, fair enough.

4          All right, go ahead and call the first witness.

5          MS. HENDERSON:  Your Honor, the Government calls

6  Special Agent Ryan Breen.

7      (RYAN BREEN, GOVERNMENT'S WITNESS, SWORN)

8          MR. GARCIA:  Please have a seat and state your

9  full name for the record.

10          THE WITNESS:  My name is Ryan Breen.  R-y-a-n,

11  B-r-e-e-n.

12                  DIRECT EXAMINATION

13  BY MS. HENDERSON:

14  Q.   Agent Breen, can you please tell me where you work.

15  A.   I'm a Special Agent with Homeland Security

16  Investigations here in Albuquerque, New Mexico.

17  Q.   And what type of cases do you investigate?

18  A.   I currently investigate Border Enforcement Security

19  Task Force, which is drug-related, gang-related,

20  gun-related crimes.

21  Q.   And that's what you're currently investigating.  What

22  did you investigate prior to that?

23  A.   Prior to that, I was on the Public Safety Group,

24  which was the Child Exploitation Unit for my office.

25  Q.   And how many years were you in that unit?

1   A.    I was in that unit for approximately two-and-a-half

2   years.

3   Q.    Can you give us that time period, please?

4   A.    From August of 2012 until June of 2015.

5   Q.    So that's during the time period that this case was

6   investigated?

7   A.    Yes, ma'am.

8   Q.    And what did you do with HSI or ICE prior to that?

9   A.    Prior to that, I was again on the Border Enforcement

10  Security Task Force, and before that I was in the

11  Immigration Investigation Group.

12  Q.    Do you have any other law enforcement experience

13  outside of what you've done at HSI?

14  A.    Yes.  Prior to joining HSI, I was a United States Air

15  Marshal for nine years.  I was also an Air Marshal

16  Instructor for three years of that time.  And before that,

17  I joined the United States Border Patrol in 1997.

18  Q.    And what positions did you hold at the Border Patrol?

19  A.    While working with the United States Border Patrol, I

20  was a patrol officer, I was a prosecutions officer in

21  which I handled immigration prosecutions for the courts

22  down there, and I was a task force officer with DEA.

23  Q.    During the time that you've been an officer, since I

24  believe you said 1997 --

25  A.    Yes, ma'am.

1    Q.    -- did you have any training and experience in

2    interviewing?

3    A.    Yes, ma'am.  I've attended multiple academies and

4    have had trainings in interviewing there.  I've attended

5    alternate classes given through the Internet Crimes

6    Against Children course, as well as Search.org, which is a

7    private multi-national corporation that gives

8    jurisdictional courses on different training aspects.  The

9    Search courses and the ICAC courses were specifically for

10   child exploitation cases.

11   Q.    How many interviews have you conducted of defendants

12   for -- and you said ICAC.  Can you explain what ICAC

13   means?

14   A.    That's the Internet Crimes Against Children.  That is

15   the task force that's located here and headed by the

16   New Mexico Attorney General's Office.

17   Q.    How many interviews have you conducted for child

18   exploitation or ICAC type cases?

19   A.    20 to 30 different interviews.

20   Q.    And at the time in December of 2013 when you

21   interviewed the Defendant, how many interviews had you

22   conducted?

23   A.    Probably 10 to 15 different interviews.

24   Q.    Have you ever conducted an interview where you had to

25   engage with a Defendant who had a learning disability?

1    A.    Yes, I have.

2    Q.    About how many times?

3    A.    One specific time when I was with the Child

4    Exploitation Unit, and multiple times when I was with the

5    United States Border Patrol.

6    Q.    Are you familiar with the investigation of Michael

7    Blackburn?

8    A.    Yes, ma'am.

9    Q.    Are you the Case Agent on the investigation of

10   Michael Blackburn?

11   A.    Yes, ma'am.

12   Q.    Can you tell us what led to your investigation and

13   the eventual arrest of the Defendant?

14   A.    Yes, ma'am.  On November 15th, my office received a

15   tip from the Cyber Crimes Center located in Washington,

16   D.C., which is an investigative branch of Homeland

17   Security Investigations.  The tip --

18   Q.    I'm sorry; can you tell us what the Cyber Crimes

19   Center is?

20   A.    The Cyber Crimes Center is an investigative branch of

21   Homeland Security Investigations that deals primarily with

22   crimes involving computer information, either child

23   exploitation crimes, fraud crimes, anything that can be

24   accomplished over the computer.  Wire fraud, anything like

25   that.  It's our clearinghouse for investigative means

1  through them.

2  Q.   And so you have had experience working with the Cyber

3  Crimes Center on multiple occasions?

4  A.   Yes, ma'am.  We've received multiple tips, not just

5  for child exploitation, but for other crimes through this

6  center.

7  Q.   And you said you received an image.  I apologize;

8  what date was that?

9  A.   On November 15, 2013, I received a tip from the Cyber

10  Crimes Center, referred to as C-3, which showed during an

11  alternate investigation an image was discovered on a TOR

12  site, which is The Onion Router.  It's a dark web site.

13  It was of a small female, a little girl, with her legs

14  spread, and a nude adult male attempting to penetrate her

15  with his penis.

16  Q.   And did you receive any other information with that

17  image?

18  A.   Yes.  Included in the image was what's called

19  EXIF data, which is any time that somebody takes a picture

20  in which that function is not turned off, if you do it

21  with your phone or a camera or whatever, different

22  information is recorded inside the picture.

23      In this case, it told us what kind of implement took

24  the picture, which was an iPhone 4, and it gave us GPS

25  locations of where the picture was taken, which turned out

1    to be 9766 Eagle Ranch Road in Albuquerque, New Mexico,

2    which was the Aspen Apartments complex.

3    Q.   And what time period were you told, based on EXIF

4    data, was this image taken?

5    A.   This image was taken in May of that year, 2013.

6    Q.   I have what's Government's Exhibit 48, previously

7    marked as Government's Exhibit 48.  Can you tell us what

8    that is?

9    A.   That's the image that we received from C-3.  It

10   appears to be a small female child, we were assuming

11   approximately three years of age, on a white mattress pad,

12   and what the sticky note is covering is an adult male

13   penis attempting to penetrate the child.

14   Q.   Is there anything else specific about this image that

15   you would like to talk about?

16   A.   We noted that in the image, the individual that was

17   attempting to penetrate the child was also a white male,

18   and that the body type of him was husky, that based on the

19   way that his belly distends, we assumed that he might be

20   overweight.

21   Q.   And does this picture accurately reflect the image

22   that you received from C-3 on November 15th?

23   A.   Yes, it does, ma'am.

24        MS. HENDERSON:  With the Court's permission, I'd

25   like to move Exhibit 48.

1          THE COURT:  Sure.  Objection?

2          MS. KATZE:  I'm going to object.  I don't think

3    the picture is relevant.  I think it's inflammatory.

4    Certainly I understand the Agent's testimony of why he got

5    notified of the case, how the case investigation started,

6    but I don't think the admission of that photo adds

7    anything to the Government's burden.  It's inflammatory.

8          THE COURT:  Well, the part that arguably is

9    inflammatory is blocked out, and --

10         MS. KATZE:  So what's the relevance of the

11   picture at all, then?

12         THE COURT:  Well, the point is, this is not the

13   first time that I've ever dealt with a child pornography

14   case.  This is a suppression hearing.  We don't have a

15   jury.  So the objection is overruled.  It'll be admitted.

16       (Government's Exhibit No. 48 admitted.)

17   BY MS. HENDERSON:

18   Q.   After you received this information on November 15th,

19   what did you do?

20   A.   After we received the information on November 15th,

21   we attempted surveillance at the Aspen Apartments multiple

22   times in an attempt to identify either a small Caucasian

23   female that was located around the building that was

24   identified by the GPS coordinates, which was Building 5,

25   or if we could find a Caucasian male whose body type fit

1    the picture.

2         We tried surveillance in the morning, hoping to maybe

3    get the child and the perpetrator going to school or to

4    work.  We then tried surveillance in the evening, hoping

5    to get the child or the perpetrator coming back from

6    school and work.  None of this was successful at that

7    time.

8    Q.   And you did conduct surveillance on multiple days;

9    correct?

10   A.   Yes, ma'am.

11   Q.   Moving forward to November 26, 2013, what did you do

12   to further your investigation?

13   A.   On November 26, 2013, we made contact with the

14   resident representative of Aspen Apartments and spoke to

15   her about the individuals that were currently residing in

16   Building 5 in the apartments that were in question.

17        We were notified that the image showed that the

18   location of the picture was taken at the northwest side of

19   the building, I guess, from how it was oriented, so we

20   were looking specifically at Apartments 515, 525, 514,

21   524.  But obviously due to the margin of error of the GPS

22   coordinates, we were specifically concentrating on the

23   entire building.

24        We were notified that the residents that were

25   currently in those apartments were not the residents

1  during the timeframe that this picture was taken.

2  Q.   And that being in May of 2013?

3  A.   Yes, ma'am.

4  Q.   So once you learned that, how did you further the

5  investigation?

6  A.   It was decided that we would interview the entire

7  occupants of Building 5 to see if anybody recalled a child

8  about that age frame, or anything suspicious that had

9  occurred in there.

10      On December 10th, I believe it was, we conducted

11 interviews of the entire building and spoke to as many of

12 the occupants as we could.  Obviously some of the

13 apartments weren't occupied.

14      During that timeframe, we were notified that in

15 Apartment 514, there used to live a family that had a

16 small female child that met the age and description of the

17 image that was sent to us from C-3.  We were also notified

18 that there was multiple males that lived in that apartment

19 at that time.

20 Q.   Due to the type of image that you had available to

21 you when you were interviewing people at that time, were

22 you able to show anybody the image that you received from

23 C-3?

24 A.   No, because as you can see in the image that we

25 received from C-3, there wasn't a face visible.

1  Q.   Were you able to identify the parents that were in

2  the building that some of the other residents referred to

3  that apartment?

4  A.   Yes.   That apartment came back to Maree Koons, and it

5  was also established that she was living there with her

6  children, Thomas Mitchell, James Christopher Mitchell, and

7  Thomas' wife Maria, as well as their two children.

8  Q.   And were you able to pull any other information and

9  documents from the apartment building regarding whoever

10  was staying in, I believe you said Apartment 514?

11  A.   Yes.   We were able to get the driver's licenses that

12  were copied from the application process, so we could see

13  Thomas Mitchell, Maria Mitchell and James Christopher

14  Mitchell, as well as Maree Koons.

15  Q.   And any documents from the apartment complex itself?

16  A.   We got the lease request and all of that information.

17  Q.   Was the time period on the lease perhaps significant

18  for any reason?

19  A.   The time period on the lease showed that they

20  occupied Apartment 514 during the time that the picture

21  was created.

22  Q.   Did you receive any more images from C-3?

23  A.   On December 13th, we received a follow-up image from

24  C-3 that was found during an FBI investigation.   This

25  image also did not have the EXIF data removed, and it

1   showed a very small female child with her legs spread, it

2   appeared to be that her hand was stretching her vagina,

3   but in this image we could see the little girl's face.

4   Q.   And you said that that also had the EXIF data.  What

5   was that EXIF data?

6   A.   I'm sorry; the EXIF data that was attached to that

7   showed that the image was taken in the same area as the

8   first image that we got.  However, it showed that the date

9   I believe was in July of 2013.

10  Q.   And was that also consistent with the lease?

11  A.   Yes, ma'am.

12  Q.   I'm showing you what's been previously marked as

13  Government's Exhibit No. 49.  Can you tell us what that

14  is?

15  A.   That is the picture that I received from C-3 and the

16  FBI depicting the small female with her legs spread.

17  Q.   So it accurately reflects the image that you received

18  from C-3 at that time?

19  A.   Yes.

20       MS. HENDERSON:  With the Court's permission, I'd

21  like to move Exhibit No. 49.

22       THE COURT:  Same objection?

23       MS. KATZE:  Same objection.

24       THE COURT:  Noted for the record, but it will be

25  admitted for the purposes of this suppression hearing.

1   And it will be admitted as a sealed -- 48 and 49 will be

2   admitted as sealed exhibits for this proceeding.

3            MS. HENDERSON:  Yes, your Honor.  Thank you.

4        (Government's Exhibit No. 49 admitted).

5   BY MS. HENDERSON:

6   Q.   Once you received a picture of the child's face, how

7   was that significant to you?

8   A.   That gave us the ability to create a sanitized image,

9   and we were able to then contact management at the Aspen

10  Apartments and show the child's face to confirm that it

11  was the child that was residing in Apartment 514 during

12  the time that the Koons/Mitchells lived there, and that it

13  was the child of Thomas and Maria Mitchell.

14  Q.   So at this point, you were able to confirm who the

15  child was, confirm the family.  What did you do with your

16  investigation at this point?

17  A.   At this point, we attempted further record checks,

18  because they had moved out of the Aspen Apartments.  We

19  found that Maree Koons had moved just down the road, and

20  after record checks we discovered that Thomas and Maria

21  Mitchell appeared to have moved to 5601 Wyoming Boulevard

22  in Albuquerque, New Mexico.

23  Q.   And that's the Academy Heights Apartment complex?

24  A.   That is the Academy Heights Apartment complex.

25  Q.   So you were able to learn that on December 13th.

1    What did you do on December 16th with that information?

2    A.   On December 16th, we made contact with the management

3    of the Academy Heights Apartment complex, and I showed the

4    sanitized copy of Victim 1's face, and she said that, yes,

5    that appeared to be the child that resided in 5601, and

6    that the Mitchells were on the lease there.

7    Q.   And just for clarification for the Court Reporter,

8    when you said Victim 1, I think we agreed to use first

9    names of the victim.  So that would be the female?

10   A.   It would be Jane Doe No. 1.  It would be Jane Doe

11   No. 1 that I showed a picture of, yes.

12   Q.   Did you know her name at the time that you showed the

13   picture, just for clarification?

14   A.   No, I didn't.

15   Q.   So once you confirmed that Jane Doe No. 1 was in the

16   apartment complex on the 16th, what was your next course

17   of action?

18   A.   After I confirmed that, I had to contact my

19   supervisors, as well as BCSO Detective Theresa Sabaugh,

20   who had been assisting me with the investigation.  We then

21   attempted to put into place a plan to make contact at the

22   residence, but we had to contact her chain of command,

23   contact my chain of command, we had to attempt to make

24   appointments with CYFD in case we encountered the child,

25   and we attempted to make appointments with a safe house,

1  All Faiths, if we needed the child interviewed.  We then

2  had to get enough agents and support in which to conduct a

3  knock and talk, as by my agency's policies and

4  regulations.  So different plans had to be put into place

5  before we were allowed to make contact at the residence.

6  Q.   And as part of this plan, did you also have a Victim

7  Advocate from your agency ready?

8  A.   I did.  I contacted Denise Gutierrez, who is the

9  Victim Advocate Coordinator for our office.

10 Q.   At the time that you were planning on doing a knock

11 and talk -- well, let me -- I'll go back to that.

12      At the time you were planning on doing the knock and

13 talk, did you know who the Defendant was?

14 A.   No.

15 Q.   Did you have any reason to suspect the Defendant at

16 this time?

17 A.   No.  We had no idea that the Defendant lived in the

18 apartment.

19 Q.   And you said that you planned on doing a knock and

20 talk.  What is a knock and talk?

21 A.   A knock and talk is an investigative technique in

22 which you go up to a residence, you knock on the door, and

23 you ask for permission to speak with them to help further

24 your investigation.  It's a completely voluntary action on

25 the part of the people that you're knocking on the door

1   of.

2   Q.   Has anyone ever refused to talk to you while you were

3   attempting to do a knock and talk?

4   A.   Yes, they have.

5   Q.   And what did you do when they refused to talk to you?

6   A.   We went away.

7   Q.   And had that happened in this case, would you have

8   gone away?

9   A.   Yes, ma'am.

10  Q.   So, on what date did you attempt to do a knock and

11  talk?

12  A.   We were able to get everything completed and go on

13  December 17th, the following day.

14  Q.   What time did you arrive at the apartment?

15  A.   7:15 in the morning.

16  Q.   I'm showing you what's been previously admitted as

17  Government's Exhibit No. 1.  Can you tell us what that is?

18  A.   That's a picture of the front door of 5601 Wyoming

19  Boulevard.

20  Q.   The apartment complex where you did the knock and

21  talk?

22  A.   Yes, ma'am.

23  Q.   Can you tell us who was available for the knock and

24  talk?

25  A.   Myself, Detective Theresa Sabaugh of the Bernalillo

1    County Sheriff's Office, Special Agent Morjn Langer,

2    Special Agent Christina Altamirano, Special Agent Eric

3    Bonza, APD Detective Jake Storey, APD Detective Josh

4    Hawkes, and then other people were attempting to arrive or

5    come in and out.  But those were the primaries that were

6    put down on the operational plan as being who was

7    definitely going to the house.

8    Q.    You also had a Victim Advocate ready; right?

9    A.    Yes, but she wasn't --

10   Q.    Where was she?

11   A.    Due to the fact that it's an unsecured scene, the

12   Victim Advocate was at a parking lot a couple of blocks

13   away, for her safety.

14   Q.    So she wasn't actually in front of the door?

15   A.    No, ma'am.

16   Q.    Where was Detective Sabaugh?

17   A.    Detective Sabaugh and I were standing in front of the

18   door.  Special Agent Altamirano was standing to the left

19   of the door in front of the windows.  And I believe the

20   other agents and officers were waiting back by the

21   vehicles in the parking lot.

22   Q.    So you had yourself and Detective Sabaugh at the

23   door?

24   A.    Yes.  And Special Agent Altamirano was covering the

25   windows, just for officer safety.

1   Q.   And everybody else was back that you mentioned, the

2   other three people were back in the parking lot?

3   A.   Yes, ma'am.

4   Q.   So what happened when you knocked on the door?

5   A.   Detective Sabaugh knocked on the door, and the door

6   was answered by the gentleman who was later identified as

7   Michael Blackburn.

8   Q.   Since you said the gentleman who was later identified

9   as Michael Blackburn, do you see the Defendant, or Michael

10   Blackburn in the courtroom today?

11   A.   Yes, ma'am.

12   Q.   Can you please describe him?

13   A.   He is sitting at the defense table.  He is wearing a

14   green jump suit.  He has short, appears to be reddish

15   hair, and he's clean shaven.

16        MS. HENDERSON:  Your Honor, would the record

17   reflect that Special Agent Breen has identified the

18   Defendant?

19        THE COURT:  The record will so reflect.

20   BY MS. HENDERSON:

21   Q.   So you previously were saying that Detective Sabaugh

22   knocked on the door and the Defendant opened the door.

23   What happened after that?

24   A.   Detective Sabaugh introduced herself and said that

25   she was from the Bernalillo County Sheriff's Department,

1    and that she was at the apartment due to possible concerns

2    with the children.  She asked Mr. Blackburn if we could

3    come in and talk to him, and he said, yes, and let us in

4    the door.

5    Q.    What was he wearing at that time?

6    A.    He had on a pair of black like basketball shorts and

7    no shirt.

8    Q.    Was he wearing shoes at the time?

9    A.    No, ma'am.

10   Q.    So once you are in the apartment complex, who all was

11   in the apartment complex with you, in terms of law

12   enforcement?

13   A.    For law enforcement, when we entered the apartment

14   complex, it was myself, Detective Sabaugh, Special Agent

15   Altamirano, Special Agent Langer, Special Agent Bonza, and

16   then Detectives Hawkes and Storey.

17   Q.    I'm showing you what is Government's Exhibit No. 3.

18   Can you tell us what this is?

19   A.    That is the front entryway of 5601 Wyoming, the

20   apartment that we entered that day on the knock and talk.

21   Q.    And I apologize; just to clarify, I thought I had

22   asked you this, but when you stated that Detective Sabaugh

23   asked if you could talk to them, did she request to come

24   into the apartment complex?

25   A.    Yes.  She asked if she could enter the apartment

1   complex, and Michael Blackburn said, yes, and let us in.

2   Q.   Okay.  So once you entered, you're in this front area

3   of the apartment complex.  What occurs?

4   A.   Once we come inside, different agents perform a

5   protective sweep.  Right now, Detective Sabaugh and myself

6   are talking with Michael Blackburn.  Other agents move

7   through the apartment to make sure that the number of

8   people that are inside the apartment are accounted for,

9   and that there's no easily accessible weapons.  So I

10  believe Detectives --

11  Q.   I want to back up a little bit.  Did Detective

12  Sabaugh ask if you guys could do a security sweep, or a

13  protective sweep?

14  A.   I thought she did, but I can't say 100%.  I thought

15  she said to Michael, do you mind if we -- or, who is in

16  the apartment, do you mind if we check?

17  Q.   And what did he say in terms of who was in the

18  apartment complex?

19  A.   He told us that there was two adults -- there was two

20  people sleeping in the living room, and that there were

21  two kids in the apartment, and himself.

22  Q.   And did he mention anybody else that normally resides

23  in the apartment complex at that time?

24  A.   That the owners or the renters of the apartment,

25  Thomas and Maria Mitchell, were not there, that they had

1    left on a trip.

2    Q.    So when you first entered the house, he informs you

3    that there are two other adults, two children, and you're

4    not positive whether or not Detective Sabaugh requested to

5    do a protective sweep or a security sweep, but that's what

6    occurred next?

7    A.    Yes, ma'am.  It's standard practice that we perform a

8    security sweep in order to identify all the individuals

9    inside the house, to make sure for officer safety that

10   there's no easily accessible weapons, or that there's not

11   anybody there that's going to hurt us.

12   Q.    And when you do a security sweep, is searching the

13   house part of that security sweep?

14   A.    No, ma'am.  The only part that you do is you look for

15   places that a person could hide, or for easily accessible

16   weapons.  So you're not actually searching the residence,

17   you're only going through cursorily to make sure that

18   there are no additional people and there are no accessible

19   weapons.

20   Q.    Is that what occurred at that time?

21   A.    Yes, ma'am.

22   Q.    Did the Defendant seem upset by the security sweep

23   occurring?

24   A.    No, ma'am.

25   Q.    Did the other two adults in the house seem upset by

1  the security sweep?

2  A.   No.  Everybody was very friendly and very calm.

3  Q.   So while you're having this conversation with the

4  Defendant about who's in the apartment at this time, do

5  you see any of the victims?

6  A.   Yes.  At this time, Jane Doe No. 1 came walking down

7  the stairs in her diaper and went to Detective Sabaugh,

8  and from that, I recognized her from the pictures that we

9  had.

10 Q.   Was there anything else that you noticed about her,

11 other than the fact that she was only wearing a diaper?

12 A.   No, not that I can --

13 Q.   Did she appear to be clean, well taken care of?

14 A.   Oh, no, she was quite disheveled and everything.  But

15 she was coming down the stairs after getting up, I'm

16 assuming, from a night's sleep.

17 Q.   So after you see Jane Doe No. 1 come down the stairs

18 and she goes with Detective Sabaugh, what occurred next?

19 A.   At that point, I stepped outside to call my

20 supervisor and notify her that we had found the victim in

21 the picture.

22 Q.   And did you also call your Victim Advocate at that

23 time?

24 A.   I did.  I called Denise and told her that the scene

25 was secure, and that she could come forward.

