1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3  _____
                                  )
4  UNITED STATES OF AMERICA,      )      No. 14-CR-00129 WJ
                                  )
5            Plaintiff,           )
                                  )
6      vs.                        )      Bonito Courtroom
                                  )      Albuquerque, New Mexico
7  MICHAEL DAMEON BLACKBURN       )      Wednesday, October 7, 2015
                                  )      8:30 A.M.
8            Defendant.           )
   _____)

9

10              TRANSCRIPT OF PROCEEDINGS
         MOTION TO SUPPRESS HEARING, VOLUME II
11     BEFORE THE HONORABLE WILLIAM P. JOHNSON
              UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:

14  For the Plaintiff:   MARISA A. LIZARRAGA
                         SHAMMARA HENDERSON
15                       UNITED STATES ATTORNEY'S OFFICE
                         District of New Mexico
16                       201 Third Street, N.W.
                         Albuquerque, New Mexico   87102
17

18  For the Defendant:   MARGARET A. KATZE
                         FEDERAL PUBLIC DEFENDER
19                       District of New Mexico
                         111 Lomas Blvd., NW, Suite 501
20                       Albuquerque, New Mexico  87102

21  REPORTED BY:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                         United States Court Reporter
22                       333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102
23                       Phone:  (505)348-2334
                         Email:  Mary_Loughran@nmcourt.fed.us
24

         Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

```
1              I N D E X                        Page

2            WITNESSES FOR THE PLAINTIFF
```

SPECIAL AGENT RYAN BREEN
    CROSS-EXAMINATION CONTINUED BY MS. KATZE .........194
    REDIRECT EXAMINATION BY MS. HENDERSON ............221
    QUESTIONS BY THE COURT ...........................228
    RECROSS-EXAMINATION BY MS. KATZE .................236
    REDIRECT EXAMINATION BY MS. HENDERSON ............236

CHRISTINA ALTAMIRANO
    DIRECT EXAMINATION BY MS. LIZARRAGA ..............238
    CROSS-EXAMINATION BY MS. KATZE ...................258
    REDIRECT EXAMINATION BY MS. LIZARRAGA ............263
    QUESTIONS BY THE COURT ...........................265

MORJN LANGER
    DIRECT EXAMINATION BY MS. LIZARRAGA ..............266
    CROSS-EXAMINATION BY MS. KATZE ...................283

THERESA SABAUGH
    DIRECT EXAMINATION BY MS. LIZARRAGA ..............286
    CROSS-EXAMINATION BY MS. KATZE ...................312
    REDIRECT EXAMINATION BY MS. LIZARRAGA ............332
    QUESTIONS BY THE COURT ...........................335


QUESTIONS OF COUNSEL BY THE COURT

    BY MS. LIZARRAGA .................................342
    BY MS. KATZE ....................................356

EXHIBITS                              FORMALLY ADMITTED

Government's Exhibits:                            Page

29    Letter from Defendant to Mitchells          308


Defendant's Exhibits:

A     Article:  An Analysis of Miranda Warnings    342
      and Waivers

1   (In Open Court at 8:31 A.M.)

2          THE COURT:  We are back on record in United

3   States vs. Blackburn.  We left off with Ms. Katze's

4   Cross-Examination of Special Agent Breen.  So you may go

5   ahead and resume the witness stand.

6          THE WITNESS:  Yes, sir.

7               CROSS-EXAMINATION CONTINUED

8   BY MS. KATZE:

9   Q.   Good morning.  Agent Breen, I think when we left off,

10  one of the breaks that we took, you were inside the house

11  at Wyoming when we left off.  So I just want to clarify a

12  couple of things.  When you got there that morning, it was

13  dark out?

14  A.   No, I don't believe it was still dark out.  I think

15  7:15, I think it had started to lighten up.

16  Q.   Okay.  So lighten up, because I looked up and sunrise

17  was at 7:08 that day.  But does that make sense?  Does

18  that mean the sun was starting to come up?

19  A.   I'm sorry; I don't understand your --

20  Q.   When you guys met at the staging area, was it dark?

21  A.   Oh, yes.  It was 6:00 something when we met at the

22  staging area.

23  Q.   Okay.  So with respect to the -- you did a Criminal

24  Complaint; right --

25  A.   Yes, ma'am.

1    Q.    -- for this case?  Okay.  So in your Criminal

2    Complaint, you said:  "Once at the residence, Detective

3    Storey made contact with Michael Dameon Blackburn and two

4    young children."  I hadn't heard that in your testimony

5    yesterday, so I was just wondering when that happened.

6    A.    I'm sorry, ma'am, I'd have to refer to the Complaint

7    to see what you're talking about.

8    Q.    Okay, I'll show it to you.

9          MS. KATZE:  May I approach, your Honor?

10         THE COURT:  Sure.

11   BY MS. KATZE:

12   Q.    It's highlighted there.

13   A.    Okay.

14   Q.    Can you explain to us what happened and what that

15   means?  You said, again:  "Once at the residence,

16   Detective Storey made contact with Michael Dameon

17   Blackburn and two young children."

18   A.    When we all came inside, we were speaking to him.

19   I'm assuming what I meant by that was that when Jake

20   Storey and Josh Hawkes entered the house, that they met

21   Michael.  Detective Storey and Detective Hawkes were the

22   two that did the security sweep upstairs, so they probably

23   encountered Jane Doe No. 1 and John Doe No. 1 at that

24   time.

25   Q.    Okay.  Well, you specifically said Detective Storey.

1  A.   But if you look on the page prior to that, I talk

2  about how we all -- the Affiant plus these people all went

3  inside.

4  Q.   That's what I was wondering.  You said all seven of

5  you went inside, but then you specifically just said,

6  Detective Storey made contact with Michael Dameon.

7  A.   Okay.

8  Q.   What specifically happened with Detective Storey and

9  Michael Dameon?

10  A.   I couldn't speak to that.  I just know that I was

11  probably saying that when he came in, because Detective

12  Hawkes and Detective Storey both came in.  So I'm assuming

13  what I meant by that was, while we were speaking with

14  Mr. Blackburn at the front door, they came in and went

15  upstairs, that he would have, at that time, encountered

16  Michael, or encountered Mr. Blackburn, and then went

17  upstairs and found the kids.

18  Q.   Okay.  Because out of the seven people, you

19  specifically said -- and let me move on from that for a

20  second.

21       Yesterday in your Direct Examination, referring to

22  the interview that took place at the station, you said

23  something to the effect that, well, we knew he wanted to

24  talk to us because we had -- let me just get what your

25  words were here.

1      All right.  You said that you knew he wanted to talk

2  to you because you had had contact with him before.  And

3  then I would just again talk about your Complaint that you

4  filled out.  You said:  "Blackburn was interviewed by

5  Affiant."  That's you; right?

6  A.   Yes, ma'am.

7  Q.   "And Detective Storey and HSI agents on scene."

8  A.   Okay.

9  Q.   Could you tell us what happened with that interview?

10  A.   When we spoke to him on scene, you mean?

11  Q.   Yes.  First let me ask you, you, Detective Storey,

12  and who are the other HSI agents are who interviewed

13  Mr. Blackburn on scene?

14  A.   I believe what it should have said is, spoke to, but

15  we can go with interview.  We spoke to him on scene and

16  just talked to him about different things that were going

17  on.

18      I know that Detective Storey spoke to him about his

19  clothing, getting him dressed and stuff like that.  And

20  then the other times that I would say I spoke to him would

21  be involving like, why are you here.  Okay, you're the

22  babysitter, where are the parents?  About the children,

23  things like that.

24  Q.   All right.  Did you tell him why you guys were there?

25  A.   Yes, ma'am.

1    Q.    And what did you say?

2    A.    That we were there for a welfare check on the

3    children.

4    Q.    Is that all you said?

5    A.    Initially, yes, that that was the original reason

6    that we went to the house.

7    Q.    Well, Keifer Orfield testified yesterday that you

8    said something about child pornography.

9    A.    That was later when the images were discovered.

10   Q.    So at that point, people -- who said what about child

11   pornography?

12   A.    Probably when Agent Langer spoke to me, that he had

13   found images on the Defendant's phone.

14   Q.    But then you spoke to other people in the house about

15   the child pornography?

16   A.    No.  I believe I would have only spoke to Detective

17   Sabaugh about it.  Well, I might have said something else

18   to Agent Langer about the images and saying that they were

19   the kids.

20       But, no, we never spoke specifically to Keifer

21   Orfield in the time that I was there about child

22   pornography or anything like that.  We did speak to him

23   about it I think during the interview at the station.

24   Q.    But you don't know how he would have heard that at

25   the house?  Because that's what he testified, right,

1  yesterday, that he understood that you were there because

2  you were looking for child pornography?

3  A.   I think what he said was that we were there because

4  of child abuse, child assault, and possible child

5  pornography.

6  Q.   Right.  So how would he have heard that?

7  A.   I can't answer that, ma'am.

8  Q.   When you first got to the house, we already talked

9  about this, but when you first got to the house, you said

10 that you asked for consent to come in.

11 A.   Yes, ma'am.

12 Q.   Can you tell us, you asked for consent for what?

13 What did you tell Mr. Blackburn at the door?

14 A.   Well, it was Detective Sabaugh that spoke to

15 Mr. Blackburn at the door.

16 Q.   What did she say?

17 A.   That we were there for a welfare check, and since

18 it's a knock and talk, it's implied that we need consent.

19 Q.   It's implied to who?

20 A.   To other law enforcement, to ourselves, as a part of

21 the Ops Plan.  Without having legal authority to bypass

22 the door, if Michael hadn't granted us consent to go in,

23 we wouldn't have gone in.

24 Q.   But what did you tell him you needed consent for?

25 A.   Oh, we would like to --

1  Q.   You get to the door and you say, hi, we're law

2  enforcement.

3  A.   Yes.  She introduced herself, said, I'm Detective

4  Sabaugh from BCSO, we're here -- I believe she referred to

5  it as a welfare check on the children.  We'd like to come

6  inside and speak to you, check on the children, is that

7  okay?

8  Q.   And so at that time, neither of you said anything

9  that there was any suspicion of criminal activity, or that

10  anybody could potentially be a suspect?

11  A.   No, not to my knowledge, ma'am.  I don't remember

12  saying that.

13  Q.   Okay.  So before we leave the house and go to the

14  station, I don't think -- at some point Agent Sabaugh goes

15  upstairs to Michael Blackburn's bedroom to get clothes for

16  the girl; is that correct?

17  A.   I don't know if that's correct.  I thought that

18  Detectives Storey and Hawkes had got clothes for the

19  children.

20  Q.   So you think that Detectives Hawkes and Storey went

21  into Mr. Blackburn's bedroom and got clothes for the

22  child?

23  A.   No, I think he went in the kids' bedroom and got

24  clothes for the child.  I don't think anybody ever

25  referred to it as Michael's bedroom.

1   Q.   Did you ever have an opportunity to see the whole

2   house?

3   A.   Briefly.  Like I said, I was coordinating a lot of

4   things where I was outside and trying to make phone calls

5   and stuff.

6   Q.   You're the Case Agent; right?

7   A.   Yes, ma'am.

8   Q.   Did you eventually go back and execute the search

9   warrant?

10  A.   Oh, no, I didn't.  I was actually in on the

11  interviews.

12  Q.   Are you responsible for basically what goes on in the

13  case as the Case Agent?

14  A.   Yes, I would assume.

15  Q.   So correct me if I'm wrong, it sounds like you didn't

16  know that it's the same bedroom, that Mr. Blackburn and

17  the children slept in one bedroom.  Did you know that?

18  A.   Oh, yes, I knew that.

19  Q.   Okay.  So when I referred to Mr. Blackburn's bedroom,

20  it's the same as the children's bedroom; right?

21  A.   Yes, it is.

22  Q.   So two officers went upstairs to Mr. Blackburn and

23  the children's bedroom to get clothes, to the best of your

24  knowledge?

25  A.   No, I can't specifically say, because you had just

1   said that you thought Detective Sabaugh had done it.  So I

2   can't specifically say who got clothes for Jane Doe No. 1.

3   Q.   So you don't know who went, but you know that some

4   law enforcement agent went upstairs to Mr. Blackburn's

5   bedroom?

6   A.   Yes.

7   Q.   Okay.  And Agent Altamirano went up to

8   Mr. Blackburn's bedroom to get the telephone that Franque

9   told her about; right?

10  A.   That's not how I understood it to happen.  I

11  understood that Franque went up and got the phone.

12  Q.   So did you understand that Agent Altamirano went

13  upstairs at all?

14  A.   I think she went with Franque, yes, ma'am.

15  Q.   Okay.  So Agent Altamirano went with Franque --

16  A.   Ms. Hatten.

17  Q.   I'm sorry?

18  A.   Ms. Hatten, but I don't know -- Franque; Ms. Hatten.

19  Q.   Ms. Hatten.  So Agent Altamirano went with Franque

20  Hatten upstairs to Mr. Blackburn's bedroom to get the

21  telephone, Mr. Blackburn's telephone; correct?

22  A.   I don't know if the phone was in the kids' bedroom or

23  the parents' bedroom.  I just know that Agent Altamirano

24  went upstairs with Franque, Franque got the phone, gave it

25  to her, and they came back downstairs.

1  Q.   Okay.  So then it sounds like Agent Altamirano, who

2  is going to testify later, is the one who can testify to

3  that?  You don't know the answer to that; right?

4  A.   No, I don't know specifically where the phone was

5  located, ma'am.

6  Q.   Okay.  So you testified that you transported Michael

7  Blackburn to the station at 8:30 in the morning --

8  A.   Yes, ma'am.

9  Q.   -- correct?  And you arrived at 7:15, so you had been

10  there about an hour and 15 minutes; right?

11  A.   Yes, ma'am.

12  Q.   And you talked a little bit about where people were,

13  but there were seven agents in the house for an hour and

14  15 minutes.  Do you know what all these seven agents were

15  doing for that hour and 15 minutes?

16  A.   Well, I know that Agent Langer and Agent Altamirano

17  were in the living room most of that time with Franque

18  Hatten, Keifer Orfield, Michael Blackburn.  I don't think

19  they were all in the house for that entire time, because

20  other people stepped out to either make phone calls or try

21  to get stuff going with like CYFD.

22      I know that myself and Theresa, Detective Sabaugh,

23  were outside a lot of that time, like on the phone with

24  our superiors and then CYFD, Victim Witness Coordinator,

25  trying to get in touch with All Faiths to see if we could

1   get emergency interviews for the kids, and stuff like

2   that.  So, no, I can't account for where everyone was for

3   the entire time in the building.

4   Q.   For the hour and 15 minutes.  You didn't have a

5   search warrant; right?

6   A.   No, ma'am.

7   Q.   And you didn't apply for one?  You didn't apply for a

8   search warrant?

9   A.   Not until later that night, yes, ma'am.

10  Q.   So you do know how to apply for a search warrant?

11  A.   Oh, certainly.

12  Q.   Because like you said, later you applied for a search

13  warrant for the phone; right?

14  A.   Yes, ma'am.

15  Q.   And did you apply for other search warrants?

16  A.   Yes, ma'am.  I applied for a search warrant for both

17  e-mails, for the phone, and for the residence.

18  Q.   So at the house, did you ever read Mr. Blackburn his

19  Miranda warnings?

20  A.   No, ma'am.

21  Q.   Did anybody give him his Miranda warnings at the

22  house?

23  A.   No, ma'am.

24  Q.   So when you transported him to the station at 8:30,

25  at what point did you search him?

1   A.   Did we search him?

2   Q.   Yes.  Did you search him in the house before you

3   cuffed him?  Did you search him when you got to the

4   station?

5   A.   Agent Bonza searched him at the house prior to us

6   transporting him.

7   Q.   And then you handcuffed him?

8   A.   I think he cuffed him first.  But, yes.

9   Q.   Okay.  And was he cuffed in front or in back?

10  A.   In back.

11  Q.   And then you said he was put in your car?

12  A.   Yes, ma'am.

13  Q.   And was he still cuffed in your car?

14  A.   Yes, ma'am.

15  Q.   Behind him?

16  A.   Yes, ma'am.

17  Q.   And then you brought him down to the station?

18  A.   Yes, ma'am.

19  Q.   And you put him in the room that we saw in the video;

20  right?

21  A.   Yes, ma'am.

22  Q.   And is that a locked room?

23  A.   Yes, it is.

24  Q.   So as he sits in there, he couldn't get out on his

25  own?

1   A.    No, ma'am.  He would have had to have knocked or made

2   some sort of gesture.

3   Q.    Asked for help or something to get out?

4   A.    Yes, ma'am.

5   Q.    So he was in there by himself the entire time; right?

6   A.    Yes, ma'am.

7   Q.    And you didn't come in to interview him until, I

8   think we saw in the video 12:30?

9   A.    Yes, something like that.  12:31, I think.

10  Q.    And you didn't actually give him something to eat

11  until 2:00?

12  A.    Yeah.  None of us had anything to eat until the

13  Sergeant brought pizza.

14  Q.    At 2:00; right?

15  A.    Yes, ma'am.

16  Q.    So you and Agent Sabaugh finally came into the room

17  at 12:30?

18  A.    Okay.

19  Q.    So it had been four hours since he had been

20  handcuffed and transported to the station; right?

21  A.    Okay.

22  Q.    Does okay mean that's correct?

23  A.    Yes, ma'am.

24  Q.    So when you went in at 12:30, you still had your

25  weapon on?

1    A.    Yes, ma'am.

2    Q.    And Detective Sabaugh had hers on, as well; right?

3    A.    No, I don't believe she had her weapon on at that

4    time.

5    Q.    I'll play a little video clip, and we'll just look at

6    it.  So I'll just ask, in a minute, can you be ready?  Oh,

7    you're ready?  Okay.

8         So, when you got in there, you handed Michael

9    Blackburn a sheet of paper called Statement of Rights?

10   A.    Yes, ma'am.

11   Q.    And these are a list of important Constitutional

12   rights?

13   A.    Yes, they are.

14   Q.    And they're frequently referred to as Miranda

15   warnings; right?

16   A.    Yes, ma'am.

17   Q.    And that's because they come from the United States

18   Supreme Court case of Miranda?

19   A.    The Arizona, yes, ma'am.

20   Q.    And so when you were in there, you didn't read these

21   important Constitutional rights to Mr. Blackburn; right?

22   A.    No, ma'am.

23   Q.    And Officer Sabaugh didn't read them?

24   A.    No, ma'am.

25   Q.    You just handed him this piece of paper; right?

1  A.    Yes, ma'am.

2  Q.    Now, if you had read him the rights, you would agree,

3  then, there wouldn't be a question of whether he had been

4  informed of his rights under the Miranda decision; right?

5  If you had actually read them and we saw in the video that

6  you had read them, there wouldn't be a question?

7  A.    I don't think there's a question.  I think he read

8  them.

9  Q.    You think he read them?

10  A.    I think he read them.

11  Q.    Well, we'll talk about whether he read them, but I'm

12  saying, you did not read them?

13  A.    No, I did not.

14  Q.    And would you agree with me if you had read them,

15  there wouldn't be a question, because we would hear that

16  you read them and we would know that he was advised of his

17  rights; is that correct?

18  A.    No, I don't like the way you're phrasing that.  I

19  think the way you're assuming it isn't the way I would

20  assume it.  You're asking me to agree with you on

21  something.

22  Q.    So you don't agree that if we saw you read them, we

23  would know he was informed of his rights?

24  A.    I guess I know he was informed of his rights, but you

25  would know better, would be a better way to phrase it.

1   Q.   Okay.  So somebody looking at and evaluating your

2   conduct, if they saw you reading the rights, there

3   wouldn't be a question; right?

4   A.   There would not be a question.

5   Q.   They would know you had read them and he was advised

6   of his rights?

7   A.   Yes, ma'am.

8   Q.   Now, it sounds like you've had a lot of training,

9   you've worked with different agencies, so what kind of

10  training have you had on the Miranda decision?

11  A.   We had Constitutional Law in both the United States

12  Border Patrol Academy, which was about 20 weeks, and then

13  again briefly in the Air Marshal Academy, because

14  obviously that wasn't a primary focus.  We were more of a

15  security force.  And then again in the Criminal

16  Investigator Academy, and then in ICAC.

17  Q.   Okay.  So it sounds like you had a lot of training on

18  this important Supreme Court decision; right?

19  A.   Yes, ma'am.

20  Q.   And the Supreme Court found that if somebody is in

21  custody and they're being interrogated, it's essential

22  that they be advised of their Constitutional rights?

23  A.   Yes, ma'am.

24  Q.   And on the form that you all use -- you're using that

25  Immigration and Customs Enforcement form; correct?

1    A.    Yes, ma'am.

2    Q.    So there are seven of them; right?  Seven -- let me

3    just go through them.

4    A.    Okay.

5    Q.    "Before we ask you any questions, it is my duty to

6    advise you of your rights."

7    A.    Uh-huh.

8    Q.    What does that mean to you?

9    A.    Before I ask him any questions, he needs to be aware

10   of his Miranda rights.

11   Q.    Right.  And the reason that's important, right, is

12   because an individual who may be a suspect in a crime, or

13   is a person of interest, needs to know that they have a

14   right not to talk to law enforcement; right?

15   A.    Yes, ma'am.

16   Q.    And because sometimes the presence of law enforcement

17   can be intimidating or overbearing; right?

18   A.    Yes, ma'am.

19   Q.    And somebody might feel like, oh, I have to answer

20   these questions because law enforcement is asking me?

21   A.    Yes, ma'am.

22   Q.    But the Supreme Court thought it was important enough

23   that you law enforcement had to advise that citizen that

24   they didn't have to talk to you?

25   A.    Yes, ma'am.

1  Q.    And also in that sentence is that it's your duty to

2  advise of their rights; right?

3  A.    Yes, ma'am.

4  Q.    The second line says:  "You have the right to remain

5  silent."  What does that mean to you?

6  A.    That he has the right not to talk.

7  Q.    And the whole reason that's important, right, is what

8  we were talking about, people might feel like they have to

9  respond to police officers?

10  A.    Yes, ma'am.

11  Q.    And people need to know they have a right not to

12  incriminate themselves if they don't want to?

13  A.    Yes, ma'am.

14  Q.    "Anything you say can be used against you in court or

15  other proceedings."  That's important, isn't it?

16  A.    Yes, ma'am.

17  Q.    Because sometimes people make statements, and then

18  those statements get used against them in court?

19  A.    Yes, ma'am.

20  Q.    So people need to know they have a right to not make

21  those statements; right?

22  A.    Yes, ma'am.

23  Q.    Number 4:  "You have the right to consult an attorney

24  before making any statements or answering any questions."

25  Would you agree that means people have a right to talk to

1    an attorney?

2    A.    Yes, ma'am.

3    Q.    And the reason that it might be important to talk to

4    an attorney is they're schooled in the law in the rules of

5    law; correct?

6    A.    Yes, ma'am.

7    Q.    And they may be able to advise the client of whether

8    it is in their best interests to talk to law enforcement?

9    A.    Yes, ma'am.

10   Q.    "If you cannot afford an attorney, one will be

11   appointed for you before any questioning, if you wish."

12   So would you agree that means, even if you're poor and you

13   don't have money to go out and hire an attorney, our

14   system thinks it's so important, we're going to appoint an

15   attorney for you to consult with?

16   A.    Yes, ma'am.

17   Q.    "If you decide to answer questions now, you still

18   have the right to stop the questioning at any time, or to

19   stop the questioning for the purpose of consulting with an

20   attorney."  So, again, the Supreme Court is reiterating

21   how important it is that you can start, and you might

22   think it's a bad idea, and you can stop; right?

23   A.    Yes, ma'am.

24   Q.    Stop at any time.  And, again, you can stop because

25   you want to talk to an attorney?

1  A.    Yes, ma'am.

2  Q.    So from your training and education, you recognize

3  how important those rights are; right?

4  A.    Certainly.

5  Q.    And you handed him a piece of paper; correct?

6  A.    Yes, ma'am.

7  Q.    And you kept talking?  You kept talking to him?  You

8  handed him a piece of paper, and you kept talking to him;

9  right?

10  A.    Yes, ma'am.

11  Q.    So you didn't let him sit there and silently read

12  these seven important rights?  You kept talking to him;

13  correct?