1  Q.    And after having seen the Defendant and Jane

2  Doe No. 1 in the same apartment complex, did you start

3  making or identifying the Defendant as a possible person

4  who was engaging in the child pornography images?

5  A.    We did identify him as a possible suspect due to his

6  body type and the fact of the original image that was sent

7  out.

8  Q.    And when you say his body type, can you explain that

9  a little bit further?

10  A.    Based on his height and weight.  The belly that was

11  shown in the picture, how it distends and almost covers

12  the penis, is what we were looking at to be similar in

13  build to the Defendant.

14  Q.    What did you learn while you were outside calling

15  your supervisor and the Victim Advocate?

16  A.    At the time that I was outside making calls to

17  arrange for the Victim Advocate and notify my supervisor

18  to see how she wanted to proceed, I had an encounter with

19  Franque Hatten.  She was brought out to me by another

20  Special Agent, Christina Altamirano.  Apparently she had

21  spoken to Special Agent Altamirano previously and told

22  her, or asked her --

23  Q.    What did she tell you, exactly?

24  A.    She asked if we were there because her mother called,

25  and we said, no, we're not there because your mom called.

1   And we asked her what that was about.

2        Apparently she had relayed a story to her mother

3   about when the Mitchells left on Saturday, the Defendant

4   took the children upstairs for an early nap, and then her

5   boyfriend, Keifer Orfield, left to go to the library.

6   Franque had stayed.  And she said she heard the children

7   screaming and crying upstairs, saying, no, no, no.  Maria

8   Mitchell called her and asked to speak to the Defendant.

9   She brought the phone upstairs and tried to go into the

10  bedroom to give him the phone, and the door was locked.

11  Q.   And what happened after the door being locked?

12  A.   She knocked on the door and told him he had a phone

13  call.  He opened the door and took the phone call, and

14  asked her, oh, I thought you had left with Keifer, and

15  she's like, no, I'm downstairs.  And he's like, oh, okay.

16  And then he took the phone call and she went back

17  downstairs.

18  Q.   And you said early nap.  Was there anything unusual

19  about the early nap?

20  A.   Well, Ms. Hatten said that she thought it was weird,

21  because the children had just gotten up about 9:00 when

22  the parents were leaving, and about 10:00 or 10:30

23  Mr. Blackburn was taking them upstairs for their nap.  She

24  said that was earlier than they usually go up.

25  Q.   And you said children.  At this point, had you

1  learned that there was more than one toddler at the house?

2  A.   Yes.  Actually, during the sweep we identified that

3  there was a second child asleep up in the bed, and that

4  would be John Doe No. 1.

5  Q.   Also referred to as, I think, John Doe No. 1?

6  A.   Yes.  John Doe No. 1 is the common reference to him.

7  Q.   Did Ms. Hatten state anything else that was unusual

8  about the two toddlers?

9  A.   She told me that both kids were hypersexual at the

10  time, that they attempted to insert objects into their

11  anus and into their vagina, that Jane Doe No. 1 would

12  simulate fellatio on like a toy hammer, or something like

13  that, that she had to continually tell her, no, close your

14  legs, you know, sit like a lady.  That she just behaved in

15  a very sexually aggressive manner for a two-year-old.

16  Q.   What else did Ms. Hatten tell you after that?  Was

17  she planning on telling anybody about what she saw?

18          MS. KATZE:  Objection.  Leading.

19          THE COURT:  Rephrase the question.

20  BY MS. HENDERSON:

21  Q.   Did she tell you anything else that she planned on

22  doing?

23  A.   Yes.  Her and Keifer were planning on leaving the

24  apartment on Friday, and she said that she was going to

25  notify CYFD at that time.

1    Q.    Was that basically the conversation that you had with

2    her?

3    A.    That's the conversation I had with her, yes, ma'am.

4    Q.    Did she say anything to you about a phone?

5    A.    No.   Not to me, no, ma'am.

6    Q.    So at this point, with the information that you

7    received from Ms. Hatten, having seen Jane Doe No. 1 and

8    the Defendant, what are you thinking at this time?

9    A.    I'm thinking that he's probably abusing the children.

10   Q.    And that he would be the person that was --

11             MS. KATZE:   Objection.   Leading.

12             THE COURT:   That's leading.

13             MS. HENDERSON:   I apologize.

14   BY MS. HENDERSON:

15   Q.    And what --

16   A.    That he would be the person that was in the image

17   that was created, yes, ma'am.

18   Q.    Did you discuss this information with Detective

19   Sabaugh?

20   A.    I believe that Detective Sabaugh and I were both in

21   agreement at this point that we thought due to the way the

22   children were acting and stuff like that, that Michael

23   Blackburn was probably the perpetrator, yes.

24   Q.    So what did you do after that?

25   A.    After making my phone calls and making arrangements,

1    I went back inside to check on the scene.

2    Q.   And when you went back inside, did anybody ask you to

3    leave?

4    A.   No, ma'am.

5    Q.   Are you aware of anybody, other than the two adults

6    or the Defendant, asking law enforcement to leave the

7    house?

8    A.   No, ma'am.

9    Q.   So what happened next?

10   A.   I went back inside, and I was waved over by Special

11   Agent Morjn Langer, who was standing just inside the

12   living room.  Himself and Special Agent Altamirano were

13   inside the living room with Michael Blackburn, Keifer

14   Orfield and Franque Hatten, keeping an eye on the adults

15   that were inside there.

16   Q.   Just one second.

17   A.   Yes, ma'am.

18   Q.   I'm showing you what's been previously admitted at

19   Government's Exhibits No. 10 and 11.  Can you tell us what

20   this is?

21   A.   That's a picture of the living room of the apartment

22   that we were in at this time.

23   Q.   And this is Government's Exhibit No. 11.

24   A.   Yes, ma'am.

25   Q.   Can you tell us what that is?

1   A.   That is just an alternate image of the living room

2   taken from a different angle.   It shows the chair and the

3   couch.   The reason the floor is cleared away is that's

4   where Franque Hatten and Keifer Orfield were sleeping when

5   we arrived.

6   Q.   And just for clarification, these images were taken

7   when?

8   A.   They were taken during the execution of the search

9   warrants the night of the 17th.

10   Q.   Do they accurately reflect what you saw that morning?

11   A.   Yes, ma'am.

12   Q.   So focusing on Government's Exhibit No. 10, can you

13   tell us where the agents were located and where the

14   Defendant was located?

15   A.   Yeah.   The agents were standing here by the window,

16   here in front of the table.   Mr. Blackburn was right here

17   on this, I believe it's a little loveseat or a

18   chair-and-a-half.   And then Keifer Orfield and Franque

19   Hatten were sitting on the couch that is seen on the far

20   wall.

21   Q.   So, what did you learn when you went into the living

22   room?

23   A.   Agent Langer called me over and told me that he had

24   the Defendant's phone, and went to hand it to me.   I asked

25   him if we had consent to look at the phone, and he told

1   me, yup, verbal and written.  He had already previewed the

2   phone, and he showed me -- he opened it up to the

3   photographs, and the first two photographs that we saw

4   were of John Doe No. 1 and Jane Doe No. 1 in pictures that

5   are consistent with child pornography.

6   Q.   So what did you do once you learned this information?

7   A.   I contacted Detective Sabaugh again.  We decided that

8   it wouldn't be good to try to interview Michael with the

9   other adults -- or Mr. Blackburn with the other adults, so

10  we asked him to step forward into the small front room

11  that's just off to the left as you enter the apartment

12  complex.  By this time, he's got a shirt on, too.  He had

13  put on a blue Polo shirt.

14  Q.   Did you see him put on the shirt?

15  A.   No, I didn't.  I was outside when that occurred.

16  Q.   And you mentioned that he went to the front room.

17  I'm showing you Government's Exhibit No. 8.  Can you tell

18  us what that is?

19  A.   Yes.  That's the front room just as you enter the

20  apartment off to the left, with the little Christmas tree,

21  and then the couch you see in the background is a little

22  pull-out couch that we later found out was for the

23  family's father who was coming to visit.  So it was going

24  to be a sleeping area.

25       But that's where we brought Mr. Blackburn to talk to

1   him away from the other adults.

2   Q.   And what did you talk about?

3   A.   We asked him if he would come down to the station to

4   continue the interview with us, and he said, yes.

5   Q.   Did he seem upset?

6   A.   No.

7   Q.   Once he agreed to go down to the station with you,

8   what occurred?

9   A.   Once he agreed to go down to the station with us,

10  Agent Bonza placed him in handcuffs and searched his

11  person.  He then asked us to grab him his sandals, which I

12  can't remember if they were just over by the door or just

13  indoor of where the living room is.  But we brought him a

14  pair of sandals, and he put those on.  We then went out

15  and got in my vehicle and drove to the station.

16  Q.   So to clarify, the sandals were the shoes that he

17  requested?

18  A.   Yes, he asked us to grab his sandals.

19  Q.   And how was the Defendant transported?

20  A.   He was transported in my government vehicle.  He sat

21  in the front seat, buckled in.  I drove, and Detective

22  Sabaugh sat in the seat behind him.

23  Q.   What happened, or where did you go?

24  A.   We went down to the BCSO main station, which is

25  located at 400 Roma in Albuquerque, New Mexico.

1  Q.   And once you got to BCSO, what did you do?

2  A.   We took Mr. Blackburn out of the car, brought him

3  down through the sallyport, brought him upstairs, and

4  placed him into an interview room, which is what you see

5  in the beginning of the tape, and took his handcuffs off

6  and had him sit in there while we got the rest of the case

7  information together before we could interview him.

8  Q.   And approximately what time did you place the

9  Defendant into the witness room, or waiting room?

10  A.   I think it was 8:52 in the morning.

11  Q.   Is it your general practice to tell somebody that

12  you've taken into custody that if they need a bathroom or

13  a water break, to let officers know?

14  A.   Yes.  And also, because he was in that type of

15  witness room, he was under constant observation from

16  officers that were monitoring him from the room across the

17  hall through the video system.

18  Q.   Are you aware of anybody who spoke to him about this

19  prior to going into the room?

20  A.   As far as I know, he was told.  I know that there

21  were several times when officers spoke to him during the

22  course of the investigation, asking if he needed the

23  bathroom or if he wanted water, or if he needed anything

24  else.

25  Q.   Did anybody -- or, at what point on the video,

1  specifically, can you see somebody go in there and ask him

2  if he needed the bathroom or water?

3  A.   Right after -- it was three hours and 30 minutes in,

4  I think.  He hadn't said anything, so they were just

5  double-checking on him.  He went in and asked if he needed

6  the bathroom or water, and I believe he said that water

7  would be all right.  And then you see him stand up and

8  walk out with the officer to -- the restrooms and water is

9  just down the hall from where that was.

10         MS. HENDERSON:  Can I switch to the laptop,

11 please?

12 BY MS. HENDERSON:

13 Q.   Can you see the image on the screen that you have in

14 front of you?

15 A.   Yes.  It's just a little dark.

16 Q.   But you can --

17 A.   Yes, I can.

18 Q.   Okay.  What is this?

19 A.   That's me coming in with my backpack and stuff, and

20 taking his handcuffs off and placing him in the room.

21 Q.   Okay.  So it's Government's Exhibit 37.  Can you tell

22 us what it is?

23 A.   Oh, I'm sorry.  It's the video that was created on

24 that date.  It's the interview room down at the BCSO

25 building, and this is the entire recording of the

1    interview.

2    Q.    So we have Exhibits No. 36 and 37.

3    A.    36 is the entire recording; 37 is the edited

4    recording.

5    Q.    Have you reviewed the entire recording?

6    A.    Yes, ma'am.

7    Q.    Did you provide a copy to the U.S. Attorneys Office?

8    A.    I did, ma'am.

9    Q.    Outside of acknowledgment of the difference between

10   Government's Exhibits 36 and 37, has the video been

11   altered in any way?

12   A.    No, ma'am.

13   Q.    Has it been enhanced by us for any purposes?

14   A.    Other than edited for time, there's no other

15   enhancements to the video, no.

16   Q.    Does the recording accurately reflect the events that

17   occurred on December 17, 2013?

18   A.    Yes, ma'am.

19   Q.    Have you reviewed all the documents that were

20   produced as a result of this recording?

21   A.    Yes, I have, ma'am.

22   Q.    And I believe the transcript is Government's

23   Exhibit No. 38.  Have you reviewed the transcript?

24   A.    Yes, I have.

25   Q.    And does it accurately reflect the recording?

1   A.   For the most part.  We have found that there were

2   places that the transcriber felt were inaudible that I

3   felt were clear.  But mostly, yes, other than that, it's

4   true and complete.

5        MS. HENDERSON:  With the Court's permission, I

6   would like to move Government's Exhibits 36 and 37 as the

7   recordings, and Exhibit No. 38 as the transcript.

8        MS. KATZE:  I have no objection to Nos. 36 and

9   37, and I provisionally have no objections to 38, I just

10  haven't had a chance to see the new edited transcript.

11       THE COURT:  All right.  With that notation, they

12  will be admitted.

13       MS. HENDERSON:  Thank you, your Honor.

14       (Government's Exhibits No. 36, 37 and 38 admitted.)

15  BY MS. HENDERSON:

16  Q.   I would like to play for you what we just discussed

17  in terms of you taking the Defendant into the room, and

18  the bathroom and water break.

19  A.   Yes, ma'am.

20       (Video recording played)

21  BY MS. HENDERSON

22  Q.   Does that accurately reflect what you understand

23  occurred between the time period that you placed the

24  Defendant into the room and when he had his first

25  bathroom/water break?

1    A.    Yes, ma'am.

2    Q.    There's a significant time period between those two

3    events.  Can you tell us what you and Detective Sabaugh

4    were doing during that time period?

5    A.    Yes, ma'am.  During that time period, we were

6    interviewing Franque Hatten and Keifer Orfield, as well as

7    going over the pictures that were on Michael's phone, and

8    we had to find an unconnected computer -- because it was

9    C-3, we couldn't connect it to a BCSO computer -- to try

10   to print out those images so that we could show them to

11   him and talk to him about them during the interview.

12   Q.    Why did you want to talk to the two other adults that

13   were in the house?

14   A.    We needed to gather more information.  We didn't want

15   to go into the interview based on limited information.

16   Because after finding out that Blackburn was the

17   perpetrator, we originally had no knowledge that he would

18   be at the house, so we were just attempting to gather more

19   facts.  The timeframe that he had lived there, what their

20   impressions were of him, if they had seen anything else or

21   any other knowledge that they might have had.

22   Q.    Did you learn anything at that point by them that was

23   relevant to the interview?

24   A.    We spoke --

25              MS. KATZE:  Objection.  Relevance.

1          THE COURT:  What's the relevance?

2          MS. HENDERSON:  Your Honor, we're trying to

3   explain the time period that they actually spent meeting

4   with them.  So the Defendant wasn't just placed in a room

5   and sitting there for hours for no reason, it's showing

6   that the agents were making preparations to actually

7   conduct an interview that was worth interviewing the

8   Defendant at that time.

9          THE COURT:  I'll allow it.  Overruled.

10  A.   Yes, ma'am.  During the interview of Franque Hatten,

11  again, we were told -- she reiterated the incident that

12  she talked about, where he had brought the children

13  upstairs prior for the nap.  She also told about having to

14  teach Jane Doe No. 1 how to wipe, because it wasn't being

15  done right.  She told about how the children were

16  extremely hypersexualized, that they would attempt to

17  insert toys in their vagina and anus.

18  BY MS. HENDERSON:

19  Q.   So basically the same things that she had kind of

20  gone over with you earlier that day?

21  A.   Yes.  And then during the interview with Keifer

22  Orfield, who hadn't made any comments prior in the day, we

23  learned specifically about the incident of Jane Doe No. 1

24  sitting on the couch and fellating the toy hammer, and him

25  getting in a fight with Thomas over that as he pulled it

1   out and told her, no.  And that he said, kids don't do

2   that, kids don't know how to do that.

3   Q.   Did he suspect the Defendant of anything?

4   A.   He thought the Defendant might be abusing the kids,

5   but he was very noncommittal in all of his statements.  He

6   didn't want to speak poorly, because that was the only

7   place that they had to stay.  He did say that Franque was

8   much more sensitive to the issue than he was.

9   Q.   You stated that you had to find a stand-alone

10  computer.  What did you do with the stand-alone computer

11  during this time period?

12  A.   Based on consent to look at the phone, we viewed some

13  more of the images that were found in the photo files and

14  printed them out, in the hopes to identify if there were

15  more children being abused or more children that Michael

16  had access to.

17  Q.   And were you using those images in preparation for

18  the interview?

19  A.   Yes, ma'am.

20  Q.   Did you make plans to actually use some of those

21  images to show the Defendant during the interview?

22  A.   Yes.  It's actually one of the interview techniques

23  that we use inside the Child Exploitation Unit.  We would

24  show the Defendant the images so that he could describe to

25  us what it was.  We also do that when we're doing a

1  peer-to-peer case, and we do the titles of the videos or

2  the pictures that they have downloaded so that they can

3  identify them themselves.

4  Q.   And what were the other reasons, like the different

5  types of cases that you would be interested in when you

6  were talking to the Defendant?

7  A.   Well, we were trying to establish two different types

8  of investigations at this point.  The HSI investigation

9  was obviously concerned with the production of child

10  pornography, but BCSO was concerned with the hands-on

11  offense, which was the penetration, the criminal sexual

12  penetration of a minor.  So we were working both angles of

13  that.

14  Q.   I just want to clarify and go back quickly to

15  Mr. Keifer.  You said he was noncommittal.  Did he make

16  any negating statements about Defendant's culpability?

17  A.   Oh, no.  No, he felt that since it was the only place

18  he had to stay, that he shouldn't be, I guess, speaking

19  poorly of the Mitchells or Mr. Blackburn.

20  Q.   So what time did you begin the interview?

21  A.   12:21.  Almost 12:30, I think it was.

22  Q.   Around 12:30?  And what did you do once you got into

23  the room?

24  A.   We introduced ourselves to Michael Blackburn.  We

25  spoke to him briefly.  At that point, I told him that I

1   needed to give him his waiver form for his Miranda rights,

2   and I handed him a paper copy of the Miranda warnings.

3   Q.   Did you offer him anything when you entered the room,

4   or did anybody offer him anything?

5   A.   Yes.   Detective Sabaugh offered him gum.   She

6   apologized for us getting him up so early and keeping him

7   for as long as we did, but that we were working on other

8   parts of the investigation, and she gave him a piece of

9   gum.   And she asked him if he needed water or anything

10  else.

11  Q.   When you handed the Defendant a copy of the Statement

12  of Rights, I believe it's Government's Exhibit No. 28 --

13  I'm showing you what's previously been marked as

14  Government's Exhibit No. 28.   Can you tell us what that

15  is?

16  A.   It's still on the video.

17  Q.   Sorry.   I apologize.

18  A.   That is the U.S. Immigration and Customs Enforcement

19  Statement of Rights and Waiver Form that we use prior to

20  speaking to a person.

21  Q.   And does it accurately reflect the Statement of

22  Rights that you used with the Defendant on December 17,

23  2013?

24  A.   Yes, it does.

25        MS. HENDERSON:   With the Court's permission, I'd

1    like to move Exhibit No. 28 into evidence.

2            THE COURT:  Any objection?

3            MS. KATZE:  No objection.

4            THE COURT:  It's admitted.

5        (Government's Exhibit No. 28 admitted.)

6    BY MS. HENDERSON

7    Q.   So, what did you do when you handed the Defendant

8    this document?

9    A.   I explained to him that he needed to be aware of his

10   rights, that he needed to read the form, and we told him

11   that just because he was aware of his rights and he read

12   the form, if he agreed to talk to us, it didn't mean that

13   he had to continue talking to us, that he could stop when

14   he wanted to.  Just by reading and signing the form, it

15   didn't remove any of the rights that he was guaranteed.

16   Q.   Did you specifically ask him or inform him verbally

17   about his rights to an attorney?

18   A.   No.

19   Q.   Did you verbally tell him that anything that he said

20   would be used against him in a courtroom, that he told

21   you?

22   A.   No.  I asked him to read the form.

23   Q.   And can you go over the form with us?

24   A.   Certainly.  It says:  "Before we ask you any

25   questions, it's my duty to advise you of your rights.  You

 1  have the right to remain silent.  Anything you say can be

 2  used against you in a court or other proceedings.

 3      "You have the right to consult an attorney before

 4  making any statement or answering any questions.  You have

 5  the right to have an attorney present with you during

 6  questioning.  If you cannot afford an attorney, one will

 7  be appointed for you before any questioning, if you wish.

 8      "If you decide to answer questions now, you still

 9  have the right to stop the questioning at any time, or to

10  stop the questioning for the purpose of consulting an

11  attorney."

12  Q.   And I'd like to stop you at that point.  Can you tell

13  us what these letters are on the left-hand side of the

14  Statement of Rights after those lines that you just read?

15  A.   They're the Defendant's initials that I asked him to

16  put there after he read each line, showing that he

17  understood his rights.

18  Q.   And when you gave him the document, did it appear

19  that he was reading it?

20  A.   Yes.  He would look down at the document while I was

21  talking to him, or while Detective Sabaugh was talking to

22  him, and then look up and make eye contact with us.

23  Q.   Did you have any reason to believe that he didn't

24  understand what he was signing?

25  A.   No.

1  Q.   Did he say he didn't understand what he was signing?

2  A.   No.

3  Q.   When asked questions about whether or not he

4  understood his rights, how did he respond to you?

5  A.   He kept saying, yeah, yeah, or yeah, right, or okay.

6  I think at one point, he even cut Detective Sabaugh off

7  and said, "Right," and then to me, he says, like, "Yes,

8  sir," or something like that.

9  Q.   Can you talk to us about the rest of this document,

10  where it says, Waiver?

11  A.   Yes.  The rest of the document is a waiver part, and

12  what it is, is it's saying that you have "read the

13  statements above and you understand these rights and waive

14  them freely and voluntarily without threat or

15  intimidation, without any promise of reward or immunity.

16  I was taken into custody at," and we said, 9:30, which was

17  to the best of our recollection.

18       And then he signed and dated this at 12:31 on that

19  date.  That's Mr. Blackburn's printed name in his

20  handwriting, and Mr. Blackburn's signature in his

21  handwriting.

22  Q.   And just to clarify, where it says 9:30 and 12-17-13,

23  up here, whose handwriting is that?

24  A.   That's mine.

25  Q.   And who's handwriting is the 12:31 and the 12-17-13?

1  A.   That's mine, again.

2  Q.   And this handwriting where it says, "Printed Name"?

3  A.   That's Mr. Blackburn's.

4  Q.   And where it says "Signature"?

5  A.   That's Mr. Blackburn's.

6  Q.   And can you tell us what these two bottom lines are?

7  A.   That's the witness lines for myself and Detective

8  Sabaugh, who saw Mr. Blackburn sign this form.

9  Q.   Where did you have him sign the waiver?

10 A.   I had him stand up after he had read it in his chair

11 for a little bit and move over to a side table, where he

12 put his initials and then signed the Waiver part.

13 Q.   And did you explain to him what the Waiver was?

14 A.   Yes.  I told him that the waiver said that he wanted

15 to talk to us right now, but that he didn't have to

16 continue to talk to us, and that he could stop.