14  A.    I did keep talking to him.

15  Q.    It struck me that this is unlike how you acted later

16  in the video when you were showing him pictures and asking

17  him to identify them.  You would show him a picture, ask

18  him to identify them, and you would ask him to tell you

19  what it was, and then you would tell him what to write on

20  the picture, and you would be silent while he was writing.

21  It seemed like you acted very differently, did you not?

22  A.    I don't know if I was acting very differently, ma'am,

23  I'm sorry.

24  Q.    Well, so that kind of leads me to my next question.

25  In all of your training, is that a technique you were

1  trained in, to talk to somebody when you hand them the

2  Miranda warning sheet?

3  A.   Oh, no.  We weren't specifically trained on how to

4  advise Miranda.  We were trained that we had to advise

5  Miranda.

6  Q.   But your goal is to get a suspect to talk to you, is

7  it not?

8  A.   My goal is to make sure that the suspect is aware of

9  his rights, and if he wants to talk to me, to talk to me.

10  Q.   But when you go in the room, aren't you hoping that

11  the suspect is going to talk to you?

12  A.   I hope that he would talk to me, yes.

13  Q.   Okay.  So you get trained in how to get suspects to

14  talk to you; correct?

15  A.   I'm trained on how to interview, yes, ma'am.

16  Q.   I would assume you get a lot of training.  Isn't that

17  kind of like one of the hearts of your profession,

18  interviewing?

19  A.   It is, but, no, we don't have an exorbitant amount of

20  it due to the curriculum and stuff that you have to get

21  through.  But it is a part of it.  We do receive some

22  training in interviewing.

23  Q.   And different techniques; right?

24  A.   I wouldn't say different techniques.  Like, I've

25  never been to a Reed School or anything like that.

1   Q.   But that's an example of interviewing techniques;

2   right?

3   A.   Yeah.

4   Q.   So there are different techniques?

5   A.   Yes, ma'am.

6   Q.   Okay.  So you've been trained in how to interview or

7   interrogate somebody; correct?

8   A.   Yes.

9   Q.   So my question is, then, that's not a particular

10  technique that you were taught, that you hand the form

11  with the rights and keep talking to him?

12  A.   Oh, no, ma'am.

13       MS. HENDERSON:  Objection, your Honor.  Asked and

14  answered.

15       THE COURT:  Are you moving on?

16       MS. KATZE:  Yes, I am.

17       THE COURT:  Okay.

18  BY MS. KATZE:

19  Q.   So when you handed him the paper, do you think it's

20  fair to say that he literally didn't have time to try to

21  read the seven Statements of Rights?

22  A.   No, I don't think that's fair.

23  Q.   So you think that -- I want to play the clip for you,

24  just so you can have another chance to look at it.  You

25  think that he had plenty of time to read those seven

1  things that I just read to you?

2  A.   Yes, ma'am.

3        MS. KATZE:   Okay.  Richard, could we just play

4  the clip?  And actually, I think, can you get it to two?

5  Because there's a little period where he's sitting in

6  there.

7  BY MS. KATZE:

8  Q.   We'll just play -- I'm just going to play from when

9  law enforcement gets in until the end of the clip.  And if

10  you could, because it's short, just pay attention to what

11  everybody's doing.  But I can play it again if I need to

12  for you.

13  A.   Okay, ma'am.

14        MS. KATZE:   Go back to where they come in,

15  please.  Okay, that's fine.  I know at first there's just

16  a little bit of like biographical stuff.

17        (Video recording played)

18  BY MS. KATZE:

19  Q.   So you had an opportunity to see a minute or so;

20  right.

21  A.   Yes, ma'am.

22  Q.   And the entire time when you give him that piece of

23  paper, either you or Detective Sabaugh are talking to him;

24  is that fair to say?

25  A.   Most of the time, yes.

1   Q.    There's not like a moment of silence.  You don't

2   pause to let him read it; correct?

3   A.    I didn't pause to let him read it silently, no,

4   ma'am.

5   Q.    And while I'll agree there are times when it appears

6   that he drops his eyes to look at the paper, he certainly

7   is making eye contact with you and Detective Sabaugh, as

8   well; right?

9   A.    Yes, ma'am.

10  Q.    And so it's not -- so in that period of time -- so,

11  now I've just paused it, because now apparently he's done

12  reading, or you've decided it's time for him to sign the

13  sheet because now you're getting ready to get him to go

14  over to the table; right?

15  A.    Yes, ma'am, we're moving to the table.

16  Q.    So the first thing I wanted to point out, the first

17  thing you said to him is, you referred to this Statement

18  of Rights form as a waivers form.

19  A.    Yes, sir.

20  Q.    So not a Statement of Rights form, a waivers form;

21  right?

22  A.    Yes, ma'am.

23  Q.    And then you told him that he needed to sign that

24  he'd received them?

25  A.    Yes, ma'am.

1   Q.    But that's not what this is; right?  What this says,

2   it's not that he received the rights; correct?

3   A.    No, ma'am.

4   Q.    So those are two kind of incorrect things that you

5   said to him; right?  You told him, this is a waiver form,

6   and then you said, you need to sign that you received it.

7   And that's not correct?

8   A.    No, he needed to initial that he received it.

9   Q.    But you told him he needed to sign that he received

10  that?

11  A.    Yes, ma'am.

12  Q.    And then you directed him over to the table; right?

13  A.    Yes, ma'am.

14  Q.    And you told him -- and we can go finish the video,

15  but you told him to put his initials next to them to show

16  that he had read them?

17  A.    And understood them, yes.

18  Q.    But you never asked him if he read those seven

19  statements; right?

20  A.    No, I asked him to put his initials next to the

21  statement if he had read them and understood them.

22  Q.    My question is, you never asked him if he read those

23  seven statements?  Do you want me to play it again?

24  A.    No, no.

25  Q.    Did you ever say, okay, so did you read these?

1  A.   No, I asked him to initial if he read and understood

2  them.

3  Q.   Could you just answer my question, please?

4  A.   Yes, ma'am.  I didn't specifically say, did you read

5  your rights.

6  Q.   And then you said:  "This says you're willing to talk

7  to us, I just need you to sign and print your name."

8  A.   Yes.

9  Q.   But you never asked him if he was willing to talk to

10 you; is that correct?

11 A.   No.

12        MS. KATZE:  Here, just play to the end of the --

13 yeah.  I just want to ask about one other thing.

14       (Video recording played)

15 BY MS. KATZE:

16 Q.   Okay.  "Now that that silliness is out of the way."

17 That's what you said; right?

18 A.   Yes, ma'am.

19 Q.   And on Direct Exam, you referred to that as a poor

20 turn of a phrase.

21 A.   An unfortunate turn of phrase, yes.

22 Q.   Let's see if your actions show that you think these

23 Constitutional rights, these Miranda warnings, are silly.

24 They weren't important enough for you to read them to him;

25 correct?

1   A.    No, I didn't read them to him, ma'am.

2   Q.    They weren't important enough for you to ask him if

3   he actually had read them; correct?

4   A.    I didn't specifically say that, but I did ask him to

5   initial next to them if you read them.  Because if you go

6   back to that clip, it says:  "I need you to understand

7   them."  And then I asked him:  "If you read these, put

8   your initials next to them."  So I didn't specifically ask

9   him, had he read them, I assumed it on the initials,

10  ma'am.

11  Q.    So you didn't specifically ask him if he read them?

12  A.    No, ma'am.

13  Q.    And you didn't specifically ask him if he understood

14  them; correct?

15  A.    I didn't specifically ask him, no ma'am.

16  Q.    And those Miranda Constitutional rights, that

17  silliness, those Constitutional rights were not important

18  enough for you to ask him if he wanted to speak to an

19  attorney; correct?

20  A.    No, ma'am, I didn't ask him if he wanted to speak to

21  an attorney.

22  Q.    And they weren't important enough for you to ask him

23  if he wanted to waive those rights?  You never said, now

24  that we've gone over those rights, do you want to actually

25  waive those rights?

1   A.   No, ma'am, I didn't specifically ask him if he wanted

2   to waive those rights.

3            MS. KATZE:  Your Honor, may we have a minute,

4   please?

5            THE COURT:  Sure.

6            MS. KATZE:  I have nothing further.  Thank you.

7            THE COURT:  Is there Redirect?

8            MS. HENDERSON:  Only briefly, your Honor.

9            MS. KATZE:  Your Honor, the witness was handed

10   something.  Can I just ask what it is?

11            MS. HENDERSON:  I was just about to put that on

12   the record.  I just gave Special Agent Breen a copy of the

13   transcript that I believe is Government's Exhibit 38.

14            MS. KATZE:  I'm sorry, a transcript of?

15            MS. HENDERSON:  Of the video.

16            MS. KATZE:  Okay.

17                      REDIRECT EXAMINATION

18   BY MS. HENDERSON:

19   Q.   So, you were just asked several questions about the

20   time period where you were going over the Miranda warnings

21   with the Defendant, and I know that the Court has seen the

22   video several times and we have discussed this during your

23   Direct.  However, I'd like to focus you quickly to Page --

24            THE COURT:  What exhibit is this, just so I can

25   follow you?

1        MS. HENDERSON:  38, your Honor.

2        THE COURT:  Thank you.  And what page on 38?

3        MS. HENDERSON:  Page 5, your Honor.

4        THE COURT:  Thank you.

5   BY MS. HENDERSON:

6   Q.   Special Agent Breen, I'd like to direct your

7   attention to Lines 21 through 23.

8   A.   Yes, ma'am.

9   Q.   Can you read those out loud, please?

10  A.   "Special Agent Breen:  So you understand these?

11  Would you mind just putting your initials right next to

12  them to show that you have read those rights?"

13  Q.   And are you referring to the seven rights that are at

14  the top of the Statement of Rights form?

15  A.   Yes, ma'am.

16  Q.   So you did ask him if he understood them?

17        MS. KATZE:  Objection.  Leading.

18  A.   Yes, ma'am.

19        THE COURT:  Overruled.

20  BY MS. HENDERSON:

21  Q.   And did you ask him if he would mind putting his

22  initials next to them, if he had read those rights?

23  A.   I did ask him to put his initials next to them

24  showing that he read those rights.

25  Q.   I know the video in areas is not the clearest.  You

1    were in the room with him?

2    A.    Yes, ma'am.

3    Q.    And when you gave him the paper, what did you

4    observe?

5    A.    It appeared that he was looking down and reading the

6    paper while we were talking to him.

7    Q.    So did you have any reason to believe, when you asked

8    him to sign his initials that he understood and read his

9    rights, that he hadn't actually done so?

10   A.    No, ma'am.  As far as I knew, he understood his

11   rights.

12   Q.    I wanted to go back to the house and just follow up

13   on a few questions to clarify a few things.

14   A.    Yes, ma'am.

15   Q.    When you're doing a knock and talk, on Cross you said

16   that there is a required minimum of six officers.

17   A.    Yes, ma'am.

18   Q.    Why is that?

19   A.    It's for officer safety.  Our office states that we

20   need to have people available to knock on the door, and

21   then you would have security for those individuals if for

22   some reason something untoward happened at the door, and

23   then you have perimeter security to make sure that other

24   people don't wander into the scene, or if someone is

25   coming back that you've not accounted for, that they pose

1  a threat to the agents that are on scene.

2  Q.   You also talked about that there's at least seven

3  officers or agents when you conducted the knock and talk.

4  A.   Yes, ma'am.

5  Q.   And then there was questions about whether or not

6  other officers were coming to the house.  Did any other

7  officers or agents show up to the house later that day?

8  A.   I believe that throughout the day, different agents

9  showed up to assist in securing the house, to help with

10  the children, and then during the execution of the search

11  warrant.

12  Q.   What happened after you -- or what is your

13  understanding of what happened after you left the house

14  with the Defendant?

15  A.   After we left the house with the Defendant, the

16  agents that were on scene waited for CYFD to show up to

17  take the children from our Victim Witness Coordinator.

18  After the children were gone, I believe Franque Hatten and

19  Keifer Orfield were dressed and I believe they left at

20  that time and came down to the station in, I guess it was

21  the Mitchells' car.  And then all the agents, as they were

22  leaving, all the agents left and secured the scene to wait

23  for the warrants to be written.

24  Q.   Did you speak to any of the other officers,

25  specifically APD Storey and -- I'm sorry, the other

1  officer, the other APD Detective --

2  A.    Hawkes.

3  Q.    -- in preparation for this hearing?

4  A.    Yes, ma'am.

5  Q.    Did you ask them about whether or not they searched

6  the house?

7  A.    Yes, ma'am.  We asked if they had started searching

8  prior to the execution of the search warrant.

9          MS. KATZE:  Objection, your Honor.  Outside the

10  scope of cross.

11         MS. HENDERSON:  Your Honor, she specifically

12  asked questions about whether or not he knew what they did

13  upstairs on Cross.

14         THE COURT:  Overruled.

15  A.    Yes, we specifically spoke prior on July 28th.

16  BY MS. HENDERSON:

17  Q.    And what did they say?

18  A.    We asked if they had begun searching the house prior

19  to the issuance of the search warrants, and they stated,

20  no.

21  Q.    What time was the search warrant issued to you that

22  day?

23  A.    9:00.  9:00 P.M.

24  Q.    And what time did the Federal search warrant begin?

25  A.    9:00 P.M.  We called to let them know that the judge

1   had signed the search warrant.

2   Q.   You were also asked why none of your reports stated

3   anything about receiving consent from Mr. Blackburn.  What

4   was your understanding when you wrote your reports and

5   your Complaint about receiving consent?

6   A.   Because we referred to it as a knock and talk, that

7   had consent not been granted, we wouldn't have been

8   allowed to enter the house.  It's part and parcel with the

9   term.  You have no authority to enter unless granted

10  consent by the people there.

11  Q.   Did your report in the Complaint refer to a knock and

12  talk throughout?

13  A.   Yes, ma'am.

14  Q.   You also were asked a question about whether or not

15  everybody was free to leave.  Throughout the entire time

16  that officers were at the Mitchells' apartment, were

17  Mr. Orfield and Ms. Hatten free to leave?

18  A.   Yes, ma'am.

19  Q.   During the entire time period -- well, let me ask

20  this:  When you first arrived at the house, was

21  Mr. Blackburn free to leave?

22  A.   Yes, ma'am.

23  Q.   At what point did you believe that you had reasonable

24  suspicion to detain the Defendant at the house?

25  A.   After we were contacted by Ms. Hatten outside and she

1  told us that she believed that he was assaulting the kids.

2  Q.   So at that point, if he had asked to leave, would you

3  have let him leave?

4  A.   No, ma'am.

5  Q.   What time did you believe that you had probable cause

6  to arrest the Defendant at the house?

7  A.   8:30.  When I saw -- I'm sorry; when I saw the

8  pictures on his phone.

9  Q.   While you were at the house, did you ever ask the

10 Defendant anything that would implicate him?

11 A.   No, ma'am.

12 Q.   We talked about that you went to the front of the

13 house after you saw the images.  What was that discussion?

14 A.   That was when I spoke with Detective Sabaugh, that

15 the images were found on Mr. Blackburn's phone, and it

16 would be better for him to not be spoken to with the other

17 adults in the house, and that we were going to ask him to

18 come down to the station and talk to us.

19 Q.   At that time, did you ask him any follow-up questions

20 about the images themselves?

21 A.   No, ma'am.

22 Q.   Are you aware of whether or not Agent Langer asked

23 him any specific questions about the images?

24 A.   No, ma'am, I'm not.

25         MS. HENDERSON:  No further questions, your Honor.

1          THE COURT:  I've got a few.  Let me ask my

2    questions, and I'll let counsel follow-up.

3          You were asked earlier -- I mean, you're the Case

4    Agent in this Federal prosecution?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Now, this was a dual, I take it, with

7    the Bernalillo County Sheriff's Office, or Detective, as

8    well as -- was there a detective from the Albuquerque

9    Police Department present?

10         THE WITNESS:  There was, sir.  It's a joint task

11   force that we were working on at that time called SPEED,

12   which is Sexual Predator Exploitation Enforcement Detail,

13   which was APD, Bernalillo County Sheriff's Office, and

14   HSI.

15         THE COURT:  But the Federal jurisdiction, or at

16   least as you were approaching this, that if there is child

17   pornography, then that would be Federal jurisdiction?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  If there was some form of criminal

20   sexual contact, would that, to your understanding, would

21   that have preceded in State court?

22         THE WITNESS:  Yes, sir.  That's a State charge.

23   We don't hold that charge.

24         THE COURT:  And so if the State authorities were

25   going to proceed on some form of State charge relating to

1    a criminal sexual contact offense, would you have been the

2    Case Agent?

3              THE WITNESS:  No, sir.  Detective Sabaugh is the

4    lead Case Agent on that part of the crime.

5              THE COURT:  Okay.  Do you know if State charges

6    were filed in this case?

7              THE WITNESS:  Yes, they were, your Honor.

8              THE COURT:  Okay.  So there are pending State

9    charges right now?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Now, some of this was asked

12   yesterday, and I'm going to just ask it for my benefit so

13   I don't have to read the transcript again.  But, let me go

14   over this.

15             In terms of your training and experience at the

16   time -- I know you have a different job title now, but

17   what was your job title during the time period that

18   encompassed this investigation in this case?

19             THE WITNESS:  I was a Special Agent with Homeland

20   Security Investigations assigned to the Public Safety

21   Unit, which was specifically for child exploitation.

22             THE COURT:  Now, as part of your training, did

23   you have to undergo some form of computer training,

24   information technology?

25             THE WITNESS:  Yes, sir.  I took --

1          THE COURT:  If you would, kind of summarize that

2     for me.

3          THE WITNESS:  As part of my initial training to

4     work on that unit, I went to multiple classes with

5     New Mexico State Police to utilize what's called the Child

6     Protective Service Program, which allows me to research

7     peer-to-peer networks.

8          I also had basic informational investigative

9     techniques through search.org, which is a national

10    not-for-profit training house that goes around and gives

11    classes on different investigative techniques for child

12    exploitation or fraud, or any type of investigation.  And

13    then I've had, like, basic analysis training on computers

14    to link files back and forth.

15         THE COURT:  When you use the term peer-to-peer

16    network, what do you mean by that?

17         THE WITNESS:  A peer-to-peer network is a network

18    in which people trade through their own computers.  If you

19    remember the service Napster which allowed people to trade

20    songs back and forth, or Limewire, it's similar to that,

21    but they utilize it to trade child pornography.

22         THE COURT:  Is there a particular -- when you use

23    the term peer-to-peer network, is there a particular name?

24    Like Napster was for music.  Is there a particular name

25    for child pornography?

1      THE WITNESS:  It's called a Gnutella network or

2  an Ares network, but there's a bunch of them, sir.

3  There's Bit Torrent.  There's all of these open format

4  networks.  Anywhere that you can trade like a hijacked

5  movie, a Hollywood release, you can also trade child

6  pornography on it.

7      THE COURT:  Now, this question was asked

8  yesterday, and I think you confirmed it, but for my

9  benefit, a thumb drive is the same thing as a flash drive?

10     THE WITNESS:  A thumb drive is the same thing as

11  a flash drive, yes, sir.

12     THE COURT:  Now, you used the term -- it was

13  either a SIM card or an SD card.  What term did you use?

14     THE WITNESS:  An SD card.  An SD card is actually

15  a scanned disc, which is why it's referred to as an SD

16  card.  It's like calling something Kleenex.  It's a solid

17  state drive that's used for storing data.  They have

18  regular SD cards, and then mini SD cards that you can find

19  in a lot of phones.  But it's a solid state drive used for

20  storing data.

21     THE COURT:  Now, am I correct that your

22  investigation determined that the Defendant's cellphone

23  was an iPhone 4?

24     THE WITNESS:  His original cellphone that he sold

25  at the kiosk was an iPhone 4, yes.

1          THE COURT:  What type of phone was at the

2   apartment?

3          THE WITNESS:  A Kyocera Rise.

4          THE COURT:  Okay.  So it was not an iPhone?

5          THE WITNESS:  No, sir.  He had sold the iPhone

6   and gotten a new phone.

7          THE COURT:  What did your investigation determine

8   in terms of the pictures in here, Exhibits 39, 40, 41, 42,

9   43, 44, 45, 46, 47, 48, 49, and these are the photographs,

10  some of which where the genital area has been covered up,

11  what did your investigation determine was the device used

12  to take those photographs?

13         MS. HENDERSON:  Your Honor, if I may, so he could

14  view the exhibits.

15         THE COURT:  Sure.  Basically, the photographs of

16  the children.

17         THE WITNESS:  It was starting from 36, your

18  Honor?

19         THE COURT:  Actually, well, let me be a little

20  more specific.

21         THE WITNESS:  I apologize, your Honor.

22         THE COURT:  No, I should have had you look at --

23  I was trying to be too general, I think.

24         THE WITNESS:  I have them now, your Honor.

25         THE COURT:  What is 36?  Can you just show that

1    to me?

2              THE WITNESS:  36 is the end of -- I'm sorry.  I

3    only have 39 starting in this one.

4              THE COURT:  All right, 39.

5              THE WITNESS:  36 is the e-mails, sir.

6              THE COURT:  All right, so let's go with 39.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  What did your investigation show --

9    well, maybe this is the way to ask it.  From 39 all the

10   way to 49, was the same device used to take the

11   photographs?

12             THE WITNESS:  No, sir.

13             THE COURT:  Okay.  Which device --

14             THE WITNESS:  48 and 49 were created on an

15   iPhone 4.  Those are the original images that were

16   received in the tips that showed the EXIF data, putting it

17   at Aspen Apartments.

18             THE COURT:  All right.  Now, before we go to the

19   other, for 48 and 49, if they were taken with an iPhone,

20   am I correct in my understanding that an iPhone or an

21   Apple product like that, if you're going to transmit the

22   photograph, it has to be done through some form of

23   wireless communication or wireless technique?

24             THE WITNESS:  No, your Honor.  He could have just

25   plugged it into another computer and used it like any

1    other camera.

2         THE COURT:  So you can take the phone, the

3    iPhone, to get the photos off the iPhone, and plug it

4    into some form of computer and transmit the photographs

5    that way?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Okay.  Now, the other photographs,

8    were they taken with the other phone?

9         THE WITNESS:  The photographs of Maria's nephews

10   and nieces were originally on the SD card.  They weren't

11   taken with the Kyocera Rise.  The two traded pictures,

12   which would be 41 and 42, were sent to Mr. Blackburn.

13   Those were not taken with that phone.  The other pictures,

14   43 through 47, were taken with the Kyocera Rise.

15        THE COURT:  And when the search warrant was

16   executed, was there either a desktop or a laptop computer

17   that Mr. Blackburn had?

18        THE WITNESS:  There was a laptop, an IBM laptop

19   computer, sir.  But it was broken.

20        THE COURT:  Did your investigation determine,

21   then, in order to get photographs into the peer-to-peer

22   network, how that was done?

23        THE WITNESS:  He didn't send them into the

24   peer-to-peer network.  He directly e-mailed them to people

25   that he had met through the Image Source.  And that was

1  all accomplished through his phone through a wi-fi

2  connection that allowed him to connect to the internet.

3          THE COURT:  All right.  That's what I wanted to

4  know.  I guess that was a long-winded way of getting

5  there.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  No, I didn't do a very artful job of

8  asking the question.  And the search warrants that were

9  issued, were they Federal search warrants, or State?

10         THE WITNESS:  The search warrants for the

11  residence, the two e-mails, and the cellphone were all

12  Federal search warrants.

13         THE COURT:  Okay.  So the State officers did not

14  go to State court to get a search warrant?

15         THE WITNESS:  The State officers issued a State

16  search warrant for material relating to the criminal

17  sexual penetration.

18         THE COURT:  So that was not encompassed in the

19  Federal search warrant?

20         THE WITNESS:  No, sir.

21         THE COURT:  Okay.  Ms. Katze, do you have any

22  questions in light of mine?

23         MS. KATZE:  I just have one question.

24                    RECROSS-EXAMINATION

25  BY MS. KATZE:

1  Q.   You indicated that charges were brought in State

2  court?

3  A.   I don't know if they've been brought.  I believe

4  Theresa has filed them with the D.A. and is waiting for a

5  return.  But I'm not sure if they've been -- I know that

6  the detective has forwarded the Complaints.

7  Q.   But as far as you know, it's not in court?

8  A.   Oh, no, ma'am.  I'm sorry.

9          MS. KATZE:  Thank you.  That was it.

10         THE COURT:  And Ms. Henderson, do you have any

11 questions in light of mine?