17 Q.   Why did you believe that he wanted to talk to you?

18 A.   Because he was already starting to communicate with

19 us prior.  He had never shown any hesitancy in wanting to

20 talk to us.  He never said, hey, I don't think I should do

21 this, or I don't want to talk to you, or anything like

22 that.  He had agreed to come down to the station with us

23 to continue the conversation.

24 Q.   But did you clarify that he didn't have to continue

25 to talk to you?

1  A.   Oh, yes, ma'am.  I said it, and so did Detective

2  Sabaugh.

3  Q.   You were with him for about two hours between the

4  Miranda warnings and the actual interview?

5  A.   Yes, ma'am.

6  Q.   Did his demeanor change at all from when you were

7  going over his Miranda rights to the rest of the

8  interview?

9  A.   No.  No, he was very forthcoming, very communicative.

10  He was friendly in the interview.  Wasn't hostile or

11  aggressive or anything.

12  Q.   When he was responding to you throughout the rest of

13  the interview and it wasn't a significant response, but an

14  affirmation, what type of words did he use?

15  A.   He would say, yeah, yeah, or right, or okay.

16  Q.   Was that consistent with how he was responding to you

17  during the Miranda rights portion of the conversation?

18  A.   Yes, ma'am.

19  Q.   Did he seem to understand what was occurring when he

20  said, right, or yeah, throughout the rest of the

21  interview?

22  A.   Yes, ma'am.

23  Q.   Did he ever state that he did not want to sign the

24  rights?

25  A.   No, ma'am.

1   Q.   Did he ever state that he didn't understand the

2   rights?

3   A.   No, ma'am.

4   Q.   How much time passed between the time that you handed

5   him the rights and when he signed the waiver?

6   A.   A little over two minutes, I believe.

7   Q.   I'm going to show you that portion of the video.

8   This is, again, Government's Exhibit No. 37.

9        (Video recording played)

10  BY MS. HENDERSON:

11  Q.   So, I just want to go back over a few of the things

12  that were said during the video.  Can I have a copy of the

13  transcript to show him?

14       Going to Government's Exhibit 38 -- your Honor, may I

15  approach the witness?

16       THE COURT:  You may.

17  Q.   Going to Page 5 of the transcript, Line 21 --

18  A.   Yes, ma'am.

19  Q.   -- can you tell us, just to clarify -- I know that

20  the audio was relatively clear, but can you read what you

21  stated at that point?

22  A.   I asked Mr. Blackburn:  "So you understand these?

23  Would you mind putting your initials right next to them to

24  show that you've read these rights?"  And that's what you

25  saw on the form, was him putting the MB next to each line

1   showing that he had read them.

2   Q.   And when you asked him to sign those, did he show

3   anything that indicated to you that he didn't understand

4   what he was doing?

5   A.   No, ma'am.

6   Q.   And when he signed the waiver part, again, did he

7   give any indication that he didn't understand what was

8   going on?

9   A.   No, ma'am.

10  Q.   When you were reading -- or when you gave him the

11  document, you can see on the video, and it's a little bit

12  darker on your screen than it is on my computer, but what

13  was he doing when you were talking to him and showing him

14  the Miranda warnings?

15  A.   It appeared that he was looking down and reading

16  them.

17  Q.   And you made a comment towards the end when you sat

18  down.  Why did you make that comment?

19  A.   Just a poor turn of phrase.

20  Q.   Were you trying to confuse him about his rights by

21  making that statement?

22  A.   No, ma'am.

23  Q.   And at that point, had he already waived his Miranda

24  rights when you said that statement?

25  A.   Yes, ma'am.

1    Q.    What did the two of you talk to him about next?

2    A.    At this point, Detective Sabaugh began the interview

3    and spoke to him about his past, how he knew the

4    Mitchells, why he was residing in that residence.

5          MS. KATZE:  Your Honor, I'm going to object.

6    This is now outside the scope of the hearing at this

7    point.  It's not relevant to the Court's inquiry once we

8    get past the Miranda warnings.

9          THE COURT:  What, the part about the -- all

10   right, so let me make sure I understand.  The question

11   that Ms. Henderson asked is concerning, I guess, the

12   Mitchells; right?

13         MS. HENDERSON:  Yes, sir.

14         THE COURT:  And the objection is, it's beyond the

15   scope of?

16         MS. KATZE:  Of the suppression hearing.  We moved

17   to suppress the statement based on a violation of Miranda,

18   and these questions are beginning to go to the substance

19   of the interview.  So it's irrelevant.  It's outside the

20   scope of the hearing.

21         THE COURT:  And what's your response?

22         MS. HENDERSON:  Just quickly, I want to reiterate

23   the point that my co-counsel made earlier to show

24   throughout the interview that the Defendant wasn't

25   coerced, which goes to the further argument that this is a

1   Fifth Amendment issue, not a Fourth Amendment issue.

2        The other part of it being that the Defendant's

3   behavior was consistent throughout the entire interview.

4   There are portions in which he is looking at documents,

5   writing on those documents, showing that he can

6   cognitively multi-task, which is similar to what he was

7   doing during the post Miranda where he was reading the

8   Statement of Rights while agents were talking to him.

9        Throughout the interview, he was also able to

10  look at images, write on those images, and maintain a

11  conversation with the agents throughout.  So this goes to

12  a part of his ability to understand what is occurring,

13  which I believe is part of, in this case, argument that

14  his cognitive ability is a learning disability which would

15  keep him from understanding what his Miranda rights are.

16       So the rest of the interview shows his ability to

17  understand consistently what's going on, to be able to

18  read and write, have a conversation simultaneously to the

19  reading and writing, and having a full understanding of

20  what was going on.  He also talks about his phone being

21  confiscated, that kind of thing.  So terms and words that

22  clearly show that he understands what's occurring.

23       THE COURT:  Anything else you want to state on

24  that?

25       MS. KATZE:  Just that we're not arguing coercion,

1    we're arguing a violation of Miranda that took place in

2    those two minutes.  And obviously the video speaks for

3    itself, but in the video you can clearly see he's never

4    reading the form.  He looks down for a nanosecond, but the

5    agent continues to talk to him the entire time he's

6    looking at it.

7            The agent read to the Court all the rights.

8    Obviously the amount of time that it took him to read the

9    Miranda form was longer than the entire time that he sat

10   down with Michael Blackburn.  That's our argument.  Not

11   coercion.  And again, the fact that I say that he reads at

12   a lower level, I am not saying that he is unable to read

13   or he's unable to answer questions.

14           So I think, once again, this is just a way to

15   kind of get in more inflammatory and irrelevant

16   information.  So I think it's outside the scope of this

17   hearing.

18           THE COURT:  I'm going to -- we've been going over

19   an hour-and-a-half now.  Let's go ahead and take a short

20   break.  I'll come back and rule at that point.

21       (A recess was held from 11:05 until 11:28 A.M.)

22           THE COURT:  All right, regarding the objection

23   that was made before I took the break, I'm looking at

24   Page 18 of Document 30, which is the Defendant's Motion to

25   Suppress Statements and Evidence Obtained in Violation of

1   the Fourth and Fifth Amendments, and this is II, in bold,

2   and the heading is:  "The Government cannot prove

3   Mr. Blackburn knowingly and intelligently waived his

4   Miranda rights."

5          Now, as I read the Defendant's motion, and as I

6   understand part of the Defendant's arguments today, he

7   wasn't read his Miranda rights orally and, therefore,

8   there was not a knowing and intelligent waiver because of

9   either a learning disability or an inability to read and

10  understand the rights on the form.

11         Now, the United States has come back in its

12  pleadings with cases that stand for the proposition that

13  it's not necessarily required that, you know, Miranda

14  rights be orally read, but that they can be given in

15  written form, and there's also some Circuit authority that

16  stands for the proposition that there is no requirement as

17  to the precise manner in which police communicate required

18  warnings to one suspected of a crime, as long as the

19  individual can read and understand the written waiver

20  form.

21         So, since that's an issue, then I will find that

22  the area of inquiry to which defense counsel objected is

23  relevant for that reason, and I'll overrule the objection.

24         I'll give you a standing objection on this, but,

25  again, since the Defendant's raised the issue and contends

1    that the Government cannot prove a knowing and intelligent

2    waiver of Miranda rights, as far as this area of inquiry,

3    the Defendant's conduct and his demeanor during the course

4    of the interrogation, I'll find it's relevant.

5           So, you may proceed.

6           MS. HENDERSON:  Your Honor, I apologize.  May I

7    re-approach the witness?  Somehow I have an exhibit --

8           THE COURT:  Sure.  Feel free to go back and forth

9    as necessary.

10          MS. HENDERSON:  Thank you, your Honor.  And just

11   so your Honor is aware, I have made a few adjustments in

12   an attempt to speed this along, with the understanding

13   that your Honor has the entire video.

14          THE COURT:  Okay.

15   BY MS. HENDERSON:

16   Q.   So, I believe where we left off, Special Agent Breen,

17   is, what did the two of you, you and Detective Sabaugh,

18   ask the Defendant after he waived his Miranda rights?

19   A.   Detective Sabaugh began talking to the Defendant

20   about his past and where he had lived prior, and how it

21   came to be that he was living with the Mitchells.

22          The Defendant then began explaining to us where he

23   had met the Mitchells, and how it is that they had become

24   friends, and how he had ended up babysitting the children

25   and having access to the kids.

1   Q.   Did the Defendant ever -- or, did you accuse the

2   Defendant of doing anything during this period?

3   A.   No.   No, when we -- during the initial part of the

4   interview, we were just trying to get more of an

5   understanding as to why he was living with the Mitchells.

6   Q.   And how did the Defendant respond to Detective

7   Sabaugh asking if he and Thomas, the father of the two

8   toddlers, were close friends?

9   A.   He said that they were, but that they wouldn't be any

10  longer.

11  Q.   And what did he mean by that?   Did you ask to clarify

12  what that statement meant?

13  A.   Yes.   Detective Sabaugh said:  "What did you mean by

14  that?"  And he said:  "When he finds out what I've done."

15  And she said:  "Well, what have you done?"  And he said:

16  "Hurt his kids."

17  Q.   Did she ask to clarify what he meant by hurting his

18  kids?

19  A.   Yes.   Further on, she said:  "How did you hurt the

20  kids?"  And he explained that he had sexually assaulted

21  them.   He talks about how he had rubbed his penis on Jane

22  Doe No. 1's vagina and on her anus, and how he had rubbed

23  his penis on John Doe No. 1's anus for sexual

24  gratification, and how he had forced them to give him oral

25  sex, or how he gave oral sex to the children on -- I

1  believe the number was approximately 200 different

2  incidences.

3  Q.   Did you ask him about taking pictures of any of these

4  incidences at that time?

5  A.   Yes.  We asked him if he would take pictures every

6  time that he sexually assaulted the children, and he said

7  that most of the time he would take pictures, but that

8  sometimes he would just try to enjoy the moment.

9  Q.   Did his demeanor ever change throughout this line of

10  questioning?

11  A.   No.  No, he was extremely friendly, offering extra

12  detail.  He just wanted to talk.

13       MS. HENDERSON:  If I may, I'm going to

14  fast-forward through the video to 12:38.

15       (Video recording played)

16       MS. KATZE:  Your Honor, can I object?  This is

17  basically asked and answered.  She asked the witness what

18  was said in the video, and then played the video to show

19  us what was said.  So it seems like if the only way they

20  can do it is to show the video, and that's what the Court

21  is going to allow, then I just -- in addition to my other

22  objection, I'm objecting to why we're hearing it twice.

23       THE COURT:  Why are we hearing it twice?

24       MS. HENDERSON:  Your Honor, I'm asking the

25  questions just to see what the agent understood whether or

1   not he was forcefully asking questions, did he interrogate

2   the Defendant in a manner in which he would feel

3   uncomfortable, or make any accusations during that time

4   period of the interrogation or interview to go to whether

5   or not he was coerced.  Also, to talk about the agent's

6   understanding of the Defendant's demeanor during the time

7   period of the answering of the questions.

8           THE COURT:  Well, would it make sense -- I mean,

9   you're planning on playing the entire video; right?

10          MS. HENDERSON:  I was going to skip over a few

11  parts, but I can play --

12          THE COURT:  I'm just trying to -- I mean, in

13  other words, if the whole video is going to be played,

14  then I can observe that as opposed to asking the agent

15  exactly what the question was and what the Defendant's

16  response was.  Because it is -- I think Ms. Katze makes a

17  point.  This is cumulative, because it's entirely

18  consistent with what the agent just testified to.

19          So I was just trying to get a sense, would it

20  make sense, then, to play the entire video, or play

21  significant chunks of it, and then pause it?  And then you

22  wanted to ask some follow-up questions of the agent, then

23  play a section of the video.

24          MS. HENDERSON:  Your Honor, I can do that, if it

25  pleases the Court for me to do that instead.  Again, some

1  of my questions are more just to kind of focus the agent's

2  understanding throughout the interview, what was

3  occurring, anything that he specifically said.

4          THE COURT:  We can do it one of two ways.  I

5  mean, you can ask the agent, like you're doing, and he can

6  testify as to the Defendant's responses, and then the

7  video is admitted, and of course I can look at that.

8          Or -- but I think, again, the specific point that

9  Ms. Katze made is that it is somewhat duplicative.  If the

10  video is going to be -- again, the answers there were

11  entirely consistent with the agent's answers.

12          MS. HENDERSON:  If it pleases your Honor, I'll

13  just play the video.  I think that that would be -- and

14  then just follow-up with some questions.

15          THE COURT:  All right, let's do it like that.

16  And then what I thought is maybe we'll break for lunch

17  around 12:30, since we didn't start until 9:30.  Does that

18  work for everybody?

19          MS. HENDERSON:  Thank you, your Honor.

20          THE COURT:  So start at whatever point you want.

21          MS. HENDERSON:  I'll just begin from where we

22  ended.

23      (Video recording played)

24          MS. HENDERSON:  Your Honor, I believe that

25  there's approximately about ten more minutes of the video

1   that I was going to show with Special Agent Ryan Breen.

2   We can finish after, or do you want me to continue it?

3          THE COURT:  If it's about ten more minutes, is

4   everybody okay just finishing this and then we'll break?

5   Okay, go ahead.

6       (Video recording played)

7          MS. HENDERSON:  That will be all of the video

8   that the Government will be using to show through Special

9   Agent Ryan Breen.  Would your Honor like to take a recess?

10          THE COURT:  Yes, let's go ahead and recess for

11   lunch.  Is an hour and 15 minutes enough for everybody?

12   Is that good for you, Ms. Katze?  Then let's resume at two

13   o'clock.

14       (A recess was held from 12:41 until 2:06 P.M.)

15          THE COURT:  Did you have a witness you wanted to

16   take out of order?

17          MS. KATZE:  I do.  Our witness from Santa Fe,

18   Vivian Abeles, is here.  Would it be possible to call her?

19   I don't think she's going to take very long.

20          THE COURT:  That's fine.  If you would go ahead

21   and have a seat at counsel table, Agent Breen --

22          THE WITNESS:  Yes, sir.

23          THE COURT:  -- and we'll take this next witness

24   out of order.

25       (VIVIAN ABELES, DEFENSE WITNESS, SWORN)

1      MR. GARCIA:  Please have a seat and state your

2  full name for the record.

3      THE WITNESS:  Vivian Abeles.

4      THE COURT:  Ma'am, if you could maybe scoot a

5  little closer so you're talking into that microphone, and

6  you can adjust it as needed.

7      MS. KATZE:  And you can move it down closer to

8  your mouth.

9      THE WITNESS:  Okay.

10                    DIRECT EXAMINATION

11  BY MS. KATZE:

12  Q.   Good afternoon, Ms. Abeles.  Can you please tell us

13  what your current job is right now?

14  A.   I'm an educational diagnostician.

15  Q.   What's an educational diagnostician?

16  A.   I evaluate people with special needs from birth to

17  senior citizen.

18  Q.   And so, how do you go about doing that?  If you

19  could, sort of tell us briefly how you do that.

20  A.   Typically, I administer a test of cognitive

21  development, in other words an intelligence test, and

22  process tests, which could be auditory processing or

23  visual processing, and academic achievement.

24  Q.   And so if you could just tell us a little bit about

25  your experience, as far as where you've worked and what

1    you've done, how long you've been in the field.

2    A.   I've been in the field at least 40 years.

3    Q.   Forty?

4    A.   Yeah; 4-0.

5    Q.   And where have you worked?

6    A.   I've worked in Massachusetts, in New York state,

7    mostly in New Mexico.  Albuquerque, El Rito, Ojo Caliente,

8    Santa Fe and Los Alamos.

9    Q.   And for whom have you worked?

10   A.   Mostly for public schools.

11   Q.   What's your education?

12   A.   I have a master's plus 45.

13   Q.   Explain to us what that means.

14   A.   My master's degree is in guidance and counseling.  My

15   undergraduate degree is in special education.  And the

16   plus 45 is in speech and language.

17   Q.   Now, I hired you to perform a diagnostic test on

18   Michael Blackburn; correct?

19   A.   Yes.

20   Q.   And I asked you to determine his reading level,

21   comprehension and his IQ --

22   A.   Yes.

23   Q.   -- correct?  Can you tell us -- so you did perform

24   tests; is that correct?

25   A.   I did.

1  Q.    Where did you do those tests?

2  A.    At the Adult Detention Center in Santa Fe.

3  Q.    Can you please tell us what tests you did?  And if

4  you could tell us, when you tell us each test that you

5  did, what is the purpose of that test.

6  A.    Okay.  I gave Michael Blackburn the Wechsler Adult

7  Intelligence Scale V.

8  Q.    What is that for?

9  A.    That's to measure intelligence, to measure cognitive

10  functioning, thinking skills, verbal comprehension, visual

11  perceptual reasoning, auditory memory, and visual

12  processing speed.

13  Q.    Okay.  What other tests?

14  A.    I gave him the Woodcock-Johnson Reading, and Reading

15  Comprehension Test.

16  Q.    What are those tests, the purpose of those?

17  A.    The purpose of those is to assess his word

18  recognition, just reading words out of context.  Reading a

19  short passage and being able to supply a word that is

20  missing in that short passage.  That's the Reading

21  Comprehension Test.

22      I gave him the Oral Speed Reading Test, and then I

23  gave him the Gray Silent Reading Test.

24  Q.    What is that?

25  A.    That is where you read a longer passage, and then you

1  have multiple choice questions.  That's another reading

2  comprehension test.

3      And then I gave him the Nelson Denny, and that's a

4  timed test.  And the first part of that test is

5  vocabulary.

6  Q.   What do you mean by timed test?

7  A.   The first is a vocabulary test.  You have 15 minutes

8  to complete that test, and it's vocabulary.

9  Q.   And do as much as you can in that 15 minutes?

10  A.   Do as much as you can in the 15 minutes.

11  Q.   I'm sorry; go on.

12  A.   The second part of the test is a reading

13  comprehension.  So you have a very lengthy passage to

14  read, and then you have multiple choice questions.  And

15  that test you have 20 minutes to complete.

16  Q.   Okay.  And are those all the tests?

17  A.   Those are all the tests I could remember without

18  having my papers in front of me, yes.  But I think that's

19  all.

20  Q.   If you need your papers, let us know.  It's okay to

21  have your papers.

22  A.   I think I will.

23          MS. KATZE:  Your Honor, is it all right --

24          THE COURT:  Yes.

25          MS. KATZE:  She'll bring you your bag.

1  A.   It's in the black bag.  Thank you.  Okay.

2  BY MS. KATZE:

3  Q.   So if you just look at your papers, is there any

4  other test?

5  A.   No, there wasn't another test that I gave.

6  Q.   Okay.  It sounds like all these tests are reading and

7  vocabulary tests.  So how does it work?  How do you give

8  the tests?  What does Michael Blackburn have to do in

9  these tests?

10  A.   Okay, so we'll start with first one that I gave, and

11  that's the Wechsler IV -- I'm sorry; I said Wechsler V

12  before, and I meant Wechsler IV.  The first test is a

13  visual spatial motor planning.  So he's given some blocks

14  and a design, and he has to copy those designs with

15  blocks.

16  Q.   Okay.

17  A.   The next test is a verbal comprehension test.  So

18  he's given two words and asked to tell me how those two

19  things I say are alike.  So, for example, if I said red

20  and blue, you'd have to tell me they're both colors.

21  Q.   And you did a bunch of those?

22  A.   Oh, yes.  That's the easy one.

23  Q.   Is that Woodcock-Johnson?

24  A.   No.  This is the Wechsler.

25  Q.   Still part of the Wechsler, okay.

1    A.    The Wechsler has a lot of subtests.  Do you want me

2    to go through each subtest?

3    Q.    No, actually, you don't have to go through the

4    subtests.  The way the tests -- it sounds like they're all

5    a little bit different as far as how you administer

6    them --

7    A.    Yes.

8    Q.    -- and what did Michael Blackburn have to do.

9    A.    Right.

10   Q.    So give us examples of what he would have to do in

11   the test.

12   A.    Sometimes he'd have to repeat numbers.  Sometimes

13   he'd have to define words.  Sometimes he'd have to look at

14   a pattern and tell me which one would complete that

15   pattern.

16   Q.    Did he have to read, ever?

17   A.    Not on the intelligence test.  The intelligence test

18   has no reading at all.

19   Q.    Okay.  So what you're telling us now -- so the

20   Wechsler is for the intelligence test?

21   A.    Right.

22   Q.    What about the other tests that you told us about?

23   The Speed Reading, the Woodcock-Johnson, the Gray Silent

24   Reading, the Nelson Denny?

25   A.    The next test I gave him was the Woodcock-Johnson.

1   Q.   And that measures, what?

2   A.   That measures reading, just the basic skill of

3   reading, reading words, and it measures reading

4   comprehension.  So the different subtests there --

5   Q.   At this moment, you don't have to tell us the

6   subtest; thanks.

7        So Speed Reading, what is that?

8   A.   How quickly he can read something.

9   Q.   Okay.

10  A.   And how fluently he reads.  So it's accuracy and

11  understanding.

12  Q.   So not just speed?

13  A.   Not just speed, no.  It has to be accurate.

14  Q.   And what's the Gray Silent Reading?

15  A.   That's the test where you are given passages and then

16  multiple choice questions related to those passages.

17  Q.   And the Nelson Denny?

18  A.   The Nelson Denny is the one that's timed.  The first

19  part is vocabulary, and the second part is a lengthy

20  passage and multiple choice questions related to the

21  passage.

22  Q.   Okay, let's talk about your findings.  Let's first

23  talk about IQ.  When people say IQ, what is that?  What is

24  that measuring?  What's an IQ test for?

25  A.   There are two different measures of intelligence.

1   One is the full scale, and that takes into consideration

2   all the subtests that are administered.  So Michael's full

3   scale IQ is at the low end of the average range.  So the

4   average range is between 85 and 109, and his IQ on the

5   full scale comes out at 90.

6   Q.   When you say full scale, what does that mean?

7   A.   That's all the subtests that are administered.

8   Q.   Okay.  So IQ measures scholastic potential; is that

9   correct?

10  A.   Yes.

11  Q.   So not actual execution or accomplishment?

12  A.   Or achievement.

13  Q.   Or achievement, rather.

14  A.   No.  Basically, it's given an optimum environment, so

15  you go to school every day, you're being taught well and

16  you have no learning disabilities, his academic potential,

17  according to this test, would be at least within the

18  low average.