12         MS. HENDERSON:  Your Honor, just a couple to

13 clarify.

14         THE COURT:  Okay.

15                  REDIRECT EXAMINATION

16 BY MS. HENDERSON:

17 Q.   You mentioned that the State received a search

18 warrant for the house?

19 A.   Yes, ma'am.  The State issued a search warrant for

20 the house, as well.

21 Q.   And at what time did the State execute their search

22 warrant for the house?

23 A.   I believe it was approximately 7:00 P.M., but I'm not

24 100% sure on that.

25 Q.   On December 17th?

1   A.   On December 17th, yes, ma'am.

2   Q.   In response to the Judge's question about several of

3   the images, I believe with the exception of the last two,

4   you mentioned that the first two, I believe 39 and 40,

5   were on the SD card, but you took that off the phone;

6   correct?

7   A.   Yes, ma'am.  These were all -- all images from 39 to

8   47 were printed from Mr. Blackburn's phone.

9   Q.   Off the SD card in the phone?

10   A.   Yes, from connecting the phone directly to a

11   stand-alone computer.

12   Q.   And so when you told the Judge that you believed that

13   the images of Maria's family were previously on the

14   SD card, that's based off your understanding from the

15   interview of the Defendant?

16   A.   Yes, ma'am.

17          MS. HENDERSON:  Thank you.

18          THE COURT:  All right, thank you.  You may step

19   down.

20          THE WITNESS:  Thank you.

21          THE COURT:  The Government may call its next

22   witness.

23          MS. LIZARRAGA:  The United States calls Special

24   Agent Christina Altamirano.

25          MR. GARCIA:  Please raise your right hand, ma'am.

1            (CHRISTINA ALTAMIRANO, GOVERNMENT'S WITNESS, SWORN)

2            MR. GARCIA:  Please have a seat and state your

3      full name for the record.

4            THE WITNESS:  My name is Christina Altamirano.

5                        DIRECT EXAMINATION

6      BY MS. LIZARRAGA:

7      Q.   Could you please spell that for the record.

8      A.   First name is C-h-r-i-s-t-i-n-a.  Last name,

9      A-l-t-a-m-i-r-a-n-o.

10     Q.   Good morning.

11     A.   Good morning.

12     Q.   Where do you work?

13     A.   I work for Homeland Security Investigations.

14     Q.   What is your title there?

15     A.   Special Agent.

16     Q.   And what division are you currently assigned to?

17     A.   Child Exploitation.

18     Q.   How long have you been working in the Child

19     Exploitation Division?

20     A.   Approximately three years.

21     Q.   And what were you doing before you were assigned to

22     the Child Exploitation Unit?

23     A.   Before, I was in El Paso working narcotics.

24     Q.   And what agency were you working with?

25     A.   Homeland Security Investigations.

1  Q.    So how long have you been with Homeland Security

2  Investigations?

3  A.    Approximately six years.

4  Q.    And what were you doing before that?

5  A.    Army.

6  Q.    Can you give me more specifics?

7  A.    Yes.  I was mobilized for about five years doing

8  joint operations.

9  Q.    What does it mean to be mobilized?

10  A.    It's a reservist called to active duty in support of

11  any contingency operations.

12  Q.    I want to talk to you a little bit about your

13  training and experience as it pertains to child

14  exploitation.  Can you go through some of the training and

15  experience that you've received?

16  A.    Once I got to Albuquerque, I received some chat

17  training, which included the basis of predators out there

18  who lure children in order to meet up for sex.  Also, it's

19  called the Crimes Against Children Conferences, I

20  attended, and then as well as just some training at HSI.

21  Q.    The Crimes Against Children Conference that you

22  attended, do you recall some of the classes that you went

23  to?

24  A.    Yes.  It was towards children being sexually

25  exploited, the types of grooming that predators will do in

1    order to exploit children.

2    Q.   And so you were in -- were you in the Child

3    Exploitation Division back in December of 2013?

4    A.   Yes, I was.

5    Q.   And did you become involved in the investigation into

6    Michael Blackburn?

7    A.   Yes, I did.

8    Q.   Do you see Michael Blackburn here in the courtroom

9    today?

10   A.   Yes, I do.

11   Q.   Can you please identify a piece of clothing that he's

12   wearing and where he's sitting?

13   A.   He is sitting with the defense, wearing a neon shirt.

14          MS. LIZARRAGA:   Your Honor, may the record

15   reflect that the witness has correctly identified the

16   Defendant.

17          THE COURT:   The record will so reflect.

18   BY MS. LIZARRAGA:

19   Q.   All right, so I want to talk to you about how you

20   became involved in this investigation.   Can you tell me

21   how it began?

22   A.   It began with a tip from C-3, which is our Cyber in

23   D.C. unit, and it was sent to Albuquerque, and Breen was

24   assigned to that case.   And I started getting involved

25   when we were looking at the EXIF data and trying to figure

1  out exactly where the location was.  Did a couple of

2  drive-bys and some surveillance.

3  Q.   So when you're talking about the EXIF data, what do

4  you mean by that, and what had EXIF data that you were

5  looking into?

6  A.   So photos, whenever you take it, it shows kind of

7  like a fingerprint showing where the photo was taken, what

8  device took it, the time it was taken, and then the

9  location.  It shows like a geo location.

10  Q.   So what kind of photograph were you investigating?

11  A.   It was a child exploitation photograph.

12  Q.   And what did you learn about that photograph?

13  A.   We learned that the geo location was in the west side

14  of Albuquerque off of Eagle Ranch Road at an apartment

15  complex.

16  Q.   I'm showing you what's been previously admitted as

17  Government's Exhibit 48.  Do you recognize that?

18  A.   Yes, I do.

19  Q.   What is that?

20  A.   That's the first photo that was sent from C-3 that

21  had the EXIF data pinging to the west side.

22  Q.   At some point, did you receive a tip regarding

23  another photograph?

24  A.   Yes.  It was a follow-on tip from C-3 with another

25  photograph, same location.

1   Q.   I'm showing you what's been admitted as Government's

2   Exhibit 49.  Do you recognize that photo?

3   A.   Yes, I do.

4   Q.   And what is it?

5   A.   That's the second photo sent from C-3 that was taken

6   at the same location.

7   Q.   And what was significant about Government's

8   Exhibit 49 for the investigation?

9   A.   That one showed a body part of a male, pretty much

10  inserting his penis into the child.

11  Q.   Well, I don't -- I believe that, and I know that

12  these are redacted, but I believe Government's Exhibit 48

13  has that; is that right?

14  A.   Yes.

15  Q.   And I can bring them to you to look under the

16  redactions, if you need.  But with regard to being able to

17  identify -- I guess, let me just ask you this:

18  Government's Exhibit 48, do you have a face in that photo?

19  A.   No, I don't.

20  Q.   So Government's Exhibit 49, what was significant

21  about that photo?

22  A.   The child's face.

23  Q.   Okay.  So after you received this photograph, what

24  did you guys do?

25  A.   We sanitized it a little more than what it's showing

1  right now, just showing the child's face, and that's what

2  we used to show neighbors and persons of the apartment

3  complex to help us identify the child.

4  Q.   All right.  And at some point, did you receive

5  information that that child could potentially be residing

6  at 5601 Wyoming Street?

7  A.   Yes.

8  Q.   All right.  So I want to direct your attention to

9  December 17, 2013.  Were you on duty that day?

10  A.   Yes, I was.

11  Q.   And what happened on December 17, 2013?

12  A.   We met up and did a small brief, and we were going to

13  conduct a knock and talk in support of a Bernalillo County

14  Sheriff's operation.

15  Q.   I'm showing you Government's Exhibit 1.  Do you

16  recognize that?

17  A.   Yes, I do.

18  Q.   What is that?

19  A.   That's the front of the apartment that we conducted

20  the knock and talk at.

21  Q.   All right.  So I want you to take me through what you

22  remember that morning getting to the house.  Do you

23  remember what time you got there?

24  A.   Not exactly, but around 7:00.

25  Q.   Okay.  Do you remember if the sun had come up?

1   A.   Yes.

2   Q.   All right.  So what happens -- what was your role in

3   this knock and talk?  What were you there to do?

4   A.   I was a support person.  I wasn't the lead on it.  I

5   was pretty much set aside, and once we were going to make

6   entry into the house, I helped out where I could.

7   Q.   So what were you able to observe that morning when --

8   or who went up to the door?

9   A.   Detective Sabaugh and Special Agent Breen went up to

10  the door, conducted the knock and talk.  The door was

11  answered, and Detective Sabaugh stated the reason why we

12  were there.

13  Q.   Could you hear and see this going on?

14  A.   Yes.

15  Q.   I'm showing you Government's Exhibit 1.  Where were

16  you?

17  A.   I was to the left, the sidewalk area, near the second

18  bush.  First or second bush.

19  Q.   So for purposes of the record, I'm pointing to the

20  second bush on the left side of the page.  Is that about

21  where you were?

22  A.   A little further in.  No, the other way.  Like, right

23  there.

24  Q.   Right here, all right.  So what happened after

25  Special Agent Breen and Detective Sabaugh knocked on the

1  door?

2  A.   The door was answered by Michael Blackburn, and

3  Detective Sabaugh told him, we're here to conduct a child

4  welfare check.

5  Q.   And what happened after that?

6  A.   He said, okay.  And then she asked if we could come

7  in and conduct the check, and he agreed.  And then he was

8  asked if anybody else was in the house, and that we were

9  just going to do a safety sweep, just to make sure for

10  safety reasons.

11  Q.   And is that standard practice?

12  A.   It is.

13  Q.   What's the purpose of a safety sweep?

14  A.   Well, for everyone's protection.  Our protection,

15  anyone else in the home's protection.  Making sure that no

16  one readily has a weapon available to them.

17  Q.   All right.  I'm showing you Government's Exhibit 3.

18  What are we looking at here?

19  A.   This is the entryway to the apartment.

20  Q.   Okay.  So at the point that you go inside, do you

21  remember who was inside the house at that point?

22  A.   Yes.  Once we made entry into the house, Blackburn

23  was kind of to the side.  One of the children was coming

24  down the stairs, and as we walked down that hallway, in

25  the living room two people were there, and that's who

1  Blackburn told us was going to be there.

2  Q.   So Blackburn informed you about who was in the house?

3  A.   He said, yes, two other people were sleeping in the

4  living room.

5  Q.   Okay.  I'm showing you Government's Exhibit 11.  Do

6  you recognize that?

7  A.   Yes.

8  Q.   What is that?

9  A.   That's the living room.

10 Q.   Did you stay at the front of the house, or what did

11 you do once you got inside?

12 A.   Once I got inside, I flowed towards the living room

13 area.

14 Q.   And who was in there?

15 A.   Franque Hatten and Keifer Orfield.

16 Q.   And did you make contact with them?

17 A.   Yes, we did.

18 Q.   What did you tell them?

19 A.   We told them who we were and what we were doing

20 there, just conducting a welfare check.

21 Q.   At that point, or I guess at any point, did anyone

22 ever ask to leave the house?

23 A.   No.

24 Q.   Did you ever hear anyone ask you to leave the house?

25 A.   No.

1    Q.    All right.  So what happens after you make contact

2    with Ms. Hatten and Mr. Orfield?

3    A.    At that point, we allowed them to get dressed and

4    asked them if we could get them additional clothing.  We

5    allowed them to put additional clothing on, because they

6    were asleep when we came in.

7         Once that occurred, Blackburn moved towards the

8    living room, as well, and all three personnel were in

9    there.  Special Agent Langer began talking to Blackburn at

10   that point.

11   Q.    And do you remember what he was talking to him about?

12   A.    SA Langer had asked him if he had a cellphone, an

13   iPhone in particular, and Blackburn had told him that he

14   had sold his iPhone at a kiosk.

15   Q.    We're still looking at Government's Exhibit 11, so

16   who all is in this room?

17   A.    So in this room is Hatten, Orfield and Blackburn.

18   Q.    And what law enforcement?

19   A.    It's myself, Special Agent Langer and Special Agent

20   Bonza.

21   Q.    Okay.  So what happened after -- you stated that you

22   were in there with the individuals.  What happened after

23   that?

24   A.    Once Blackburn started speaking to Special Agent

25   Langer, Hatten came up to me and asked if she could talk

1  to me outside.

2  Q.   And what did you tell her?

3  A.   I said, sure, give me one second, and I let Special

4  Agent Langer know that we were going to step outside.

5  Q.   And did you step outside?

6  A.   Yes, we did.

7  Q.   Where did you go?

8  A.   We went back to the front of the residence.

9  Q.   And what happened once you got outside?

10  A.   She asked me if we were there because her mom called

11  us.

12  Q.   Did you know what she was talking about?

13  A.   No, I did not.  And I asked her to elaborate on that.

14  Q.   What did she tell you?

15  A.   She told me that a couple of days prior to the

16  17th, she had called her mom because she felt that

17  Blackburn was sexually abusing the children.  I asked her

18  why she thought that, and she said that the kids were

19  hypersexual, and that on Saturday, once the children's

20  parents left, Blackburn had went upstairs with the

21  children.  They had just woken up, but he said they were

22  going down for a nap.  She had received a call from

23  Ms. Mitchell, the children's mother, who said that she

24  wanted to speak to Blackburn, so she went upstairs and

25  tried to open the door, and it was locked.  She heard one

1   of the kids saying, no, and then Blackburn came to the

2   door.

3   Q.   And so at this point, did you have any suspicion

4   about who the offender might be?

5   A.   At that point, I thought it was Blackburn.

6   Q.   And you testified you had seen the pictures prior to

7   going to the house that day?

8   A.   Yes.

9   Q.   All right.  And so, were you aware -- when you got to

10  the house, were you aware of whether or not there were any

11  children in the house?

12  A.   No.  Just the information that we received that the

13  Mitchells had moved to that area.

14  Q.   Once you got inside the house?

15  A.   Once he opened the door, I saw one of the victims.

16  Q.   Okay.  So after Ms. Hatten told you this, what did

17  you then do?

18  A.   I called SA Breen with me and had her tell her part

19  of the story, as well, and then he left to take a phone

20  call.  And then she said, also, he's lying to you guys, he

21  does have a cellphone.

22  Q.   And so what does that -- what is she making reference

23  to?

24  A.   Well, inside the house, he was telling SA Langer that

25  he didn't have a cellphone.  So she told me that he did

1   have a cellphone, and I asked her, you've seen him with

2   it?  And she said, yeah, it's upstairs, I'll show you.  So

3   I followed her.

4   Q.    And where did she go?

5   A.    She went upstairs, she hung a left into the kids'

6   bedroom, and she grabbed a cellphone.

7   Q.    Okay.  I'm showing you Government's Exhibit 15.  What

8   are we looking at in this picture?

9   A.    That's a linen closet to the right.  As soon as you

10  come up the stairway, that's the closet you see.  To the

11  left is another bedroom.

12  Q.    And Government's Exhibit 16, what are we looking at

13  here?

14  A.    So, to the left is the stairwell.  To the right, the

15  door opened all the way to the right is a closet.  And in

16  the middle is the kids' bedroom.

17  Q.    And is this where you followed Ms. Hatten?

18  A.    Yes, I did.

19  Q.    Where did she take you?

20  A.    She took me into that middle bedroom.

21  Q.    I'm showing you Government's Exhibit 19.  Do you

22  recognize this?

23  A.    Yes.

24  Q.    What is that?

25  A.    That's the children's bedroom.

1  Q.    I'm showing you Government's Exhibit 20.   What are we

2  looking at here?

3  A.    Another angle of the children's bedroom.

4  Q.    Government's Exhibit 21?

5  A.    Another image of the children's bedroom.

6  Q.    And Government's Exhibit 22?

7  A.    Another image of the children's bedroom.

8  Q.    All right.   So you followed Ms. Hatten upstairs?

9  A.    Yes.

10  Q.    And what happened when you got upstairs?

11  A.    Once we got upstairs, she went into that bedroom and

12  grabbed a cellphone.

13  Q.    Do you remember where specifically in the room it

14  was?

15  A.    No, I don't.

16  Q.    And so just to be clear, she's the one that went and

17  got the phone?

18  A.    Yes.

19  Q.    And what did she do with the phone?

20  A.    Once she got it, she just turned around and gave it

21  to me.

22  Q.    And what did you do with the phone?

23  A.    I asked her if this is Blackburn's phone, and she

24  said, yes.   I said, okay, let's go back downstairs.

25  Q.    And did you guys go back downstairs?

1    A.    Yes, we did.

2    Q.    What did you do with the phone?

3    A.    Once we got back downstairs, I went to Special Agent

4    Langer and handed him the phone, and told him that it was

5    Blackburn's phone.

6    Q.    At any point in time from when Ms. Hatten gave you

7    the phone to when you gave it to Special Agent Langer, did

8    you ever open the phone?

9    A.    No.

10   Q.    Did you ever look through the phone?

11   A.    No.

12   Q.    What happened after you gave the phone to Special

13   Agent Langer?

14   A.    He asked Blackburn if it was his phone, and Blackburn

15   stated, yes.

16   Q.    And what happened after that?

17   A.    Morjn asked if we could search the phone, and he

18   said, yes, and then Morjn said, well, you know, we'll need

19   you to sign a Consent to Search form, first.

20   Q.    Did Special Agent Morjn give the Defendant a consent

21   to search form?

22   A.    Yes, he did.

23   Q.    Did he explain it to the Defendant?

24   A.    Yes, he did.

25   Q.    And you witnessed all of this?

1   A.    Yes, I did.

2   Q.    Have you, in your training and experience, have you

3   ever dealt with individuals with learning disabilities?

4   A.    Yes, I have.

5   Q.    Based on your observations of the Defendant at that

6   time, did it appear that he had any learning disabilities?

7   A.    No, it did not.

8   Q.    Was he able to communicate with you?

9   A.    Yes, he was.

10   Q.    Did he appear to have trouble understanding anything

11   that was going on?

12   A.    No, he didn't.

13   Q.    How would you describe the Defendant's demeanor

14   during his interactions with you, in general?

15   A.    He was calm during this time, and he was cooperating.

16   Q.    What happened -- so, you testified that Special Agent

17   Langer gave him a Consent to Search form; is that correct?

18   A.    Correct.

19   Q.    Did the Defendant sign it?

20   A.    Yes, he did.

21   Q.    And what happened after that?

22   A.    Once he signed it, then Special Agent Langer began

23   looking through his phone.

24   Q.    And what happened after that?

25   A.    Special Agent Langer saw images of child exploitation

1    on there.

2    Q.    And what did he do?

3    A.    He looked at Blackburn, and then he went into the

4    hallway and contacted Special Agent Breen.

5    Q.    And what happened after that?

6    A.    Well, I stayed in there, in the living room with

7    Blackburn, Orfield and Hatten, and then shortly after,

8    they escorted Blackburn into the hallway.

9    Q.    And did you stay in the living room?

10   A.    Yes, I did.

11   Q.    What happened after they escorted Blackburn out of

12   the living room?

13   A.    I stayed in there for a little bit, you know, still

14   with Hatten and Orfield, and then moments later Special

15   Agent Langer came in and told me that we needed to have

16   everyone exit the house, because we needed to preserve

17   everything else that was in there.

18   Q.    I want to go back really quickly to when you went

19   upstairs with Ms. Hatten.  Did you observe any other law

20   enforcement officials upstairs?

21   A.    Yes, I did.

22   Q.    Who did you see upstairs?

23   A.    Detective Sabaugh was up there, the Victim

24   Coordinator Assistance person that we have with HSI was up

25   there, and they were both playing with the kids, trying to

1   get them dressed.

2   Q.   Did you see anyone else up there?

3   A.   Not that I recall.

4   Q.   Okay.  And so, now fast-forwarding back to Special

5   Agent Langer coming and telling you -- and I'm sorry, what

6   did he tell you after Blackburn had been removed from the

7   living room?

8   A.   He said that everyone needed to leave so that the

9   house could be preserved, or the apartment could be

10  preserved.

11  Q.   And when you say preserved, what do you mean?

12  A.   Well, we had to secure it and lock it so that we

13  could wait for the search warrant.

14  Q.   At any point in time up to then, did you search the

15  house at all?

16  A.   No.

17  Q.   Did you observe anyone else from your agency or the

18  Bernalillo County Sheriff's Office or the Albuquerque

19  Police Department conducting a search?

20  A.   No.

21  Q.   So after Special Agent Langer decides to secure the

22  scene, what did you then do?

23  A.   I left the apartment.  I left the apartment and just

24  went to my vehicle.

25  Q.   And were you able to observe other people leaving the

1   apartment?

2   A.   Yes.  Everyone left, and once everyone was gone, they

3   shut the residence.

4   Q.   Okay.  And do you remember about what time that was

5   at?

6   A.   No, I don't.

7   Q.   Can you give me an estimation of, you know, maybe how

8   many hours you had already been there?

9          MS. KATZE:  Objection.  Asked and answered.

10         THE COURT:  I don't recall, so I'll allow the

11  question.  Overruled.

12  A.   We had probably been there for at least an hour, so

13  between 8:00 and 8:30.

14  BY MS. LIZARRAGA:

15  Q.   Okay.  And so when you left the residence, did you

16  stay there?

17  A.   Yes.  I stayed in my vehicle watching the residence.

18  Q.   Why?

19  A.   Because it had to be secured.  We had to make sure

20  that nobody else entered the residence or left the

21  residence after we had closed it.

22  Q.   And what were you waiting for?

23  A.   Search warrants.

24  Q.   How long were you at the residence on December 17th

25  waiting?

1   A.   We were there probably until about 2100, a little

2   after, waiting for the search warrants to be signed.

3   Q.   And what time is 2100?  You'll have to forgive me.

4   A.   9:00 P.M.

5   Q.   9:00 P.M., okay.  So, were you there the entire time?

6   A.   The entire time.

7   Q.   You never left?

8   A.   I did leave to use the restroom, but then came right

9   back.

10  Q.   During that whole timeframe, did you ever observe

11  anyone go into the residence before you got the search

12  warrant?

13  A.   No.

14  Q.   Let me ask you this:  Did the State and locals also

15  get a search warrant?

16  A.   Yes, they did.

17  Q.   And who executed their search warrant first?

18  A.   The State did.

19  Q.   And do you remember about what time that happened?

20  A.   No, I don't.

21  Q.   But it was before you executed yours?

22  A.   It was before ours, yes, it was.

23  Q.   And so before the execution of the search warrant,

24  did you ever observe anyone go into that house?

25  A.   No.

1     MS. LIZARRAGA:  Your Honor, may I have a moment?

2     THE COURT:  Sure.

3     MS. LIZARRAGA:  Your Honor, I pass the witness.

4     THE COURT:  Let's do this.  Let's take a short

5 break.

6   (A recess was held from 9:52 until 10:17 A.M.)

7     THE COURT:  All right, you may cross-examine,

8 Ms. Katze.

9     MS. KATZE:  Thank you.

10       CROSS-EXAMINATION

11 BY MS. KATZE:

12 Q.   I wanted to talk to you about when you were in the

13 living room, and you said Franque Hatten asked you to go

14 outside and talk to her.

15 A.   Yes, ma'am.

16 Q.   So you went outside the front of the house?

17 A.   Yes, ma'am.

18 Q.   And the two of you talked?

19 A.   Yes, ma'am.

20 Q.   And she told you that she had some concerns that

21 maybe Michael Blackburn had been sexually assaulting the

22 kids?

23 A.   Yes, ma'am.

24 Q.   And then further, she said that she knew that he had

25 a cellphone; correct?

1  A.   Yes, ma'am.

2  Q.   And then you guys spoke about the cellphone?

3  A.   I asked her if she knew what it looked like.

4  Q.   And she said she did?

5  A.   Yes.

6  Q.   And did you ask her where it was?

7  A.   No.  She said, I'll show you.

8  Q.   She said she knew where it was?

9  A.   Yes.

10 Q.   And it was upstairs in a bedroom?

11 A.   She didn't tell me where it was.  She said, I'll show

12 you.

13 Q.   Okay.  So then you went with her upstairs?

14 A.   Yes, ma'am.

15 Q.   And so then you went -- and it was a bedroom;

16 correct?