19  Q.   The low average?

20  A.   The low end of the average range.  But the other

21  subtests -- I mean, the other one is the General Ability

22  Index.  In the General Ability Index, you take away the

23  processing.  So you take away the auditory memory and you

24  take away the visual processing speed, and that gives you

25  a general ability index, which I think is a better

1    indicator of your academic potential, your scholastic

2    potential.  And for Michael, that's 107, I think -- 101.

3    Q.   So it's a little higher?

4    A.   It is a little bit higher.

5    Q.   Does that mean under the right circumstances in the

6    right environment, he could do better?

7    A.   Right.

8    Q.   Is that what it means?

9    A.   Given that he --

10   Q.   So there's -- I'm sorry.

11   A.   Given that he's a slow processor visually and that

12   his auditory memory is relatively weak, yes.

13   Q.   What's auditory memory?

14   A.   In this particular case, what auditory memory would

15   be is if I asked you to repeat a series of numbers that I

16   say, but in sequential order.  So if I said 9, 4, 3, 6, 3,

17   you would say 3, 3, 4, 6, 9.

18   Q.   Hopefully I would.

19   A.   Yeah.

20   Q.   So that's --

21   A.   That's one of the auditory memory subtests.

22   Q.   You just said he's a slow processor.

23   A.   Yes.

24   Q.   What does that mean?

25   A.   It means that when Michael is presented with

1   something, he takes his time to think about it before he

2   responds, especially when it's visual.

3   Q.   So how does pressure effect that?

4   A.   I would assume that pressure effects it tremendously.

5   Q.   In what way?

6   A.   Well, you're already feeling under pressure, so

7   there's some anxiety there.  If you have a time pressure,

8   where you have to be somewhere really quickly, and you've

9   got to finish this beforehand, there's some anxiety

10  involved in that for most people.

11  Q.   And if you're a slow processor, does it make it more

12  difficult to actually process if there is pressure?

13  A.   I would think so.

14  Q.   Well, when you actually did the tests, what are the

15  signs that you saw in Michael Blackburn that he was a slow

16  processor?  What did he do?

17  A.   When he was reading, he would read things over and

18  over again.  He would subvocalize.

19  Q.   What does subvocalize mean?

20  A.   He would speak to himself.  And one thing that that

21  might indicate is that he needs to hear it as well as see

22  it in order to commit it to memory.  I also felt as though

23  he did not want to make a mistake, and so he was being

24  very, very careful about how he was reading the passages.

25  Q.   Did he ask questions, or seek any guidance or

1  direction from you?

2  A.   Not much, no.  And I think that the directions are

3  pretty clear, and I would make sure that he understood

4  before he went on.

5  Q.   You saw this slow processing in more than one test or

6  subtest; is that right?

7  A.   Yeah.  If I would ask him like, for example, on the

8  similarity subtest, how are these two things alike, he

9  spent quite a bit of time thinking about them.

10  Q.   Okay.  Now, did you give him a test of general

11  knowledge?

12  A.   I did.

13  Q.   And what is the reason for doing that, and what did

14  you do?

15  A.   Well, it was a part of the intelligence test, and

16  there were huge gaps in his knowledge.

17  Q.   Meaning he had low --

18  A.   Things that you would expect someone of his age to

19  know.

20  Q.   For example?

21  A.   Who was the President of the United States during the

22  Civil War.

23  Q.   Any other examples?

24  A.   I'm sorry; I'm having a hard time finding the page.

25  Yeah, what is the line that separates the southern and

1   northern hemispheres.

2   Q.   He didn't know that?

3   A.   No.  What Michael did at that time was, he chose a

4   word from the question and answered it that way.

5   Q.   So you found him to be a slow processor with low

6   general knowledge.  Based on your observations and doing

7   those tests, did you suspect that he could have a learning

8   disability?

9   A.   I would suspect that, but I don't know his

10  background.

11  Q.   But from what you saw, did he display characteristics

12  that would be consistent with learning disability?

13  A.   The slow processing would be consistent with it.  I

14  have to say, though, that on some of the other information

15  questions, the higher level ones, Michael knew some of

16  those answers.  So that's why I'm saying that there were

17  gaps.

18  Q.   So it's inconsistent, okay.

19       Now, I don't know if you are able to, but can you say

20  at what grade level he reads at?

21  A.   That's a hard one, because it depends on the

22  situation.

23  Q.   What do you mean?

24  A.   Knowing the gaps in his general knowledge, if Michael

25  is not prepared for what he is going to be reading, he

1    might not be able to read that piece, no matter what, if

2    it's above a 6th grade level, because he doesn't have

3    the background.  But if he has the background information

4    and he's given enough time, I would say that he would

5    probably be able to read high-level high school.

6    Q.   Okay, so again controlling for certain things, like

7    you said, time and pressure and opportunity to re-read.

8        Was there any evidence during your testing that

9    Michael Blackburn was in any way trying to make himself

10   look worse than he was for you?

11   A.   I didn't sense that.

12   Q.   And you've done diagnostic testing you said for 40

13   years?

14   A.   Yeah.  I can usually tell.

15   Q.   And you did not have that sense?

16   A.   I didn't get that sense, yeah.

17   Q.   Now, you had an opportunity to review the Statement

18   of Rights form; right?  I sent you the Statement of Rights

19   form that's frequently referred to as Miranda rights.  And

20   I also sent you a brief clip that covers the time from

21   when the agents come in the room with Michael through --

22   they give him the piece of paper, until when he signs on

23   the piece of paper.  And then I think the agent says, "And

24   now we're done with that silliness," or something.  It's a

25   short clip.  I sent you both those, and you had an

1  opportunity to review those.

2      Do you have any opinion, based on your experience and

3  on the video clip, and the statement form that I gave you,

4  and the time that you spent with Michael Blackburn, and

5  his test results, as to whether or not it seemed like,

6  first of all, he read the form, and second of all, whether

7  he could have possibly understood his Constitutional

8  rights, in what you could see?

9  A.   From what I could see, I never saw Michael really --

10 I saw him looking at the page.  So I could assume maybe

11 that he was reading it.  But the agents were talking to

12 him the whole time.

13 Q.   And would that effect his ability to be able to read?

14 Let's assume when his eyes went down, that he was trying

15 to read.  Would someone talking to him effect his ability

16 to read?

17 A.   From what I observed of Michael, he really focuses on

18 what he's doing.  So the other input could be confusing.

19 Q.   Okay.

20 A.   It could be distracting.

21 Q.   And from what you could see from the very short

22 amount of time and from the Rights page that I sent you,

23 was there any way Michael could have, in the seconds that

24 he's looking down at the paper, is there any way he could

25 have actually read those Rights that were on that form?

1   A.   I don't think so.

2   Q.   Let's just assume, hypothetically, there was a way

3   that he actually was able to read that.  Is there any way

4   based on his slow processing, et cetera, was there any way

5   that he would be able to comprehend them?

6   A.   Without having any background knowledge, I wouldn't

7   think so.

8            MS. KATZE:  Okay.  Thank you.

9            THE COURT:  Counsel my cross-examine.

10           MS. LIZARRAGA:  Thank you, your Honor.

11                      CROSS-EXAMINATION

12   BY MS. LIZARRAGA:

13   Q.   Good afternoon, Ms. Abeles.  Am I pronouncing that

14   right?

15   A.   That's good enough.

16   Q.   Good enough, all right.  I have a difficult last

17   name, as well.  My name is Ms. Lizarraga, and I'll be

18   asking you a couple of follow-up questions this afternoon.

19       You currently work as an educational diagnostician at

20   Santa Fe Indian School; is that correct?

21   A.   I'm a contractor there.

22   Q.   You're a contractor.  And so is that your main form

23   of employment?

24   A.   No.

25   Q.   What is your main form of employment?

1    A.    Los Alamos Public Schools.

2    Q.    And that's not listed on your resumé; is that

3    correct?

4    A.    I'm sorry if it isn't.  I sent in a resumé really

5    quickly.

6    Q.    I'm showing you a copy.

7    A.    Yes.  Los Alamos Public Schools is right there.  It's

8    one, two, three, four, five, the sixth one down.

9    Q.    Oh, I'm sorry.  The way that I was reading this is

10   basically August of 1989, and then I wasn't sure what the

11   dots meant.

12   A.    Continuing.

13   Q.    Continuing.  So, are you a contractor there, as well?

14   A.    No, I'm an employee.

15   Q.    So you currently work at Los Alamos Public Schools,

16   and then you contract with Santa Fe Indian School; is that

17   correct?

18   A.    Among others.

19   Q.    Among others.  What other schools do you work at?

20   A.    New Mexico School for the Arts.  Terra Encantada

21   Charter School.  Master's Program at the Santa Fe

22   Community College.

23   Q.    And is your --

24   A.    Tesuque Day School.

25   Q.    And is your role in all those capacities, is it as an

1  educational diagnostician?

2  A.   Yes.

3  Q.   So most of the places that you currently work, or

4  have worked in the past, those are middle schools and high

5  schools; is that correct?

6  A.   No.

7  Q.   You wouldn't say the large majority of them are

8  middle schools and high schools?

9  A.   My main job is at Los Alamos Public Schools, and I

10  test children who are two years old up to 21.

11  Q.   So that's your main base of experience, is testing

12  children from age 2 to 21; correct?

13  A.   Currently.

14  Q.   Okay.  And I think you hit on this on Direct, but

15  just so I understand, an educational diagnostician, it's

16  basically a type of special education teacher who

17  assesses, diagnoses and works with children with learning

18  problems.  Is that a fair representation?

19  A.   No, you don't have to be a special education teacher.

20  Q.   Okay.  So what are some of the qualifications that

21  you have to have in order to be an educational

22  diagnostician?

23  A.   I don't know.  I've been doing it for so long, I

24  don't know what the -- you have to pass a test, that's for

25  sure.  You have to have your master's degree.  But there

1  are other people who do not have teaching experience, like

2  clinical psychologists, who also are educational

3  diagnosticians.

4  Q.   All right.  But you do have special training with

5  regard to special education; isn't that correct?

6  A.   I do.

7  Q.   And so would it be fair to say that most of your

8  experience deals with individuals under the age of 25?

9  A.   Mostly, yeah.  Yeah, mostly.

10  Q.   All right.  And when you're assessing these kids, is

11  part of that to develop an Individualized Education Plan?

12  A.   No.

13  Q.   No?  What are some of the other purposes?

14  A.   Just to find eligibility.

15  Q.   Eligibility for what?

16  A.   Eligibility for special education.

17  Q.   And if these students are required to be in special

18  education, doesn't the law mandate that they have an

19  Individualized Education Plan?

20  A.   The law does, but it doesn't mean that I do.

21  Q.   That's not part of your job?  All right.

22      And so I'm curious, how many people have you given

23  these types of tests to outside of the school setting?  I

24  know that you evaluated Mr. Blackburn, but other than him.

25  A.   Oh, there have been many.  If you can pull up my

1   resumé again --

2   Q.    Uh-huh.

3   A.    -- I think it was in the eighties.  Okay, the Center

4   for Physical Therapy and Rehabilitation, '85 to '89.  And

5   I have no idea of the numbers, but I tested quite a few

6   people there.

7   Q.    But that was approximately 30 years ago?

8   A.    Yeah.

9   Q.    Okay.  So you --

10  A.    Oh, I have to take it back.  I don't know if it's on

11  my resumé or not, but I have worked at the Santa Fe

12  Community College over several years, and some years I've

13  tested adults, five or more in a particular year, some

14  years none.  But I have tested several people who are

15  older than 30.

16  Q.    Okay.  And so putting Mr. Blackburn aside, can you

17  tell me when the last time that you tested someone over 25

18  was?

19  A.    I'm sorry; I'd have to think how old my children were

20  in order to figure that out.

21  Q.    Over five years?

22  A.    I'd say between five and ten years.

23  Q.    All right.  So then most of your recent experience

24  pertains to testing individuals under 25; would that be

25  fair?

1    A.    Yes.

2    Q.    And you were certified as a school psychologist at

3    some point, but that certification has since expired; is

4    that correct?

5    A.    Right, I let it go.

6    Q.    And when did it expire?

7    A.    2013.

8    Q.    All right.  And have you ever testified in court

9    before?

10   A.    No.

11   Q.    This is your first time?

12   A.    In court.

13   Q.    All right.  Have you ever been designated an expert

14   before?

15   A.    Yes.

16   Q.    And where was that?

17   A.    In New Mexico.

18   Q.    For what?

19   A.    For special education issues.

20   Q.    In what context?

21   A.    As an expert witness, as a diagnostician.

22   Q.    But you didn't have to testify?

23   A.    I did, but not in court.

24   Q.    Oh, so like during a deposition?

25   A.    Yes.

1  Q.   Okay.  And when was that?

2  A.   Over several years.  Probably in the early '90s to

3  early 2000s.

4  Q.   All right.  And do you consider yourself to be a

5  learning disability specialist?

6  A.   Yes.

7  Q.   What does that title mean to you?

8  A.   It means that I understand learning differences and

9  the kinds of accommodations that a person might require in

10 order to be successful.

11 Q.   And that's based on your education and your training

12 and experience; is that correct?

13 A.   Yes.

14 Q.   All right.  So I want to talk to you about some of

15 the tests that you did on the Defendant in this case.  You

16 examined him on September 29, 2015; is that correct?

17 A.   Yes.

18 Q.   And you administered all four tests on the same day;

19 is that correct?

20 A.   Uh-huh.

21 Q.   How much time did you spend with him in total?

22 A.   From 9:30 to 1:00.

23 Q.   And did you administer each test one after the other?

24 A.   Pretty much.

25 Q.   All right.  And is that standard practice?  Do you

1   typically give individuals that many tests in one day?

2   A.   Sometimes more.

3   Q.   Sometimes more, all right.  So you don't find that

4   administering that many tests at once would at all impair

5   someone's performance on maybe the later tests that you

6   give versus the earlier tests?

7   A.   No.

8   Q.   Have you ever given anyone a test in a prison setting

9   before?

10  A.   No.

11  Q.   So it's possible that that setting, in and of itself,

12  could have affected the Defendant's performance on the

13  test; is that right?

14  A.   Anything's possible.

15  Q.   Well, would you agree that that could have affected

16  his performance on the test?

17  A.   It could have, yes.

18  Q.   Okay.  And so his attorney requested that you assess

19  his intellectual and reading comprehension abilities;

20  correct?

21  A.   Yes.

22  Q.   And you were given the Defendant's age at that time;

23  is that right?

24  A.   Yes.

25  Q.   He was 29, about to 30 when you administered the

1  test; is that correct?

2  A.   Yes.

3  Q.   You did not conduct any type of clinical or

4  diagnostic interview, did you?

5  A.   No.

6  Q.   What materials, if any, did you go over prior to

7  testing the Defendant?

8  A.   None.

9  Q.   All right.  And are you familiar with AHEAD, the

10  Association on Higher Education And Disability?

11  A.   No.

12  Q.   All right.  Well, according to AHEAD guidelines --

13  they have some guidelines with regard to the comprehensive

14  disability documentation.  I know that AHEAD -- based on

15  my research, I thought it was something fairly common in

16  the field, but basically, they list out several things

17  that are necessary in order to get a comprehension feel

18  for someone's -- I guess whether or not they have any type

19  of impairment.  But you're not familiar with those, at

20  all?

21  A.   I'm familiar with it in the state of New Mexico, what

22  I have to do in my job.  I was not asked to do a

23  diagnostic evaluation.  I was asked to do an intelligence

24  test and reading comprehension, and that's what I did.

25  Q.   And you would agree with me that if you had done a

1    diagnostic evaluation, that would have given you a better

2    picture and assessment of the Defendant's intelligence and

3    reading comprehension; isn't that correct?

4    A.    I don't know if that's correct.

5    Q.    You don't believe that you would have had a fuller

6    picture of the Defendant's abilities if you had done a

7    diagnostic interview?

8    A.    I don't know that I agree or disagree with that.  I

9    don't know.

10   Q.    You don't believe that it would have been helpful to

11   explore some of his history to see whether any of these

12   symptoms had been prevalent throughout the course of his

13   life?

14   A.    It may have been helpful, but I don't know that it

15   would have effected the test results.  I was asked to give

16   tests and not asked to diagnose.

17   Q.    Okay.  And you would agree that having reviewed any

18   pertinent academic history of the Defendant, that that

19   would have been helpful in assessing his abilities with

20   regard to --

21   A.    You keep on saying assessing.  I was not asked to do

22   a diagnostic evaluation.  I was asked to give tests.

23   Q.    Ms. Abeles, you just testified on Direct, though, and

24   you gave some opinions regarding what the results of those

25   tests were; isn't that correct?

1    A.    I do have opinions based on that, and they are

2    opinions.   And if I were to be asked to do a diagnostic

3    evaluation, I would have requested the background

4    information.   But I was not asked to do that.

5    Q.    And I understand that you weren't asked to do that.

6    I'm simply asking you whether it would have been

7    beneficial.

8           MS. KATZE:   Your Honor, I'm going to object.   I

9    think this issue has been asked and answered many times.

10          THE COURT:   She's entitled to explore the basis

11   for the opinion.   So I'm going to allow the question.

12   Overruled.

13   BY MS. LIZARRAGA:

14   Q.    So ma'am, like I said, I understand that you weren't

15   asked to do those specific things, but you would agree

16   with me that had you done them, that you would have been

17   in a better position to give opinions regarding whether or

18   not the Defendant can comprehend -- with regard to the

19   Defendant's reading comprehension?

20   A.    No, I don't agree with that.

21   Q.    You don't agree?

22   A.    What I was testing was his ability right then and

23   there, his ability now.   I was not testing his ability or

24   comparing his ability to 15 years ago when he was in high

25   school.   I was asked to test his ability now.

1  Q.   And again, on Direct you testified that you then

2  reviewed a video that had been given to you that shows the

3  Defendant, and that's two years old; isn't that correct?

4  The video that Ms. Katze --

5  A.   The video that is two years old -- oh, okay.

6  Q.   The video that Ms. Katze sent you.

7  A.   Right.  That's two years ago, yeah.

8  Q.   So you are comfortable rendering opinions about his

9  ability two years ago even though you only tested him a

10  month ago?

11  A.   Yeah, based on what I saw.  Based on what I observed

12  and the test scores that I have, I would find it pretty

13  difficult for Michael to comprehend given no background

14  information.

15  Q.   So don't you think that if you had had background

16  information, you'd be in a better position to have a

17  fuller knowledge regarding those opinions?

18  A.   I don't know.

19  Q.   Okay.  You stated that you're not familiar with IDEA,

20  but I believe that this also falls in line with --

21  A.   Familiar with IDEA?

22  Q.   Yes.

23  A.   I-D-E-A?

24  Q.   Yes.

25  A.   Yes, I'm familiar with IDEA.

1  Q.   Oh, you are?  So you are familiar with IDEA?

2  A.   That wasn't what I thought you said.

3          THE COURT:  I think she was thinking of the

4  Individuals with Disabilities Education Act.

5          MS. LIZARRAGA:  Yes.

6          THE COURT:  Is that what you were referring to?

7          THE WITNESS:  Yes.

8          MS. LIZARRAGA:  I am the one who misspoke.  I

9  apologize.

10  BY MS. LIZARRAGA:

11  Q.   So, you are familiar with that?

12  A.   Yes, of course.

13  Q.   So, IDEA basically tells us that selected subtest

14  scores from measures of intellectual ability, memory

15  function tests, attention or tracking tests, or continuous

16  performance tests do not, in and of themselves, establish

17  the presence or absence of a specific disability.  You're

18  familiar with that; correct?

19  A.   Of course.

20  Q.   Okay.  And just to be clear, on September 29th all

21  you did was administer the tests; correct?

22  A.   Yes.

23  Q.   All right.  I want to briefly go through some of

24  those tests with you.  First, I want to talk to you about

25  the Wechsler Adult Intelligence Scale.  Am I pronouncing

1   that correctly, Wechsler?  All right.

2       So that is basically -- I believe you testified on

3   Direct that that's a test used to assess the general

4   thinking and reasoning skills of an individual, something

5   to that effect.  Is that right?

6   A.   Uh-huh.

7   Q.   And there are five main scores to that test; is that

8   correct?

9   A.   Yes.

10  Q.   There is a Verbal Comprehension Score; is that

11  correct?

12  A.   Yes.

13  Q.   A Perceptual Reasoning Score; is that correct?

14  A.   Yes.

15  Q.   A Working Memory Score?

16  A.   Yes.

17  Q.   The Processing Speed Score?

18  A.   Yes.

19  Q.   And the Full Scale Score; correct?

20  A.   And add a sixth, General Ability Index.

21  Q.   The General Ability Index, okay.  And so the

22  Defendant in this case, he actually scored average on all

23  but two of those scales; is that correct?

24  A.   Yes.

25  Q.   And on one of the scales that he scored below

1   average, it was only by one point; is that right?

2   A.   Unless you use the confidence integral, which is

3   standard practice to use the confidence integral, and then

4   he scores pretty much below to within the average range.

5   Q.   But there is a different way to test it where it

6   would have only been by one point; is that correct?

7   A.   It's not standard practice.

8   Q.   But he did score average on the Verbal Comprehension?

9   A.   Yes.

10  Q.   On the Perceptual Reasoning?

11  A.   Yes.

12  Q.   On the --

13  A.   Full Scale.

14  Q.   -- Full Scale?

15  A.   And on the General Ability Index.

16  Q.   And on the General Ability Index, okay.

17       He did the worst on the Processing Speed Index;

18  correct?

19  A.   Correct.

20  Q.   And I think you hit on it a little bit on Direct, but

21  if you'll just indulge me, can you explain again how the

22  test works with regard to the Processing Speed Index?

23  A.   I don't understand your question.

24  Q.   What does that portion of the test entail?

25  A.   Okay.  It entails a timed test where you look at a

1  code and you copy the code.  So if on the top of the

2  page you have a 1, and on top of the 1 you have a half

3  moon, every time you see the 1 you have to draw that half

4  moon.  That's the coding.

5  Q.   Okay, that's the coding.  All right.  Now, the test

6  assumes that whoever is taking it is performing to the

7  best of their ability; isn't that correct?

8  A.   Yes.

9  Q.   And it's possible for an individual being tested to

10  manipulate the test; correct?

11  A.   Sure.

12  Q.   And you're aware that the Defendant in this case has

13  a huge incentive to do poorly on that portion of the test?

14  A.   No, I'm not aware of that.

15  Q.   All right.  Well, the Defendant is currently charged

16  with crimes that could potentially get him a life sentence

17  in jail.  Would you consider that to be something that

18  would incentivize him to do poorly on a test?

19  A.   No.

20  Q.   Even if I told you that the only way he can get out

21  of that is to show that there was some deficiency with the

22  evidence in this case, it still wouldn't change your

23  opinion whether he has an incentive to do poorly?

24  A.   I can't answer that question.

25  Q.   All right.  Next, I want to talk to you about the

1    Gray Silent Reading Test.  Now, that's a test that

2    determines whether an individual has developed, or is

3    developing the ability to silently read with

4    comprehension; is that correct?

5    A.    Yes.

6    Q.    And you were aware of the Defendant's age when you

7    gave him that test; is that right?