17 A.   Yes, ma'am.

18 Q.   And it was Michael Blackburn's bedroom?

19 A.   I wasn't sure at that time.

20 Q.   I'm just going to show you what the Government marked

21 as 23, because they showed you some pictures of that

22 bedroom, correct, already?  You looked at pictures of the

23 bedroom previously?  Is that better?

24 A.   Yes, ma'am.

25 Q.   So you already looked at some other pictures; right?

1   A.   Yes, previously.

2   Q.   And the pictures they showed you had little

3   children's beds in them; correct?

4   A.   Yes, ma'am.

5   Q.   So there were two little children's beds in that

6   room; right?

7   A.   Yes, ma'am.

8   Q.   But in addition to that, there's this big adult,

9   grown-up mattress there; right?

10   A.   That is an adult-sized mattress, yes.

11   Q.   So you said you went into the bedroom with her; is

12   that correct?

13   A.   I stayed at the doorway.

14   Q.   Okay.  And Ms. Hatten went in and got the cellphone;

15   correct?

16   A.   Yes, she did.

17   Q.   And the cellphone was over here in this wall unit;

18   correct?

19   A.   I don't remember exactly where it was at.

20   Q.   You were not observing her when she went in to get

21   the phone?

22   A.   I did observe her, but I don't remember where she

23   went.

24   Q.   Okay.  Do you remember that the phone was plugged

25   into the wall?

1   A.   No, because I don't remember where she went to.

2   Q.   Okay.  So is this kind of the only thing that you're

3   having trouble remembering?  It seemed like you had good

4   memory of the details when you testified on Direct Exam.

5   A.   Earlier I stated that I did not remember where she

6   got it from.

7   Q.   Okay.  And you don't remember that it was plugged in?

8   A.   No, because I don't remember where she got it from.

9   Q.   So you don't remember seeing her unplug it?

10          MS. LIZARRAGA:  Objection, your Honor.  Asked and

11   answered.

12          THE COURT:  Sustained.

13   BY MS. KATZE:

14   Q.   Now, you never asked Michael Blackburn for permission

15   to go into his bedroom, did you?

16   A.   No, because I did not know that was his bedroom.

17   Q.   And you did not ask Michael Blackburn if it was okay

18   to go get his phone, did you?

19   A.   No, I didn't need to.

20   Q.   You knew you were going upstairs with Franque Hatten

21   to look for Michael Blackburn's phone; correct?

22   A.   She said, I'll show you, and I went.

23   Q.   My question is, you knew when you followed her

24   upstairs that you were going upstairs to get Michael

25   Blackburn's phone; correct?

1   A.   I was going to go see where his phone was, yes.

2   Q.   And did you go see where his phone was?

3   A.   Yes.  She handed it to me.

4   Q.   In his bedroom?

5   A.   I didn't know that was his bedroom.

6   Q.   So again my question is -- if you could, just answer

7   my question "yes" or "no."  You were going upstairs with

8   Franque Hatten; "yes" or "no"?

9   A.   Yes.

10  Q.   And she, you asked her to show you where the phone

11  was; "yes" or "no"?

12  A.   I didn't ask her to show me where the phone was.  She

13  said, I'll show you.

14  Q.   And you said?

15  A.   I said, okay.

16  Q.   And then you followed her to find Michael Blackburn's

17  phone; correct?

18  A.   To see where his phone was, yes.

19  Q.   And then she handed you Michael Blackburn's phone?

20  A.   Correct.

21  Q.   You did not ask Michael Blackburn for permission to

22  go get his phone; is that correct?

23  A.   Correct.

24           MS. KATZE:  One moment, your Honor.

25           THE COURT:  Sure.

1    MS. KATZE:  I have nothing further.  Thank you.

2    THE COURT:  You may Redirect.

3    MS. LIZARRAGA:  Thank you.

4                    REDIRECT EXAMINATION

5    BY MS. LIZARRAGA:

6    Q.   Special Agent Altamirano, before you went with

7    Ms. Hatten upstairs to -- before you followed her upstairs

8    and she was going to get the Defendant's phone, did you

9    feel that you had any type of reasonable suspicion?

10   A.   I had --

11   MS. KATZE:  Objection.  Outside the scope of

12   Cross.

13   MS. LIZARRAGA:  On Cross-Examination, she asked

14   her specifically if she had asked Mr. Blackburn for

15   permission to go get his cellphone, so I'm merely going

16   over with her her mental state at the point that she goes

17   back upstairs with Ms. Hatten.

18   THE COURT:  I agree, it's not outside the scope.

19   Overruled.

20   A.   Okay, so I knew that there was images of child

21   exploitation.  I knew in that image there was a child's

22   face.  I knew I had seen that child in that apartment, and

23   that victim was there.  I knew that there are devices that

24   you need in order to produce child pornography.  So I was

25   going with Hatten --

1  BY MS. LIZARRAGA:

2  Q.   Let me just stop you there.  Did you have any

3  suspicion about who the offender was at that time?

4  A.   At that time, yes.  I believed it was Blackburn.

5  Q.   Based on what?

6  A.   His physical appearance, and what Ms. Hatten had just

7  told me.

8  Q.   Can you explain why you thought it was him based on

9  his physical appearance?

10  A.   Because on one of the pictures, it shows his belly

11  area and his penis.

12  Q.   So out of all the people that were in the house, did

13  anyone else match that physical description?

14  A.   No, they did not.

15  Q.   And those were all things running through your mind

16  before you went with Ms. Hatten upstairs?

17          MS. KATZE:  Objection.  Leading.

18          THE COURT:  That's leading.  Rephrase.

19  BY MS. LIZARRAGA:

20  Q.   When had you -- the things that you just testified

21  to, when had you made those connections?

22  A.   I made the connection that due to his physical

23  appearance, once I saw who else was in the house, that it

24  was him.

25  Q.   And when did you make the connection -- when did you

1   suspect that it was him?

2   A.   Once we got into the room and all the adults were

3   present downstairs, and then once Ms. Hatten told me her

4   suspicions, it solidified my reasoning.

5           MS. LIZARRAGA:  No further questions.

6           THE COURT:  Just so I'm clear, the young child

7   who is in the picture --

8           THE WITNESS:  Yes, your Honor.

9           THE COURT:  -- did she just come down the steps?

10          THE WITNESS:  Yes, your Honor.  She was coming

11  down the stairway once we were making entry into the

12  house, and then Detective Sabaugh went up the stairway and

13  she went into Detective Sabaugh's arms.

14          THE COURT:  So this is clear, this is before,

15  then, Ms. Hatten had spoken to you?

16          THE WITNESS:  Yes, your Honor.  As I stated

17  earlier, I saw the pictures, I knew what the child looked

18  like.  Once we made entry into the apartment, the child

19  was coming down the stairwell.  I saw the child, and I

20  knew right then and there that the victims were in the

21  house -- the victim.  I thought it was just one victim.

22          THE COURT:  All right.  Any other questions of

23  this witness?

24          MS. KATZE:  No, your Honor.

25          MS. LIZARRAGA:  No, your Honor.  Thank you.

1          THE COURT:  May the witness be excused?

2          MS. LIZARRAGA:  Yes, your Honor.

3          THE COURT:  Thank you.

4          MS. LIZARRAGA:  The United States calls Special

5   Agent Morjn Langer.

6       (MORJN LANGER, GOVERNMENT'S WITNESS, SWORN)

7          MR. GARCIA:  Please have a seat and state your

8   full name for the record.

9          THE WITNESS:  Morjn Langer.

10                     DIRECT EXAMINATION

11  BY MS. LIZARRAGA:

12  Q.   Could you please spell your name for the record?

13  A.   M-o-r-j-n L-a-n-g-e-r.

14  Q.   Good morning.

15  A.   Good morning.

16  Q.   Where do you work?

17  A.   I'm a Special Agent with Homeland Security

18  Investigations here in Albuquerque, New Mexico.

19  Q.   How long have you been with Homeland Security

20  Investigations?

21  A.   I was with Homeland Security Investigations in all

22  its prior names since 2003 when it was created.

23  Q.   And what were you doing before that?

24  A.   Before that, I was a Special Agent with the

25  Immigration and Naturalization Service since about 1995.

1  Q.    What division are you currently assigned to?

2  A.    I'm currently assigned to the Border Enforcement and

3  Security Task Force, primarily doing human trafficking and

4  human smuggling investigations.

5  Q.    Is that the only division that you've ever worked in?

6  A.    No.

7  Q.    What other divisions have you worked in?

8  A.    In Albuquerque, I've also worked in the Joint

9  Terrorism Task Force, I've worked in the Child

10  Exploitation Unit, as well as more general investigative

11  groups that covered financial investigations, narcotics

12  investigations, and various immigration violations.  And

13  then I've worked other program areas in New York City and

14  a community north of New York City, as well.

15  Q.    I want to talk to you a little bit about your

16  experience with child exploitation.  How long were you in

17  that division?

18  A.    From approximately April of 2012 until March of this

19  year.

20  Q.    And have you received any specialized training

21  regarding child exploitation cases?

22  A.    Yes.  I've taken several classes that were sponsored

23  through the Internet Crimes Against Children Task Force

24  here in New Mexico.  Some of those classes were given by

25  an organization called Search, which is like a nationally

1   recognized organization that provides training on internet

2   and child exploitation investigations.

3        I've taken classes on child pornography, peer-to-peer

4   investigations, and I'm also a certified undercover online

5   chatter, which is through ICAC, or an Internet Crimes

6   Against Children class.

7   Q.   What do you have to do to get certified?

8   A.   It's approximately a four- to five-day class, eight

9   hours a day.  Some of it is like classroom instruction,

10  and some of it is like practical hands-on type learning.

11  Q.   So, were you in the Child Exploitation Division back

12  in December of 2012 -- or excuse me; 2013?

13  A.   Yes.

14  Q.   Okay.  And are you familiar with the investigation

15  against Michael Blackburn?

16  A.   Yes.

17  Q.   Do you see him here in the courtroom today?

18  A.   Yes.  He's seated at the defense table in the, like,

19  light green jump suit.

20        MS. LIZARRAGA:  Your Honor, may the record

21  reflect that the witness has correctly identified the

22  Defendant.

23        THE COURT:  The record will so reflect.

24        MS. LIZARRAGA:  Thank you.

25

1   BY MS. LIZARRAGA:

2   Q.   I want to talk to you specifically about December 17,

3   2013.  Do you remember that day?

4   A.   Yes.

5   Q.   What happened on that day?

6   A.   That was the day that we conducted a knock and talk

7   style operation at the apartment where Michael Blackburn

8   was living, and then executed a subsequent Federal search

9   warrant that night, or evening.

10  Q.   Okay.  So I want to kind of go through that with you.

11  On the morning of December 17th, what was your function?

12  A.   Basically, just to assist in the security of the

13  knock and talk, to make sure that whatever adults we

14  encountered were kind of secured and kept in an area where

15  they couldn't have been of harm to the other agents.

16  After we received consent to enter the --

17  Q.   Excuse me.  I just want to break that up there --

18  A.   Okay.

19  Q.   -- because I don't want to go quite right there yet.

20       So, that morning of December 17th, before the knock

21  and talk actually happened, what information did you have

22  about the investigation?

23  A.   I knew that Agent Breen had been the Case Agent on

24  this investigation.  I knew that he was investigating, I

25  believe at that time it was two photographs that had been

1  pulled off of TOR network that showed an extremely young

2  female being molested by an adult male.  And I had done

3  some work with Agent Breen interviewing some residents of

4  an apartment complex in Albuquerque's northwest sector of

5  the city where the longitude and latitude of at least one

6  of the photographs was shown to have been taken in that

7  area or at that spot.

8  Q.    Special Agent Langer, I'm showing you what's been

9  admitted as Government's Exhibit 48.  I know that it's

10 redacted, but do you recognize that photo?

11 A.    Yes.

12 Q.    What is that photo?

13 A.    That's one of the TOR photos, I believe.

14 Q.    And when you say TOR, what is TOR?

15 A.    TOR stands for The Onion Router.  It's a section of

16 the internet that attempts to hide where the IP addresses

17 are emanating or originating from using a routing system,

18 different routers.  So the IP might show like it's in

19 Brazil when, in fact, it's somewhere completely different.

20 Q.    Did you have any other information about the photo,

21 other than that it was found on TOR?

22 A.    Just that it had a longitude and latitude associated

23 with it, that it had the device that had taken the photo,

24 which I believe was an iPhone, and that the adult in the

25 photo was definitely male and definitely heavy-set.

1  Q.   All right.  I'm putting Government's Exhibit 48 back

2  up, and I know it's kind of difficult to see from this

3  photo, but where in this photo can you tell that there is

4  a male?

5  A.   Well, at the extreme kind of bottom of the photo, you

6  can somewhat make out the stomach area, and then in the

7  sanitized part of it, there is a penis I believe

8  attempting to penetrate the young female, as I recall.

9  Q.   I'm showing you Government's Exhibit 49.  Do you

10  recognize this photo?

11  A.   Yes.  That, I believe, was the second TOR photo that

12  Agent Breen received, or was made aware of.

13  Q.   So prior to the morning of December 17th, had you had

14  an opportunity to look at both of these photos,

15  Government's Exhibits 48 and 49?

16  A.   Yes.  Probably the first one more so than the second

17  one.

18  Q.   And that would be Government's Exhibit 48?

19  A.   Yes.

20  Q.   All right.  So the morning of the 17th, what was

21  the plan?  You stated that you were at a residence; is

22  that correct?

23  A.   We had met probably around 7:00 in the morning and

24  had kind of a quick briefing, and the plan was to knock on

25  the door of the residence, I believe it was 5601 Wyoming,

1  and attempt to speak to whoever is there and get consent

2  to enter the home and try to figure out if the victimized

3  children were there, and who the offender was.

4  Q.   I'm showing you Government's Exhibit 1.  Do you

5  recognize that?

6  A.   Yes.  That's 5601 Wyoming.

7  Q.   Okay.  So the morning of the 17th, who actually

8  went and knocked on the door?

9  A.   It was a Bernalillo County Sheriff's officer,

10  Detective Theresa Sabaugh, who I believe was first, and I

11  believe Agent Breen was second to the door.

12  Q.   And where were you when they went to go knock on the

13  door?

14  A.   I was by the door, but quite a ways back from like

15  the front of the group trying to get into the house, or

16  gain entry to the house.

17  Q.   Okay.  So from the picture that we're looking at,

18  Government's Exhibit 1, would we be able to see where you

19  were when they went and knocked on the door?

20  A.   Probably towards the lower left-hand corner of the

21  picture.  Probably somewhere down towards there.

22  Q.   All right.  So, were you able to hear Detective

23  Sabaugh and Special Agent Breen when they knocked on the

24  door?

25  A.   I probably heard the knock, yes.

1   Q.   What happened after they knocked?

2   A.   I didn't see any part of the consent to enter the

3   home or anything like that.  I was too far back to hear

4   any of the conversation or even see who answered the door.

5   Q.   And so what were you able to see?

6   A.   I was just -- I definitely know that they knocked,

7   and at some point after they knocked they told us that

8   they had gotten consent to go into the house.  And then we

9   all went in, or most of us went in.

10  Q.   So, what did you do when you got inside the house?

11  A.   I stayed on the ground floor.  The house was like a

12  duplex style apartment or townhome, and I just went

13  through some of the rooms downstairs and made sure that

14  there were no people that we weren't aware of in the

15  rooms, or nothing that could hurt us, like a weapon.

16       And then eventually the three adults that were home

17  ended up kind of in the rear room of the downstairs, and I

18  ended up in that room with them.

19  Q.   I'm showing you Government's Exhibit 11.  Do you

20  recognize that?

21  A.   Yes.  That's like that rear kind of living room where

22  all the adults ended up.

23  Q.   Once you got inside the house, were you able to

24  determine whether there were -- you stated that there were

25  three adults.  Were you able to determine whether there

1    were any minor children there?

2    A.    Yeah.   There were two small children, a boy and a

3    girl.

4    Q.    And did you notice anything about either of the

5    children?

6    A.    No.   I didn't really have much to do with the

7    children that morning.

8    Q.    But you were aware that they were there?

9    A.    Yes.

10   Q.    All right.   And so you testified that you ended up in

11   this back room, the room we're looking at in Government's

12   Exhibit 11; correct?

13   A.    Yes.

14   Q.    Who was in that room with you?

15   A.    It was myself, Keifer Orfield, Franque Hatten, and

16   Michael Blackburn.

17   Q.    And what were you doing in the room with them?

18   A.    More or less just security, keeping them kind of in

19   one place while everyone else did the rest of the security

20   sweep of the house.   And then eventually -- I just stayed

21   in that room, and I began kind of having small talk with

22   all three of them, but primarily with Michael.

23   Q.    Why were you having small talk primarily with

24   Michael?

25   A.    Well, I was aware that the photos on TOR depicted a

1  heavy-set adult male, and Michael was the only one in the

2  residence that fit that description.  So it was my

3  suspicion that Michael was the perpetrator of the abuse.

4  Q.    And so what were you talking to him about?

5  A.    Initially, just small talk.  Kind of rapport building

6  type stuff.  And then I eventually asked him about his

7  cellphone, whether he had a cellphone, and he said he did.

8  And I asked him if it was an iPhone, and he said, no.

9  And I asked if he had ever had an iPhone, and he said,

10 yes, but he had sold it at either a store or a kiosk at

11 the Cottonwood Mall.

12 Q.    While you were engaging in conversation with the

13 Defendant, did he appear to have trouble understanding

14 anything that you were asking him, or anything that was

15 going on in the conversation?

16 A.    No.  He appeared very friendly, very cooperative.  He

17 was quite engaged in the conversation, and seemed free and

18 willing to talk to me as much as I would talk to him.

19 Q.    In your training and experience, have you ever dealt

20 with individuals that have a learning disability?

21 A.    Yes.

22 Q.    Did it appear to you that the Defendant had any type

23 of learning disability?

24 A.    No.

25 Q.    So, you stated that you're talking to him about a

1   cellphone.  Did you notice anything simultaneously going

2   on while you're having that conversation with him?

3   A.   Well, the other agents and officers that were there

4   were doing other things in the house, and I was aware that

5   that was going on, but I was mainly focusing on the three

6   adults in that room.

7   Q.   Did the three adults in that room remain in that room

8   the whole time?

9   A.   Yes.  Well, at one point, Franque Hatten, who is an

10   adult female, asked to speak to me in private, and I

11   didn't want to leave the other two, Michael and Keifer,

12   alone.  Plus, I thought maybe she would be more

13   comfortable speaking to a female officer or agent.  So I

14   asked Agent Altamirano if she would speak to Ms. Hatten in

15   private, and then the two of them left the room and I

16   think went outside.

17   Q.   What happened when they came back, or did they come

18   back?

19   A.   They came back, and they presented me with a phone

20   that was identified as Michael Blackburn's cellphone.

21   Q.   And what did you do?

22   A.   I took it.  I began by asking Michael if this is his

23   cellphone, and he said, yes.  And then I asked him if it

24   would be all right, or if it would be okay if I

25   consensually searched the cellphone, and he said, yes.

1      I either asked someone to watch the three of them in

2  the room and went and got a Consent to Search form, or I

3  asked someone to go get one from a vehicle.  The Consent

4  to Search form was brought back in, and I went over the

5  form with Michael.  I didn't read it to him, but I --

6  Q.   Let me just stop you right there.  I'm showing you

7  what's been previously marked as Government's Exhibit 27.

8  Do you recognize this?

9  A.   Yes.  That's the Consent to Search form that I used

10  that morning for Michael's cellphone.

11  Q.   Does Government's Exhibit 27 accurately reflect the

12  Consent to Search that you used that day on

13  December 17th?

14  A.   Yes.

15      MS. LIZARRAGA:  Your Honor, I move for the

16  admission of Government's Exhibit 27.

17      MS. KATZE:  No objection.

18      THE COURT:  It is admitted.

19      MS. LIZARRAGA:  Thank you.

20  BY MS. LIZARRAGA:

21  Q.   So, Special Agent Langer, you said that you had

22  gotten verbal consent from the Defendant?

23  A.   Yes, initially.

24  Q.   Okay.  And then tell me about what you did with this

25  form.

1   A.   I kind of laid it on a -- there was like a coffee

2   table in the room, and I went over it with Michael.  I

3   explained to him, once again, that he didn't have to sign

4   it and didn't have to give consent, and that if he was

5   doing it, it would be of his own free will without any

6   type of coercion or threats or anything from me.

7        He again stated that he would give consent to allow

8   his phone to be searched, so I had him sign, date and

9   print his name at the bottom of the form there.

10  Q.   All right.  Just really quickly, Government's

11  Exhibit 10, do you recognize that?

12  A.   Yes.  That's the room that this all happened in.

13  Q.   You had mentioned a coffee table.  Do you see one in

14  Government's Exhibit 10?

15  A.   Yes.  It's the one like right in the middle of the

16  room with kind of -- it looks like glass on top.

17  Q.   So that was the coffee table that you put --

18  A.   Yes.

19  Q.   -- Government's Exhibit 27 on?  All right.  And so

20  going back to Government's Exhibit 27, this up here, whose

21  handwriting is this?

22  A.   That's mine.

23  Q.   All right.  So the entire portion of the Consent to

24  Search, excluding the box, that's all your handwriting?

25  A.   Yes.

1  Q.    All right.  And then down here in the box, we see,

2  "Name (Please Print)."  Whose handwriting is that?

3  A.    That's Michael Blackburn's.

4  Q.    And the signature line, whose handwriting is that?

5  A.    Michael Blackburn.

6  Q.    And the date and time?

7  A.    Michael Blackburn.

8  Q.    And witnesses?

9  A.    That's my signature and title.

10 Q.    Okay.  While you were going over this form with the

11 Defendant, did he have any questions for you?

12 A.    No.

13 Q.    Did he appear to have difficulty understanding

14 anything that you were telling him?

15 A.    No.

16 Q.    So, what did you do after you received consent from

17 the Defendant to search his phone?

18 A.    Well, at some point I realized the phone was pattern

19 locked, so I asked Michael for the pattern lock, and he

20 provided it.  And I believe it's drawn on the back of the

21 form.

22 Q.    All right.  So I'm going back to Government's

23 Exhibit 27, and I'm turning it over.  What are we looking

24 at there?

25 A.    That's the pattern lock code to unlock it that

1    Michael provided to me that morning.

2    Q.    So, what happened after the Defendant provided you

3    with the pattern lock?

4    A.    I unlocked the phone, and I believe went right to the

5    photo galleries and began looking, and the first two

6    images I looked at were both images of child pornography.

7    Q.    Were you able to identify the children in the photos?

8    A.    Yes.   I believe the children were the ones that were

9    in the residence at the time.

10   Q.    So what is going through your mind as soon as you see

11   these photos?

12   A.    Well, particularly one of them depicted the same,

13   what appeared to be the same heavy-set male that are in

14   the TOR photos.   So my thought was that Michael Blackburn

15   was the perpetrator in the photos.

16   Q.    And where did you find the photos again?

17   A.    I believe it was in the photo gallery or photo

18   section of the cellphone.

19   Q.    On the Defendant's phone?

20   A.    Yes.

21   Q.    Okay.   And so what did you do after you found those

22   child pornography photos?

23   A.    I alerted Agent Breen that they were on the phone,

24   and Michael was placed under arrest shortly after I did

25   that.

1  Q.    Are you the one who placed him under arrest?

2  A.    No.

3  Q.    Do you know who did?

4  A.    I believe it was Agent Bonza.

5  Q.    And what happened after the Defendant was placed

6  under arrest?

7  A.    He was led out of the apartment, or townhome.

8  Q.    And what did you do?

9  A.    I just stayed with Ms. Hatten and Keifer Orfield.

10 Q.    So, Special Agent Langer, who is all in the house at

11 this point?

12 A.    After Michael is arrested?

13 Q.    Yes.

14        MS. KATZE:  Objection.  Relevance.

15        THE COURT:  What's the relevance?

16        MS. LIZARRAGA:  I'm fine moving on.

17        THE COURT:  Okay.

18 BY MS. LIZARRAGA:

19 Q.    What did you do after Michael Blackburn was arrested?

20 A.    I just stayed in the room with Franque and Keifer

21 until --

22        MS. KATZE:  Same objection, your Honor.

23 Relevance to this whole period.

24        THE COURT:  Overruled.

25 A.    I just stayed in the room with Keifer and Franque

1  until the few loose ends we had to tie up were done, and

2  then we all left the residence.