8    A.    Yes.

9    Q.    He was six days shy of turning 30; right?

10   A.    Yes.

11   Q.    So I guess I'm curious why you gave him that test,

12   because the test is only appropriate for individuals aged

13   7 through 25; isn't that right?

14   A.    Yes.

15   Q.    So why did you decide to give him that test even

16   though it's only appropriate for individuals up to age 25?

17   A.    I gave him that test to see if I could find a reading

18   grade level.

19   Q.    But the test manufacturer itself says that it is only

20   appropriate for individuals up to age 25; correct?

21   A.    That's fine.  I used my professional judgment so that

22   I could see what grade level reading he would be at.

23   Q.    And just to redirect my question to you, the

24   manufacturers of the test explicitly state --

25               MS. KATZE:  Your Honor, asked and answered both

1  times.

2        THE COURT:  The objection is asked and answered.

3  What's your response?

4        MS. LIZARRAGA:  That she never answered my

5  question.

6  A.   I did answer your question.  I said that I gave that

7  test so that I could find a reading grade level.

8        THE COURT:  Let's move on.  I understand the

9  point you're making.

10        MS. LIZARRAGA:  All right.  Thank you, your

11  Honor.

12  BY MS. LIZARRAGA:

13  Q.   Even putting that aside, according to your report,

14  the Defendant still ranked within the norm; correct?

15  A.   Yes, he still ranked within the norm.

16  Q.   What was his actual score?

17  A.   The actual score on the test?  Do you want a raw

18  score, do you want a grade level, or an age level?

19  Q.   I'll take all three.

20  A.   Okay.

21  Q.   Or let's just do the raw score, please.

22  A.   I believe it was 52.  Yes, it was 52, which

23  translates to an age equivalent above 18 years, and a

24  grade equivalent above 12.2.

25  Q.   Thank you.  And you noted in your report that the

1  Defendant read very slowly; correct?

2  A.   Very slowly.

3  Q.   But, again, it would be simple for someone to read

4  slower than normal if they want to appear to be having

5  difficulty; correct?

6  A.   Anything -- the questions that you're asking me, I

7  can't tell you whether that would be appropriate or not.

8  This is not a timed test, and the individual knows that

9  it's not timed.  So a person takes the time that they need

10 to take in order to do their best.  And I would assume

11 that if he was trying not to look good, he would

12 purposefully answer things incorrectly.

13 Q.   And he could purposefully take longer than he wanted

14 to; correct?

15 A.   Anybody can take purposefully longer than they need

16 to.

17 Q.   Thank you.  And the same goes for the last two tests

18 that you administered; correct?  If someone wanted to do

19 poorly on them, then it wouldn't be that difficult for

20 them to do that; correct?

21 A.   I guess.

22 Q.   All right.  So you testified about -- I believe on

23 Direct Examination, Ms. Katze was asking you about

24 anxiety, whether or not it would be more difficult for

25 someone to read if they were anxious.  But you don't have

1    any particular trainings or certifications with regard to

2    diagnosing anxiety in individuals, do you?  You're not a

3    clinical psychologist, are you?

4    A.    Not now.

5    Q.    Okay.  You stated that Ms. Katze sent you a clip of a

6    video to interview; correct?  The video where the

7    Defendant is being given the Miranda form to read?

8    A.    Yes.

9    Q.    All right.  And so is that -- it was a fairly short

10   portion of that video?  You did not receive the full copy

11   of the interview?

12   A.    No.

13   Q.    All right.  And so you didn't see any portions of the

14   interview where the Defendant is actually multi-tasking,

15   writing things down and listening to the agent as he's

16   doing that; is that right?

17   A.    No.

18   Q.    So you didn't have an opportunity to observe those

19   things?

20   A.    No.

21   Q.    And you spent approximately three-and-a-half hours

22   with the Defendant; is that right?

23   A.    Yes.

24   Q.    All right.  At any portion during your time with the

25   Defendant, did you ever talk to him about Miranda?

1  A.   No.

2  Q.   So you never spoke to him about whether or not he's

3  familiar with Miranda warnings?

4  A.   No.

5  Q.   You stated on Direct that in your opinion, based on

6  reviewing the video, you didn't believe that he had

7  sufficiently comprehended the material in front of him;

8  correct?

9  A.   That he had sufficient time.

10  Q.   Sufficient time.  And so if he had familiarity with

11  Miranda warnings outside of that context, would that

12  change your opinion at all?

13  A.   No.  Actually, no.  I mean, let me --

14  Q.   Would you --

15  A.   If he knew his rights and had full awareness of his

16  rights and what they were asking him to do, chances are

17  that he would be able to sign those, because he wouldn't

18  even have to read them because he would know them.

19      I was asked if he had to read them and comprehend

20  them, would he have the time to understand them.  I wasn't

21  asked if he had the background knowledge, so I can't

22  answer that question, because I don't know.

23  Q.   Well, would you agree with me that Miranda warnings

24  are something that are fairly commonplace nowadays?  Most

25  people know what those are?

1   A.   No, I wouldn't agree with that.  People who watch

2   television maybe do.  But --

3   Q.   And would you agree --

4   A.   They would know that it has something to do with

5   being arrested, but I don't know that they know their

6   Miranda rights.

7   Q.   Would you agree with me that the large majority of

8   America has access to and usually watches TV?

9   A.   Depends on what -- no, I don't know that I would

10  agree or disagree with you, because I have no way of

11  really knowing that.  I can tell you my children don't

12  watch television, and most of my friends don't watch

13  television.

14  Q.   Well, good for them.  They're probably better off for

15  it.

16       All right.  And so, you are basing your opinions on

17  the approximately three-and-a-half hours that you spent

18  with the Defendant; is that correct?

19  A.   On three-and-a-half hours and on my professional

20  knowledge.

21  Q.   All right.  And you've never observed Michael in any

22  other settings other than when you saw him that day in

23  prison, and the very short clip that was sent to you;

24  correct?

25  A.   Correct.

1        MS. LIZARRAGA:  Your Honor, may I have one

2   moment?

3        THE COURT:  Sure.

4        MS. LIZARRAGA:  Your Honor, I pass the witness.

5        THE COURT:  I've got a couple of questions.  Let

6   me ask mine, and then you can follow-up.

7        Ms. Abeles, is that how you pronounce your last

8   name?

9        THE WITNESS:  Close enough.

10        THE COURT:  Okay.  You made a point of saying you

11   weren't asked to do a diagnostic evaluation.  For my

12   benefit, what's the difference in, say, a diagnostic

13   evaluation, as you use that term, and what you were asked

14   to do in this case?

15        THE WITNESS:  For a diagnostic evaluation, I

16   would have explored many more things with Michael

17   Blackburn, and I would have felt that I had the time and

18   scope to be able to do that.  I also would have asked for

19   the background information.

20        I did ask Michael when we were doing this test if

21   he recognized anything from the testing, and he didn't.

22   And I asked him if he had ever received special support in

23   school, and I believe it was in Tennessee that he said,

24   yes, he had.  So I suspected that there might have been

25   something going on.  But I never did receive any

1   background information.  He did tell me that Ms. Katze, if

2   there were records, that she had them.

3          THE COURT:  Now, when you do a diagnostic

4   evaluation, would this normally be for the purposes of

5   determining, in the context of your work for Los Alamos

6   Schools and then the -- it's the Indian School in

7   Santa Fe?

8          THE WITNESS:  Right.

9          THE COURT:  Is this for the purpose of

10  determining eligibility for --

11          THE WITNESS:  Right.

12          THE COURT:  -- special education services?

13          THE WITNESS:  Right.

14          THE COURT:  So in other words, you're diagnosing

15  for, what, if you can give me an idea?  Learning

16  disabilities?

17          THE WITNESS:  For exceptionality, whether it be

18  health impaired, or specific learning disability.  There

19  are a whole slew.

20          THE COURT:  Sure.  Are these conditions that are,

21  for example, identified in the DSM-V?

22          THE WITNESS:  No, not in the DSM-V.  No, this is

23  State.

24          THE COURT:  All right.  It's for purposes of

25  state?

1          THE WITNESS:  Yes.

2          THE COURT:  So, for example, if someone had --

3    I've been doing this a long time.  It used to be referred

4    to as a slight level of mental retardation.  I think now

5    the term is mental impairment.

6          THE WITNESS:  Intellectually deficient.

7          THE COURT:  I'm sorry, intellectually deficient.

8    In other words, if someone was intellectually deficient,

9    then the type of diagnostic evaluation that you perform,

10   the testing that you do, you would be able to ascertain

11   that; correct?

12         THE WITNESS:  Right.

13         THE COURT:  And in the case of the Defendant, did

14   you -- well, were you able to make, in terms of what you

15   did tests for -- well, let me back up.  I'm not doing a

16   very good job of asking this question.

17         THE WITNESS:  I think I know what you're asking.

18         THE COURT:  Well, you said you weren't asked to

19   do a diagnostic evaluation.  So, what were you asked or

20   tasked to do?

21         THE WITNESS:  I was asked to do an intelligence

22   measure, and I was asked to assess his reading

23   comprehension.

24         THE COURT:  All right.  Now, based on the IQ,

25   then, he would not be in the category of where he was

1    having mental deficiency?

2             THE WITNESS:  An intellectual deficiency.

3             THE COURT:  I'm sorry; I'm still not used to the

4    new term.

5             THE WITNESS:  No, he was not.

6             THE COURT:  In other words, his IQ is high enough

7    that he would not have -- what's the term again?

8             THE WITNESS:  Intellectual deficiency.

9             THE COURT:  Am I correct in that, that he would

10   not have an intellectual deficiency?

11            THE WITNESS:  No, he would not.  He's at least of

12   average intelligence.

13            THE COURT:  All right, I understand that.  Okay,

14   I'm clear.  So now, Ms. Katze, you may have Redirect.

15                    REDIRECT EXAMINATION

16   BY MS. KATZE:

17   Q.   So just because somebody is of average intelligence

18   doesn't mean that they don't have learning deficiencies;

19   correct?

20   A.   One of the pieces of the definition of a specific

21   learning disability is that you must be of at least

22   average intelligence.

23   Q.   So somebody who is of average intelligence can still

24   be found to have a learning disability.  So may I ask you,

25   as an example, Michael Blackburn, average intelligence, or

1   low average, but average intelligence, but has a serious

2   processing issue; correct?

3   A.   I can't say that he has a serious processing issue

4   based on those two tests.  If I were to do diagnostics, I

5   would explore further.  I would not --

6   Q.   From what you did do, you testified on Direct

7   Examination and were asked on Cross-Examination that you

8   found that he was a slow processor?

9   A.   Right, yes.

10  Q.   And someone who is a slow processor could be of

11  average or low average intelligence; correct?

12  A.   Correct.

13  Q.   And then, how does the slow processing affect their

14  --

15          MS. LIZARRAGA:  Objection, your Honor.  Leading.

16          THE COURT:  Why don't you rephrase.

17  BY MS. KATZE:

18  Q.   How does slow processing effect the ability of

19  someone with average intelligence, then, to read something

20  and comprehend it?

21  A.   They would need more time.

22  Q.   You saw the video clip, and it was 23 seconds.  You

23  testified before -- what is your opinion as to whether

24  somebody with that slow processing issue, whether they

25  would be able to read it in that amount of time and

1  process it?

2  A.   I think that he would not be able to read and process

3  that in 23 seconds.

4  Q.   Okay.

5  A.   Or that he would have difficulty.

6  Q.   Let me ask you a question.  What's the difference

7  between how Michael Blackburn did on tests that were timed

8  versus tests that were not timed?

9  A.   Significant.  So, I gave him the Woodcock-Johnson,

10 and on the Woodcock-Johnson he scored in the limited to

11 average proficiency range in reading comprehension.  There

12 is no time factor there.  The passages are very short.  He

13 only has to select one word to complete the passage, and

14 he's a bit below average, but not significantly so.

15      And so I gave him the test of Silent Reading to just

16 get an indicator of what grade level he could be at, and

17 then I gave him a timed test, and he was in the 1st

18 percentile, which is significantly below.  If the 50th

19 percentile is average, and the average range is between 25

20 and 75, he's in the 1st, which means 99% of the population

21 is stronger than he is in reading quickly and

22 understanding what they read.

23      MS. KATZE:  Okay.  Could I have one moment, your

24 Honor?

25      THE COURT:  Sure.

1          MS. KATZE:  That's it.  Thank you.  May

2     Ms. Abeles be excused?

3          THE COURT:  Sure.  Thank you.  You're free to

4     leave.

5          THE WITNESS:  Thank you.

6          THE COURT:  Did you wish to finish with Agent

7     Breen?

8          MS. HENDERSON:  Yes, your Honor.  Thank you.

9          THE COURT:  You may resume the witness stand.

10    Counsel may proceed.

11         MS. HENDERSON:  Thank you, your Honor.

12                DIRECT EXAMINATION CONTINUED

13    BY MS. HENDERSON:

14    Q.   Earlier today we viewed a portion of the interview

15    that you did of the Defendant post Miranda.  What time did

16    you leave the room?

17    A.   Approximately, I believe it was 1:45.

18    Q.   1:45.  And I believe, just for the record, that's on

19    Page 73 of the transcript; correct?

20    A.   Yes.  We finished with the initial discussion.  After

21    the Defendant had signed the paperwork, we stepped out for

22    a moment to contact supervisors and discuss how we were

23    going to proceed with the investigation.

24    Q.   Did you go back in and speak to the Defendant after

25    that time period that we finished watching?

1   A.   Yes, we did.   It was brought to our attention that

2   the Defendant spoke about connecting his previous phone,

3   the iPhone 4, to a computer to move the child

4   pornography that he was holding on that to a flash drive

5   that he said was in a bag at his house, so we wanted to

6   know where the computer was that he had used to move those

7   images, because of the chance that the thumb nails or the

8   after images would have been held on that commuter, as

9   well.

10  Q.   So while Detective Sabaugh spent a little bit more

11  time with him, you only went in there briefly for the

12  other part that you just explained right now; correct?

13  A.   Yes.   We just spoke briefly about the location, and

14  he told us that it was on one of Thomas' old laptops that

15  was in a pawn shop.

16  Q.   I just wanted to direct your attention to a couple of

17  things that we viewed in the video.   Before you started

18  asking questions of the Defendant, did you ask him

19  anything?

20  A.   Yes.   When I -- before I went into my part of the

21  questions, I asked him if he had any questions at that

22  time, or concerns.   I believe I said, do you have any

23  questions at this time?

24  Q.   And what was his response?

25  A.   He said, no.

1    Q.    You saw the video, but what was your personal

2    recollection, not based off the video, of his demeanor

3    throughout the time period that you were with him during

4    that interview?

5    A.    He was very open and friendly, jovial.  He made

6    references to --

7          MS. KATZE:  I'm going to object, your Honor.

8    This is a decision that the Court makes.  We've watched

9    the video.  The Agent doesn't need to give you his opinion

10   of how Mr. Blackburn was acting.  I think that's a

11   decision the Court can make, whether he was jovial and

12   cooperative.

13         MS. HENDERSON:  I was going to follow-up with a

14   question for a period of time that your Honor was not

15   going to be able to see.

16         THE COURT:  I'm sorry; the question is focused on

17   a part of the video I didn't see?

18         MS. HENDERSON:  It's from his behavior at the

19   house.

20         THE COURT:  Why don't you -- in other words, I've

21   seen the video, so I agree.  In other words, in terms of

22   evaluating the Defendant's demeanor, I'm capable of

23   evaluating that.  And counsel can argue as to what that

24   is.

25         But if you're talking about an interaction the

1    Agent had with the Defendant that's not on video, if

2    that's what you want to inquire about, then I'll allow it.

3    BY MS. HENDERSON:

4    Q.    How was his demeanor in comparison from the time you

5    interviewed him to the time period earlier that day at his

6    apartment?

7    A.    He had the same demeanor.  He was very friendly

8    towards us, very open and discussing.

9    Q.    During the interview, you showed him several images;

10   right?

11   A.    Yes, ma'am.

12   Q.    I'm showing you Government's Exhibits 39 through 47.

13        MS. HENDERSON:  And your Honor, may I approach?

14        THE COURT:  You may.

15   BY MS. HENDERSON:

16   Q.    Can you tell us what those are?

17   A.    They appear to be copies of the images that I showed

18   to the Defendant during the interview portion that we

19   watched on the video.

20   Q.    Are they all the images, or just several of them?

21   A.    Just several of the images.  There's some that are

22   not present that were shown to him.

23   Q.    And during the time period that you were showing him

24   these images, was the Defendant able to multi-task?

25   A.    Yes.  He was able to discuss what he was seeing in

1 the image, he was able to write out what it was, he was

2 able to recall who the different people are, or attempt to

3 recall different names, and describe to us what was going

4 on inside the image while we were speaking to him.

5 Q.   So was he able to actually write and talk to you at

6 the same time?

7 A.   Yes.

8 Q.   Do all of those exhibits accurately reflect the

9 images and what he wrote on December 17, 2013?

10 A.   Yes, they do.

11        MS. HENDERSON:  Your Honor, the Government would

12 move Exhibits --

13        MS. KATZE:  Your Honor, I'm going to object.

14        THE COURT:  Just a second.  Let her state the

15 exhibits she wants to move.

16        MS. HENDERSON:  The Government would move

17 Exhibits 39 through 47.

18        THE COURT:  Okay.

19        MS. KATZE:  So my objection would be, as I said

20 before, that they're irrelevant and inflammatory, but also

21 based on the agent's conversation, I'm not sure what the

22 selection criteria was, if they went over a certain amount

23 of pictures, but have picked those pictures to put into

24 evidence.

25        THE COURT:  I'll overrule.  There's sufficient

1   foundation laid for having these exhibits admitted for

2   purposes of this hearing.

3          (Government's Exhibits No. 39 through 47 admitted.)

4          MS. HENDERSON:  And your Honor, just for the

5   purposes of efficiency of time, your Honor is able to read

6   everything that's on these exhibits?  Unless your Honor

7   would like me to go through those.

8          THE COURT:  No.  I appreciate that.

9   BY MS. HENDERSON:

10  Q.   Similar to the Government's exhibits that have

11  already been admitted, 48 and 49, I'm going to these to

12  you.  Do you recognize what those are, again?

13  A.   Yes, ma'am.  They're copies of the original images

14  that we received as part of the tip from C-3 that

15  contained the EXIF data showing the apartment in the Aspen

16  Apartments.

17  Q.   Are those the last two exhibits that you showed the

18  Defendant in that video?

19  A.   Yes.  In the video, these are the last two.  When I

20  tell him that I had forgotten two and asked him if he

21  could look at them, these are the two that are printed out

22  on full pages that you can see him flipping over to look

23  at the picture, and then flipping back over to write the

24  description on the back.

25  Q.   And again, was he able to carry on a conversation

1  with you and Detective Sabaugh when he was writing on

2  those exhibits?

3  A.   He was.  He was able to speak to us, look down at the

4  picture, turn the picture over, write on the back, have a

5  conversation with us.  He even at one point pointed out,

6  again, as he wrote out -- I think you can hear him in the

7  video.  He's talking about Eagle Ranch Apartment on the

8  couch, and then shows us the back of it to say, I wrote

9  Eagle Ranch Apartment on the couch.  He's doing this the

10  whole time that he's speaking with us.

11  Q.   Was the Defendant able to explain to you his

12  understanding of the technology he used to trade images?

13  A.   Yes.  He explained to us that he made contact with

14  individuals on websites called Image Search.  He explained

15  how he put up an e-mail so that people could contact him

16  and send him requests to trade child pornography.  He

17  explained to us how he moved the images from one phone to

18  an SD card to a thumb drive.

19        MS. KATZE:  I'm going to object again.  This is

20  what we --

21        THE COURT:  I'm going to overrule, and I'll tell

22  you why.  Because one of the questions that I was going to

23  ask the officer is that -- it struck me, I'm not entirely

24  familiar with some of these terms, so I was going to go

25  into this area.  I'm the one that's got to decide this,

1   and it's beneficial for me.  So the objection is

2   overruled.

3   A.   And he said that his primary form of transmitting was

4   through e-mails.

5   BY MS. HENDERSON:

6   Q.   Was through e-mails.  You mentioned the site called

7   Image Search that he referenced.  Can you just quickly

8   explain what that is?

9   A.   Image Search is a site out of Russia.  It's

10  I-m-g-s-r-c.r-u.  What it was originally intended for was

11  a photo sharing site, and what it seems to have been

12  utilized for most recently is to allow people to make

13  contact with other individuals who wish to trade child

14  pornography by allowing them an open source to put e-mails

15  and contact information on.

16      And then, also, to show their predilections through

17  the type of pictures that they put up.  They're using

18  child erotica or nudist pictures of children, and then

19  allowing others to kind of make contact through that.

20  Q.   You also mentioned an SD card and flash drive.  Can

21  you just quickly talk about what those mean?

22  A.   Yes.  During the interview, the Defendant told us

23  that he had transferred the files, or taken different

24  images and moved them to an SD card.  An SD card is a

25  solid state memory card.  In this case, one was inserted

1   into his phone in which we found the original images.  He

2   told us that another one was on the kid's entertainment

3   center or TV stand, I believe he called it during the

4   interview.

5        And a flash drive is a solid state memory device,

6   otherwise called a thumb drive, that is commonly used to

7   store data and images nowadays.

8             MS. HENDERSON:  And your Honor, did I cover --

9             THE COURT:  Yes.  Those were some of the same

10  questions that I was going to ask.

11  BY MS. HENDERSON:

12  Q.   You also mentioned e-mail.  I believe in the video he

13  mentioned the two e-mails that he had.  Did you get a

14  search warrant, even though he gave you consent, did you

15  get a search warrant for these accounts?

16  A.   Yes, ma'am.  We got a search warrant for both the

17  slickboy27@gmail.com, and blackburnmic@rocketmail,com.

18  Q.   And do you remember when you got those search

19  warrants?

20  A.   The search warrants were issued December 20th.

21  Q.   Were there any e-mails in particular that you would

22  like to discuss here today?

23  A.   We have a specific e-mail in which Michael, the

24  Defendant, was using images captured from his phone to

25  communicate with a gentleman in England who is referred to

1  as padpad3@outlook.com.

2  Q.   I have Government's exhibits previously marked 31

3  through 35 that I would like to show you.  Can you tell us

4  what those are?

5  A.   These are the e-mails printed out of screen shots

6  that were forwarded to an e-mail called

7  padpad3@outlook.com.  The screen shots are from what

8  appear to be a cellphone having a text conversation.  In

9  this case, the text conversation is with Tanya, who was

10  identified as the mother of Blackburn's son.

11  Q.   And can you tell us what a screen shot is?

12  A.   A screen shot is the ability you have on a phone to

13  take a picture of what is sitting upon the screen at that

14  moment.

15  Q.   And you said that was attached to the e-mail.  Can

16  you explain what that means?

17  A.   Yes.  These images were then attached to an e-mail

18  and sent forward, just like normal images, except for in

19  this case they were embedded into the e-mail.  So the

20  difference would be, if you attached a photo normally, you

21  would have a little icon that said there was a photo.  If

22  you embed the image, as soon as you open the image, it

23  would be there to read just as if it popped up as the

24  text.

25  Q.   Okay.  Do all of those accurately reflect the e-mails

1  in that chain of conversation between the two e-mail

2  accounts?