3  Q.   Okay.  While you were there in the morning, did you

4  ever search the house?

5  A.   No.

6  Q.   Did you ever observe anyone else searching the house?

7  A.   No.

8  Q.   You said that you had to tie up some loose ends.

9  What are you talking about?

10  A.   We had to get the Child, Youth and Family Department,

11  or division there to take custody of the two children, and

12  we also had to arrange to get Franque and Keifer down to

13  the BCSO Main station to be interviewed.

14  Q.   And so at what point did you leave the house?

15  A.   It was probably sometime between 9:00 and 10:00 in

16  the morning.

17  Q.   And what was your plan after leaving the house?

18  A.   Agent Breen was going to secure a Federal search

19  warrant based on the child pornography images that were

20  found, and we were going to keep the location secure until

21  that warrant could be obtained.

22  Q.   Did you stay at the location after you left the

23  house?

24  A.   Yes.  We stayed outside, but not inside.

25  Q.   Did you observe anyone go into the house while you

1   were keeping it secure?

2   A.   Not until probably about 7:00 P.M.   Some State

3   officers entered because they had a State warrant based on

4   the child abuse or child molestation charges.

5   Q.   And was a Federal search warrant eventually obtained?

6   A.   Yes.

7   Q.   Do you remember about what time?

8   A.   Probably we were notified it was signed around

9   9:00 P.M.

10  Q.   And did you help participate in the Federal search

11  warrant of the home?

12  A.   Yes.

13          MS. LIZARRAGA:   Your Honor, may I have a moment?

14          THE COURT:   Sure.

15          MS. LIZARRAGA:   Your Honor, I pass the witness.

16                    CROSS-EXAMINATION

17  BY MS. KATZE:

18  Q.   Good morning.

19  A.   Good morning, Counselor.

20  Q.   Did you write any reports regarding this case?

21  A.   No.

22  Q.   Okay.   I didn't think so.   I didn't get any.

23          You indicated that when you were in the living room,

24  that you were talking to Mr. Blackburn, chatting,

25  whatever.

1  A.   Yes, correct.

2  Q.   At any point, did you read him his Miranda warnings?

3  A.   No.

4  Q.   You indicated that you were given a cellphone?

5  A.   Yes.

6  Q.   Who did you actually get the phone from?

7  A.   I believe it was Agent Altamirano.

8  Q.   And did you see where she got it?

9  A.   No.

10 Q.   So you had the phone in your hand and you went to

11 Michael Blackburn, and you asked him if he would let you

12 look in the phone?

13 A.   No.  I initially asked if it was his phone.

14 Q.   Okay.  But he saw you had the phone?

15 A.   I presume he did, yes.  When I asked if it was his

16 phone, I held it up and showed it to him.

17 Q.   Okay.  And then you talked on Direct Examination, I

18 guess after he said it was his phone, then you asked if

19 you could do, what, with it?

20 A.   I asked if he would allow me to consensually search

21 the phone without a warrant.

22 Q.   And then, also, you went over on Direct Examination

23 the form.

24 A.   Yes.

25 Q.   And you said that you actually went over the form

1  with him?  You said that you explained his rights to him

2  and explained what consent to search meant?

3  A.    I explained the form to him, yes.

4  Q.    And when you say you explained the form to him, what

5  do you mean?

6  A.    I find it more helpful, that people tend to

7  understand the form better when I explain it in summary

8  rather than read it to them.  I find they often don't

9  understand -- they find it easier to understand the form

10  when I explain it to them rather than just be like, here's

11  the form, read it.

12       But I'm very cautious with those forms.  I don't like

13  to bully anyone into signing them.  And I reiterate, you

14  don't have to, this is entirely of your own free will.

15  And, you know, if they ever have any kind of doubts, I'll

16  lean towards just not doing it and getting a search

17  warrant.

18  Q.    So it's important to you that they understand what

19  they're signing?

20  A.    Of course.

21  Q.    Age it's important to you that they understand what

22  rights they give up when they sign a form like that?

23  A.    Absolutely.

24       MS. KATZE:  May I have a moment?

25       THE COURT:  Yes.

1    MS. KATZE:  Nothing further.  Thank you.

2    THE COURT:  Is there any Redirect?

3    MS. LIZARRAGA:  No, your Honor.

4    THE COURT:  May the witness be excused?

5    MS. LIZARRAGA:  Yes, your Honor.

6    THE COURT:  Thank you.

7    THE WITNESS:  Thank you.

8    MS. LIZARRAGA:  The United States calls Detective

9  Theresa Sabaugh.

10    (THERESA SABAUGH, GOVERNMENT'S WITNESS, SWORN)

11    MR. GARCIA:  Please have a seat and state your

12  full name for the record.

13    THE WITNESS:  Theresa Sabaugh.

14                    DIRECT EXAMINATION

15  BY MS. LIZARRAGA:

16  Q.   Good afternoon, Detective.

17  A.   Good afternoon.

18  Q.   Could you please spell your name for the record.

19  A.   T-h-e-r-e-s-a, and my last name is S-a-b, as in boy,

20  -a-u-g-h.

21  Q.   Where do you work?

22  A.   The Bernalillo County Sheriff's Department.

23  Q.   How long have you been with the Bernalillo County

24  Sheriff's Office?

25  A.   Twelve years.

1  Q.    And what is your title?

2  A.    I'm a detective with the Special Victims Unit.

3  Q.    What is the Special Victims Unit?

4  A.    We do crimes against children and sex crimes, adult

5  and child.

6  Q.    How long have you been with the Special Victims Unit?

7  A.    A little over four years now.

8  Q.    And what were you doing before you were with the

9  Special Victims Unit?

10  A.    I was in Field Service for a few years.  I did

11  narcotics for two years, and white collar for one year.

12  Q.    I want to go over some of your training specifically

13  regarding any type of sexual exploitation or sexual abuse

14  of children.  Can you highlight some of the training that

15  you've received in that field?

16  A.    I've done approximately 300 hours of crimes against

17  children, sex crimes investigations.  About half of those

18  are internet crimes against children, which would include

19  child exploitation.

20  Q.    And have you been part of any details?

21  A.    Yes.  In the last two years, I've been a part of the

22  SPEED detail, which is the Sexual Predator Exploitation

23  Enforcement Detail, including Homeland Security and the

24  Albuquerque Police Department.

25  Q.    And do you work in conjunction with Federal agents on

1    your cases?

2    A.   Yes.

3    Q.   I want to take you back to December of 2013.  You

4    were working with the Special Victims Unit at that time?

5    A.   Yes.

6    Q.   And are you familiar with a case that eventually led

7    to the arrest of Michael Blackburn?

8    A.   Yes, ma'am.

9    Q.   Do you see Michael Blackburn here in the courtroom

10   today?

11   A.   I do.

12   Q.   Could you please point out a piece of clothing that

13   he's wearing and tell us where he's sitting?

14   A.   He's sitting to my right in a fluorescent shirt.

15          MS. LIZARRAGA:  Your Honor, may the record

16   reflect that the witness has correctly identified the

17   Defendant.

18          THE COURT:  The record will so reflect.

19   BY MS. LIZARRAGA:

20   Q.   All right.  So Detective Sabaugh, can you tell me how

21   your involvement in this case began?

22   A.   In December of 2013, Special Agent Breen had advised

23   me that he had received a picture from another office in

24   his department that depicted a young child getting

25   penetrated by an adult penis.  In that, it showed EXIF

1   data, which would be the GPS coordinates, I guess, to the

2   picture that was taken, which led us to the northwest part

3   of Albuquerque where we did a canvas of the apartments

4   over there.

5   Q.   So based on your investigation, were you able to

6   determine where you thought that the potential victim in

7   the photo might be living?

8   A.   Special Agent Breen did, yes.

9   Q.   And when did your heavy involvement in the case

10   begin?

11   A.   The Friday before we went to the Mitchells'

12   residence, Special Agent Breen had called me late that

13   Friday afternoon and advised me that he had located the

14   address, 5601 Wyoming, to be the address where the

15   children are residing presently, at the time.  So that was

16   when I first, like, heavily got into the case.

17      It still wasn't my case.  It was still the Homeland

18   Security Investigations case, until Monday when we had a

19   meeting about the specifics, what we were going to do.

20   Q.   Do you remember the actual date of that Monday?

21   A.   December -- I'd have to look at the paper, I'm sorry,

22   or my report.

23   Q.   Would looking at your report help refresh your

24   recollection?

25   A.   Yes.  I'm sorry.

1          MS. LIZARRAGA:  Your Honor, may I approach?

2          THE COURT:  You may.

3     A.    I apologize, I should know the date.  Okay.

4     December 13th was a Friday.  December 16th we met at the

5     Homeland Security Investigations office to form a game

6     plan.  And December 17th is when we went to the

7     residence.

8     BY MS. LIZARRAGA:

9     Q.    Okay.  So at what point in time did this become your

10    case?

11    A.    December 16th, late in the afternoon.

12    Q.    And so why did you not immediately go out to the

13    residence on the afternoon of December 16th?

14    A.    At the time, we weren't sure if the suspect, which we

15    had thought previously may have been the brother, we were

16    told that they were living in separate residences.  We

17    didn't find the exigency at the time to go out at that

18    time.  We figured it would be better to form a game plan

19    and get my resources working -- organized; I'm sorry.

20    Q.    No problem.  So on December 16th, did you know who

21    Michael Blackburn was?

22    A.    No.

23    Q.    Did you have any idea -- you said the Mitchells.  Who

24    are they?

25    A.    That was Thomas and Maria Mitchell.  Those are the

1    kids', the two two-year-olds parents.

2    Q.    And you stated that you were suspecting the uncle?

3    A.    When we discussed the case, when we saw the picture,

4    and of course it was just the penis and a belly, we only

5    knew two male subjects to be living with the kids, one

6    Thomas, and one, I believe James is the name, to be living

7    there, and James fit the profile better than Thomas did,

8    as far as what his recorded stature was.

9    Q.    Okay.  So on December 16th, this becomes your case.

10   Tell me about some of the things that you did on the 16th

11   in preparation for going out to the house on the 17th.

12   A.    Of course, it was still in conjunction with Homeland

13   Security, so we had to get both supervisors on board with

14   what we were going to do, along with APD, the Albuquerque

15   Police Department.

16         We organized who was going to go out to the house

17   with us.  I called the safe house and scheduled two safe

18   house interviews, hoping that the kids would be able to

19   talk.  I also called CYFD in hopes that they would come

20   out with us to the welfare check in the morning, which

21   they did not do.  But I was trying to get all that

22   organized.

23   Q.    On the 16th?

24   A.    On the 16th.

25   Q.    Okay.  And so let's talk now about December 17th.

1  You testified that at this point, this is your case; is

2  that correct?

3  A.    Yes.

4  Q.    And so what was the game plan on the 17th?

5  A.    Well, we were going to do a welfare check on the

6  kids.

7  Q.    Let me just stop you there.  Can you please explain

8  what a welfare check is?

9  A.    Yes.  Basically, whenever we get any report of any

10  kind of sexual abuse or physical abuse or neglect

11  involving children, or a child, we will go to the house,

12  if we don't have probable cause for a search warrant, we

13  will go to the house and conduct what we call a welfare

14  check, just to make sure that the kids are being provided

15  for, they're not being neglected, they're not being

16  abused, and if we have to open up an investigation.

17  Q.    All right.  I'm showing you New Mexico State Statute

18  32A-4-3.  Do you recognize this statute?

19  A.    Yes.  That's our Duty to Report Child Abuse.

20  Q.    You said it's your Duty to Report.  Can you explain

21  that duty?

22  A.    So, basically, I got the investigation on Monday

23  afternoon.  It's my duty to investigate it within I

24  believe 48 hours of the initial report.  I am liable if I

25  don't, basically.  If I don't go out there and investigate

1    it, then I would be in trouble.

2    Q.   So does this statute mandate that you actually do go

3    out and investigate?

4    A.   Yes.

5    Q.   All right.  And in conjunction with this statute, I'm

6    showing you New Mexico State Statute 30-6-4.  Do you

7    recognize this statute?

8    A.   Yes.

9    Q.   And can you explain what your understanding of this

10   statute is?

11   A.   We use this when we go out to do the welfare checks.

12   When we get a referral or another report indicating child

13   abuse or neglect, we go out there and that gives us the

14   ability to enter a home and to investigate.  So they can't

15   obstruct us.  They can't deny access to the kids to do an

16   investigation.

17   Q.   So if you go to a home where you are investigating

18   allegations of sexual abuse, under the law do you need

19   consent to enter?

20   A.   No.  We can enter if we believe that the children are

21   there.

22   Q.   And that derives from New Mexico State Statute

23   30-6-4?

24   A.   Yes.

25   Q.   All right.  So the morning of December 17th, kind of

1    just take me through what happened.  Did you have a

2    briefing before you got to the residence?

3    A.    Yeah.  I believe we met at a building down the

4    street, where we all met, so that way we weren't just

5    meeting in front of their house.  We all -- we gave them

6    the information, which most people already knew at this

7    point, what the objective was.  We had already arranged

8    everything the day before.  And then we all caravaned over

9    there to the residence, 5601 Wyoming.

10   Q.    When you say, we all, who are you referring to?

11   A.    I mean, there were Homeland Security Agents Morjn

12   Langer, Christina Altamirano, Ryan Breen.  Albuquerque

13   Police Department detectives, their Child Exploitation

14   detail, Jake Storey, Josh Hawkes, and their Sergeant, Jeff

15   Petersen.

16   Q.    All right.  I'm showing you Government's Exhibit 1.

17   Do you recognize this photo?

18   A.    Yes.  That's the residence.

19   Q.    So, what happened after your briefing?

20   A.    We all caravaned to 5601 Wyoming.

21   Q.    And what happened when you got there?

22   A.    I knocked on the door.

23   Q.    Who specifically went up to the door?

24   A.    I believe it was me and Special Agent Breen.

25   Q.    Okay.  So at this point, this is your case still?

1  A.    Yes.

2  Q.    All right.  So you knock on the door.  What happens

3  after that?

4  A.    Mr. Blackburn answered the door wearing only boxers.

5  I don't remember specifically everything, but I remember

6  talking to him and I asked him, like, who lives there, and

7  advising him that we were looking for the Mitchells, and

8  he said that they were out of town and that he lived there

9  with the two children.

10  Q.    Did you identify yourself as law enforcement?

11  A.    Yes.  I had a jacket on that had my badge of office

12  on it, and I introduced myself.

13  Q.    Other than your jacket, do you remember what else you

14  were wearing?

15  A.    I was wearing a gray shirt and gray pants, plain

16  clothes.

17  Q.    So you weren't in full uniform?

18  A.    No.

19  Q.    All right.  Did the Defendant give you consent to

20  enter?

21  A.    Yes.  He allowed us inside the residence.

22  Q.    What happened once you got inside the residence?

23  A.    As we were talking to him in the foyer, I don't

24  remember specifics, but I remember a lot of things were

25  going through my head.  But the children came down the

1   stairs as we were talking to Mr. Blackburn, wearing only

2   their diapers.

3   Q.   I'm showing you Government's Exhibit 4.  What are we

4   looking at here?

5   A.   Those are the stairs.

6   Q.   All right.  And I'm showing you Government's

7   Exhibit 7.  What are we looking at here?

8   A.   That's the -- okay, that's looking this way.  That's

9   the foyer, the entryway of the residence.

10   Q.   So when you walk into the house, the stairs are

11   fairly close to the door?

12   A.   They're very close.  They're right there.

13   Q.   All right.  So what happened when you observed -- you

14   said you observed some children coming down the stairs?

15   A.   I immediately recognized Jane Doe No. 1 from the

16   picture.  She has very distinctive blond hair and she's

17   little.  She was wearing only her diaper.  So my

18   intention, then, went to the children.

19   Q.   So prior to getting to the residence, you had

20   observed the pictures that were part of Special Agent

21   Breen's investigation?

22   A.   I did see a sanitized photo of Jane Doe No. 1, yes.

23   Q.   I'm showing you Government's Exhibit 49.  Do you

24   recognize that?

25   A.   Yes.

1   Q.   Is that the photo that you're referring to?

2   A.   Yes.

3   Q.   Okay.  So based on this photo, you were able to

4   recognize -- you stated her name was Jane Doe No. 1?

5   A.   Jane Doe No. 1.

6   Q.   Right away?

7   A.   Right away.

8   Q.   And what did you do then?  As soon as you recognized

9   Jane Doe No. 1, tell me what is going through your mind at

10   that point.

11   A.   A lot of things are going through my mind.  I'm

12   thinking, okay, there are the kids, there's this guy that

13   fits the description.  I was told about the belly of a

14   white male.  We didn't know who he was.  So a lot of

15   things were going through my head, like okay, now what do

16   we have to do?

17       I wanted to get the children clothed, so I asked Jane

18   Doe No. 1, I told them, let's go upstairs and get you

19   clothes, and she jumped right into my arms without any

20   hesitation, even though I was a stranger.

21   Q.   Can you describe physically the state of the

22   children?

23   A.   They looked shabby.  They didn't look like they had

24   brushed their hair in a lot of days.  They didn't look

25   like they had bathed.  They were just in diapers.  They

1    didn't look well kept at all.

2    Q.   All right.  And at that point, did you have any

3    suspicion as to who the offender might be?

4    A.   Yes.  I thought it was Michael Blackburn.

5    Q.   Okay.  So Jane Doe No. 1 jumps in your arms.  What do

6    you do after that?

7    A.   I take them upstairs to try to find them some

8    clothes.  I knew that at that point we were going to be

9    taking the kids on a 48-hour hold and they would need

10   clothing.

11   Q.   And so, where upstairs did you go?

12   A.   Once you go upstairs, I believe their bedroom was to

13   the left.  And so I just went there.

14   Q.   All right.  I'm showing you Government's Exhibit 19.

15   Do you recognize that?

16   A.   Yes.  That's their bedroom.

17   Q.   And how did you know that it was their bedroom?

18   A.   I believe -- I can't remember if there were two or

19   just one, but there was one toddler bed.  There was a

20   bigger bed in there, also.  I do believe there were two.

21   I thought there were two toddler beds.  Plus, there were

22   toys and clothes on the floor, so it was kind of apparent

23   that it was the kids' bedroom.

24   Q.   I'm showing you Government's Exhibit 21.  I think we

25   can see two beds in that picture.  Do you agree?

1   A.    Yes.

2   Q.    All right.  Were you able to observe how many

3   bedrooms were upstairs?

4   A.    You know, I didn't look through the house very much.

5   Other detectives were clearing it for additional

6   residents.  But my focus was on the children.  I went

7   right up to the bedroom to try to find them some clothes.

8       I remember there being another bedroom over to the

9   right, I believe, and a bathroom, but I don't remember if

10  there were two bedrooms or just one.

11  Q.    Okay.  So you take -- we've talked about Jane

12  Doe No. 1.  Was there another child there, as well?

13  A.    There was another two-year-old, her brother, John

14  Doe No. 1.

15  Q.    Okay.  And so you're with both of them?

16  A.    Yes.

17  Q.    And what were you doing when you were upstairs with

18  them?

19  A.    Well, there were other detectives that were clearing

20  the residence, and at that point we were all trying to

21  find them clothes.  And then I think at a certain point, I

22  ended up breaking off and I started calling CYFD to try to

23  get a CYFD investigator down there right away, because we

24  would need one immediately.

25  Q.    And were you able to do that?

1    A.    Yes.

2    Q.    What other things did you start to arrange for?

3    A.    I noticed that neither child could speak, or they

4    weren't verbal at all.   Jane Doe No. 1, almost three years

5    old, couldn't even say her name yet.   So I knew the safe

6    houses weren't going to happen.   So I called the safe

7    house to cancel them.

8         But most of my time was on with CYFD, because I had

9    to call the Central Intake.   It just takes a long time to

10   do a referral, because they made me do an emergency

11   referral versus coming out with us to do the welfare

12   check.

13   Q.    As part of your job, do you often work with CYFD in

14   situations like this?

15   A.    Yes.

16   Q.    What's the point of calling CYFD?

17   A.    Well, we knew the kids were going to be taken into

18   custody.   The parents weren't home.   They were in

19   California.   There were two other strangers living in the

20   home that we didn't know who they were.   I had been told

21   by Special Agent Altamirano that Franque had indicated to

22   her that she believed that Blackburn was sexually abusing

23   the kids, so at that point we knew that they weren't going

24   to stay in that home, because we would need to do an

25   investigation, a thorough investigation.

1   Q.   So what happened after you were done making these

2   phone calls?

3   A.   The next thing I remember is being in the car with

4   Michael Blackburn and Special Agent Breen.  I was on the

5   phone the majority of the time.  But I was in the back

6   seat, and Michael Blackburn was in the front seat, in the

7   passenger seat.

8   Q.   Did you talk to the Defendant at all while you were

9   in the car?

10   A.   No.

11   Q.   And where did you take him?

12   A.   To the John Price Law Enforcement Center.  We call it

13   the Main, over here at 400 Roma.

14   Q.   And what happened when you got there?

15   A.   We put him in an interview room.

16   Q.   What did you do after you put him in an interview

17   room?

18   A.   Well, Franque and Keifer, the two people that were

19   staying with them, they had indicated, or she had

20   indicated that she felt they had been sexually abused, so

21   we asked them to voluntarily come to the Main for an

22   interview.  So we were waiting for them to show up,

23   because I wanted to have what they had to say before I

24   went in to talk to Mr. Blackburn.

25   Q.   Why did you want to hear what they had to say before

1   you went to interview the Defendant?

2   A.   It's rare that suspects in these kinds of crimes just

3   tell us everything right up front, or be honest, so I

4   wanted to find out more information.  It's always better

5   to have more information before you go in for an

6   interview.

7   Q.   Do you remember about what time you got to the

8   station with the Defendant?

9   A.   It might have been around 8:30, 9:00, somewhere

10  around there.

11  Q.   And do you remember what time Franque and Keifer

12  actually showed up at the station?

13  A.   I think it was a while.  I think it was 10:30 or

14  11:00.  We were waiting for them for a while.  Actually, I

15  think Special Agent Breen called them a couple of times to

16  see where they were at, because we were waiting for them.

17  Q.   So, did they eventually come?

18  A.   Yes.

19  Q.   What happened when they got there?

20  A.   We put them in separate interview rooms, and then we

21  interviewed them.

22  Q.   And what did you do after -- were you able to gain

23  useful information during that interview?

24  A.   Yeah.  Franque said that she had noticed the kids

25  being super hypersexual.  Jane Doe No. 1 would often touch

1    her genitals, try to put toys in her vagina, and try to --

2    it looked like she was performing fellatio on toys and

3    stuff.  John Doe No. 1 was putting things in his rectum,

4    or trying to.  She noticed that Michael Blackburn was the

5    primary caregiver, even when the parents were there.

6         She also said on the Saturday prior to us being

7    there, that the Mitchells had left for California, and the

8    kids had woken up around 8:30, the Mitchells left around

9    9:00, and called her around 10:00 to talk to Michael.  She

10   said that when she went upstairs to go give Michael her

11   phone, the door was locked when she would try to go in,

12   because Michael shared a bedroom with the two kids.  And

13   she could hear John Doe No. 1 screaming and crying, no.

14   She said it took a couple of minutes before Mr. Blackburn

15   came to the door, and Jane Doe No. 1 was completely naked,

16   and John Doe No. 1 only had a diaper on, I believe.

17   Q.   So what did you do after you were done with the

18   interview with Ms. Hatten and Mr. Orfield?

19   A.   We spoke to Mr. Blackburn.

20   Q.   Okay.  Now, was that interview recorded?

21   A.   Yes.

22   Q.   Prior to coming here to testify today, did you have

23   an opportunity to review that recording?

24   A.   Yes.

25   Q.   All right.  We've already played a large portion of

1    the video here in court.  In the interest of speeding

2    things along, I'm just going to fast forward to the --

3    well, I'll go over some of the preliminary things with

4    you, but I'm not actually going to show you the interview,

5    I'm just going to ask about the portions that you were

6    involved in.

7    A.    Okay.

8    Q.    At the beginning of the interview, do you recall, or

9    was the Defendant given a Miranda rights form?