3  A.   Yes, ma'am.

4       MS. HENDERSON:  Your Honor, the Government would

5  move Exhibits 31 through 35 into evidence.

6       THE COURT:  Same objections?

7       MS. KATZE:  Yes.

8       THE COURT:  The same ruling.  I'll admit them.

9       (Government's Exhibit No. 31 through 35 admitted.)

10  BY MS. HENDERSON:

11  Q.   Just briefly, you mentioned that the screen shots

12  were a conversation between him, the Defendant, and the

13  mother of his child.  Can you describe the conversation?

14  A.   In the conversation, the Defendant is discussing that

15  he has had sexual contact with John Doe No. 1 and Jane

16  Doe No. 1, and that he wants to have sexual contact with

17  his son, that he wants to rape his son with his friend

18  from England, and that they're hoping to fly over and be

19  his first.

20       The mother of the child is arguing and calling him

21  sick and saying that she's going to contact the FBI, to

22  which Blackburn responds that, one, the parents already

23  know about it, and two, she doesn't have any hard

24  evidence, so he wouldn't get in trouble.

25  Q.   I'm directing your attention specifically to

1    Government's Exhibit 35.  Throughout this conversation,

2    does the Defendant seem to be able to articulate himself

3    to Tanya, the mother of his child?

4    A.    Yes, ma'am.

5    Q.    With the exception of auto-correct, he's able to

6    write and say what he's thinking?

7    A.    Yes, ma'am.

8    Q.    And you mentioned that the mother had concern and

9    said that she's going to go to the FBI, and he said that

10    she didn't have any evidence.  Can you direct us to where

11    that is on Exhibit No. 35?

12    A.    Right down here, which would be the icon where you

13    see -- that's actually Blackburn's son.  That's the icon,

14    I believe.  That's John Doe No. 2 [Defendant's minor

15    biological child].  And that's him saying:  "Go ahead, you

16    have no hard evidence."

17          MS. HENDERSON:  Your Honor, the Government is

18    going to withdraw, again, for time purposes and the fact

19    that we feel that it's probably not necessary considering

20    the number of exhibits that the Government is presenting

21    to your Honor.

22          I know that you said you would reserve on

23    Exhibit No. 30.  It's the ROI of Franque Hatten.  But

24    we're still going to go into the questioning of what he

25    did to attempt to get her here today.

1          THE COURT:  Yes, why don't you go ahead and make

2    a record on what attempts were made.

3          Well, I'm sorry, let me make sure I understand.

4    Are you withdrawing the exhibit?

5          MS. HENDERSON:  Yes, your Honor.

6          THE COURT:  All right.  Do you want to put on the

7    record what efforts were made to get her here?

8          MS. HENDERSON:  Only if you find it necessary,

9    your Honor.

10         THE COURT:  I'll leave that up to you.  If you're

11   withdrawing it, then I think that kind of moots

12   Ms. Katze's objection.

13         MS. HENDERSON:  Yes, your Honor.  No further

14   questions.

15         THE COURT:  Counsel may cross-examine.

16                    CROSS-EXAMINATION

17   BY MS. KATZE:

18   Q.   Agent Breen, on November 17th, you received

19   information from Cyber Crime Center; correct?

20   A.   No.  November 15th, ma'am.

21   Q.   November 15th, okay.  I'm sorry, you learned on

22   November 15th, and you contacted Officer Sabaugh on the

23   17th?  Did you get her involved in the investigation two

24   days later?

25   A.   No, ma'am.

1    Q.    When did she get involved in the investigation?

2    A.    I believe since we were all part of SPEED, Detective

3    Sabaugh started helping during the interviews in the

4    Building 5 complex.  So I think that's when she came into

5    the investigation.

6    Q.    So later in December?

7    A.    Yes, ma'am.

8    Q.    So Agent Altamirano was helping you at first?

9    A.    Yes, ma'am.

10   Q.    And was she in on it right from the beginning, also?

11   A.    Pretty much from the beginning.  We don't work with

12   partners, but, yes, she was in the unit with me and agreed

13   to help me on like the surveillance and stuff like that.

14   Q.    So you did surveillance at the Aspen Apartments on

15   November 18th?

16   A.    Yes, we did surveillance.

17   Q.    And you did it again on the 20th?

18   A.    Yes, ma'am.

19   Q.    And then on the 26th, I believe you said you spoke to

20   a resident representative?

21   A.    Yes, ma'am.

22   Q.    So that's someone who knew who all the residents who

23   were in the apartment?

24   A.    That is a person that the apartment designates to be

25   like a mediator between people that are coming to speak to

1    the residents, through them.  So in order to -- say you

2    wanted to go and talk to somebody at that apartment.  They

3    wouldn't just give you the apartment number.  If you knew

4    they lived in Aspen Apartments, you would go to the

5    representative, and the representative would hear whatever

6    you were seeking to speak to the resident about, and then

7    they would decide the point of contact or how you would

8    get to them.

9    Q.   So the point in talking to them was to see, what?

10   A.   Who was residing in the Building 5 apartments at that

11   time, and who was residing during the timeframe that the

12   picture was taken.

13   Q.   Okay.  So then on December 10th, I guess that's about

14   a little over two weeks later -- so nothing happened from

15   November 26th to December 10th?

16   A.   I don't know, ma'am.  Not if it's not recorded.

17   Q.   You didn't do anything?

18   A.   No, ma'am.

19   Q.   And then on December 10th, you went and interviewed

20   residents at the Aspen Apartments?

21   A.   Yes, in the Building 5.

22   Q.   And so was that the day, then -- did you go with

23   Altamirano or Sabaugh?

24   A.   I went with Detective Sabaugh, SA Langer, SA Bonza,

25   and myself.

1  Q.    So you all went on December 10th to interview

2  residents?

3  A.    Those four, yes.

4  Q.    And then three days later, you got another image from

5  the Cyber Crime Center?

6  A.    Yes, ma'am.

7  Q.    And also on that day, you were able to ID who the

8  child was; right?

9  A.    We were able to get told that she looked like the

10 child that was in Apartment 514, yes.

11 Q.    Right.  You got her name; right?

12 A.    No.

13 Q.    You didn't get her name?  I understood from your

14 testimony that on December 13th, you were able to identify

15 who the child was and who the parents were.

16 A.    We were able to identify who the parents were, but

17 Jane Doe No. 1's name wasn't on the lease.

18 Q.    But somebody connected that child with those parents?

19 A.    Yes, ma'am.

20 Q.    So you knew who the parents were.  And then you found

21 out where they were currently residing, the Wyoming

22 address?

23 A.    Through records checks, yeah.  It took a few days,

24 but we did find out.

25 Q.    So according to your report and Officer Sabaugh's

1  report, on December 13th you were able to find out that

2  address; is that correct?

3  A.   I can't say for sure, ma'am.  I just know that it

4  took us records checks, because they had moved.  But we

5  did find where Maree Koons had just moved down the street

6  to a different set of apartments, but I can't say for

7  certain when the Academy Heights Apartments came into

8  play.  I thought it took more than a day.

9  Q.   In any case, from December 13th when you found out

10  who the parents were, then the next thing was

11  December 16th?  Is that when you guys met to coordinate

12  Federal and State cases?

13  A.   That was part of it, yes, ma'am.  December 16th is

14  when I made contact with the management at the Academy

15  Heights Apartment.

16  Q.   Okay.  So on the 16th, did you actually have a

17  meeting with other law enforcement officers?

18  A.   Yes, ma'am.

19  Q.   And where did that take place.

20  A.   At the HSI building.

21  Q.   Who was present for that meeting?

22  A.   Theresa Sabaugh for BCSO, myself, Supervisor Davalu

23  Cummings, I think other members of the SPEED task force at

24  that time, but I'm not specifically sure.  I believe that

25  Ms. Altamirano was there, as well.

1    Q.   Okay.  So was it at that time that you prepared how

2    you were going to go to the townhouse?

3    A.   Yes, ma'am.

4    Q.   Now, you referred that you all planned to do what you

5    called a knock and talk; right?

6    A.   Yes, ma'am.  It was a knock and talk that was a

7    welfare check done by the BCSO.

8    Q.   Okay.  First let's talk about the knock and talk.

9    Had you ever done a knock and talk before that?

10   A.   Oh, yes.

11   Q.   So in this particular knock and talk, you listed

12   seven agents or officers who actually were there and ended

13   up going in the house, but you also, in Direct

14   Examination, you said other officers were attempting to

15   arrive.

16   A.   Yes, ma'am.

17   Q.   What does that mean?

18   A.   Well, at the time, we were part of SPEED, which is

19   Sexual Predator Exploitation Enforcement Detail, which

20   means we were a joint task force that worked with APD,

21   BCSO and HSI.  Because of other commitments of the state

22   and locals, even though sometimes they say, yeah, we can

23   come and assist on this, they might get called out for

24   other things that aren't really in our purview, but that

25   they have to go out and assist on.

1  Q.   But you were going over to do this what you call a

2  knock and talk, and you said you got there at 7:15 A.M.

3  A.   Yes, ma'am.

4  Q.   I assume you made that plan the day before at the

5  planning meeting, correct --

6  A.   Yes, ma'am.

7  Q.   -- that you would all be there at 7:15?

8  A.   Well, actually, we met prior at a parking lot a

9  little ways down the way to talk.

10  Q.   So you had like a pre-staging area where you all

11  would meet?

12  A.   No, just a staging area.

13  Q.   Okay, a staging area where you would all meet?

14  A.   Yes, ma'am.

15  Q.   And then you would all go over to the Wyoming

16  address --

17  A.   Yes, ma'am.

18  Q.   -- correct?  So, I just don't understand when you

19  were saying -- on Direct Examination when you said, other

20  officers were attempting to get there, to arrive, does

21  that mean as part of your plan, there were going to be

22  more officers there than the seven of you?  What do you

23  mean?

24      I know you said they do other things, but did you

25  expect other people to be there that morning at your

1    staging area?

2    A.    No, ma'am.  We have a minimum number that we're

3    allowed to go into a knock and talk with, and because we

4    had other people that may be available and we weren't sure

5    what we were going to encounter, we had other agents that

6    were going to come and assist if needed.  Some of them

7    just came to help after we had made the contact.

8    Q.    So how many of those agents were there?

9    A.    Throughout the day?

10   Q.    Well, let's just start with initially.

11   A.    Oh, just initially, the people that were listed,

12   ma'am.

13   Q.    So you didn't have anybody else that was nearby ready

14   to come?

15   A.    The Victim Witness Coordinator was still back at that

16   parking lot that we had met at.

17   Q.    Okay.  So the seven of you met, and the Victim

18   Witness person?

19   A.    Yes, ma'am.

20   Q.    Now, you just said that there's a minimum amount of

21   people when you do a knock and talk.

22   A.    Yes.

23   Q.    What's the minimum?

24   A.    Six.

25   Q.    Six people.  And you guys went with seven?

1    A.    Yes, ma'am.

2    Q.    Why is there a minimum amount of six?

3    A.    That's the policy of my office.

4    Q.    And you describe the knock and talk as completely

5    voluntary?

6    A.    It is.

7    Q.    Going to a house with a show of force of six people,

8    do you think that looks completely voluntary to somebody?

9    A.    We don't go to the house with the six people, ma'am.

10   We're there, but no, in this case it was two of us that

11   were at the door.

12   Q.    Okay, two were at the door, one was at the window,

13   and there were still four other people close enough to

14   come in the house right after you?

15   A.    Yes, ma'am, in the parking lot.

16   Q.    And you indicated that it was a welfare check?

17   A.    Yes, ma'am.

18   Q.    So a welfare check indicates that you're worried

19   about an individual; correct?

20   A.    Yes, ma'am.

21   Q.    And you indicated for you, this case started 40 days

22   before; right?  Well, no, I'm sorry.  32 or 34 days

23   before; correct?

24   A.    Yes, ma'am.

25   Q.    Let's talk about, then, when you got -- well, let me

1  just ask you first, at the staging area there are seven of

2  you agents and law enforcement officers; right?

3  A.   Yes, ma'am.

4  Q.   Are you all armed?

5  A.   Yes, ma'am.

6  Q.   And what are the nonfederal agents wearing?  Are they

7  in uniform?

8  A.   No, ma'am, they're detectives s.  They don't have

9  uniforms.

10 Q.   How did they dress, do you remember?

11 A.   I believe they were in jeans and ball caps with their

12 vests over the top.

13 Q.   Did you guys talk about that the day before in your

14 planning, what people were going to wear?

15 A.   We have requirements for what it is, yes, ma'am.

16 Q.   What are the requirements to wear?

17 A.   Your duty gear.  Whatever your office determines is

18 your duty gear.

19 Q.   And what does your office determine is your duty

20 gear?

21 A.   I wear my bulletproof vest and a weapon, and then in

22 the case of whether you're going to be doing an interview

23 or not, it depends on how you're dressed for that.  But we

24 were issued like cargo pants and a shirt that says HSI.

25 So it makes sure you're identified as police.

1   Q.   So is the shirt outside your vest, or the vest is

2   outside your shirt?

3   A.   My vest is outside my shirt, ma'am.

4   Q.   And does your vest say that you're from a Federal

5   agency?

6   A.   Yes, ma'am.

7   Q.   Is that how all HSI people were dressed?

8   A.   Yes, ma'am.

9   Q.   So, can you remember how the sheriff's officers were

10   dressed?

11   A.   Detective Sabaugh?

12   Q.   Was she the --

13   A.   She was the only BCSO.

14   Q.   Isn't Storey --

15   A.   No.  He's a detective with APD.

16   Q.   I'm sorry.  I was clumping all the nonfederal people

17   together.

18        Okay, first, what were the APD officers wearing?

19   A.   I think jeans and a T-shirt, and their vest on the

20   outside of their T-shirt that showed police.

21   Q.   So they have something showing that they're police,

22   as well?

23   A.   Yes, ma'am.

24   Q.   And Agent Sabaugh?

25   A.   She had on a jacket, but she didn't have a vest on.

1   She was, I think, six months pregnant at the time, or

2   seven months pregnant, so she just had like a black jacket

3   with an emblem right here that said, BCSO.  I think it was

4   black.

5   Q.   Okay.  Now, when you had your meeting the day before

6   on the 16th and you were planning how you were going to

7   get to the house the next day, you specifically decided to

8   go very early; correct?  7:15 in the morning?

9   A.   Yes.

10  Q.   And you all had to meet first?

11  A.   Uh-huh.

12  Q.   And so when you got to the house at 7:15, you

13  indicated that you were one of the people who was right at

14  the door; correct?

15  A.   Yes, ma'am.

16  Q.   And you knocked at the door?

17  A.   No.  Detective Sabaugh knocked on the door.

18  Q.   Okay.  You were right next to her; right?

19  A.   Yes, ma'am.

20  Q.   And it was obvious to you that the people in the

21  house were not awake?

22  A.   No.  They answered the door.

23  Q.   He didn't answer the door right away; right?

24  A.   No, he didn't spring the door open.  It took a second

25  or two, and then he came and he answered the door.

1  Q.    And you said that the person that answered the door

2  was Michael Blackburn?

3  A.    Yes, ma'am.

4  Q.    He came down, and he was just in shorts?

5  A.    Yes, ma'am.

6  Q.    And at that time, there was nobody else who came to

7  the door; correct?

8  A.    No, ma'am.  No one else at the door.

9  Q.    Eventually you were to find another two adults who

10  apparently had been laying on the floor in the living

11  room; correct?

12  A.    Yes, ma'am.

13  Q.    But they did not come to the door?

14  A.    No, ma'am.

15  Q.    Now, you indicated on Direct Examination that you

16  asked Michael Blackburn for consent to enter the house.

17  A.    Detective Sabaugh asked for consent to enter the

18  house, yes, ma'am.

19  Q.    And you testified that he gave consent?

20  A.    Yes, ma'am.

21  Q.    Wouldn't it be fair to say that that conversation

22  didn't happen, that nobody asked him for consent to go

23  into the house?

24  A.    No, that would not be fair to say.

25  Q.    So my question for you is, and it's pretty critical,

1    and yet it does not appear in not only your report, but in

2    any report, that you all requested consent to enter the

3    house and it was given.  It doesn't appear in any of your

4    reports.

5    A.   It does, ma'am.  In the Keifer Orfield interview, he

6    said that he was laying awake and he heard us ask for

7    consent to enter the house, and it was given by Michael.

8    Q.   Okay, I'm talking about -- let's talk about your

9    report.

10   A.   That is my report.

11   Q.   You reported what you did, and Officer Sabaugh

12   reported what she did.  I'm not asking what a witness told

13   you and you put in your report.  I'm saying you guys at

14   the door, you did not indicate, when we got to the door,

15   we asked for consent to enter and the man who turned out

16   to be Michael Blackburn gave consent.  You did not put

17   that in your report?

18   A.   In my initial report, no.

19   Q.   But you did put in other consent that was gotten;

20   right?  Like, for example, later on Agent Langer got

21   consent from Mr. Blackburn to look at his phone; right?

22   A.   Yes, ma'am.

23   Q.   And there was a signed consent form?

24   A.   Yes, ma'am.

25   Q.   And that appears in your report?

1   A.   Yes, ma'am.

2   Q.   And that appears in other people's reports?

3   A.   Yes, ma'am.

4   Q.   But the critical consent to go into a house during a

5   knock and talk, that's not in your report?

6   A.   Not in my initial report, no, ma'am.

7   Q.   So you spoke to Michael Blackburn at the door

8   initially; correct?

9   A.   Detective Sabaugh did, yes, ma'am.

10  Q.   Where were you when she was talking to him?

11  A.   Standing next to her.

12  Q.   And then according to your testimony, he allowed you

13  to come in?

14  A.   Yes, ma'am.

15  Q.   And so at that point, the seven law enforcement

16  officers entered the house?

17  A.   I don't think all seven came in.

18  Q.   Who came in?

19  A.   I was there, Detective Sabaugh was there, Eric Bonza

20  was there, Langer, Altamirano, Storey and Hawkes.  So,

21  yes, seven.

22  Q.   There were seven?

23  A.   Sorry.

24  Q.   So the seven law enforcement agents, armed and

25  wearing things identifying themselves as law enforcement,

1    entered the home; correct?

2    A.   Yes, ma'am.

3    Q.   At the point that all those officers and agents

4    entered the house, had the other two adults, Keifer

5    Orfield and Franque Hatten, had they risen from sleeping

6    on the floor yet?

7    A.   They were awake on the floor, but, no, they were

8    still in there when we made our -- well, as far as I know.

9    I didn't make it in there, myself.  I was still talking

10   with Detective Sabaugh and Mr. Blackburn at that time when

11   the others went to do the security sweep.

12   Q.   I was going to ask you about that security sweep.  So

13   you testified on Direct Examination that you all did a

14   security sweep.

15   A.   Yes, ma'am.

16   Q.   So, was that something that you had already prepared

17   the day before in your meeting on the 16th, who would go

18   where and do what?

19   A.   Oh, no, ma'am.  You just flow with what's in the

20   environment.  You can't -- like say you said you're always

21   going to turn right, and all of a sudden you turn and

22   there's a wall there.  Well, you still have to go find

23   work.  So, no, you just flow through and you try to make

24   sure that the house is secure and that everybody is going

25   to be safe.

1   Q.    Did anybody direct people's flow, or everybody just

2   independently flows?

3   A.    Just pretty much independently flows, ma'am.

4   Q.    So we have seven agents in the house, and it's a

5   two-story townhouse; correct?

6   A.    Yes, ma'am.

7   Q.    Do you have any idea how many agents went upstairs?

8   A.    I believe two, but I'm not sure.

9   Q.    Do you remember which two?

10  A.    I believe it was Detective Hawkes and Storey.

11  Q.    So you did not go upstairs with them?

12  A.    No, ma'am.

13  Q.    So you don't know what they did when they were

14  upstairs?

15  A.    No, ma'am.  Looking for people and weapons, because

16  that's what we do at that time.

17  Q.    So you did see them?

18  A.    No.  You said, do I know what they did while they

19  were upstairs.

20  Q.    Were you up there with them?

21  A.    No.

22  Q.    So you didn't see what they did?

23  A.    No, ma'am, I didn't see.

24  Q.    You were downstairs?

25  A.    Yes, ma'am.

1   Q.    And as a part of the protective sweep, where did you

2   go?  What did you do?

3   A.    I actually stayed with Mr. Blackburn in the front

4   room with Detective Sabaugh.

5   Q.    Okay.  And I think you used the words on Direct

6   Examination, keeping an eye on the adults that were there.

7   We were talking about your protective sweep, and you said,

8   I was keeping an eye on the adults there.

9   A.    I don't think I was keeping an eye on the adults.  I

10  believe the other agents were keeping an eye on the

11  adults.

12  Q.    Which other agents?

13  A.    I think that was specifically Agent Langer and Agent

14  Altamirano.

15  Q.    And when you say that, so were you keeping an eye on

16  Mr. Blackburn and they were keeping an eye on the other

17  two adults?

18  A.    Well, I was talking to Mr. Blackburn.  I think when

19  they flowed in, they ended up in the living room, which is

20  where Keifer Orfield and Franque Hatten were.

21  Q.    Because you said they were still on the floor,

22  initially?

23  A.    Yes, ma'am.

24  Q.    So at that point, nobody's free to leave the house;

25  is that correct?

1  A.    No, that's not correct, ma'am.

2  Q.    So even though you had people keeping an eye on the

3  adults, you're saying they were free to leave?

4  A.    Yes, ma'am.  Had anyone requested for us to leave, or

5  for themselves to leave, they would have been allowed to

6  leave the house.

7  Q.    They could have just walked out; that's what you're

8  saying?

9  A.    Yes, ma'am.

10  Q.    Let me just ask you another question about that.  You

11  said you were there to do a welfare check.  You had kind

12  of been on and off investigating this case for a little

13  over a month, and you had at least a suspicion that there

14  was at least child pornography and perhaps the production

15  of child pornography going on there; right?

16  A.    No, ma'am.  I knew of the one location where the

17  production and stuff of the child pornography was going

18  on, but I didn't have any images or anything that had been

19  produced at that address yet.

20  Q.    Okay.  But it was the same people, right, that you

21  were looking for?

22  A.    Well, I didn't know if it was the same people.  I

23  knew it was the little girl, but I didn't know who was

24  assaulting the little girl.  So I didn't know who was

25  producing, so I couldn't say that the people that were

1  there at that time were the ones that were producing the

2  child pornography at the Aspen Apartments.

3  Q.   But I assume you had a suspicion of that, did you

4  not?

5  A.   We were hoping to find the little girl.  But, no, we

6  didn't know specifically what individual we were looking

7  for.

8  Q.   Didn't you put in your report that you suspected

9  Thomas Mitchell, the father, his brother James?

10  A.   I did.  And then the last line in that is, or an

11  unidentified male yet to be found.

12  Q.   Say that again.

13  A.   I think the last thing I said in that sentence was,

14  we were looking for Thomas Mitchell, James Christopher

15  Mitchell, or a yet unidentified male.

16  Q.   But you said in your report that you possibly

17  suspected the brother, James Mitchell; right?

18  A.   Yes, ma'am.

19  Q.   Okay.  So anyway, you go over to the house, and it's

20  still your testimony that everybody was completely free to

21  leave --

22  A.   Oh, yes, ma'am.

23  Q.   -- totally free to leave?  And would you say, then,

24  that you didn't have control of the house?