10   A.    He was.

11   Q.    And did you observe him take the form?

12   A.    Yes.

13   Q.    What did you observe him do with the form?

14   A.    He and Special Agent Breen went to the table where it

15   appeared that he was reading it and signing the paper.

16   Q.    All right.  I'm showing you Government's Exhibit 28.

17   Do you recognize that?

18   A.    Yes.

19   Q.    And you were there, you witnessed Mr. Blackburn sign

20   this form?

21   A.    Yes.

22   Q.    Did you ask him if -- or, did he appear to have any

23   trouble understanding what was going on at that point?

24   A.    It didn't appear so.

25   Q.    Did he ask you any questions?

1  A.    No.

2  Q.    All right.  So after that, there's a portion of time

3  where both you and Special Agent Breen are interviewing

4  him; correct?

5  A.    Yes.

6  Q.    And then Special Agent Breen leaves and you go back

7  in yourself; correct?

8  A.    Yes.

9  Q.    What was the purpose of going back in?

10  A.    Well, we knew that the child exploitation would be

11  Special Agent Breen's charges, but I had to get more

12  details on the criminal sexual penetration of a minor and

13  all the other State charges that I would be filing against

14  Mr. Blackburn.

15  Q.    Okay.  So at the point when you go back into the room

16  and it's just you and Michael Blackburn, did his demeanor

17  change at all from when Special Agent Breen had also been

18  in the room?

19  A.    No.

20  Q.    Did you ask him if he was okay?

21  A.    I think so.  I think I asked him a couple of times.

22  He actually appeared to be relieved to be talking to us at

23  a certain point, I think.

24  Q.    What were some of the things that you discussed with

25  the Defendant when it was just you interviewing him?

1  A.   We discussed --

2       MS. KATZE:  Objection, your Honor.  Is she just

3  going to question her, or are we going to see the video?

4  It's the same objection I had before, so that we don't

5  have to do it twice.

6       MS. LIZARRAGA:  I was planning on not showing the

7  video and just having her summarize.

8       THE COURT:  That's fine.

9  A.   We went over the pictures that we had of him sexually

10 assaulting the two kids, and he was able to look at the

11 pictures and ascertain through what the kids were wearing,

12 or what they weren't wearing, or the background of the

13 pictures, where they were at, when it happened, what he

14 was doing, where everybody was at during each assault.

15     Not every assault.  Not every picture was clear to

16 him.  But he was able to give him a large portion.

17      MS. KATZE:  Your Honor, excuse me.  Can I just,

18 for the record, make a relevancy objection to this?

19      THE COURT:  Sure.  And I'll give you a standing

20 objection.

21      MS. KATZE:  Thank you.

22 BY MS. LIZARRAGA:

23 Q.   What was the importance of getting that level of

24 detail?

25 A.   Because for State charges, we need a date and time

1    and what occurred and who was where, just for the State

2    charges, for the specifics of the charges.

3    Q.   Are you aware of whether or not the Defendant was

4    given any bathroom or water breaks while he was there?

5    A.   Yes, he was.  And also, he was provided food.

6    Q.   Okay.  And so, do you remember approximately how long

7    your interview with him lasted when Special Agent Breen

8    was not in the room?

9    A.   It was over an hour, I'm sure.  I can't remember.  I

10   watched the whole thing, but I can't remember specifically

11   how long mine was.  But I was in there over an hour.

12   Q.   Okay.  And were you in and out of the room?

13   A.   Yes.

14   Q.   At some point in time, did you give the Defendant an

15   opportunity to write something?

16   A.   Yeah.  I asked him if he wanted -- because he kept

17   mentioning that he wanted to stop, he thought it was evil,

18   and that he just didn't think he would have another

19   opportunity ever again to do this.  So I took that as he

20   was feeling bad about it, so I offered him a chance to

21   write an apology letter to the Mitchells for what he had

22   done to the kids.

23   Q.   And what was his response to that?

24   A.   He at first didn't think it would work -- he didn't

25   think it would be necessary.  But then I gave him the

1  opportunity, I left pen and paper there, and he wrote an

2  apology letter.

3  Q.   I'm showing you what's been previously marked as

4  Government's Exhibit 29.  Do you recognize this?

5  A.   Yes.

6  Q.   What is it?

7  A.   That's the apology letter that he wrote to Thomas and

8  Maria Mitchell.

9  Q.   Does Government's Exhibit 29 accurately reflect the

10 apology letter that Michael Blackburn wrote on

11 December 17, 2013?

12 A.   Yes.

13      MS. LIZARRAGA:  Your Honor, I move for the

14 admission of Government's Exhibit 29.

15      MS. KATZE:  Your Honor, I would object.

16 Relevance.

17      THE COURT:  All right.  Objection noted, but

18 overruled.  It will be admitted.

19     (Government's Exhibit No. 29 admitted.)

20 BY MS. LIZARRAGA:

21 Q.   Could you just go ahead and read for me -- well, I

22 guess before that, let me ask this.  Did you witness him

23 actually -- were you in the room when he wrote this

24 letter?

25 A.   No.

1  Q.   So was he by himself?

2  A.   Yes.

3  Q.   All right.  Can you go ahead and read Government's

4  Exhibit 29 for us?

5  A.   "Dear Thomas and Maria.  What I have done is

6  unforgettable and was evil.  I did not do anything to

7  deserve" -- wait.  Oh, "Ya'll did not do anything to

8  deserve what I did.  It was 'cuz of my evil ways that your

9  children got hurt.  I am deeply sorry that I put ya'll

10  through all this pain and suffering, and hope that now

11  that I am gone, you and your children will be safe and

12  won't have to go through all this suffering again.  Thank

13  you, Michael, 12-17-13."

14  Q.   Detective Sabaugh, in your training and experience,

15  have you ever dealt with individuals who had a learning

16  disability?

17  A.   Yes.  I have interviewed people that said they had a

18  learning disability.  I've never gotten, you know, them

19  medically checked.

20  Q.   When you were speaking to the Defendant during your

21  interview, did it appear to you at all that he had any

22  type of learning disability?

23  A.   No.  He was very articulate.  He was able to explain

24  to me different technology and websites that he was able

25  to get onto.  He corrected me when I said something wrong

1  or inaccurate.  He was able to explain, which was great.

2  Q.   Did you ever observe him multi-tasking throughout the

3  interview?

4  A.   I don't know if I gave him a chance to multi-task.  I

5  mean, he was able to look at the pictures, talk to me and

6  describe what was going on, and how he came to the

7  conclusion of where those pictures -- you know, where the

8  assaults had happened during that time.  That's probably

9  the only time I remember him multi-tasking.

10 Q.   Did he write on the pictures at all?

11 A.   Yes, he did.

12 Q.   And while he was writing on the pictures, were either

13 you or Special Agent Breen speaking to him at the same

14 time?

15 A.   Oh, I'm sure, yes.  Not on all occasions, but some.

16 Q.   So when you were done with your portion of the

17 interview, what happened after that?

18 A.   That was it for that period of time.  He was being

19 arrested federally, so I didn't have any charging

20 documents to do.  Search warrants were being done at the

21 residence, but I wasn't a part of those.  I actually

22 waited until Thomas and Maria got home from California,

23 and it was like 9:00 P.M. before they got there, to

24 interview them.

25 Q.   At what point was the decision made that the case was

1  going to go Federal?

2  A.   It was sometime during the interview.  I don't really

3  recall when it happened, because it wasn't part of my --

4  you know, I was doing my thing, and I think it was Special

5  Agent Breen that was speaking to you all to find out if it

6  was going to be accepted or not.

7  Q.   And with regard to any potential State charges, have

8  you pursued any State charges against the Defendant?

9  A.   Yes.  Everything is pending at District Court right

10  now.

11  Q.   Okay.  So what charges are pending?

12  A.   Oh, we have numerous counts of criminal sexual

13  penetration of a minor, criminal sexual contact with a

14  minor, kidnapping, intimidation of a witness, child abuse,

15  of course, and I think that's it.  And there are numerous

16  counts of each of those, not just one count.

17           MS. LIZARRAGA:  Your Honor, may I have a moment?

18           THE COURT:  Sure.

19  BY MS. LIZARRAGA:

20  Q.   Just to clarify, with regard to the State charges,

21  what exactly have you done?  Have you submitted a charging

22  document?

23           MS. KATZE:  Objection.  Irrelevant to the issue

24  we have here.

25           THE COURT:  Well, part of it is, I may have --

1  how is it relevant?

2         MS. LIZARRAGA:  I think -- well, the reason I was

3  asking the question is because the Court had questioned

4  Special Agent Breen about it.

5         THE COURT:  And I was just trying to ascertain

6  whether it was a Federal search warrant or a State search

7  warrant.  So that's how we got into that.  And as it

8  turned out, there were both.

9         And you made the point.  There have been no --

10  let's just clear this up once and for all.  There's not a

11  -- in other words, you've turned your investigation over

12  to the State District Attorney's office; correct?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  So at this point, that's probably all

15  we need to get in.  And I wasn't trying to -- like I said,

16  I was just trying to --

17         MS. KATZE:  I understand what you were asking,

18  your Honor.

19         THE COURT:  -- determine whether there was a

20  Federal search warrant or a State search warrant.

21         MS. LIZARRAGA:  I have no further questions.

22         THE COURT:  Counsel may Cross.

23                   CROSS-EXAMINATION

24  BY MS. KATZE:

25  Q.   Good morning.

1   A.   Good morning.

2   Q.   Detective, you first became involved in the case, was

3   it on December 13th, or did you say you did some of the

4   surveillance before that?

5   A.   I did try to canvas the apartment building with

6   Special Agent Breen, but it was only one evening.

7   Q.   Do you remember what the date of that was?

8   A.   I don't, I'm sorry.  I remember it had snowed.

9   Q.   So Agent Breen contacted you?

10  A.   Yes.

11  Q.   And he told you that he had been contacted by the

12  Cyber Crimes Center?

13  A.   I don't remember who contacted him, but he advised

14  that he had received a photo from another agency, or

15  another department.

16  Q.   And so he had already started the investigation?

17  A.   I believe so.

18  Q.   Then after you did some surveillance, he let you know

19  that they had identified the girl in the photo?

20  A.   Yes.

21  Q.   What her name was?

22  A.   Jane Doe No. 1.

23  Q.   Right.  And I think they had also identified who her

24  parents were; right?

25  A.   Yes.

1   Q.   And as a result, they got the new address on Wyoming?

2   A.   Correct.

3   Q.   So he got all of that information?

4   A.   He got all of that, yes.

5   Q.   And then you mentioned also that he even went so far

6   as to know that Thomas Mitchell, the father, had a

7   brother, James, who initially maybe was a suspect?

8   A.   Correct.

9   Q.   So they had information on James; right?

10  A.   Correct.

11  Q.   Then on December 16th, that's when you guys had a

12  meeting about how you were going to go to the house;

13  right?

14  A.   Correct.

15  Q.   Was everybody, all the people that you named that

16  ended up going to the house the next day, were they all

17  present at the meeting?

18  A.   No.

19  Q.   So just some of the people?

20  A.   It was the supervisors and me and Special Agent

21  Breen, I believe.  I think that was it.

22  Q.   And then you all had recruited the other people to

23  go.  I know you had mentioned there were some Albuquerque

24  Police.

25  A.   It was the SPEED detail, the detail that I worked

1  with.  I was housed over with APD at the time, so it was

2  just natural.  And at the time, Jeff Petersen with APD was

3  essentially my supervisor, because I was housed over there

4  with them.

5  Q.   Okay.  So he was one of the people who was there when

6  you guys went on the 17th?

7  A.   Yes.

8  Q.   So, then you testified that on the morning of the

9  17th, you all got together at another location, not

10  right in front of the house?

11  A.   Correct.

12  Q.   And what time did you guys meet?

13  A.   It was early.  It was probably around 7:00 in the

14  morning.

15  Q.   So it was dark when you guys initially met?  Because

16  this is December 17th.

17  A.   I don't remember it being dark, but I don't remember,

18  to be honest with you.  It could have been dark, but I

19  don't remember.

20  Q.   I understand.  It's almost two years ago.

21  A.   Exactly.

22  Q.   So you were armed; right?

23  A.   Yes.

24  Q.   So you wear -- I'm trying to remember from the video.

25  You wear a side --

1   A.   A Glock, yes.

2   Q.   A Glock on your --

3   A.   On my right side.

4   Q.   And as far as you knew, everybody else was armed?

5   A.   Yes.

6   Q.   How were people dressed?  I know you said you had a

7   jacket with your, I guess, BCSO insignia?

8   A.   Yes.

9   Q.   Were other people similarly dressed with jackets or

10  vests that identified them as law enforcement?

11  A.   Yes.

12  Q.   Now, you all had made a plan the day before that you

13  wanted to get to the house early; right?

14  A.   Uh-huh.

15  Q.   And that's why you were there at 7:15 in the morning;

16  right?

17  A.   Exactly.

18  Q.   So you get to the house, and I guess you said you

19  were sort of the first knocking on the door person?

20  A.   Yes.

21  Q.   And was it pretty obvious to you right away that the

22  people in the house either were sleeping or had just woken

23  up because you knocked on the door?

24  A.   Yes.

25  Q.   And you said that Michael Blackburn came to the door;

1   right?

2   A.    Yes.

3   Q.    On Direct Examination, you were asked if he gave you

4   consent to enter.

5   A.    Uh-huh.

6   Q.    And you said that he did?

7   A.    Yes.

8   Q.    Can you tell me what you asked him?  What did you ask

9   him for consent for?

10  A.    Normally, and I can't tell you exactly what I said,

11  but I know that there wasn't an issue, so I know that this

12  is what I normally say.  And I've done probably a hundred

13  welfare checks.

14        I usually say, my name is Theresa Sabaugh, I'm here

15  to check on -- you know, are the Mitchells here?  I

16  remember I asked him that and he said they were out of

17  town.  And I said, who all lives here, and he said he did

18  with the two children.  And I asked -- well, usually I

19  would say, may we come in, then.  Can we come in, and we

20  went inside.  Not inside; we just stepped inside the door.

21  Q.    Okay.  So in this particular case, you filled out

22  what you call your -- is it the case report?

23  A.    Yes, ma'am.

24  Q.    Is that --

25  A.    It's a supplemental report.

1  Q.    Supplemental report.  And so that kind of -- that's a

2  report where you write about the investigation, and what

3  happened, and what you did; correct?

4  A.    Yes.

5  Q.    And so obviously you try to be as complete and

6  accurate and thorough as you can be?

7  A.    I try.

8  Q.    My question is, there's nothing in that report about

9  the fact that you asked for consent or were given consent.

10  A.    Right.

11  Q.    And yet later on, there's something in the report

12  about that he gave consent to search a phone.  So I'm

13  wondering why if he did, in fact, give consent, why it

14  wouldn't be in your report.

15  A.    Well, because it wasn't an issue.  Had he not given

16  me consent, then I would remember it more and I would have

17  documented that.  Because it wasn't an issue and he was

18  welcoming us inside, it wasn't an issue for me to write it

19  in my report.  And from now on, I will.

20  Q.    You indicated that you told him that you were there

21  for a welfare check, that you were concerned about the

22  kids.

23  A.    Yes.

24  Q.    You had already seen these pictures that apparently

25  were child pornography; right?

1   A.   Yes.

2   Q.   But at that point, you didn't tell him, we're

3   investigating possible child pornography?

4   A.   I was trying to ascertain who lived there, because if

5   it was the Mitchells, I needed to talk to them.  I didn't

6   know -- we were a little thrown off that he answered the

7   door, because we didn't expect him.  We didn't know who he

8   was.  So that was a little -- I don't normally just tell

9   everybody exactly everything.  I said I was there for a

10  welfare check.

11  Q.   So when you were talking to him, he told you that

12  there were two other adults staying there; right?

13  A.   Yes.

14  Q.   But you didn't see -- like when you guys were first

15  talking at the door, you didn't see them?

16  A.   No, I didn't.

17  Q.   And when was it that you actually -- because they

18  were sleeping in that back bedroom; right?

19  A.   I think they were in the living room.

20  Q.   I'm sorry; you're right, the living room.  The room

21  at the end of the hall.

22  A.   The living room, yes.

23  Q.   They were sleeping in there?

24  A.   Yes.

25  Q.   When did you first become aware of their actual

1   physical presence, not just that Michael told you there

2   were two people?

3   A.   It wasn't until later.  I didn't know until later,

4   because I didn't go back there.

5   Q.   So in the time that you were at the door, or stepping

6   inside the door, you never saw them, they didn't come down

7   the hall?

8   A.   No.

9   Q.   Okay.  So there were -- it sounds like there were at

10  least seven or maybe eight law enforcement officers there?

11  A.   There were a few.  I don't remember how many.  I'd

12  have to -- do you want me to count in my head?

13  Q.   That's all right.  We've kind of already been through

14  it.  In addition to your supervisor, Petersen?

15  A.   Petersen.

16  Q.   So I think that makes it eight.  So, eventually all

17  law enforcement got in the house --

18  A.   Yes.

19  Q.   -- and were in different places.  But you said -- so

20  it sounds like the way you're explaining it, very quickly

21  after you got inside the door is when the kids came down?

22  A.   That's my recollection.

23  Q.   And did both kids come down?

24  A.   I believe so.

25  Q.   Okay.  And you said they were in diapers?

1   A.   Yes.

2   Q.   I mean, is it possible that they had just woken up?

3   A.   Oh, yes.

4   Q.   So maybe they were sleeping in their diapers?

5   A.   Yes.

6   Q.   And I think you said on Direct Examination, you

7   didn't have anything to do with the adults; right?

8   A.   Not really, no.  Not at the house.

9   Q.   So at the house, you weren't in the living room with

10  people, you had nothing to do with the other agents who

11  were watching people; is that correct?

12  A.   No, not really.  Not any direct involvement.

13  Q.   Okay.  Let me just ask you about the condition of the

14  kids.  So, you said that they looked like maybe they

15  hadn't been bathed in a while, their hair looked matted or

16  something.  Other than they maybe looked a little bit

17  unkempt, did they look injured --

18  A.   No.

19  Q.   -- like from what you could initially see?

20  A.   No.

21  Q.   And this might not even be relevant, because they

22  might have woken up with a dirty diaper, but I mean, were

23  the diapers dirty?

24  A.   I don't recall that.

25  Q.   Okay.  You said, we were upstairs looking for

1    clothes.  Who is we?

2    A.   Well, it was a two-story, so at one point, and I

3    couldn't tell you the specifics of this, at one point

4    officers came in to do a security sweep of the residence,

5    and I believe it was APD that was upstairs with me.  I

6    believe it was Jeff.  I remember Jeff Petersen and, yeah,

7    Josh Hawkes and Jake Storey were upstairs, I think, just

8    making sure the other bedrooms were clear, I guess.

9    That's what my understanding was.

10   Q.   So you were upstairs with the kids, and you went into

11   the bedroom where their clothes were at some point; right?

12   A.   Yes.

13   Q.   And that was Michael Blackburn's bedroom; right?

14   A.   Yes.

15   Q.   So when you were in there, I know on Direct you

16   couldn't remember whether there were two little toddler

17   beds or one, but there were toddler beds and there was

18   Michael Blackburn's bed?

19   A.   Yes.

20   Q.   Would it be fair to say that you did not ask Michael

21   Blackburn for permission to go up into that bedroom?

22   A.   No, I did not.

23   Q.   Now -- I'm sorry.  Hold on one second.

24        Okay.  So then it sounds like you said the next thing

25   you remember is that you were transporting Mr. Blackburn

1   to the station.

2   A.   After speaking on the phone.  I was on the phone

3   almost the entire time, yeah.

4   Q.   I think you said it was probably around 8:30.  So

5   someone else was watching the kids?

6   A.   Yes.  I think actually, because APD was upstairs, I

7   think once they started to try to find the kids' clothes,

8   too, then I started getting on the phone.  So I handed

9   that off to them.

10  Q.   Did you have anything to do with searching

11  Mr. Blackburn?

12  A.   No.

13  Q.   And you didn't have anything to do with cuffing him?

14  A.   I'm sorry; what?  Cuffing him?

15  Q.   Yes.

16  A.   No.

17  Q.   So once you got him down to the station, he was put

18  in an interview room?

19  A.   Yes.

20  Q.   And it's a type of room where he can't get out --

21  A.   Right.

22  Q.   -- on his own?  And so you guys left him there.  You

23  said you had to wait a while to interview Keifer and

24  Franque, and then you went to interview him?

25  A.   Yes.

1   Q.   And I think from looking at the video, you started to

2   interview him around 12:30; is that correct?

3   A.   That's about the time, yeah.

4   Q.   So it was about four hours from when you transported

5   him?

6   A.   Yes.

7   Q.   Let me just ask you one question about your interview

8   with Keifer.

9   A.   Okay.

10  Q.   You had indicated -- well, you had indicated that you

11  did interview Keifer; right?

12  A.   Yes.

13  Q.   And Keifer specifically said to you that although he

14  noticed the children's hypersexual behavior, he did not

15  suspect abuse by Blackburn?

16  A.   That's correct.

17  Q.   Now going to the interview with Mr. Blackburn, it's

18  you and Agent Breen going in at like 12:30?

19  A.   Yes.

20  Q.   And you still have your side arm on; right?

21  A.   Yes.

22  Q.   And Agent Breen hands the sheet that you were shown,

23  the Statement of Rights?

24  A.   Yes.

25  Q.   He hands him that sheet.  Did you actually ever see

1  that sheet?

2  A.   Yes, I did.  It's a part of my case file.

3  Q.   Is it the same sheet that you use?

4  A.   No, it's a little bit different.  It has the same

5  rights on it, of course, because they're Constitutional

6  rights.

7  Q.   But it's not the exact same form?

8  A.   It's not the exact same form, no.

9  Q.   Okay.  So Agent Breen has the sheet, and these are

10 what are typically referred to as Miranda warnings; right?

11 A.   Yes.

12 Q.   Let me ask you, you've been trained in Miranda

13 warnings, right --

14 A.   Yes.

15 Q.   -- in the Miranda case?  And so you understand the

16 importance of those rights; correct?

17 A.   Yes.

18 Q.   I mean, you're advising a suspect of their

19 Constitutional rights?

20 A.   Correct.

21 Q.   And you would agree those are important rights?

22 A.   I agree.

23 Q.   And it's important that an individual who is about to

24 be interrogated understands those rights?

25 A.   Exactly.

1   Q.   Because they have the right to not speak to you at

2   all, to remain silent; right?

3   A.   Uh-huh.

4   Q.   They have a right to consult with an attorney?

5   A.   Right.

6   Q.   And they have a right to stop talking after they

7   start talking?

8   A.   Yes.

9   Q.   So Agent Breen didn't read these rights to

10  Mr. Blackburn; right?

11  A.   No.

12  Q.   And you didn't read them to him, either; right?

13  A.   No.

14  Q.   Agent Breen just simply handed him this sheet of

15  paper?

16  A.   Yes.

17  Q.   And at no time did Agent Breen ask about

18  Mr. Blackburn's reading ability?  Like he didn't ask him,

19  can you read okay?

20  A.   Not during the interview, no.

21  Q.   And you didn't ask that, either?

22  A.   No.

23  Q.   So then after handing him this piece of paper, Agent

24  Breen kept talking to him?  Let me just show you a short

25  clip.

1   A.    I don't know.

2   Q.    It's all right.  Let me show you a very short clip.

3          MS. LIZARRAGA:  Your Honor, at this point I would

4   object.  We've been over the clip.  It's been admitted

5   into evidence.  The Court can fully assess what happened

6   in the interview.

7          THE COURT:  I'll tell you what, I'm going to let

8   her do it, but then on Redirect if you want to expand on

9   it, since she's using the video, I'll allow you to do, as

10  well.

11         MS. KATZE:  Thank you.  This is just like a

12  little two-minute piece.

13      (Video recording played)

14  BY MS. KATZE:

15  Q.    Thanks for watching that.  Now, when Agent Breen

16  gives Mr. Blackburn the sheet with the Statement of

17  Rights, Agent Breen is still talking to him?

18  A.    Yes.

19  Q.    And then you're talking to him?

20  A.    Yes.  I was explaining to him how important they

21  were, that he understand them.

22  Q.    But nobody actually explained any specific rights to

23  him; is that correct?

24  A.    Well, I did tell him that he didn't have to speak to

25  us.

1  Q.   Let me go back here.  Okay, so he's handed the piece

2  of paper, and there's not a time really when he has like a

3  quiet time to look and read it; is that right?