25  A.   No, ma'am.

1  Q.   You didn't feel like you had control of the house?

2  A.   No.  I would say that we were safe in the house, that

3  we knew where the adults were.  We made sure that there

4  were no visible weapons.  Is that what you mean by

5  control?

6  Q.   Well, it just sounds to me like you've got seven

7  armed agents in a little duplex townhouse, two people who

8  have clearly just woken up, and in your own words, you're

9  keeping an eye on them.  It sounds like you have control

10 of the house.  Do you feel like you were in control of the

11 house?

12 A.   I'm not sure what you mean by that.

13 Q.   Like, as far as feeling like -- you didn't feel at

14 that point that there were, for example, any risks to you

15 at that point?

16 A.   No.  I felt that we had identified the people that

17 were in the house and whether there were any available

18 weapons.

19 Q.   And you felt that they were not a threat to you;

20 right?

21 A.   No, they didn't have any available weapons.

22 Q.   Well, in addition to no weapons, you had enough

23 agents who were, in your words, keeping an eye on them;

24 right?

25 A.   No.  Actually, for the number of people that were in

1    the house, we were under what our agency requires for

2    agents.

3    Q.   For three adults, you need to have more than seven

4    agents?

5    A.   Yes.

6    Q.   Wow.  That's a big ratio, I would think, especially

7    when you're armed and they're not.

8         But anyway, so you were in the house.  How would you

9    describe the temperature in the house?  Was it warm?

10   A.   The temperature in the house?

11   Q.   Inside.  I'm assuming it's warm if Michael Blackburn

12   is answering the door without his shirt on and no shoes,

13   that the house is warm inside.

14   A.   I don't recall what the temperature of the house was,

15   ma'am, I'm sorry.

16   Q.   If it was very cold, you would remember; right?

17   Wouldn't it strike you as like, this house is freezing

18   cold?

19   A.   I don't know, ma'am, if that would be something

20   I'd -- sorry.

21   Q.   You don't know if you'd have noticed if it was really

22   cold?

23   A.   No, not particularly.

24   Q.   Okay.  But you did notice that; right?

25   A.   No, I didn't notice if it was very warm or very cold.

1          THE COURT:  Would this be a good time to take a

2   short break?

3          MS. KATZE:  If you would like a short break,

4   sure.

5          THE COURT:  Let's go ahead.  Judge Molzen is

6   here, and you had another matter for another client that I

7   think you wanted to try to deal with.  So maybe this would

8   be a good time to take a break.

9          MS. KATZE:  Okay.

10      (A recess was held from 3:45 until 4:08 P.M.)

11          MS. LIZARRAGA:  Your Honor, we have a request.

12   We have a witness that we brought from Santa Fe, and we

13   were hoping to get him on today.  My only concern is at

14   this point, I don't know if we can get him a hotel room,

15   because all the hotels are booked.

16          THE COURT:  Because of the balloon fiesta.  How

17   long do you anticipate your direct testimony to be?

18          MS. LIZARRAGA:  I anticipate it would be 20

19   minutes.  I mean, I think if we put him on right now, we

20   could be --

21          THE COURT:  Are you okay with that if we go

22   ahead, and then you can resume cross-examination of the

23   agent?

24          MS. KATZE:  Sure.

25          THE COURT:  Okay.  You'd be hard pressed to say

1   no since we took your witness out of order.

2          All right, let's go ahead.  Sorry, Agent, go

3   ahead and step down.

4          MS. LIZARRAGA:  The United States calls Keifer

5   Orfield.

6          THE COURT:  By the way, I didn't mean to

7   surprise, but she was available to handle that other

8   matter for your other client.

9          MS. KATZE:  No, thank you very much.  I

10  appreciate it.

11         THE COURT:  Come on up, sir, and take the witness

12  stand.

13      (KEIFER ORFIELD. GOVERNMENT'S WITNESS, SWORN)

14         MR. GARCIA:  Please have a seat and state your

15  full name for the record.

16         THE WITNESS:  My name is Keifer Carl Orfield.

17                     DIRECT EXAMINATION

18  BY MS. LIZARRAGA:

19  Q.   And could you please spell that for the record.

20  A.   It's K-e-i-f-e-r, and then Orfield is O-r-f-i-e-l-d.

21  Q.   Good afternoon, Mr. Orfield.  How old are you?

22  A.   I am 25 years old.

23  Q.   And are you currently employed?

24  A.   Yes, I am.

25  Q.   Where are you employed?

1   A.   Dankoff Solar Pumps.

2   Q.   And where is that?

3   A.   Santa Fe, New Mexico.

4          THE COURT:  I'm sorry; did you say something

5   solar pumps?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Okay.

8   BY MS. LIZARRAGA:

9   Q.   And what do you do there?

10  A.   Build and design solar-powered water pumps and

11  systems.

12  Q.   How long have you worked there?

13  A.   About a year and a half.

14  Q.   All right.  And just by way of background, have you

15  ever testified before?

16  A.   No, I have not.

17  Q.   All right.  Well, if there's anything that I ask you

18  that you want me to clarify, just feel free to let me

19  know.

20  A.   Of course.

21  Q.   Where do you currently reside?

22  A.   In Santa Fe, New Mexico.

23  Q.   How long have you lived there?

24  A.   Eight, nine months.

25  Q.   And where were you living back on December 17, 2013?

1   A.   In Albuquerque.

2   Q.   Do you remember where specifically you were living?

3   A.   Not specifically.  I was couch surfing, kind of like

4   staying with some friends.

5   Q.   I'm showing you what's been previously admitted as

6   Government's Exhibit 1.  Do you recognize that?

7   A.   Yes.  That was the house I was staying at.

8   Q.   All right.  And were you staying there on

9   December 17, 2013?

10  A.   I believe so.

11  Q.   Who lived in that house at that time?

12  A.   A friend of mine, Maria, and her husband, Thomas,

13  their two children, and Michael Blackburn, and my fiancé

14  and myself.

15  Q.   And what is your fiancé's -- or what was your

16  fiancé's name at the time?

17  A.   Thank you.  Franque Hatten.

18  Q.   Okay.  You mentioned Michael Blackburn.  Do you see

19  him here in the courtroom today?

20  A.   Yes, I do.

21  Q.   Could you please identify a piece of clothing that

22  he's wearing and where he is sitting?

23  A.   Green jump suit, and back right-hand corner.

24       MS. LIZARRAGA:  Your Honor, may the record

25  reflect that the witness has correctly identified the

1    Defendant?

2            THE COURT:  The record will so reflect.

3    BY MS. LIZARRAGA:

4    Q.   Approximately how long had you been living with the

5    Mitchells, do you remember?

6    A.   Maybe a month, month-and-a-half.  Not very long.  We

7    had been neighborish when we were staying in a hotel.

8    Q.   And do you know the Defendant as Michael?  Is that

9    what you know him as?

10   A.   Yes.

11   Q.   Was he living with the Mitchells that entire time, as

12   well?

13   A.   Yes.

14   Q.   Did you have the opportunity to interact with him

15   during that time?

16   A.   Yeah, a few times we hung out, played video games,

17   talked, stuff like that.  Watched movies.

18   Q.   Did he ever appear to have a problem interacting with

19   you?

20   A.   No.

21   Q.   Or understanding things that you guys would discuss?

22   A.   No.  He seemed very, you know, intellectually there.

23   Q.   I want to draw your attention to December 17, 2013.

24   Do you remember a day that law enforcement showed up at

25   the Mitchells' house?

1    A.    Yes, I do.

2    Q.    All right.  And I just kind of want to go through

3    what you remember about that day.

4    A.    Okay.

5    Q.    So, do you remember about what time they came?

6    A.    Not specifically, no.

7    Q.    Was it in the morning?

8    A.    I would be waking up, so either morning or mid

9    afternoon.

10   Q.    All right.  And where were you sleeping at the

11   Mitchells' residence at that time?

12   A.    Living room floor.

13   Q.    I'm showing you what's been previously admitted as

14   Government's Exhibit 11.  Do you recognize this?

15   A.    That would be the living room floor.

16   Q.    And is that where you were sleeping?

17   A.    Yes.

18   Q.    I apologize; I don't know what I touched here.

19   Hopefully it will go off.

20        All right, is that where you were sleeping when --

21   what do you remember by law enforcement coming to the

22   house that day?

23   A.    There was a knock on the door, and they identified

24   themselves as National Security, opened the door, they

25   asked if they could come in, and proceeded to come in once

1    given permission.

2    Q.    Who answered the door?

3    A.    I believe Michael did, himself.

4    Q.    Okay.  And you could hear this conversation happening

5    from the living room?

6    A.    I was kind of standing in the hallway staring at the

7    whole thing going down.

8    Q.    All right.  I had shown you -- I'm showing you

9    Government's Exhibit 5.  Do you recognize that?

10    A.    Yes.

11    Q.    What are we looking at there?

12    A.    That's the hallway going directly to the living room.

13    To the left would be the kitchen -- well, the first left

14    is a little dining room area.  The second left would be

15    the kitchen.

16    Q.    So when you walked into the house, would this be the

17    front area where you're standing?

18    A.    Yes.

19    Q.    So is it a far distance from the front of the house

20    to the room that you were in?

21    A.    No.  Maybe 20 to 30 feet.

22    Q.    All right.  I'm just going to zoom in back here.  Can

23    you see the end table in the back of that picture?

24    A.    Yes, I can.

25    Q.    And I'm going to go back to Government's Exhibit 11.

1    You can't see the end table in this picture, but where was

2    that end table on December 17th?

3    A.    It would be the right-hand side of the photograph,

4    outside of the frame.

5    Q.    All right.  So it wasn't very far from the front door

6    to the living room?

7    A.    No.

8    Q.    Okay.  You stated that Michael answered the door, and

9    you said something about hearing law enforcement.  What

10   did they say?

11   A.    They identified themselves as law enforcement.  There

12   was Albuquerque PD and NSA.  And they asked if they could

13   get into the building.  I believe they said what they were

14   investigating.  It's hazy, it's been two years, but I do

15   remember them asking if they could enter the room.

16   Q.    And you said NSA.  Could it perhaps be HSI or ICE?

17   A.    Possibly.

18   Q.    But it was a Federal agency?

19   A.    Federal agency and police department.

20   Q.    And you specifically heard them ask for permission to

21   come in?

22   A.    Yes.

23   Q.    Did you hear the Defendant respond to that question?

24   A.    Yes.

25   Q.    What was his response?

1   A.    I think I've said three times in a row now; yes.

2   Q.    So what happened after he told them they could come

3   inside?

4   A.    They proceeded to enter into the house and started

5   asking questions, separating people from each other.  Not

6   in the sense of, we're taking you outside, we're taking

7   you upstairs, more of, we're going to have a couple of

8   agents with each other and we're going to find out what's

9   going on.

10  Q.    What was your understanding of why they were there?

11  A.    From my general understanding of what it was, it was

12  something to do with child pornography, and that was the

13  gist.  Child pornography and some sort of child assault,

14  child abuse thing.

15  Q.    All right.  Can you describe to me what law

16  enforcement's demeanor was like when they came into the

17  house?

18  A.    Very calm, very polite.  There was no rough action.

19  There was no one being overly aggressive.  It was very,

20  hey, we're coming in to ask a couple of questions, we want

21  to find out your guys' side of the story, this is what

22  we're here for.  Nothing that made me feel uncomfortable,

23  and I'm a crazy conspiracy theorist and already

24  uncomfortable as it is.  So for law enforcement to be

25  inside of a house that I'm occupying and make me feel

1  comfortable, it felt nice.

2  Q.   Okay.  And would you say that you're particularly law

3  enforcement friendly?

4  A.   For the most part.  Yeah, for the most part.  I don't

5  argue, I don't fight back, I just know my rights and

6  that's what I stick to.

7  Q.   All right.  But you didn't feel threatened by them at

8  all?

9  A.   Not at all.

10  Q.   Okay.  So, you said that they -- do you remember, did

11  you ever ask to leave?

12  A.   I asked to step outside, smoke a cigarette.  At the

13  time, it was way more packs than I am now.  There was

14  never a moment of, no, you can't step outside and smoke.

15  There was no, you're being held against your will.  It

16  was, hey, we're here for some questions, we're going to,

17  you know, find something out.

18      And I mean, it really honestly felt rather than

19  being, hey, we're kicking down doors and taking you away

20  in cuffs, we're coming in to talk to you.

21  Q.   So you felt that they were acting --

22         MS. KATZE:  Objection.  Leading.

23         THE COURT:  Rephrase.

24         MS. LIZARRAGA:  Yes.

25

BY MS. LIZARRAGA:

Q.    Where were you during the majority of the time that law enforcement was there?

A.    The living room on the back couch.

Q.    And where was the Defendant, Michael Blackburn?

A.    Between either the kitchen and the front room, and then outside front.

Q.    So were you able to observe him most of the time that he was there?

A.    For the majority of the time, yes.

Q.    All right.  What did his demeanor appear to be like?

A.    I believe saying a kicked dog wouldn't be the correct term, but --

       MS. KATZE:  I'm sorry; I couldn't understand what you said.

A.    I believe kicked dog wouldn't be the right term, but it would be calm and kind of head down.  Not very -- nowhere near -- no aggression towards police officers. There was no being defensive by any stretch of the imagination.  He was very copacetic to what they were asking and what he was moving around as.  There was no aggression, I guess is the best way to put it.

Q.    Did he appear to be cooperative?

A.    Very.

Q.    All right.  While you were in the living room, at

1  some point was there a discussion of the Defendant's

2  cellphone?

3  A.    There was.

4  Q.    And can you tell me what you remember about that?

5  A.    There was a moment where one of the agents or

6  officers, I don't really know the terminology which was

7  given for which person was talking to him, asked to see

8  his cellphone.  He proceeded to say, yes.  They asked him

9  if he would fill out a form releasing the rights to his

10  cellphone.  From the best of my knowledge -- I didn't

11  watch him fill out the form.  And then I proceeded to

12  watch them look through his cellphone, watch as in kind of

13  glance around the corner, go back to sit down, sit there,

14  hear the conversation.

15  Q.    Okay.  I just kind of want to break that up a little

16  bit.

17  A.    Sure.

18  Q.    You testified that an agent asked him to look at his

19  cellphone; correct?

20  A.    Yes.

21  Q.    What was the Defendant's response?

22  A.    Yes.

23  Q.    Did he appear hesitant at all?

24  A.    Not from my recollection.  Not in a, oh, hold on, let

25  me unlock it, or hold on, let me go through some things.

1  More, here, let me push this button, and he handed it off.

2  Q.   All right.  And did you observe the Defendant fill

3  out a form?

4  A.   I did not.

5  Q.   You did not?

6  A.   I heard the conversation about the form and a short,

7  okay.

8  Q.   What do you remember hearing about the form?

9  A.   It was needed in order to go through his phone.  So

10  I'm assuming before any phone -- you know, any records on

11  the phone are looked through, just because of how the

12  conversation flow was.

13  Q.   And what happened after law enforcement went through

14  the phone?

15  A.   They proceeded to take him outside and talk to him,

16  and then to the best of my knowledge, they put him in

17  cuffs and took him away.

18  Q.   All right.  So what happened after the Defendant was

19  taken out of the living room?

20  A.   We were asked if we could go down to the police

21  station here in Albuquerque to give a statement -- by we,

22  meaning my ex-fiancé and myself -- while they were going

23  to be doing a search of the house during this time.  We

24  came down to the station, gave our statements, and

25  proceeded to await the search to be completed.

1   Q.   I just want to break that down a little bit.  When

2   you refer to your fiancé, is that Franque Hatten?

3   A.   That's Franque Hatten.

4   Q.   And just going back very quickly, was there a time

5   when you two were in the -- did Ms. Hatten ever leave the

6   living room when you were in there?

7   A.   Yes.  She asked to speak to one of the female

8   officers off to the side.  I don't know what conversation

9   took place during that moment, but the female officer

10  obliged her and they went upstairs, or outside.  Around

11  the corner, basically.

12  Q.   All right.  So going back to after Michael's been

13  taken out of the house, you stated that law enforcement

14  asked if you would give an interview?

15  A.   Yes, if we would go down to the station to make a

16  statement.

17  Q.   Did you feel that you were being forced to do that?

18  A.   Not at all.  There's a difference between saying,

19  hey, can you get in your car and come down here, and let's

20  go in the back of my car and we'll take you down there.

21  So at no point did I feel like I was forced to.  I had my

22  own free will to go down there and talk if I wanted to.

23  Q.   Before you left the house, while you were in the

24  living room, did you observe any officers searching

25  through the house?

1   A.   Not at all.

2   Q.   All right.

3   A.   When the adults left the house, from my witnessing,

4   they all stepped outside.

5   Q.   All right.  And did they tell you what their plan

6   was?

7   A.   Awaiting a search warrant before they would proceed

8   to search the house.  Could take a couple of hours.  We

9   proceeded to come back to the house in the midst of that

10  process and were told to leave.

11  Q.   I want to -- before we get to that, so you agreed to

12  go down to the station to give an interview?

13  A.   Yes.

14  Q.   Was that the John Price Law Center downtown?

15  A.   I believe so.

16  Q.   Okay.  And so, were you driven there by police?  How

17  did you get there?

18  A.   We used Maria and Thomas' car.

19  Q.   And when you say we, who are you referring to?

20  A.   Franque Hatten and myself.

21  Q.   All right.  So did you immediately go down to the

22  station as soon as the Defendant was removed from the

23  living room?

24  A.   As soon as we were asked to, yes.

25  Q.   As soon as you were asked to?

1  A.   Yes.

2  Q.   Okay.  And you did give a statement to law

3  enforcement --

4  A.   We did.

5  Q.   -- at that time?

6  A.   Yes.

7  Q.   All right.  And did you have any suspicions of any

8  wrongdoing by the Defendant and the two children at that

9  time?

10 A.   Yes, I did.

11 Q.   And can you please tell us why.

12 A.   As a, you know, adult male who has a child and has

13 been around children for a long period of time, certain

14 behaviors that the children were doing made me concerned,

15 made me worried.  And there was actions that were done by

16 Mr. Blackburn that, again, raised flags.

17      Where I was more concerned, than actually witnessing

18 anything or seeing anything on that side of things, I had

19 moments of, something's not right here.  This is -- you

20 know, watching a child touch themselves in a certain way,

21 or play with certain toys in a way of putting it into

22 orifices is not something that I've seen children do a

23 lot, and on a regular basis.

24 Q.   Just to interrupt you there real quick, is that

25 something that you witnessed the children --

1  A.   That is something I witnessed the children doing.

2  Q.   The Mitchells' children?

3  A.   Yes.

4  Q.   Do you know what their names are?

5  A.   I don't remember their names.

6  Q.   Okay.  But it was -- do you remember whether it was a

7  boy, a girl?

8  A.   It was a boy and a girl about -- one was definitely

9  two, and one was about to be two.

10  Q.   Okay.  So, you stated you had concerns because of the

11  way that the children were acting?

12  A.   The way the children were acting, yes, was one of my

13  main bits when I gave my statement, and it's always been a

14  concern.

15  Q.   Can you describe specifically what they were doing?

16  A.   Yes.  The little girl would lay on her back, spread

17  her legs and pat her vagina.

18       MS. KATZE:  I'm going to object, your Honor, to

19  the relevance of these questions.

20       MS. LIZARRAGA:  Your Honor, this is what he

21  communicated to Agent Breen and Detective Sabaugh when he

22  was taken down to the station.  We have the witness here,

23  and so I think that it is relevant.

24       It also goes to show why it took the time for

25  Agent Breen and Detective Sabaugh, why there was a time

1  lapse before they actually went in and interviewed the

2  Defendant.

3          MS. KATZE:  Then that would be covered by the

4  fact of, were you interviewed, and how long were you in

5  there.

6          THE COURT:  I'll note the objection for the

7  record, but I'm going to overrule it and I'll allow the

8  question.  So the witness may answer.

9  A.   Okay.  Also, I mean, between the female child patting

10 her vagina, and the little boy sticking felt-shaped

11 objects up his butt -- his anus, sorry; that's something

12 that I've never seen two-year-olds do, other than a little

13 bit of exploratory where they go, oh, wait, what is this,

14 and freak out about it.  Not on a constant, this is

15 something we need to be doing.  And that was one of my

16 main concerns, watching the children act in that certain

17 way.

18 BY MS. LIZARRAGA:

19 Q.   Did you articulate that to law enforcement during

20 your interview?

21 A.   I did.

22 Q.   Okay.  Do you remember approximately how long your

23 interview took?

24 A.   I want to say anywhere between two or three hours.  I

25 mean, that's between me and waiting for Franque Hatten, as

1    well.  I was there for quite a while.

2    Q.   All right.  So you were there, and then you waited

3    for your fiancé to get done at the time?

4    A.   Yes.

5    Q.   And what did you do when you left the station?

6    A.   We hoped due to our time that we had been in the

7    station that we'd be back and the search warrant would be

8    over, the search would be over, and we would be able to

9    enter the house again.  We weren't able to.  So we

10   continued to drive around and waited in a park for a

11   while.

12        We also tried desperately to contact Maria and

13   Thomas, who were out of state at the time.  No luck there.

14   But we were basically twiddling our thumbs and waiting as

15   long as we could.

16   Q.   So after your interview, did you actually go back --

17   A.   We did.

18   Q.   -- to the house?

19   A.   We did.

20   Q.   And what did you observe when you got back to the

21   house?

22   A.   Officers on the outside of the house.  There was no

23   one inside the house at the time, that I was able to see,

24   going in and out of the house.

25             MS. KATZE:  Objection, your Honor.  Relevance.

1   What happened when he went back to the house.

2        MS. LIZARRAGA:  Your Honor, she's trying to argue

3   that they started the search early.  Him witnessing law

4   enforcement --

5        THE COURT:  The objection is overruled.

6   A.   There were two officers outside of the house in a

7   vehicle.  When we proceeded to get out of the car, the

8   vehicle we were borrowing, and started going towards the

9   door, they stopped us and said, hey, we still haven't

10  started the search warrant, we still need you to stay off

11  the premises.  So we proceeded to get back in the vehicle

12  and drive away.  We weren't allowed back in the house

13  until well after dark, 7:30 or 8:00.

14  Q.   Why were you allowed back at that time?

15  A.   From our understanding, it was over.  There was no

16  more officers there.  They had searched the building and

17  we were given the okay to come back home.

18  Q.   Other than going to the house right after the

19  interview, when was the next time you went back to the

20  house?

21  A.   I mean, between traffic from here to over there, that

22  was the only time we came back.  And then we left and

23  drove around the area for a while until 7:30, 8:00.  Like

24  I said, two years ago, I can't really specifically tell

25  the time.

1  Q.   No, I understand that.  So was there -- you go back

2  to the house after your initial interview, and then you

3  didn't go back until the evening; is that correct?

4  A.   Yes, ma'am.

5  Q.   And what happened when you got back there in the

6  evening?

7  A.   We entered the house and saw basically where the

8  search had happened.  I mean, when you search a building,

9  I'm assuming as much, you go through everything.  So we

10  kind of tried to take a catalog of our stuff that was gone

11  through, and basically just kind of see what we needed to

12  clean up before Thomas and Maria arrived home, as in like

13  putting seat cushions back together and flipping beds

14  back.