4  A.   It didn't appear that he needed it.  He was reading

5  it.  It looked like he was reading it.

6  Q.   I guess that's a question for what he's doing.  To

7  me, it looks like he's looking at Agent Breen and looking

8  at you.

9  A.   I thought he was looking at the piece of paper and

10  reading it.

11  Q.   So I understand that you thought he read the rights,

12  but you didn't ask him if he read them, did you?

13  A.   I wasn't -- it appeared he was reading them when I

14  was in there.  Like I didn't ask him, no, specifically.

15  Q.   Right, you didn't ask him, and Agent Breen didn't ask

16  him if he had actually read them?

17  A.   No.

18  Q.   And Agent Breen didn't ask if he actually understood

19  the rights?

20  A.   I don't think he ever asked him that.  He did say

21  that we have to make sure that you are advised of them and

22  that you understand them.  He did say that in the

23  beginning.

24  Q.   But nobody actually asked him, do you understand

25  these rights?

1   A.   No, I didn't.

2   Q.   Neither Agent Breen nor you specifically asked him if

3   he wanted to speak to an attorney?

4   A.   No.

5   Q.   And neither of you actually asked him if he wanted to

6   waive those rights?

7   A.   Actually, Agent Breen did say, in the back there it

8   says, this says down here that if you're willing to talk

9   to us, you have to sign right here.

10   Q.   But Agent Breen never actually asked him if he wanted

11   to waive the rights that are on the form?  He doesn't

12   specifically ask him that?

13   A.   Agent Breen was advising him of his rights, and I

14   think that that's just his way of doing it.  But he did

15   say, this says right here that you're willing to talk to

16   us, or whatever he said at the end there.

17   Q.   Well, but initially he simply just -- he doesn't go

18   through any of the rights, he just says, initial here;

19   right?  Is that what we just saw in the video?

20   A.   But you're asking me specifically if he was asked

21   about waiving rights, and he does say, this down here

22   says, you know, you're willing to talk to us, initial and

23   sign.  Doesn't he say that?  I mean, didn't I --

24   Q.   Well, the Court has the video, so that's fine.

25        MS. KATZE:  May I have a moment, your Honor?

1          THE COURT:  Sure.

2   BY MS. KATZE:

3   Q.   Just one last question.  You had testified that you

4   thought the Miranda warnings are very important and that

5   they cover very important Constitutional rights.  Why is

6   it that you and Agent Breen didn't give him some time to

7   just read them?

8   A.   He looked like he had read them.  He looked like he

9   was reading them when we were talking to him.  It's not

10  our policy to leave somebody in the room with -- I mean,

11  it's not my policy.  I'm not going to speak for Agent

12  Breen.  I don't normally leave somebody in the room with

13  their advisory rights.

14  Q.   What about just not talking to them while they're

15  looking at it?

16  A.   It would be fair to say that I do things a little

17  differently, but he was advised his rights with a piece of

18  paper, and we believed him -- he didn't ask any questions,

19  he didn't seem to misunderstand anything.  So I think that

20  he understood his rights.

21  Q.   But I guess my question is, given that they're so

22  important, was there a reason why you talked while he was

23  looking at it?

24          MS. LIZARRAGA:  Objection.

25  A.   I was --

1      THE COURT:  Just a second.  What's the objection?

2      MS. LIZARRAGA:  I think this has been asked and

3  answered.

4      THE COURT:  I'll let her answer this question,

5  and then let's --

6  A.   While I was speaking to him, I was telling him how

7  important it is for him to understand them, and that he

8  doesn't have to talk to us without an attorney.  Or maybe

9  I didn't say without an attorney, but I said that he

10  doesn't have to talk to us.  So I was trying to explain to

11  him his rights while he was reading them.

12      I did not -- Agent Breen had a different tactic and I

13  didn't want to walk on his toes during that, but I was

14  trying to explain to him his rights during that, that

15  period of talking to him.  It wasn't just me babbling on.

16      MS. KATZE:  Thank you.

17      THE COURT:  Why don't we do this.  It's almost

18  noon.  Do you want to break for lunch?  Or, how much

19  Redirect do you have?

20      MS. LIZARRAGA:  I think it will only take me ten

21  minutes.

22      THE COURT:  That's fine.  Let's go ahead and

23  finish with this witness.

24      MS. LIZARRAGA:  Thank you, your Honor.  And this

25  is our last witness.

REDIRECT EXAMINATION

BY MS. LIZARRAGA:

Q.   Detective Sabaugh, on Cross-Examination, Ms. Katze asked you whether or not you observed anyone in the hall when you came into the house.  I'm showing you what's been admitted as Government's Exhibit 5.  Is this -- what are we looking at here?

A.   That's down the hall.  I think the kitchen is to the left there.

Q.   And when you first walked into the house, where was your attention on?

A.   Mr. Blackburn in the foyer.

Q.   And other than it being on Mr. Blackburn?

A.   The children.

Q.   Okay.  So were you actually looking back to the back of the hall to see if anyone was there?

A.   No.  My attention was to Mr. Blackburn, because he was the immediate person I was speaking to, and then when the children came down and I recognized Jane Doe No. 1, then my attention went there and Agent Breen stayed with Blackburn, I believe.

Q.   So is it possible that someone in that living room could have come into the hall during that point?

A.   Oh, yeah, they could have.  Other agents and people had gone in there, too, into the residence.  So I wasn't

1    concerned.

2    Q.    And Detective Sabaugh, on Cross-Examination Ms. Katze

3    asked you about the children's room.  Do you remember

4    that?

5    A.    Yes.

6    Q.    At the point that you went upstairs with the children

7    and went into their room, were you aware that that was

8    Michael Blackburn's room, as well?

9    A.    No.

10   Q.    On Cross-Examination, Ms. Katze went over the whole

11   advisement of rights portion with you and Special Agent

12   Breen.  At any point in time, did the Defendant tell you

13   that he couldn't read?

14   A.    No.

15   Q.    Did he tell you that he needed more time?

16   A.    No.

17   Q.    At any point in time throughout the interview, if he

18   had trouble understanding something, did he tell you that?

19   A.    Yes.

20   Q.    Did he ever correct you throughout the interview?

21   A.    Yes.

22   Q.    Can you remember, like, maybe how many times that

23   happened later on?

24   A.    Oh, it was a few times, because if I had said

25   something about him insulting one of the kids or whatever,

1  or if it was at a different residence, like I thought it

2  was in a different apartment than where it happened, he

3  corrected me.  There were a couple of times that I can

4  think of.

5  Q.   Was there ever a point in time when you asked him a

6  question and he told you, he said, oh, I need a second to

7  think about this?

8  A.   No.

9  Q.   Okay.  But -- with regard to the advisement of

10  rights?

11  A.   No.

12  Q.   Okay.  Now, when Special Agent Breen handed him the

13  paper, you were actually physically in the room with him?

14  A.   Yes.

15  Q.   Were you able to observe him?

16  A.   Yes.

17  Q.   Were you able to observe him face on?

18  A.   Yes.

19  Q.   And what did he appear to be doing with the

20  advisement form?

21  A.   He looked like he was reading it.

22  Q.   Did you have any reason to believe that he didn't

23  understand what was on that form?

24  A.   No.  And if I did, I would have clarified.

25       MS. LIZARRAGA:  Your Honor, I have no further

1    questions.

2           THE COURT:  I've got a couple.  And you covered

3    this, but just so I'm clear on it, you got involved in

4    this -- in other words, initially Agent Breen was involved

5    based on a picture or a photograph that appeared to be

6    child pornography?

7           THE WITNESS:  Yes, sir.

8           THE COURT:  And because in one of those photos,

9    also, it appeared that there was some form of criminal

10   sexual contact of a child, then you or your agency was

11   called into the investigation; is that right?

12          THE WITNESS:  Yeah.  We all work together, so

13   that was part of the detail.  And maybe I should have

14   clarified a little bit better, but my role in SPEED for

15   the most part was not the exploitation part so much, it

16   was the hands-on offenses, that I would take over any kind

17   of alleged hands-on offense.

18          THE COURT:  So in other words, a protocol is set

19   up where if it's, as you say, a hands-on --

20          THE WITNESS:  I was kind of the person they

21   called for any hands-on offenses, because I was from SVU

22   and I did most of those cases.

23          THE COURT:  If it's purely a photograph of child

24   pornography, then --

25          THE WITNESS:  It would have stayed with -- it

1  probably would have just stayed with Special Agent Breen.

2  But he was looking for manpower, basically, to do a

3  canvas.  It wasn't even at the time -- you know, it was

4  just, we're going to go try to find these people.  It was

5  more about resources, just to canvas, in the very

6  beginning.

7          THE COURT:  Okay.

8          THE WITNESS:  I was just helping out.

9          THE COURT:  Now, I've heard testimony from some

10  of the agents, and they used the term knock and talk.  Is

11  that a term that you use?

12          In other words, what I'm getting at is, like

13  knock on the door and talk to the residents, is that the

14  same, in your mind, as a welfare check on the children?

15  And I realize some agencies have their own terminology and

16  their own culture, so to speak.

17          THE WITNESS:  I think that's what it is.  I think

18  that this was a knock and talk, probably, to them.  To me,

19  it was a welfare check of a child where, yes, I did knock

20  on the door and I did talk to people.  But a knock and

21  talk -- I'm relating it to my drug days.  It's just a

22  little different for me, I think.  But it's essentially

23  the same, I guess.

24          For me it was a welfare check of a child.  I

25  guess it was a knock and talk, essentially, if that's what

1    they called it.  But it was a welfare check for us.

2         THE COURT:  So in terms of describing what

3    initially you did in going to the residence at Wyoming,

4    you would characterize that as a welfare check of the

5    children?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Okay.  Now, I believe Ms. Lizarraga

8    showed you copies of some statutes.  Based on your

9    training and experience and your protocols, if you're

10   doing a welfare check of the children and you knock on a

11   residence and you say, we're here to do a welfare check,

12   and if the occupants do not allow you to come in and see

13   the children, then based on your training and experience,

14   what are you allowed to do?

15        THE WITNESS:  We're allowed to arrest them for

16   obstructing us from a criminal investigation of a child,

17   or abuse of a child.  It's an obstruction of a child abuse

18   investigation.

19        THE COURT:  So your understanding of your

20   protocols are that if you're not allowed to actually see

21   the children, and you believe they're in the residence,

22   then you have the ability to go ahead without going to get

23   a warrant and basically determine if the children are

24   okay?

25        THE WITNESS:  Yes.

1          THE COURT:  Okay.

2          THE WITNESS:  Yes.

3          THE COURT:  So again, that day in December when

4   you had the initial encounter with the Defendant,

5   Mr. Blackburn, at the time that you knocked on the door

6   and he answered, if you were not allowed in, then what

7   would have been your next step?

8          THE WITNESS:  There would have been a little bit

9   more escalation.  It would have been, hey, we're coming in

10  -- well, I hate to speculate on what would have happened.

11  There are so many ways, you know, I could have conducted

12  it.

13          If he wouldn't have let us in, he would have been

14  brought out of the residence, and then we would have gone

15  inside to make sure that the children were okay.

16          THE COURT:  And then at that point, if the

17  children are okay, then in terms of your protocol, what's

18  the next step?  Does it end there?

19          THE WITNESS:  Well, I would have talked to

20  Mr. Blackburn.  What normally would happen is -- what I

21  would speculate would have happened, if we're playing the

22  what-if game, if he didn't let us in, he would have been

23  brought outside the residence and I would have talked to

24  him.  Like, hey, who else is in there, we need to know,

25  and he would have told us, the kids.  So we would have

1   gone to check on the kids.  And then I would have talked

2   to him.  Like, where are their parents, blah blah blah.

3          The result probably would have been the same.  He

4   would have come downtown, because we identified Jane

5   Doe No. 1 right away.  And then CYFD would have been

6   called.  Everything would have been the same, probably,

7   after that.

8          THE COURT:  And it's normal -- any time you're

9   doing a welfare check, if you suspect there's something

10  going on with the children, is it customary to then notify

11  Children, Youth and Families to come in?

12         THE WITNESS:  Yes, sir, especially since the

13  parents were not in the state.  And at the time, we didn't

14  have any reason to believe that the parents knew about the

15  abuse or anything like that.  So had they been there, we

16  would have been able to interview them, and things may

17  have been different, too.

18         But because there was no caretaker for the

19  children, because we were taking Michael Blackburn, we

20  would have called.  Plus, just because of the photos, I

21  mean, it would have been a CYFD referral anyway, because

22  of what was happening.  It would have happened anyway,

23  regardless.

24         THE COURT:  Okay.  Now, do you have any

25  questions, Ms. Katze, in light of mine?

1          MS. KATZE:  No.

2          MS. LIZARRAGA:  No follow-up, your Honor.

3          THE COURT:  Okay.  May the witness be excused?

4          MS. LIZARRAGA:  Yes, your Honor.

5          THE COURT:  All right.  Thank you.

6          THE WITNESS:  Thank you, your Honor.

7          THE COURT:  All right.  So you have no further

8   witness evidence; right?

9          MS. LIZARRAGA:  That's correct, your Honor.

10          THE COURT:  And Ms. Katze, did you have any

11   further evidence you wanted to --

12          MS. KATZE:  I do not.

13          THE COURT:  Okay.  Then it's noontime.  Why don't

14   we come back at 1:30 and have argument.

15          MS. KATZE:  I actually do have one thing.  I want

16   to give the Court and the Government -- I think it's an

17   important article about a research that was done about

18   Miranda.  So if I could just put this in the record.  It's

19   a research that was done on Miranda warnings.

20          And then, your Honor, the second thing I'd ask,

21   rather than coming back this afternoon and doing

22   arguments, I would ask if you would give us time to do

23   written briefing on the issue, especially because it seems

24   to me that at least from the last witness, it seems that

25   the Government is bringing up a new theory of entry into

1  the house that they did not bring up in their response.

2      All the other agents indicated that the entry of

3  the house was a knock and talk, it was voluntary.  It

4  seems that the last agent, if I understand it, it seems

5  like she's basically saying it's a welfare check, and

6  she's going to get in the house.

7      But for the whole hearing, what I would ask for

8  is, if you could give us, I don't know, like a week to

9  order the transcript, and then maybe two weeks after that,

10  we could simultaneously file like a closing and legal

11  argument for the Court, rather than --

12      THE COURT:  I don't have a problem doing that,

13  but I would like to explore some issues with you all, just

14  because it's fresh in my mind.

15      MS. KATZE:  Okay.  I mean, I don't have a problem

16  talking about it.  I just don't want to be in a position

17  where --

18      THE COURT:  And that's one of the issues I want

19  to -- and I don't know.  In other words, I heard the

20  Federal agents say, in terms of the knock and talk, that

21  if someone doesn't want to talk, then that's it.

22      MS. KATZE:  Right.

23      THE COURT:  But I heard something that I wasn't

24  aware of in terms of those State statutes, so I think

25  that's --

1          MS. KATZE:  The same with me.

2          THE COURT:  Right.  So certainly I'll allow some

3    additional briefing on that, but there are some other

4    areas I wanted to visit with you all about.

5          But, yes, that way if you want to order the

6    transcript and do some supplemental briefing -- there are

7    some important issues that have to be resolved, so I want

8    to make sure everybody has time to make the record and

9    make the arguments they wish.

10         All right.  So we'll resume at 1:30.

11       (Recess was held from 12:01 until 1:35 P.M.)

12         THE COURT:  Shall we start with the United States

13   first?

14         MS. KATZE:  Your Honor, before we start, I had

15   given the Court and the Government this Miranda article,

16   and I think I should enter it into evidence.  So, I just

17   want to enter it into evidence, and it's A for the

18   defense.

19         THE COURT:  Any objection?

20         MS. LIZARRAGA:  No objection, your Honor.

21         THE COURT:  All right, it will be Defendant's

22   Exhibit A.

23       (Defendant's Exhibit No. A admitted.)

24         THE COURT:  All right, I'm ready.  And what I'd

25   like to do, if I could -- I mean, you're welcome to

1   follow-up, but I've got some specific areas of inquiry

2   that I'd like to just start with.

3         Let's start with the knock and talk.  Now, I

4   understand that the Federal agents' testimony was that on

5   a knock and talk, if there's not consent, then they don't

6   enter.

7         MS. LIZARRAGA:  Correct.

8         THE COURT:  Now, the last -- and this was

9   Detective Sabaugh, but are you relying on, aside from the

10  knock and talk and it's the position that there was

11  consent by Mr. Blackburn for the agents to enter and to

12  initially talk, are you also relying on those State

13  statutes that you questioned Detective Sabaugh about?

14        MS. LIZARRAGA:  Well, your Honor, our position is

15  that there absolutely was consent.

16        THE COURT:  Right, I understand.  But in other

17  words, that gets me to why are you asking --

18        MS. LIZARRAGA:  Right.  I brought up the

19  New Mexico State statute because even though the Federal

20  agents would not have had authority to enter the house had

21  Mr. Blackburn not given consent, I do believe that under

22  the State laws of New Mexico, Detective Sabaugh would

23  have.

24        So if for whatever reason the Court feels that

25  our evidence pertaining to the Defendant's consent is not

1   entirely clear, then we would also rely on those State

2   statutes, which would have enabled Detective Sabaugh to go

3   into the home to check on the welfare of the children.

4          THE COURT:  But under those State statutes, what

5   -- in other words, let's say she could go into the home

6   and check on the children.  She would have seen that the

7   children are there.  In other words, what then under that

8   statute would be allowed?

9          MS. LIZARRAGA:  Well, I think that the statute

10  would have allowed her to push Mr. Blackburn aside,

11  because no one is allowed to obstruct law enforcement when

12  they're doing that type of check.  As soon as they see the

13  children, she said that she immediately made the

14  connection that the minor female, Jane Doe No. 1, was the

15  actual minor female that was depicted in, I believe

16  Government's Exhibit 48, and so at that point, I think

17  that the State has the authority to call out CYFD.

18         THE COURT:  And take the children into custody?

19         MS. LIZARRAGA:  Yes.

20         THE COURT:  Now, I'm assuming you would take the

21  position that they would be allowed to do a protective

22  sweep of the house?

23         MS. LIZARRAGA:  Yes, your Honor.

24         THE COURT:  Okay.  But aside from that point and

25  then contacting CYFD to take the children into protective

1    custody, would they be allowed to do anything else absent

2    obtaining a search warrant?

3         MS. LIZARRAGA:  I think that they would be

4    allowed to secure the premises while they obtained a

5    search warrant.  I think at that point, they definitely

6    have probable cause to believe that there is evidence in

7    that home related to either a State offense or a Federal

8    offense.  So I think that they would have been allowed to

9    do a sweep, a protective sweep, and then secure the home

10   to make sure that there was no destruction of evidence in

11   that house.

12        THE COURT:  Now, getting back to the knock and

13   talk, you're relying on Agent Breen's testimony, as well

14   as Detective Sabaugh's testimony, that there was consent

15   by Mr. Blackburn for the officers to enter, as well as the

16   other occupant.  I'm drawing a blank on his name.

17        MS. LIZARRAGA:  Yes.  Keifer Orfield also

18   testified that he heard the agents ask for permission to

19   come in, and he heard Mr. Blackburn say that they could.

20        I believe that Special Agent Altamirano also

21   testified that she was standing right outside the door and

22   that she heard Detective Sabaugh ask for consent, and that

23   she heard the Defendant give consent.

24        THE COURT:  Okay.  In terms of evidence in

25   support of the consent for the agents to enter, is there

1   anything else you wish to call to my attention on that

2   kind of initial issue?

3        MS. LIZARRAGA:  I think just the testimony of our

4   witnesses saying that they did ask for consent, and that

5   the Defendant did agree to give consent.  I believe that

6   four of the five witnesses we called were all consistent,

7   that that is exactly what happened, including a nonlaw

8   enforcement person who was in the house.

9        THE COURT:  Now, where does it leave, from your

10  analysis, once the young female child comes down the steps

11  and there's the testimony that she is the one depicted in

12  Photographs 48 and 49, then at that point, where are we?

13       MS. LIZARRAGA:  I think that factually what

14  happened is that at that point, the officers were in the

15  house because they had agreed to be let in.  So while

16  they're in the house, and as long as the occupants are

17  fine with them being in the house, I think that they're

18  fine doing exactly what they did.

19       I think that that's further bolstered by the fact

20  that we heard testimony that each of the agents who

21  entered the house were aware of the investigation prior to

22  going in, and once they got there, they all immediately

23  began to suspect Michael Blackburn of being the offender.

24  So I think everything that happened was well within the

25  bounds of the law.

1          I think they were trying to figure out what to do

2     with the kids, they're trying to coordinate with CYFD,

3     they're trying to make sure that there's no destruction of

4     evidence.  I don't think that there was -- or, there's no

5     testimony that any actual search of the house happened

6     prior to them obtaining a warrant.  I guess the only other

7     issue would be with regard to the Defendant's cellphone.

8          THE COURT:  Yes, and that was the next thing.

9     Now, I suspect Ms. Katze will say that Agent Altamirano

10    conducted a search to obtain the phone, a search of the

11    house.

12         MS. LIZARRAGA:  Sure, and I think that that goes

13    directly against the evidence that we heard.  What she

14    said is that Ms. Hatten brought to her attention that she

15    believed that Mr. Blackburn was sexually abusing the

16    children, that he did have a cellphone, and that she would

17    show her where it is.

18         Hypothetically, even if Ms. Hatten hadn't taken

19    Agent Altamirano to get the phone, I think at that point

20    the agent would still be acting well within the legal

21    bounds to get the phone to ensure that there is no

22    destruction of evidence.  You heard that there was no

23    actual search of the phone until the Defendant consented

24    to it.

25         So at the point that Agent Altamirano followed

1   Ms. Hatten upstairs, she testified that she had just

2   received information that Ms. Hatten suspected the

3   Defendant of sexually abusing the children.  She knew that

4   the previous pictures that she had seen, Government's

5   Exhibits 48 and 49, were taken with a cellphone, so she

6   had every reason to believe that there may be additional

7   evidence on that cellphone, and I think law enforcement is

8   perfectly justified in maintaining evidence.

9        There was no search of the phone.  I think that

10  you can secure evidence to ensure that there is no

11  destruction of it while you are either obtaining -- you

12  can maintain the evidence, and then if you get consent,

13  obviously you can go into the phone, or you can wait until

14  you get a search warrant to actually go into the phone.

15       THE COURT:  Now, who was the other federal agent?

16  His first name is Morjn.

17       MS. LIZARRAGA:  Morjn Langer.

18       THE COURT:  Agent Langer.  Now, I understand the

19  Government's position to be that Agent Altamirano, if you

20  will, secured the phone and took it downstairs.  From the

21  Government's standpoint, is there anything wrong with

22  Agent Langer asking the Defendant if that was his phone?

23       MS. LIZARRAGA:  Absolutely not.  I think that at

24  that point, he's trying to identify whether or not that's

25  his phone.  I think that courts have found that when

1   you're asking for consent to search something, that

2   doesn't trigger any type of Miranda warning that's

3   necessary.

4          So simply identifying objects that belong to the

5   Defendant versus the other occupants in the house -- he's

6   simply asking the Defendant, is this your phone.  The

7   Defendant said, yes, it is.  And then he asked for consent

8   to search.

9          THE COURT:  Miranda speaks to custodial

10  interrogation.  At what point was the Defendant in custody

11  that would trigger Miranda?

12         MS. LIZARRAGA:  I believe that he was in custody

13  as soon as handcuffs were placed on him.

14         THE COURT:  Now, Agent -- I don't know why I

15  can't --

16         MS. LIZARRAGA:  Langer.

17         THE COURT:  Langer, yes.  He testified that after

18  asking the Defendant if that was his phone, he then asked

19  the Defendant if he could search the phone, and Agent

20  Langer testified that there was voluntary consent given by

21  the Defendant for Agent Langer to examine or look through

22  the phone.

23         MS. LIZARRAGA:  Yes.

24         THE COURT:  And then, am I correct in assuming

25  that from the Government's perspective, that verbal

1   consent would have been sufficient in and of itself for

2   Agent Langer to search the contents, or look for

3   photographs on the phone?