15      After Thomas and Maria arrived home, we then

16  proceeded to go through stuff and just stared putting

17  things back, and helped them put the house back together.

18  Q.   When did Thomas and Maria get home?

19  A.   From my remembrance, later that evening.  Like late,

20  late that evening.  They were driving out to get Thomas'

21  father, I believe.

22  Q.   Have you interviewed with law enforcement, other than

23  on December 17th, at all?

24  A.   For this particular?

25  Q.   Just in general.

1   A.   In general, I was pulled over at one point late last

2   year, and I had a -- I did not pay a court ticket back in

3   Las Cruces.  But, no, not really.  A couple of times, I

4   think.

5   Q.   All right.  And so how would you rate your

6   interaction with police in this case compared with any

7   other interactions that you've had?

8   A.   In Santa Fe, they're much more hostile.  Quick to --

9   quick to yell, quick to raise their voice, and quick to

10  start yelling things about putting out your cigarette or

11  coming down from your house.

12       In this case, in particular, there was no hostility.

13  There was -- you know, it kind of felt like I was talking

14  to friends, which is weird for me.

15            MS. LIZARRAGA:  Your Honor, I have no further

16  questions.

17            THE COURT:  Counsel may cross.

18                       CROSS-EXAMINATION

19  BY MS. KATZE:

20  Q.   So, your name is Keifer Orfield?

21  A.   Yes.

22  Q.   Keifer Carl Orfield?

23  A.   Yes, ma'am.

24  Q.   But on the number of occasions when you have been

25  stopped by the police, do you use the name Carl Orfield?

1  A.    Actually, that was a misprint on my ID.  I had my

2  military ID, which goes Carl Keifer Orfield.  And so for

3  some reason, not reading the military ID correctly, they

4  think my name is Carl Orfield.

5  Q.    So when you get stopped by the police, you show your

6  military ID?

7  A.    I have in the past, when I have not had a state ID.

8  Q.    I'm sorry; say again?

9  A.    When I have not had a state ID, I have used my

10 military ID as a proof of identification.

11 Q.    Okay.  But now you have a driver's license?

12 A.    Now I do, yes.  When I got out of the military, I was

13 not allowed to drive.  I had an incident.  I had a seizure

14 at one point, so they were cautious about giving me my

15 driver's license back.

16 Q.    Okay.  But you were driving, right, because didn't

17 you --

18 A.    Franque was driving.

19 Q.    But didn't you get arrested a number of times for

20 tickets, stopped for tickets when you were driving?

21 A.    Yes, ma'am.  This is post being cleared for a

22 driver's license.  And I have also gotten tickets for not

23 having a driver's license when I was younger.

24 Q.    Okay.  But let's say in Las Cruces, April 30th, 2013.

25 A.    Uh-huh.

1  Q.    There you got charged with an expired registered

2  plate, no driver's license, and they had the name of Carl

3  Orfield.

4  A.    Yes.

5  Q.    So you were driving without a license?

6  A.    I was driving without my driver's license.

7  Q.    Okay.

8  A.    Left my wallet at home.

9  Q.    And in 2012, the year before -- so how long did you

10 go without a driver's license?

11 A.    About three years.

12 Q.    So no driver's license, no insurance in 2012, and at

13 that time they had you as Keifer Orfield.  So how did they

14 have you as Keifer Orfield at that time?

15 A.    Honestly, a correction to the police officer as he

16 was writing my tickets.  I was noticing that he was

17 writing Carl the second time.

18 Q.    But in 2011 when you were driving with a suspended or

19 revoked license in Las Cruces, then you were Carl Orfield?

20 A.    Yes.  The lovely Las Cruces Police for some reason

21 have constantly confused the two.  It depends on who reads

22 my military ID at the time, or when I did have a driver's

23 license or an expired driver's license.  For example, the

24 last date you specifically gave, I had an expired driver's

25 license.

1    Q.   When did you get out of the military?

2    A.   2012, specifically.  Up until that point, I had been

3    in other countries.

4    Q.   Now I'm a little bit confused.  There's this case

5    here from March of 2011.

6    A.   That's when I first got back from overseas.  I got

7    back in January.

8    Q.   I thought you got out of the military in 2012?

9    A.   Not out of the military, back from overseas.  Big

10   difference.

11   Q.   So when were you out of the military?

12   A.   2012, November.

13   Q.   When did you go in the military?

14   A.   August 28th, 2008.

15   Q.   Okay.  What kind of discharge did you get?

16   A.   I had honorable from active duty, and other than

17   honorable from Reserves.

18   Q.   What does that mean?

19   A.   Paperwork discharge.  I asked to be removed from

20   service.  I couldn't handle being a civilian and a

21   soldier.  I had requested to go full active, and my

22   request was denied.

23   Q.   Okay.  So I'm going to sort of skip to the end.  You

24   said that you were interviewed at the police station and

25   you gave a statement; right?

1    A.   Yes, ma'am.

2    Q.   So when you went in to give a statement, they took

3    you into a room; right?

4    A.   Yes, ma'am.

5    Q.   And there were two law enforcement officers?

6    A.   I believe so.

7    Q.   And when they took you in that room, they searched

8    you and took your wallet and your keys; right?

9    A.   No.  Entering into the station, I had to go through a

10   nice little metal detector.

11   Q.   So you don't remember being searched and having

12   things taken?

13   A.   I never had anything taken away from me.

14   Q.   Okay.

15   A.   I had stuff set off to the side, probably, but never

16   removed from --

17   Q.   What do you mean, stuff set off to the side probably?

18   What does that mean?

19   A.   Like I said, two years ago, I don't really remember

20   if they took it away-away, but I do remember not having it

21   on my person.  They may have put it in a basket near me.

22        MS. LIZARRAGA:  Your Honor, I'm going to object

23   to the relevance.

24        MS. KATZE:  She went into it on Direct

25   Examination, his whole going down to the police station.

1          THE COURT:  I'll allow it.  Overruled.

2   BY MS. KATZE:

3   Q.   Now, you indicated during the course of this

4   interview when you were in this room with the two law

5   enforcement officers -- did you at that point know whether

6   you were in any way under investigation?

7   A.   I knew that I was not under investigation, yes.

8   Q.   Okay.  And you said on Direct Examination that you

9   had expressed some concern about Mr. Blackburn --

10  A.   Uh-huh.

11  Q.   -- and the sexual, very hypersexualization of the

12  children.

13  A.   Yes, ma'am.

14  Q.   So when you were interviewed, you were interviewed by

15  a man and a woman; right?

16  A.   I'm not entirely sure.

17  Q.   Do you remember being interviewed by Theresa Sabaugh

18  from the Bernalillo County Sheriff's Department?

19  A.   I don't recall her name.

20  Q.   Do you remember that when you spoke to her, you told

21  her that you did notice the children's hypersexual

22  behavior, but you did not suspect abuse by Blackburn?

23  A.   I do not recall if I said that.  I said I did not

24  suspect -- excuse me.  Hold on.  You're making my words

25  get confused in my head.

1      I don't recall if I said that or not.  I, at the

2  time, didn't fully suspect Mr. Blackburn.  I did not want

3  to press charges.  I did not want to making accusations

4  without evidence.  I don't want to do that.

5  Q.   Okay.  I'm just asking --

6  A.   Not my job.

7  Q.   -- a specific question, whether you remembered saying

8  to her --

9  A.   I do not remember if I said that.

10  Q.   -- that although you noticed the children's

11  hypersexual behavior, you didn't suspect Blackburn?

12  A.   I don't remember that.

13  Q.   Okay.  You also talked about that you hung out, I

14  think you used the word hung out with Mike Blackburn a

15  little bit while you were at the house.

16  A.   Yes.

17  Q.   And your hanging out included playing video games?

18  A.   Occasionally, yes.

19  Q.   You guys played video games together?

20  A.   The Wii, yes.

21  Q.   The what?

22  A.   The Wii.

23  Q.   The Wii, that's what you and --

24  A.   Yes.

25  Q.   That's something that you guys did together?

1   A.   Yes.

2   Q.   I want to go back to December 17th.  You and

3   Franque were staying on the living room floor; right?

4   A.   Yes.

5   Q.   So we looked at those pictures.  When you walk in the

6   front door, that's where the stairs are to the second

7   floor, right inside the front door; right?

8   A.   Yes.

9   Q.   And the room you were staying at is all the way in

10  the back of the house in those pictures; correct?

11  A.   I wouldn't say all the way in the back of the house.

12  Q.   Is there another room behind it?

13  A.   In the back of the house, yes.

14  Q.   So look at this picture.

15  A.   Yes.

16  Q.   So is the front of the house kind of right here where

17  my pen is?  Is that where you come in the front door?

18  A.   There is about a four-by-eight space to the left, and

19  then there is a kitchen, and then there is a living room

20  in the back.

21  Q.   Okay.  So if we look at this hall here, is the front

22  door at the end of this hall, right here?

23  A.   You're in the front door, is where the photo would be

24  taken from.

25  Q.   Okay, that would be the front door; right?  And then

1  we see a hall.  And all the way in the back of the hall,

2  you can see at the very back there's a wooden table,

3  right, in that room?

4  A.   About 15, 20 feet.

5  Q.   Just look at the picture for a second.

6  A.   Okay.

7  Q.   Thanks.

8  A.   I can see the back of the wall, actually.

9  Q.   You can see the back of the wall with the windows;

10 right?

11 A.   Uh-huh.

12 Q.   That's the back of the house --

13 A.   Yes, ma'am.

14 Q.   -- right?  And is that the room you stayed in?

15 A.   That is the room we stayed in.

16 Q.   So would it be fair to say you were guys were

17 sleeping in the room in the back of the house?

18 A.   Sure.

19 Q.   Is that fair?

20 A.   Yes, ma'am.

21 Q.   And you were asleep when law enforcement knocked on

22 the door; correct?

23 A.   Yes.

24 Q.   You did not come to the door?

25 A.   No, I did not come to the door.

1   Q.   Did you hear the knocking?

2   A.   Yes.

3   Q.   You did?  Did it wake you up?

4   A.   I was in the process of waking up before the knocking

5   came through, so I heard the knocking because I was awake.

6   Q.   Okay.

7   A.   I was in that nice lovely stage of, I really don't

8   want to get up yet, when you're kind of groggy in the nice

9   early morning or mid afternoon, depending on however

10  you're waking up.

11  Q.   Okay.  So you were not working then; right?

12  A.   No, I was not.

13  Q.   This is 7:15 A.M. in the morning in December.

14  A.   Okay.

15  Q.   So you didn't answer the door.  Did you hear

16  Mr. Blackburn come down the stairs?

17  A.   Yes, I heard him answer the door.  I didn't hear him

18  come down the stairs, or where he came from.  I heard him

19  answer the door.

20  Q.   But you didn't get up to go to the door?

21  A.   No.

22  Q.   So you were back in that room at the end of the

23  house; correct?

24  A.   Yes.

25  Q.   At some point, did you come into the house?  Did you

1   get up and walk back in towards the front door at all?

2   A.   I walked towards the -- you see the second doorway?

3   Q.   Okay, coming from the back?

4   A.   Coming from the back, that would be the first

5   doorway.

6   Q.   That's the first doorway. that's the second doorway?

7   A.   That would be the bathroom, that would be kitchen,

8   that would be the little dining room/storage area.

9   Q.   Okay, so you --

10   A.   I came up to the bathroom area.

11   Q.   So you came out of the back room?

12   A.   To the bathroom area.

13   Q.   What were you wearing?

14   A.   Possibly boxers.

15   Q.   Okay.

16   A.   Possibly just boxers.

17   Q.   Is the house pretty warm?

18   A.   It was at the time, yes.

19   Q.   Okay.  And so Michael Blackburn and law enforcement

20   initially were standing right near the front door?

21   A.   Yes.

22   Q.   Did you walk over when they were standing there?

23   A.   Not until they started to proceed to come into the

24   house, after they asked.

25   Q.   All the law enforcement?  When all the -- there were

1  seven agents who ended up coming in.

2  A.   I don't think they all came in all at once, but they

3  did start to come in.

4  Q.   Where were you as they started coming in?

5  A.   I was heading towards the front.

6  Q.   Okay.  So when did you first see any law enforcement

7  officers?

8  A.   After Michael Blackburn let them in, after he opened

9  the door.

10  Q.   Let's talk about what you did.  You're in that back

11  bedroom, you hear something, you get up, and you start

12  walking down the hall?

13  A.   Yes, ma'am.

14  Q.   As you're walking down the hall, are law enforcement

15  agents coming in?

16  A.   Negative.  They are -- I was standing, like I said,

17  in that second -- you know, first coming from the back,

18  first doorway coming from the back, standing there.  Hear

19  the conversation between law enforcement and

20  Mr. Blackburn.  They proceeded to start coming in, and I

21  actually started walking forward.

22  Q.   So you started walking towards them?

23  A.   Yes, ma'am.

24  Q.   Then you said on Direct Examination that law

25  enforcement came into the house and separated people?

1  A.   As in they started moving us into -- you know, they

2  moved the children away from everyone.

3  Q.   Can I stop you for a second?

4  A.   Sure.

5  Q.   Had the children already come downstairs by the time

6  you came forward?

7  A.   Yes.  They were starting to come downstairs.

8  Q.   They were already down?  But you don't remember if

9  law enforcement was already in the house; is that right?

10  A.   That's not -- I believe so.  I just said that the law

11  enforcement were coming into the house --

12  Q.   Okay.

13  A.   -- and the children were already downstairs.

14  Q.   Were the children already downstairs?

15       THE COURT:  Just a minute.  We've got a court

16  reporter who is making a transcription, so the two of you

17  can't be talking over each other.

18       THE WITNESS:  Thank you, your Honor.

19       THE COURT:  I know you haven't testified before,

20  but try to -- don't start answering the question until she

21  finishes asking.  And Ms. Katze, let him finish answering

22  before you ask the next question.  It'll make it easier

23  for the court reporter.

24       THE WITNESS:  Okay.

25

1  BY MS. KATZE:

2  Q.   Let's go back to what you referred to as them

3  separating people.

4  A.   Okay.

5  Q.   So, the seven law enforcement agents got in the

6  house --

7  A.   Yes, ma'am.

8  Q.   -- and you said that they were separating -- you said

9  they separated people, they separated the adults.

10  A.   Okay, I may have used that term in the wrong sense.

11  Franque asked to go outside.  Mr. Blackburn was being

12  talked to by other officers.  And I was in the living

13  room.  There was a moment when all of us were in the

14  living room together, and then they all went off their

15  separate ways.

16      As in separation, no one forced us to separate.  No

17  one forced us to go into any other direction than where we

18  want to be.  Franque Hatten asked to be separated from

19  myself and the people at large.

20  Q.   So let me ask you -- hold on a second.

21  A.   Go ahead.

22  Q.   So when you said that people separated, did the

23  agents go with you?  Because you also said a couple of

24  agents on each person.

25  A.   I had two people in the living room with me.

1  Q.   So you were sitting in the living room?

2  A.   It could be have two people, three people.  There

3  could have been seven people.  With Franque, I knew that

4  there might have been one.  With myself, there was two.

5  Q.   Because you were in the living room?

6  A.   I was in the living room.

7  Q.   So you didn't see what was happening in other rooms

8  or outside?

9  A.   Yes.

10 Q.   And with you in the living room, there were two

11 agents there with you?

12 A.   Yes.

13 Q.   But you, on Direct Examination, said that you felt

14 absolutely free to leave and go --

15 A.   Yes.

16 Q.   -- even though there were two agents sitting on you?

17 A.   Yes.  They weren't sitting on me, but they were in

18 the same room as me, yes.

19 Q.   So you in the living room?

20 A.   Yes, ma'am.

21 Q.   While you were in the house, law enforcement never

22 interviewed you there, did they --

23 A.   No.

24 Q.   -- in the house?  They didn't ask you if you had a

25 cellphone?

1    A.   They asked if we had cellphones.

2    Q.   Did they ask to look at your cellphone?

3    A.   I didn't have a cellphone at the time.

4    Q.   Did Franque have a cellphone?

5    A.   She did.

6    Q.   Did she give them her cellphone?

7    A.   I don't remember.

8    Q.   You said she went outside and talked to a law

9    enforcement officer --

10   A.   Yes.

11   Q.   -- but you did not go out with her --

12   A.   No.

13   Q.   -- is that correct?  Did you see where she went after

14   she was outside?

15   A.   No.

16   Q.   So once she went out to talk to the agent, you did

17   not see her again until, when?

18   A.   Maybe 15 minutes after they were done talking.

19   Q.   Where did you see her?

20   A.   She came back into the living room.

21   Q.   So they didn't go through any of your stuff?

22   A.   No.  Not at that time.

23   Q.   What do you mean not at that time?

24   A.   I'm assuming during the search warrant they went

25   through my stuff.

1  Q.    All right.  You did testify to that, right, that they

2  kind of tore the house up.

3  A.    They went through the house, yes.

4  Q.    But you did testify that they did talk to Michael

5  Blackburn?

6  A.    Yes.

7  Q.    And they did ask if they could look in his telephone?

8  A.    Yes.

9  Q.    And did you see them look in his telephone?

10  A.    Like I had previously stated, I didn't see the whole

11  interaction, as in them going through the cellphone, him

12  signing paperwork.  I heard the interaction, and witnessed

13  them walking with the cellphone.

14  Q.    Okay.  I just want to go back to something that you

15  said when we talked about you being interviewed and you

16  had some concerns.  You said, I'm an adult male with a

17  child.

18  A.    Yes, ma'am.

19  Q.    How old is your child?

20  A.    She is two years old.

21  Q.    And do you have custody of her?

22  A.    I do not.  I gave her up for adoption.  I couldn't --

23  I was homeless at the time.  I was jobless and homeless,

24  so I did what any reasonable adult would do.

25          MS. KATZE:  One moment, please.

1          THE COURT:  Sure.

2    BY MS. KATZE:

3    Q.   Just a couple more questions.  So the concerns that

4    you had about Mr. Blackburn and the children, did you

5    express those concerns to anybody in the month-and-a-half

6    you were there?

7    A.   I brought it up to the parents about the children's

8    behavior.  They stated that it was normal for them, for

9    the children.  And so part of my brain went, that's

10   strange, and part of my brain went, well, I'm not their

11   parent, so I don't know.

12   Q.   So you didn't report it elsewhere?

13   A.   I did not report it elsewhere.

14   Q.   Can I ask, were you using drugs at that time?

15   A.   No, I was not.

16          MS. KATZE:  Okay.  I have nothing further.

17          THE COURT:  Just real quick, in terms of your

18   military service, were you in the National Guard and then

19   got mobilized?

20          THE WITNESS:  I did a split contract.  I did two

21   years active, two years Reserves.

22          THE COURT:  Okay.  Was it in the Army?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  And then you got -- were you in Iraq

25   or Afghanistan?

1          THE WITNESS:  Afghanistan.

2          THE COURT:  So then you finished your tour in

3     Afghanistan, came back, and then you still had some

4     time --

5          THE WITNESS:  I had my two years of Reserves.

6          THE COURT:  -- in the Reserves?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Was that Army Reserves?

9          THE WITNESS:  That was Army Reserves, yes, sir.

10          THE COURT:  Okay.  And what was your MOS?

11          THE WITNESS:  I was a 68 Whiskey.  I was a medic.

12          THE COURT:  Medic, okay.  Is there any Redirect?

13          MS. LIZARRAGA:  Your Honor, I just want to

14     briefly show him this picture for clarification of the

15     record of where he was standing.

16          THE COURT:  Okay.

17                    REDIRECT EXAMINATION

18     BY MS. LIZARRAGA:

19     Q.   So Mr. Orfield, on Cross-Examination you and

20     Ms. Katze had a long discussion of Government's Exhibit 5.

21     So the record is clear, I'm going to show you Government's

22     Exhibit 6 now.  Is that about where you were standing?

23     A.   That would be about where I was standing.

24          MS. LIZARRAGA:  Thank you.  I have no further

25     questions.

1           THE COURT:  May the witness be excused?

2           MS. LIZARRAGA:  Yes, your Honor.

3           THE COURT:  Thank you for your patience and

4   waiting today, and thank you for your service.  You may be

5   excused.  You are free to leave the building and return to

6   Santa Fe.

7           THE WITNESS:  Thank you.

8           THE COURT:  What's Counsel's -- obviously I set

9   aside two days for this, so we're going to continue

10  tomorrow.  How many more witnesses do we have?

11          MS. LIZARRAGA:  Your Honor, after Special Agent

12  Breen is done testifying, we have three more witnesses.

13  They will not take nearly as long as Special Agent Breen.

14          We will be calling Special Agent Morjn Langer.  I

15  expect that, at most, his testimony both Direct and

16  Cross-Examination should take an hour, at most.

17          We will also be calling Special Agent Christina

18  Altamirano, and I would expect about the same projection

19  for her.

20          And then our last witness will be Detective

21  Theresa Sabaugh.  She may take up to an hour and a half.

22  But Special Agent Breen is definitely our longest witness,

23  as soon as he's done.

24          THE COURT:  Let me ask you this, Ms. Katze.  How

25  much more would you anticipate for your Cross-Examination

1    of Agent Breen?  How much more did you --

2            MS. KATZE:  I still have a little ways to go.

3    Perhaps we could break for the day and start at whatever

4    time you want in the morning and finish, because then the

5    Government presumedly would have Redirect.  I still have

6    quite a bit.

7            THE COURT:  Can we start at 8:30?

8            MS. KATZE:  That's fine with me.

9            THE COURT:  Is there any problem having the

10   Defendant here at 8:30?

11           MARSHAL COZART:  No, your Honor.  We'll get him

12   here.

13           THE COURT:  All right, then, let's do that.

14   Since it's 5:00, we'll go ahead and break today.  And we

15   don't have any more witness issues as far as taking them

16   out of order?

17           MS. LIZARRAGA:  That's correct.

18           THE COURT:  All right.  So what will happen in

19   the morning is, we'll finish the Cross on Agent Breen,

20   Redirect, and then continue with the rest of the

21   witnesses.

22           So with that, we'll be in recess for the evening.

23   Thank you.

24   (Proceedings adjourned at 4:55 P.M. and

25   resumed at 8:31 A.M. on October 7, 2015)

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3    _____
                                    )
4    UNITED STATES OF AMERICA,      )      No. 14-CR-00129 WJ
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       )
                                    )
7    MICHAEL DAMEON BLACKBURN,       )
                                    )
8              Defendant.           )
     _____)

9

10          CERTIFICATE OF OFFICIAL COURT REPORTER

11       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65,

12   Federal Official Realtime Court Reporter, in and for the

13   United States District Court for the District of New

14   Mexico, do hereby certify that pursuant to Section 753,

15   Title 28, United States Code, that the foregoing is a true

16   and correct transcript of the stenographically reported

17   proceedings held in the above-entitled matter on October

18   6, 2015 and that the transcript page format is in

19   conformance with the regulations of the Judicial

20   Conference of the United States.

21   Dated this 21st day of October, 2015.

22   _____
     MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23   FEDERAL OFFICIAL COURT REPORTER
     333 Lomas Boulevard, Northwest
24   Albuquerque, New Mexico  87102
     Phone:  (505)348-2334
25   Email:  Mary_Loughran@nmcourt.fed.us