4          MS. LIZARRAGA:  Yes.

5          THE COURT:  Now, Agent Langer also testified that

6   he got a consent form, filled it out, verbally explained

7   it to him, and then had the Defendant read and sign.  Is

8   that a fair summation?

9          MS. LIZARRAGA:  Yes, your Honor.

10         THE COURT:  Is there anything else that you wish

11   to add regarding the search of the phone that I've

12   overlooked?

13         MS. LIZARRAGA:  No, your Honor.  I would just

14   point out that what courts look at in order for consent to

15   be valid are a number of different circumstances, whether

16   or not there's any coercion.  I think that all of our

17   witnesses testified that the Defendant's demeanor was

18   cooperative throughout.  We heard from Keifer Orfield that

19   he felt that the police were being extremely nice.  I

20   think at some point, he even said he felt like he was

21   talking to his friends.  So I think all of the evidence

22   clearly established that there was no coercion by police

23   at all in obtaining that consent.

24         THE COURT:  Okay.  So now we get to the point

25   about the confession, and I'll let you proceed on that.

1          MS. LIZARRAGA:  All right.  Thank you, your

2    Honor.  The Court did have several opportunities to

3    observe the video.  The Court heard from both Detective

4    Sabaugh and Special Agent Breen who were there.  I believe

5    that there is no doubt that the Defendant was given the

6    form and that the Defendant signed the form.

7          So I think that the only issue for the Court to

8    decide is whether or not the Defendant knowingly knew his

9    rights and waived them.  I believe with the evidence in

10   this case, we've met our burden of preponderance by

11   establishing that he did, in fact, do that.

12         You can see in the video that he is looking down

13   at the form.  We heard from both Detective Sabaugh and

14   Special Agent Ryan Breen, who were actually in the room

15   with him at that time, that they observed him reading the

16   form.  The Defendant did not have any questions for them.

17   He never told them, oh, I don't know how to read; I need

18   more time; I don't know what any of this means.

19         And I would point out that later on in the

20   interview with Defendant, there are portions where he does

21   correct Detective Sabaugh if she's gotten something

22   incorrect.  He does ask for time to think about something.

23   He tells the agents that, you know, he wants to make sure

24   he's getting it right.

25         So I think that part of the reason why courts

1  look to the totality of the circumstances is because all

2  of that dictates what the Defendant's level of

3  understanding was at the time.

4         Now, we did hear from Ms. Abeles about the

5  Defendant's reading comprehension.  I would simply point

6  out to the Court that she was never actually qualified as

7  an expert.  I know she rendered some opinions.

8         THE COURT:  You didn't object, though.

9         MS. LIZARRAGA:  That's correct.  I mean, I wanted

10 her to be able to get out her testimony, but with regard

11 to the weight to give what she said, she met with the

12 Defendant for a total of three-and-a-half hours, and she

13 then reviewed a video of the Defendant that had occurred

14 two years prior.  She didn't appear to realize that when I

15 was questioning her about it on cross-examination.

16        THE COURT:  What's the significance of the two

17 year time lapse?

18        MS. LIZARRAGA:  Well, I believe that when I was

19 cross-examining her and questioning her about the

20 Defendant's abilities, what she testified to is that she

21 could only speak to what his abilities were the day that

22 she actually examined him.  So I would just point that

23 out.  And I also would point out that she did administer

24 to the Defendant a test which is specifically supposed to

25 be only for individuals up to 25 years old.

1          I would also point out that the only thing that

2    she relied on was the Defendant's own self-reporting

3    during the test.  The Defendant clearly understands that

4    he's in a hot spot.  I think he has every incentive to do

5    poorly on that test.  And I think that's something that

6    the Court should consider in weighing both the results of

7    any testing that she conducted, and in weighing her

8    opinions about whether or not he would have had sufficient

9    time to read.

10          I'd also note that she was only provided with a

11   two-minute clip.  She did not review the entire video.

12   She did not review portions of the video where the

13   Defendant is clearly multi-tasking.  He's writing on

14   documents, listening to agents as they're talking to him,

15   responding to them.  So our position is that he definitely

16   understood what his rights were and voluntarily agreed to

17   waive them.

18          THE COURT:  You asked her some questions in cross

19   basically alluding -- I don't remember if she first raised

20   it, or maybe you asked it, but a full-blown diagnostic

21   evaluation versus what she was tasked to do.  What if any

22   significance do you attribute to that?

23          MS. LIZARRAGA:  Well, I think that her -- she

24   simply gave him tests, and I think that, basically, if you

25   follow the procedures that were laid out by AHEAD that I

1   pointed out, and I'm happy to supplement the record with

2   that portion of what I was referring to on cross,

3   individuals in this profession tell you that you cannot

4   rely solely on these tests in order to be able to

5   accurately determine whether or not someone has a learning

6   disability and what their true level of reading

7   comprehension is.

8        So I think basically what happened here is, she

9   gave him the test, but she didn't do a diagnostic

10  interview, she didn't ask for any records pertaining to

11  his academic background, she didn't interview him about

12  his family history.  And those are all steps that have

13  been deemed important in order to fully be able to assess

14  whether or not an individual has a learning disability.

15       THE COURT:  Okay.  Any additional argument you

16  wish to make?

17       MS. LIZARRAGA:  The only additional argument that

18  I wish to make is, our position is absolutely that the

19  Defendant was adequately advised of his Miranda rights,

20  and that he knowingly waived them.

21       If for whatever reason the Court does find a

22  deficiency with Miranda, then I think that the remedy is

23  to exclude the Defendant's confession.  I think anything

24  that we learned during the confession is still fair game.

25  What courts say is, even if there is a violation of

1   Miranda, as long as there was no coercion, you can still

2   use evidence that you found out throughout the interview

3   later on.

4        So say, for example, that the Defendant told

5   Special Agent Breen and Detective Sabaugh about his e-mail

6   accounts during the interview.  As a result of that, we

7   went and got search warrants for his e-mail accounts, and

8   what we found on his e-mail accounts forms the basis of

9   our distribution and receipt counts.  And so our position

10  would be that, you know, we would still be able to move

11  forward with the evidence in our case, and that there is

12  no fruit of the poisonous tree remedy for a Miranda

13  violation.

14       THE COURT:  Yes, I thank you for that.  I forgot,

15  there was one other area that I wished to explore with

16  you.

17       If a determination was made that there was not a

18  knowing and intelligent waiver of Miranda prior to the

19  confession, and I can't remember if you cited the cases

20  you're relying on, but since, as you said, there was no

21  coercion, then the officers would be able -- although the

22  remedy would be the confession would be excluded, say, at

23  a trial, what the agents learned from the interview that

24  led to other evidence would not exclude that evidence.

25       MS. LIZARRAGA:  That's correct, your Honor.

1        THE COURT:  And did you cite your authorities for

2   that?

3        MS. LIZARRAGA:  I don't think I have orally to

4   the Court.  It's found on Page 20 of my brief.

5        THE COURT:  That's fine, as long as it's in your

6   brief.

7        MS. LIZARRAGA:  Yes, I have those cites to 10th

8   Circuit law, as well as United States Supreme Court law,

9   on Page 20 of Document 33.

10        THE COURT:  Okay.  All right, thank you.

11        MS. LIZARRAGA:  Thank you very much.

12        THE COURT:  Ms. Katze, let me ask, as I

13   understood at least the tone of your pleadings, there were

14   in effect two Constitutional violations that you were

15   focusing on.  One obviously is the Miranda, the question

16   of whether the Miranda warnings were adequate prior to the

17   confession.  And then, also, the initial entry to the

18   apartment.

19        MS. KATZE:  Yes.  The Fourth Amendment and the

20   Fifth Amendment.

21        THE COURT:  Right.  Are there any other

22   Constitutional violations that you are --

23        MS. KATZE:  In order to give you a thorough

24   answer, I'll review the record, but I know that initially

25   from the information that we had and how we proceeded in

1    the hearing, yes, the Fourth Amendment violation, given

2    the entry and the subsequent search in the home, and the

3    Fifth Amendment violation of the Miranda.

4          THE COURT:  So I guess the point about the --

5    you're talking about basically the phone when you say the

6    subsequent search of the home?

7          MS. KATZE:  Yes, going up into the bedroom and

8    getting his phone out of his bedroom without consent.

9          THE COURT:  All right.  Under your analysis, if

10   there was not proper consent given for the initial entry,

11   then are you claiming that's a fruit of the poisonous

12   tree?

13         MS. KATZE:  Yes.  Yes, if there's an illegal

14   entry, anything you get as a result of the illegal entry

15   would be a fruit of the poisonous tree.

16         Additionally, even if their entry into the home

17   is found legal, Altamirano's seizure of the phone is

18   illegal.  It's still a seizure without consent.

19         THE COURT:  All right.  That was something I

20   wanted to explore with you, because there was testimony

21   that Hatten was the one -- in other words, none of the

22   agents knew that phone was up in the room.  And this may

23   not make a difference, but you characterized that bedroom

24   as Mr. Blackburn's bedroom, and I think it could also be

25   characterized as the children's bedroom.

1        MS. KATZE:  I think they were all staying in

2   there.  The Government characterized it as the children's

3   bedroom, and it could be characterized as Mr. Blackburn's

4   bedroom, right.  Mr. Blackburn and the two children were

5   staying in the bedroom, yes.

6        THE COURT:  Right.  So at least on this record,

7   it doesn't appear to me that the agents knew anything

8   about the location of that phone until Hatten volunteered

9   its location, and Altamirano's testimony was that she went

10  and got it and gave it to her.

11       MS. KATZE:  I don't recall any other testimony,

12  either, than that Hatten took her upstairs and got the

13  phone in the bedroom and gave it to her.

14       THE COURT:  How do you respond to Ms. Lizarraga's

15  argument that agents are entitled to secure evidence until

16  either a search warrant is obtained, or consent to search

17  is given?

18       MS. KATZE:  Consent to search would be an

19  exception to the warrant requirement, but there has to be

20  another exception to the warrant requirement.  And just

21  because they're going to get a search warrant, or they

22  hope to get a search warrant, that's not an exception to

23  the search warrant.  So I disagree that if there's a phone

24  and you want to look at the phone, that you can take the

25  phone and hold it.  That's still a seizure.

1          THE COURT:  So the fact that it's a seizure

2     totally negates the other officer's testimony that he

3     obtained verbal consent from the Defendant to search

4     through the phone, that he got a consent, and then did one

5     other step that wasn't done at the time of the confession,

6     but explained the form?

7          MS. KATZE:  Well, I think that's a good question,

8     because there's sort of two steps to that.  Let's assume

9     that Altamirano getting the phone without consent, taking

10    that phone, that that's a seizure and it's an illegal

11    seizure.  So then, is that the end of it?  Anything that

12    flows from that is illegal?

13          Your question then, is -- I don't know if that's

14    your question, but let's assume that the seizure is

15    illegal.  She brings the phone down to Langer.  Can that

16    illegality be purged, that tainted illegality be purged by

17    then asking Mr. Blackburn for permission to search his

18    phone.

19          I think the answer to that is, no, but I think

20    that's another -- I think that's a really good question.

21    I think that's something that should be included in the

22    briefing.  Yes, that's a good question.

23          THE COURT:  Because in other words, at this point

24    Langer's testimony wasn't uncontroverted, that at least in

25    terms of asking verbal consent, he obtained it.  He also

1  testified that he had a form, a consent form filled out.

2  And then he went the additional step and testified that he

3  explained the form.

4       MS. KATZE:  Yes.

5       THE COURT:  So it seems to me like for you to

6  prevail on that issue, then, you have to be right that

7  Altamirano's taking the phone from Hatten constituted a

8  seizure, which then did not allow the agents to do

9  anything else.

10      MS. KATZE:  I guess I would have to either be

11 right on that and/or I would have to be right that if

12 there was a nonconsensual entry into the home, that those

13 are fruits of the poisonous tree.

14      THE COURT:  Okay.  So, go ahead.  Those were the

15 issues I just wanted to focus on now.  Is there anything

16 else you want to say now?

17      MS. KATZE:  Well, with respect to the --

18      THE COURT:  All the issues that are in.

19      MS. KATZE:  Your Honor, I think some of them are

20 obvious, and I'll address them in the briefing.

21      I mean, I think our position is that it's not a

22 consensual entry just given the fact that we learned eight

23 armed law enforcement agents come to the house at 7:15,

24 and no matter what kind of nomenclature they use -- they

25 call it a knock and talk -- I think it's the overbearing

1  presence of the agents when they wake people up.

2       And then additionally, evidence by -- I think

3  Langer was the one that seemed pretty straight-forward

4  about it, that there was no question that all those agents

5  went in the home and secured the home and separated,

6  monitored and were on top of the adults, and didn't let

7  them leave.  So I think it was actually a detention.

8       I think we need to -- I would say as far as what

9  Detective Sabaugh said, I think Federal law trumps State

10  law regardless.  But the Fourth Amendment is obviously

11  king in that area, so I think we have to address that.

12       And as far as the confession, I think the

13  videotape speaks for itself.  I have watched it so many

14  times, and there's absolutely no way I see how there was

15  ever, ever a time that Mr. Blackburn could have

16  meaningfully read those Miranda warnings.  He's a person

17  who's never been arrested, he hasn't been in the criminal

18  justice system, not that that should even matter.  I mean,

19  that's not the point.

20       THE COURT:  No, but the point is, I'm sure

21  opposing counsel would say if he did have a lengthy rap

22  sheet, that he's been down that Miranda road before.

23       MS. KATZE:  Right.  And in this case, he has not

24  been.  But you look at the videotape, and from the moment

25  Agent Breen gives him that piece of paper, Agent Breen is

1    talking, and then Detective Sabaugh is talking.  And you

2    do see that Mr. Blackburn, he's looking at Agent Breen,

3    he's looking at Detective Sabaugh, and there are times

4    when it does appear that he drops his eyes, but there's

5    just no way -- let's say he has the sharpest reading

6    skills, brain, doesn't have the slow processing issue that

7    he has, there's no way he could read that.  I couldn't

8    read those seven rights and the paragraph at the end.

9            The fact is, it just seems like the way to avoid

10   that is to read the Miranda warnings.  And I realize that

11   there is not a set way that you have to read it, but I

12   think that way Agent Breen, or the Government, I should

13   say, wouldn't be in this position.

14           And I think that it is such a critical decision,

15   and those rights are so critical that to not have them not

16   only not read to him, but absolutely nothing asked to

17   ensure that he read them, that he understood them, that he

18   waived them.  It was referred to as a waiver sheet, not a

19   Statement of Rights sheet, and he was asked to just come

20   over and sign it.  Literally not one question to try to

21   gauge his comprehension.

22           And then, I mean, I hate to say it, but Agent

23   Breen can call it an unfortunate turn of phrase, now that

24   we're done with the silliness, but that kind of seemed

25   like that's what law enforcement attitude was at that

1    moment in that room.  Like, we want to get down to asking

2    you questions about child pornography, this is silliness,

3    and we treat it like silliness because we don't ever ask

4    you any actual questions to gauge whether you, A,

5    understand your rights, have read them, and, B, understand

6    them and waive them.  So, I think those are the issues.

7            THE COURT:  Now, one thing Detective -- I saw

8    this.  How does this impact your analysis, if at all?  But

9    Detective Sabaugh, and it's in the tape, she did tell the

10   Defendant that he doesn't have to talk to us.

11           MS. KATZE:  But that's not enough, right.  In the

12   Miranda decision, there's a number of Constitutional

13   rights that an individual has to be informed of.  And just

14   informing someone of one right -- I would just ask the

15   Court to watch the tape again, or I'd be happy to e-mail

16   to your court our little --

17           THE COURT:  No, we've got the transcript.

18           MS. KATZE:  Or I was going to say, if it's easier

19   to look at the two minutes.

20           THE COURT:  If you want to e-mail that, that's

21   fine.

22           MS. KATZE:  I'll e-mail that to you, because the

23   Government keeps talking about how he multi-tasks.  I have

24   no idea what they mean by that.  I never saw in the whole

25   video him multi-tasking.  In fact, I actually saw the

1  opposite.  As opposed to Agent Breen initially during the

2  Miranda warnings, where he's talking to him the whole time

3  he hands him the form, when he's asking him to look at

4  pictures, he'd hand him a picture, he'd ask him what's in

5  the picture, Mr. Blackburn answers, and then the agent

6  tells him what to write, and then the agent is silent, and

7  Mr. Blackburn writes on the picture.

8        And so it just seems to me -- like, I don't know

9  what they mean by multi-tasking, but it's a whole

10 different approach.  It just gives the impression to me

11 like, let's just blow over these rights, because we want

12 to get down to interviewing you, and now when we're

13 interviewing you, we're going to use the techniques we

14 learned by being friendly and calm and giving you time to

15 do things so that we can get the most information out of

16 you.

17        THE COURT:  Now, one of the things, and if you

18 want to address it in the briefing, feel free to wait

19 until then, but you will need to respond to the point that

20 since there was no "coercion," at least from the

21 Government's perspective, in terms of the interview

22 techniques, that if there were a Miranda violation, that

23 doesn't prevent them from -- in other words, that doesn't

24 exclude -- obviously the remedy is clearly excluding the

25 confession, but the information they received from that

1   that led them to, say, the e-mails and stuff would still

2   not be excluded.  So, if you would address that issue that

3   was raised.

4           MS. KATZE:  Okay, I'll address that in my brief.

5           THE COURT:  That's fine.  I'm just saying, be

6   sure to.

7           And then, there's one other thing.  Part of the

8   reason that I was asking the questions about the -- I

9   think it's fair to say this would have been, if there was

10  only evidence of child pornography, this would have been

11  strictly a Federal investigation.  If it had only been

12  evidence of criminal sexual contact with a minor, it would

13  have proceeded as a State investigation.  The photographs

14  suggest evidence of both, so in other words, it makes

15  sense that there was kind of a task force; Federal/State.

16          But one of the -- and the reason I was asking

17  this question is to determine, the evidence came out that

18  there were separate State and Federal search warrants, and

19  the State search warrants were executed around 7:00, I

20  believe is what the evidence was, and of course those

21  search warrants, the evidence that the State actors would

22  have been looking for would have been evidence of the

23  criminal sexual contact.  And then two hours later, the

24  Federal warrants were executed.

25          So my question to you is:  Under the inevitable

1  discovery rule, would the execution of the State search

2  warrant, and given the fact that this was a joint, they

3  would have uncovered -- they would have found the

4  cellphone sitting on the shelf in the children's room,

5  because they would have been looking in that room.  It was

6  both the Defendant's room and the children's room.

7          So, would the inevitable discovery rule come into

8  play where they would find the cellphone then, and then,

9  of course, that would have been covered by if not the

10  State search warrant, then the Federal search warrant that

11  was to be executed two hours later?

12          MS. KATZE:  I'll be happy to address that in my

13  briefs.  I think I mentioned in my response to the

14  Government that they basically waived that argument.  They

15  did not bring that argument up.  So I would argue that

16  that argument is waived.  But I think that it depends

17  on -- well, we have to look at how they got the search

18  warrants and the circumstances of that.

19          But, I mean, if the Court wants me to address it,

20  I will.  I just feel that that argument has been waived,

21  because it has not been -- it was not addressed.

22          THE COURT:  Right.  But you've requested to do

23  the additional briefing based on the way the evidence came

24  in.

25          MS. KATZE:  And I'm happy to address it.

 1            THE COURT:  In other words, the Government is

 2    entitled to address it, as well.

 3            And then the final thing I want to talk to you

 4    about is procedure.  I know -- in fact, my court reporter

 5    has told me that you already ordered a transcript, or

 6    somebody has.

 7            MS. KATZE:  Yes.  I've asked -- I said that I was

 8    going to order it.  So procedurally, I was just getting my

 9    calendar, because I was thinking if we could order it like

10    a seven day, like the week rate, then what I thought --

11    would you be willing to do this?  If we order it in the

12    week rate, then you give me two weeks to respond, and then

13    the Government has whatever time you give them?

14            THE COURT:  Two weeks.  And then you get the last

15    word.

16            MS. KATZE:  Yes.

17            THE COURT:  Is that acceptable to you, that

18    procedure?

19            MS. LIZARRAGA:  Yes, your Honor.

20            THE COURT:  How about -- is two weeks sufficient?

21    In other words, we could start the clock from the time my

22    reporter gets the transcript prepared.

23            MS. KATZE:  Yes.  That would be great.  So then,

24    what if we could say a week -- well, Monday is a holiday.

25    How about, could I have two weeks from the 19th of

1  October?

2       THE COURT:  Just a second.

3       (A discussion was held off the record.)

4       MS. KATZE:  I could also do a 14-day order.  My

5  office might like me better for that.

6       THE COURT:  All right, let's do a 14-day order.

7  So the transcript will be done in 14 days, and then do you

8  want two weeks, an additional two weeks to form your --

9       MS. KATZE:  Yes, if that's okay.

10       THE COURT:  Sure.  Is that adequate time for you?

11       MS. KATZE:  I hope so.  If it's not, can I ask my

12  opposing counsel if I can have more time?

13       THE COURT:  Sure.  I mean, I've got some issues

14  that I've got to -- they're in the hopper that I'm dealing

15  with, as well, in addition to this case.  Is that two

16  weeks sufficient time for you?

17       MS. LIZARRAGA:  Yes, your Honor.

18       THE COURT:  And then, what do you want, one or

19  two weeks to do a reply?

20       MS. KATZE:  Can I have two weeks?

21       THE COURT:  All right.  So, transcript within two

22  weeks, and then you have two weeks.

23       MS. KATZE:  So two weeks from today is the

24  21st.  So I'll just -- can we just make it that?

25       THE COURT:  Two weeks from the 21st.

1      MS. KATZE:  Right.  And then we'll start the

2  clock then.

3      THE COURT:  Right, we'll start the clock then.

4      MS. KATZE:  Thank you.

5      THE COURT:  All right.  Is there anything else

6  you want to cover today?

7      MS. KATZE:  I can't think of anything else.

8      THE COURT:  How about you?

9      MS. LIZARRAGA:  Your Honor, if I could just

10  quickly respond to one of Ms. Katze's points, and point

11  out to the Court that with regard to the Defendant having

12  no knowledge of the criminal justice system, I would just

13  want to direct the Court's attention to Government's

14  Exhibit 35.  That was an e-mail that the Defendant sent on

15  August 9, 2013, that attached a screen shot from his

16  phone, and in this he's talking to the mother of his

17  child, basically saying that he wants to rape that child,

18  and so she ends up telling him that she's going to contact

19  the FBI, and his response is:  "Go ahead, you have no hard

20  evidence."

21      So I think that that does show that he at least

22  has some idea about the way that the criminal justice

23  system works.  I think it also clearly shows that he knows

24  how to read.  But I just wanted to point that out.

25      And I'm glad that the Court brought up the

1   inevitable discovery doctrine.  We will certainly brief

2   the Court on that.  And with regard to the portions of the

3   interview where the Defendant is multi-tasking, I'm happy

4   in our brief to pinpoint the exact times during the

5   interview that it's our position that he is actually

6   multi-tasking.

7        THE COURT:  Okay.  All right, then.  Well, I

8   didn't need -- the original photos were returned, but I

9   did pull those discs out, so I've got the CDs of the

10  actual interviews.  So I've got that.

11       And then, Ms. Katze, if you want to send an

12  e-mail on the part you're relying on, that way we won't

13  have to look through the entire thing.  But I do have the

14  entire interview that I can look at.

15       So with that, this matter has been well briefed

16  and well litigated, and I'll await the additional

17  responses, and then I'll issue a decision.

18       All right, thank you.

19  (Proceedings adjourned at 2:17 P.M.)

20

21                    *  *  *  *  *

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                              )
UNITED STATES OF AMERICA,     )      No. 14-CR-00129 WJ
                              )
          Plaintiff,          )
                              )
     vs.                      )
                              )
MICHAEL DAMEON BLACKBURN,     )
                              )
          Defendant.          )
_____)

CERTIFICATE OF OFFICIAL COURT REPORTER

     I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65,

Federal Official Realtime Court Reporter, in and for the

United States District Court for the District of New

Mexico, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a true

and correct transcript of the stenographically reported

proceedings held in the above-entitled matter on October

7, 2015 and that the transcript page format is in

conformance with the regulations of the Judicial

Conference of the United States.

Dated this 21st day of October , 2015.

_____
MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102
Phone:  (505)348-2334
Email:  Mary_Loughran@nmcourt.fed.us