IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                                    Cr. No. 14-00129 WJ

MICHAEL DAMEON BLACKBURN,

        Defendant.

**MR. BLACKBURN'S POST-HEARING BRIEF IN SUPPORT OF HIS MOTION TO SUPPRESS STATEMENTS AND EVIDENCE OBTAINED IN VIOLATION OF THE FOURTH AND FIFTH AMENDMENTS**

Defendant Michael Dameon Blackburn, through counsel, submits the following brief, in light of the evidence presented at the evidentiary hearing held on October 6 and 7, 2015, in support of his motion to suppress all evidence, including photographs that are purportedly child pornography and Mr. Blackburn's statements, that law enforcement officers obtained as a result of their warrantless, unconsented-to entry into and search of Mr. Blackburn's home, their warrantless, unconsented-to seizure of Mr. Blackburn's cell phone and Mr. Blackburn's unintelligent *Miranda* rights waiver (Documents ("Doc.") 30 & 37).

**ARGUMENT**

**I. This court should suppress Mr. Blackburn's December 17, 2013 statements and evidence found in his home, his cell phone and computer-related media as products of officers violating the Fourth Amendment when they entered and searched Mr. Blackburn's home and seized his cell phone without a warrant or consent.**

**A.** *Introduction*

The testimony at the evidentiary hearing established the officers' relentless trampling of Mr. Blackburn's Fourth Amendment rights and his consequent entitlement to suppression of all

the evidence discovered at his house, including the contents of his cell phone and other electronic media, all the statements he made on December 17, 2013, and all evidence derived from those statements.  No matter what conduct state law authorized, that law could not authorize Bernalillo County Deputy Sheriff Theresa Sabaugh to contravene the Fourth Amendment of the United States Constitution.

Officers violated the Fourth Amendment when they had four days to obtain a warrant to search Mr. Blackburn's home and instead barged into his home without a warrant or consent. Officers' claims that Mr. Blackburn consented to their entry are not credible, given their failure to mention that supposed consent in their reports and Deputy Sabaugh's mistaken belief she did not need any consent.  Officers' versions of events contradict Keifer Orfield's assertion that he was in a position to hear Mr. Blackburn consent to the officers' entry.  Even if Mr. Blackburn gave some indication it was alright for the officers to enter, he did not give genuine consent but only acquiesced to Deputy Sabaugh's claim of authority to conduct a welfare check.  In any event, any consent was involuntary due to a number of coercive factors, including Deputy Sabaugh's determination to arrest Mr. Blackburn if he denied her access.

Under the government witnesses' version of events, several officers conducted a protective sweep of Mr. Blackburn's home beyond the scope of Mr. Blackburn's purported consent.  Under longstanding Tenth Circuit precedent, such a sweep, which, as in this case, is not in aid of an arrest, runs afoul of the Fourth Amendment.

Under her version of events, HSI Special Agent Christina Altamirano's unconsented-to, warrantless seizure of Mr. Blackburn's cell phone also transgressed the Fourth Amendment. Agent Altamirano obtained the phone from Franque Hatten who entered Mr. Blackburn's

bedroom which she had no actual or apparent authority to enter and took his phone which she had no actual or apparent authority to take.  Even if Agent Altamirano had legitimately located the phone, no exigent circumstances justified her seizure of the phone without a warrant.

The powerful confluence of all the above illegal activities lead to Mr. Blackburn's acknowledgment upon display to him of the seized cell phone that the phone was his, his consent to search the phone, the discovery of alleged child pornography on the phone and ultimately his statements at the police station.  The government has not met its heavy burden to prove intervening events purged the taint of the unconstitutional acts, in particular the unlawful phone seizure.

The Tenth Circuit has consistently held that a voluntary consent by itself is not enough to attenuate a taint.  The three-factor—proximity, intervening circumstances, misconduct flagrancy—test of *Brown v. Illinois*, 422 U.S. 590 (1975), controls.  The phone search consent came immediately after Homeland Security Investigations ("HSI") Special Agent Morjn Langer demonstrated to Mr. Blackburn that his phone had been seized.  HSI Special Agent Ryan Breen and Deputy Sabaugh used the results of the phone seizure during the police-station interrogation. There were no significant intervening events and the officers' Fourth Amendment violations were flagrant.  Therefore, this court must suppress all of Mr. Blackburn's statements on December 17, 2013, all the contents of Mr. Blackburn's cell phone, all the evidence secured pursuant to the search warrant, which was obtained by virtue of Mr. Blackburn's statements and the search of Mr. Blackburn's phone, and all evidence resulting from the leads obtained from Mr. Blackburn's statements.

The inevitable discovery doctrine does not apply to this case.  The government waived

reliance on that doctrine.  In any event, the government has not presented sufficient evidence to merit the requisite high level of confidence that the officers would have discovered the evidence against Mr. Blackburn by lawful means absent their unlawful conduct.  Indeed, no government witness indicated officers would have sought a warrant to search Mr. Blackburn's home had they not unconstitutionally intruded upon the home and seized his phone, leading to a search of that phone.

   **B.** *The Fourth Amendment trumps state law.*

   The government's and Deputy Sabaugh's suggestion that N.M. Stat §§ 30-6-4 and 32A-4-3 provide some sort of authority to enter Mr. Blackburn's home regardless of the Fourth Amendment is a non-starter.  The United States Supreme Court has explicitly rejected such a notion.  A state "may not . . . authorize police conduct which trenches upon Fourth Amendment rights," the Court has said.  *Sibron v. New York*, 392 U.S. 40, 61 (1968).  "The question . . . is not whether the search (or seizure) was authorized by state law.  The question is rather whether the search was reasonable under the Fourth Amendment."  *Id.*  In *Sibron*, the Court found an officer's seizure and search of the defendant's person violated the Fourth Amendment because the officer did not have probable cause to arrest the defendant or reasonable grounds to believe he was armed and dangerous and, in any event, the search was not reasonably limited in scope. *Id.* at 62-65.  It did not matter whether or not New York law authorized the officer's conduct.  *Id.* at 62,

   Similarly in this case, whether or not New Mexico permitted or commanded Deputy Sabaugh to do what she did is of no moment.  That what she and the other officers did violated the Fourth Amendment is all that matters.  *See also Dunn v. Marelli*, 3 F. App'x 710, 715 (10th

Cir. 2001) ("we reject [civil rights] Defendants' extraordinary argument that the searches and

seizures were necessarily constitutional because they were conducted pursuant to a state statute

that was constitutional at that time.  The mere fact that the Act was in existence says nothing

about the constitutionality of the searches and seizures under the Fourth Amendment."); *Chavez*

*v. Board of County Commissioners of Curry County*, 31 P.3d 1027, 1034-36 (N.M. App. 2001)

(implicit in N.M. Stat. § 32A-4-6(A)(1), which authorizes law enforcement officers to take

custody of children under certain circumstances, is the Fourth Amendment requirement that an

officer may not intrude on a person's reasonable expectation of privacy unless the officer has

reasonable grounds to believe that immediate action is necessary to safeguard a child; otherwise

the officer must obtain a warrant); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 568

(S.D.N.Y. 2013) ("The Fourth Amendment, and not New York law, establishes the requirements

for a constitutional frisk in this case.")

    **C.** *Mr. Blackburn did not consent to the officers' entry into his home.*

    Officers' testimony that Mr. Blackburn consented to their entry, (Motion Hearing

Transcript ("Tr.") 35-36, 139 (Agent Breen), 245 (Agent Altamirano), 295 (Deputy Sabaugh), is

not credible.  First, no officer said anything in a report prior to the motion to suppress about Mr.

Blackburn consenting, but did mention him consenting to the search of his phone.  (Tr. 139-41,

318).  For the reasons stated in Mr. Blackburn's reply, this circumstance casts serious doubt on

the newly arisen claim that he did consent.  (Doc. 37 at 3-4 (citing among others *United States v.*

*Griffith*, 762 F. Supp. 2d 1179, 1182, 1192 (D. Ariz. 2010) (disbelieving officers' testimony that

defendants' vehicle was traveling so slowly as to be suspicious, because neither officer thought

the speed was significant enough to include in a report)).

Second, the officers' explanations at the hearing as to why they never mentioned the supposed consent raises even more doubts about the veracity of their consent claim. Agent Breen asserted his reference to "knock and talk" in his report indicated consent. (Tr. 226). But the phrase "knock and talk" says nothing about entry or consent to entry. *See Tapia v. City of Albuquerque*, 10 F. Supp. 3d 1323, 1397 (D.N.M. 2014) ("the knock and talk itself is not a search. '[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' *i.e.,* knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence.'" (quoting *Florida v. Jardines,* 133 S. Ct. at 1423 (Alito, J., dissenting)).

Deputy Sabaugh explained: "Had he not given me consent, then I would remember it more and I would have documented that." (Tr. 318). In other words, she never reports a consent because apparently refusing consent is so rare. That practice seems absurd and contrary to the custom of the typical law enforcement officer. And her own report contradicts her explanation. She did note Mr. Blackburn's consent to a search of his phone in the same report that she did not note his purported consent to entry. (Doc. 37, Attachment ("Att.") D 3). Third, that Deputy Sabaugh believed she did not need consent and would arrest Mr Blackburn if he resisted, (Tr. 293, 337-39), increases the likelihood she did not seek consent in this case.

Mr. Orfield's testimony that he heard Mr. Blackburn consent to the officers' entry is suspect as well. He averred he arose from lying groggy from sleep on the living room floor and walked down the hall to several feet from the front door in time to hear Mr. Blackburn's consent. (Tr. 154-57, 179-80; Exhibit ("Ex.") # 5 (hallway photo)). But Agent Altamirano testified that, after she entered the apartment, Mr. Orfield was sleeping in the living room. (Tr. 245-46, 247).

That is where Agent Breen thought Mr. Orfield was.  (Tr. 142).  Moreover, HSI Special Agent Morjn Langer's testimony indicated he was standing closer to the front-door encounter than Mr. Orfield and he did not hear the front-door exchange.  (Tr. 272-73; Ex. # 1 (front door photo)).  Mr. Orfield's confusing testimony about his name, driver's license, military ID and when he was overseas, plus his less than honorable discharge from the Military Reserves, further call into question his credibility.  (Tr. 171-73).

For all of these reasons, it is not believable that Mr. Blackburn consented to the officers' entry into his home.  Deputy Sabaugh testified that by December 13, 2013, Agent Breen and she knew Jane Doe number one ("Jane") lived at the home they invaded four days later.  (Tr. 289).  For the reasons stated in Mr. Blackburn's motion to suppress, after that four-day delay without securing a warrant, entering Mr. Blackburn's home without a warrant or consent violated the Fourth Amendment.  (Doc. 30 at 8-13).

**D.** *Any consent by Mr. Blackburn to enter his home was involuntary.*

Even assuming arguendo that Mr. Blackburn consented, the government bears the burden of showing his consent was voluntary by (1) proffering clear and positive testimony that consent was unequivocal and specific and freely given and (2) the consent was given without implied or express duress or coercion.  *United States v. Salas*, 756 F.3d 1196, 1203 (10th Cir. 2014).  Courts determine whether the government has met its burden by an examination of the totality of the circumstances.  *United States v. Bass*, 661 F.3d 1299, 1304 (10th Cir. 2011).  The combination of circumstances revealed at the hearing prevent the government from proving the voluntariness of any entry consent.

First, Deputy Sabaugh presented the reason for her appearance at Mr. Blackburn's front

door in a way that implied Mr. Blackburn had no right to refuse entry. She said something like: "We're here to conduct a welfare check of the children." (Tr. 34-35, 245, 317, 319). That check could not be conducted absent entry. The deputy's words conveyed a strong message to Mr. Blackburn that the officers would not take no for an answer. "[G]overnment actions are coercive when they imply an individual has no right to refuse consent." *United States v. Harrison*, 639 F.3d 1273, 1279 (10th Cir. 2011). That is what happened here.

The circumstances in this case are similar to the officer claiming he had a non-existent warrant to search the defendant's home, as occurred in *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). As the defendant did in *Bumper*, Mr. Blackburn simply acquiesced to the officers' claim of authority. *Id.* That is coercion, not voluntary consent.

Second, doubtless Deputy Sabaugh delivered her apparent ultimatum with the conviction of someone who believed, as she did, that she had the right to enter whether or not Mr. Blackburn consented. In fact, according to her, it would be a crime for Mr. Blackburn to deny her entry. (Tr. 292-93, 337-38). The deputy's aggressive tone is a factor that contributed to coerciveness. *See Harrison*, 639 F.3d at 1278 (noting aggressive tone as a coercive factor).

Third, the officers deliberately came at an hour that would cause fear and confusion: 7:15 a.m. (Tr. 32, 133). Everybody, including the officers, knows that a disturbance at such a time is substantially more scary and discombobulating than one in the middle of the day. The officers' appearance woke up the people in the home. (Tr. 316). The hour choice was all part of the officers' coercive tactics. *See Quintero*, 648 F.3d at 670 (delay until 10:30 p.m., rousting the defendant from bed contributed to the coerciveness); *Liberal*, 632 F.3d at 1082, 1084 (encountering the defendant at 2:00 a.m. contributed to the coerciveness).

8

Fourth, Mr. Blackburn had been rousted from bed wearing only shorts, no shirt or shoes. (Tr. 35, 295). He was not only unexpectedly disturbed at an early hour but was barely clothed and thus feeling especially vulnerable. *See Quintero*, 648 F.3d at 670 (rousting the defendant from bed contributed to the coerciveness).

Fifth, there were eight armed officers. (Tr. 136, 294, 320). It is not clear how many Mr. Blackburn could see when Agent Breen and Deputy Sabaugh first approached him. Agent Altamirano was right next to them in front of a window, (Tr. 33), and Agent Langer was a few feet away, (Tr. 272-73; Ex. # 1 (front door photo)). The others were in the nearby parking lot. (Tr. 32-33), The number of officers was intimidating. Regardless of the exact number of officers he noticed, Mr. Blackburn was necessarily daunted by the number of armed officers he did see. *See United States v. Quintero*, 648 F.3d 660, 670 (8th Cir. 2011) (that six people, including three officers and two security guards, approached the home, contributed to the coercive atmosphere rendering the consent to entry involuntary); *Liberal v. Estrada*, 632 F.3d 1064, 1082, 1084 (9th Cir. 2011) (similar conclusion regarding consent to search a car where there were seven police officers).

Sixth, the officers did not advise Mr. Blackburn he had the right to refuse entry. That factor also supported the officers' goal to convince Mr. Blackburn he had no choice but to consent. *See United States v. Iribe*, 11 F.3d 1553, (10th Cir. 1993) (finding the district court did not clearly err when it found the defendant's consent to search the garage was involuntary in part because he was not effectively advised of his right to refuse consent).

In sum, the officers engaged in a calculated scheme to frighten and subdue whoever answered the door into allowing entry. That scheme succeeded. If Mr. Blackburn had consented

to the officers' entry, it would have been involuntary and therefore invalid. Consequently, for the reasons stated in Mr. Blackburn's motion to suppress the entry into his home violated the Fourth Amendment. (Doc. 30 at 8-13).

**E.** *The officers' unconsented-to protective sweep violated the Fourth Amendment.*

While Agent Breen and Deputy Sabaugh talked to Mr. Blackburn, several other officers conducted a "protective sweep" throughout the home to account for everyone in the home and to look for easily accessible weapons. (Tr. 36). Agent Breen could not remember "100%" Deputy Sabaugh asking for permission to do the sweep. (Tr. 36). The substantial weight of the evidence indicates that at most the deputy asked only if "we" could enter to conduct a child welfare check. (Tr. 34several -35, 245, 317, 319).

The protective sweep went far beyond any child welfare check consent. "The scope of consent is measured by objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). A typical reasonable person would not understand by Deputy Sabaugh's purported consent request that Mr. Blackburn consented to several officers searching throughout the home for people and weapons. Mr. Blackburn could not have contemplated his supposed consent would lead to such an extensive search totally unrelated to the children's welfare. The protective sweep went far beyond the scope of Mr. Blackburn's consent in violation of the Fourth Amendment. *See Osage*, 235 F.3d at 520-22 (consent to search the bag did not include consent to destroy tamale can in the bag); *United States v. Cotton*, 722 F.3d 271, 275-78 (5th Cir. 2013) (consent to enter and search the car for the defendant's luggage was not consent to search discrete locations within the car

where luggage could not reasonably be expected to be found).

The protective sweep cannot be justified on other grounds.  A protective sweep based solely on the safety of law enforcement officers, as this sweep was, may be conducted only incident to an arrest.  *United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007).  There was no arrest to aid in this case at the time of the sweep.  Nor did the officers have a smidgeon of evidence indicating that, while they were there, they or anyone else would be in danger.  There was no legitimate justification for the sweep.

**F.** *Under Agent Altamirano's version of events, she violated Mr. Blackburn's Fourth Amendment rights when she seized his cell phone without any exigent circumstances or a warrant after Ms. Hatten entered Mr. Blackburn's bedroom and stole his phone without actual or apparent authority to do so.*

According to Agent Altamirano, Ms. Hatten told the agent, among other things, that Mr. Blackburn lied to Agent Langer when he said he did not have a cell phone.  He has a cell phone, Ms. Hatten insisted.  The agent asked: "you've seen him with it?"  Ms. Hatten said: "it's upstairs, I'll show you."  (Tr. 249-50).  The agent said "okay" and followed Ms. Hatten upstairs and "into that middle bedroom," which was Mr. Blackburn's bedroom.  (Tr. 250, 262).  The agent watched Ms. Hatten grab the phone and then Ms. Hatten "turned around and gave it to" the agent.  (Tr. 251).  The agent seized the phone, took it downstairs and handed it to Agent Langer.  (Tr. 251-52).  Agent Altamirano acknowledged Mr. Blackburn never gave her permission to enter his bedroom or take his phone.  (Tr. 261, 262).

The government apparently wishes to justify the phone's seizure based on some sort of plain view grounds.  But the government has not met its burden to prove that exception to the warrant requirement applies.  *See United States v. Kiyuung*, 171 F.3d 78, 83-84 (2d Cir. 1999)

11

(government did not meet its burden to prove plain view exception applied).  "[G]enerally an officer should get a warrant if possible before he seizes an item in plain view.  He cannot seize absent exigent circumstances.  If he could obtain a warrant, then he cannot use the 'plain view' exception for the evidence." *United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002); *see also United States v. Schultz*, 2013 WL 2352742, ** 4-5 (E.D. Mich. 2013) (relying on the quote from *McLevain* to hold the plain view exception did not apply).  This is so because "no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" *Horton v. California*, 496 U.S. 128, 137, n. 7 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 445, 468 (1971)).

No exigent circumstances justified Agent Altamirano's seizure of Mr. Blackburn's phone. "The evidence was not going anywhere." *McLevain*, 310 F.3d at 443; *see United States v. Pacheco-Ruiz*, 549 F2d 1204, 1207 (9th Cir. 1976) (officers were required to get a warrant because there were enough officers present to make certain that until a warrant was issued no undocumented alien could leave the premises without being checked for citizenship); *United States v. Bassford*, 601 F. Supp. 1324, 133-34 (D. Me. 1985) (assuming the discovery of the film canister was constitutional, since no one but the officers were in or near the building containing the canister, there was no risk of disposal and therefore no exigency justifying its warrantless seizure).  Nothing prevented the government from obtaining a warrant to seize and search the phone.  Its warrantless seizure was therefore unconstitutional.

Moreover, a plain view seizure is proper only if the officer was lawfully in a position from which to view the object seized in plain view and the officer had a lawful right of access to the object itself.  *Harman v. Pollock*, 586 F.3d 1254, 1264 (101th Cir. 2009).  Agent Altamirano

was not lawfully in a position to view the phone.  Nor did she have a lawful right of access to it.

An officer may not consistent with the Fourth Amendment enter a person's room and seize that person's property with the consent of any person who happens to be around.  The consent must come from someone who has actual or apparent authority to consent.  *United States v. Romero*, 749 F.3d 900, 905 (10th Cir. 2014).  Ms. Hatten had no such authority to consent to Agent Altamirano's entry upstairs and into Mr. Blackburn's room[1] and seizure of his phone.

Actual authority can be established either through (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.  *Id.*  With respect to the first category, the government must show the consenter could access the property at will without the consent of the defendant.  *United States v. Cos*, 498 F.3d 1115, 1127-28 (10th Cir. 2007).  The second category depends on the relationship between the consenter and the defendant.  Co-tenant relationships do not establish such a presumption.  *Id.* at 1128.

The evidence demonstrates Ms. Hatten did not have actual authority to invite Agent Altamirano up the stairs and into Mr. Blackburn's room and to seize his phone.  Ms. Hatten was staying in the living room.  (Tr. 245-46, 247).  She was a co-tenant, nothing more.  She did not have a key to Mr. Blackburn's room.  She did not have free access to it since she told Agent Altamirano that at one time he locked her out.  (Tr. 248).  She certainly had no authority to give someone else access to the room.  She had no personal belongings there.  There is zero evidence Ms. Hatten shared the use of Mr. Blackburn's phone.  Ms. Hatten had no actual authority to consent to Agent Altamirano's entry into Mr. Blackburn's room or to the agent's seizure of the

---

[1] Agent Altamirano testified both that she entered Mr. Blackburn's bedroom, (Tr. 250), and that she stayed at the doorway, (Tr. 260).  Either way, she invaded a space that Ms. Hatten had no authority to invite her into.

phone. *See Cos*, 498 F.3d at 1127-28 (no actual authority where the consenter had no keys to the apartment and no personal belongings there); *United States v. Arrington*, 296 F. App'x 646, 649 (10th Cir. 2008) (similar regarding hotel room).

There is apparent authority when the facts available to the officer would warrant a reasonable person to believe the consenting person had actual authority. *Romero*, 749 F.3d at 905. Mere presence on the premises and access to the property in question is insufficient to establish apparent authority. *Cos*, 498 F.3d at 1129. If the officer is presented with ambiguous facts, the officer has a duty to investigate further before relying on the consent. *Id.* at 1128.

Agent Altamirano could not possibly reasonably believe Ms. Hatten had the relevant actual authority. Indeed, the agent could only believe the opposite. She knew or should have known the room was Mr. Blackburn's. There was an adult bed in the room, (Tr. 260), and Mr. Blackburn's phone was in the room. Ms. Hatten lived downstairs in the living room. (Tr. 245-46, 247). And Ms. Hatten told the agent the phone was Mr. Blackburn's, not hers. (Tr. 249-50). Apparent authority could not justify the agent's entry into Mr. Blackburn's room and seizure of his phone. *See Cos*, 498 F.3d at 1128-31 (no apparent authority to consent to apartment entry where the consenter answered the door and her children were in the apartment, but the officers knew nothing about her relationship with the defendant); *United States v. Jaras*, 86 F.3d 383, 389-90 (5th Cir. 1996) (no apparent authority to consent to search a suitcase where the consenting person told the officer the suitcase was the defendant's).

The absence of actual or apparent authority distinguishes this case from *United States v. Benoit*, 713 F.3d 1 (10th Cir. 2013). In that case, the civilian had actual authority to invite the officer into her shared home and shared office where the computer containing child pornography

was.  *Id.* at 11.  In the absence of such authority in this case, the plain view doctrine does not

apply.  *See United States v. Neely*, 345 F.3d 366, 371 (5th Cir. 2003) (plain view exception did

not apply because the officers did not have a lawful right of access to the storage room in which

the hospital had stored the defendant's bloody clothing); *United States v. Roark*, 36 F.3d 14, 18

(6th Cir. 1994) (plain view exception was inapposite because the improperly seized marijuana

was in plain view only as a direct result of the officers' unjustified, unconsented-to entrance into

a second house).

      **G.** *The government has not met its heavy burden to prove a purging of the taint of the officers' illegal conduct.*

      A whole host of illegal and coercive actions by the eight officers in the small duplex

apartment engulfed the suddenly-awakened, barely-clothed Mr. Blackburn.  The officers had

entered Mr. Blackburn's home without consent or with involuntary consent.  Several officers

conducted an illegal protective sweep throughout the home.  Deputy Sabaugh took the children

upstairs to look for clothes, (Tr. 295-97, 298-99), although there was no emergency need to do

so, given the warmth of the house and the absence of any injury, (Tr. 180, 320-21).  Other

officers joined the deputy in her search for the children's clothes.  (Tr. 323).  Officers kept their

eyes on the adult residents, making sure they did not create any security problems.  (Tr. 157,

274).  Testimony that officers "allowed" the adults to do certain things, (Tr. 158, 247),

demonstrated the officers were in control.  Agent Altamirano illegally entered Mr. Blackburn's

bedroom and seized his phone.  Agent Langer displayed the phone to him.  (Tr. 276, 284).

      This is the context within which the taint analysis must be considered.  *Harrison*, 639

F.3d at 1278 (considering the taint issue in light of the "totality of the circumstances").

Voluntary consent in itself is not an intervening circumstance that removes a taint.  *United States v. Fox*, 600 F.3d 1253, 1260 (10th Cir. 2010).  Nor are voluntary statements by themselves. *Brown*, 422 U.S. at  600-603; *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053-1055 (10th Cir. 1994).  Instead the government must prove a sufficient attenuation or break in the causal connection between the illegal conduct and the consent and/or the statements.  *Fox*, 600 F.3d at 1259.  That burden is "heavy."  *Id.*  To assess whether the government has met that heavy burden a court must consider three factors enumerated in *Brown*, 422 U.S. at 603-04: (1) temporal proximity; (2) presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.  *Fox*, 600 F.3d at 1259-60.  In this case, all three factors strongly weigh against a purge finding with respect to Mr. Blackburn's consent to search his phone, all his statements on December 17, 2013, and the evidence derived from those statements.

First, Mr. Blackburn's acknowledgment that the illegally seized phone was his came immediately in response to Agent Langer displaying the phone to him.  (Tr. 276).  Seconds later he orally consented and then moments later consented in writing to a  search of the phone.  All this while still in the midst of the effects of all the non-phone-related indignities.  Thus, the proximity factor weighs heavily against attenuation with respect to that consent.  *See Fox*, 600 F.3d at 1260 (the time it took to drive across the street, run a records check and search a car's front compartment weighed against an attenuation finding regarding a consent to search a home); *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994) (a few-minute proximity weighed "heavily" against a purge finding).

Mr. Blackburn made his statements at the police station between four and five hours from the officers' initial illegal entry and illegal seizure of his phone.  The Supreme Court has held

statements to be temporally proximate six hours following a violation.  *See Taylor v. Alabama*, 457 U.S. 687, 691 (1982).  So the proximity factor favors a taint finding with respect to Mr. Blackburn's statements.

Second, there were no intervening events between Agent Langer's phone confrontation and Mr. Blackburn's acknowledgment the phone was his.  As noted above, a consent to search by itself does not purge a taint.  *See Fox*, 600 F.3d at 1260.  Here the consent was nothing like a "release from custody, an appearance before a magistrate, or consultation with an attorney," that have been found to sever the causal connection with illegal conduct.  *See id.* at 1261 (quoting *United States v. Washington*, 387 F.3d 1060, 1074 (9th Cir. 2004).

The circumstances here are much different than those in *United States v. Mendoza-Salgado*, 964 F.3d 993 (10th Cir. 1992), where a careful explanation of a consent form and advisement of the right to withhold consent did purge the taint.  *Id.* at 1012-13.  In that case, the Tenth Circuit found it significant that the consenter, rather than the officers, broached the search issue.  She urged the agents to "go ahead and search." *Id.* at 1012.   By contrast, in this case, Agent Langer sought a consent to search from Mr. Blackburn, (Tr. 276), who, according to Agent Altamirano, had, prior to Agent Langer confronting him with his phone, had denied having a cell phone[2], (Tr. 249).  So Mr. Blackburn's phone consent did not purge the taint of the officers' illegal conduct.

No intervening circumstances attenuated the taint with respect to Mr. Blackburn's videotaped statements either.  Officers took Mr. Blackburn directly from the scene of the

---

[2] On the other hand, Agent Langer testified Mr. Blackburn initially acknowledged he had a cell phone.  (Tr. 275).

unconstitutional intrusion and seizure in too-tight handcuffs to a small locked interview room

from which he could not leave.  He was isolated there with no contact with a friend, family

member or advocate.  About three and a half hours after his confinement there, he had one brief

contact with a human, an officer, to get a cup of water.  (Ex. # 36 12:21:50). He was left to stew

and worry about what had just happened to him.  Then two officers who were part of the raid on

his home, Agent Breen and Officer Sabaugh, asked him questions relating to the reason for the

raid.

        During a substantial part of the interrogation, the officers questioned Mr. Blackburn about

the photos found on his phone.  Agent Breen made it clear to Mr. Blackburn the photos came

from that phone.  (Ex. 38 at 35).  In this way, the effects of the officers' misconduct, and in

particular, the unconstitutional seizure of the phone carried on.

        In fact, Agent Breen and Officer Sabaugh reinforced the effect of the initial confrontation

with Mr. Blackburn in the home.  At the beginning of the police-station interrogation, they acted

as though they were essentially just continuing the inquiries begun earlier that day and his

acquiescence to their questioning was a foregone conclusion.  To start the process off, the agent

handed Mr. Blackburn a *Miranda* rights waiver form and said: "I need you to read it before we

go into our questions."  (Ex. # 38 at 4). Later, the agent pointed to the bottom of the waiver form

and explained: "this says you're willing to talk to us right now," without ever asking him if he

was willing to talk to them.  (Ex. # 38 at 6).  As the discussion under Point II shows, the

truncated *Miranda* waiver procedure the officers engaged in did not constitute any sort of

intervening circumstance that could possibly purge the taint of Mr. Blackburn's intimidating

experience that morning.

Third, the officers' conduct was purposeful and flagrant.  Under this third *Brown* factor, the issue is not whether that conduct coerced a consent or statements, but rather whether the improprieties were obvious and were investigatory in design and purpose and executed in the hope that something might turn up.  *Fox*, 600 F.3d at 1261.  For the reasons discussed above and in Mr. Blackburn's motion to suppress and reply regarding that motion, the unlawfulness of the officers' conduct was obvious.  It is also apparent that misconduct was investigatory in design and purpose.  The officers gave no thought to a warrant until they had uncovered alleged child pornography on Mr. Blackburn's phone.

Considering all of these factors, the government has not met its heavy burden to prove the taint of its Fourth Amendment violations was purged when Mr. Blackburn consented to the phone search and gave statements at the police station.  *See United States v. Holmes*, 505 F.3d 1296, 1294-95 (D.C. Cir. 2007) (illegal seizure of car keys tainted subsequent consent to search the car); *United States v. Santa*, 236 F.3d 662, 676-78 (11th Cir. 2000) (illegal warrantless entry tainted the defendant's consent to search); *United States v. Wilson*, 36 F.3d 1298, 1308 (5th Cir. 1994) (confession resulted from exploitation of illegally seized checkbook); *United States v. Duchi*, 906 F.2d 1278, 1285 (8th Cir. 1990) (illegal warrantless entry and search tainted the discovery of the cocaine, plane tickets and motel receipt discovered after the entry and the defendant's subsequent consent to search); *United States v. Patino*, 830 F.2d 1413, 1418 (7th Cir. 1987) (taint of illegal entry and search was not purged with respect to the defendant's statements started twenty minutes after the entry and lasting for two hours where agents allowed her to leave the home twice to look for her dog in the company of an agent, and the agents decided not to obtain a warrant, despite ample opportunity to do so);

In addition, the taint reaches all evidence the government discovered because of Mr.
Blackburn's statements, including the e-mail addresses he disclosed, and the evidence discovered
as a result of the warrants issued in reliance on those statements and the evidence found on the
phone.  *See United States v. Hernandez*, 279 F.3d 302, 309-10 (5th Cir. 2002) (affirming
suppression of heroin where officer decided to seek consent to search suitcase containing the
heroin only after illegally manipulating the suitcase).  *United States v. Ienco*, 182 F.3d 517, 529-
532 (7th Cir. 1999)(unlawful detention of defendants leading to discovery of co-defendant's
identity tainted co-defendant's subsequent testimony; decision to testify was not a sufficiently
independent intervening event); *United States v. Johns*, 891 F.2d 243, 244-246 (9th Cir.
1989)(illegally obtained identification of defendant tended to "significantly direct" subsequent
investigation so that it tainted evidence acquired as result of surveillance prompted by the
unlawful identification).

Accordingly, this court should suppress any evidence found on Mr. Blackburn's phone,
all of Mr. Blackburn's statements made on December 17, 2013, any evidence discovered as the
result of those statements and all evidence discovered pursuant to the search warrants issued in
this case.

**H.** *The inevitable discovery doctrine does not apply to this case.*

As Mr. Blackburn has previously demonstrated, the government has waived reliance on
the inevitable discovery doctrine.  (Doc. 37 at 10).  In any event, it does not apply to the
circumstances of this case.  The inevitable discovery doctrine provides an exception to the
exclusionary rule when the illegally-discovered evidence ultimately or inevitably would have
been discovered  by lawful means independent of the initial illegality.  *United States v. Martinez*,

512 F.3d 1268, 1273 (10th Cir. 2008).  When the government's contention is, as it is in this case, that a warrant would have been obtained absent the unlawful conduct, "the court must examine each contingency that would need to have been resolved in favor of the government and apply the inevitable discovery doctrine 'only when it has a high level of confidence' that the warrant would have been issued and the evidence obtained."  *United States v. Christy*, 739 F.3d 534, 541-42 (10th Cir. 2014).  The government must meet its burden in that regard by relying on "demonstrated historical facts capable of ready verification or impeachment."  *Nix v. Williams*, 467 U.S. 431, 444, n. 5 (1984).  The government has not met that burden.

First, it is undisputed officers took no steps to obtain a warrant until after they engaged in unconstitutional behavior at Mr. Blackburn's home.  This is a factor of "great importance" weighing against application of the inevitable discovery doctrine  *Christy*, 739 F.3d at 543, n. 5 (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000)).

Second, neither Agent Breen nor Deputy Sabaugh testified to the effect or gave any clue he or she would have sought a warrant if they had not conducted their investigation at Mr. Blackburn's home or if they had not discovered purported child pornography on Mr. Blackburn's phone.  Indeed, Deputy Sabaugh testified she would have entered the home without a warrant whether or not Mr. Blackburn voluntarily consented to her entry.  (Tr. 293, 337-39).

Third, Agent Breen and Deputy Sabaugh did not seek to obtain warrants until after officers found what they believed to be child pornography on Mr. Blackburn's phone.  Agent Breen testified he felt reasonable suspicion rose to probable cause to arrest Mr. Blackburn after he viewed those incriminating photos.  (Tr. 227).  This is "evidence law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted

21

to force the issue by creating a fait accompli." *Christy*, 739 F.3d at 541 (citations and quotations omitted). This is a factor arguing against applying the inevitable discovery doctrine.

For all of these reasons, that doctrine has no place in this case. The government has not shown with a high level of confidence that the officers would have obtained a warrant absent their unlawful conduct. This court must suppress all the fruits of that unconstitutional activity.

**II. The government has not proven Mr. Blackburn knowingly and intelligently waived his *Miranda* rights.**

**A.** *Introduction*

At the hearing, the government failed to meet its "heavy burden" to prove Mr. Blackburn knowingly and intelligently waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 475 (1966). The government apparently clings to the ludicrous notion that, during the approximately 27 seconds Mr. Blackburn looked down in the direction of the *Miranda* rights form, Mr. Blackburn, who had no prior exposure to the *Miranda* rights, somehow managed to read all 114 words of the statement of rights and 57 words of the waiver and understood all his rights and the full consequences of signing the waiver, while both agents are talking to him and he is responding to them.

The government apparently relies on the notion that Mr. Blackburn evidenced during the interrogation and in his e-mails the requisite skills to accomplish that amazing feat. What the government showed Mr. Blackburn did is not remotely comparable to what the government claims Mr. Blackburn accomplished during those 27 seconds. Educational diagnostician Vivian Abeles's testimony that Mr. Blackburn is extraordinarily slow at processing and comprehending what he reads makes it even more obvious Mr. Blackburn did not knowingly and intelligently

waive his *Miranda* rights.

Accordingly, this court must suppress Mr. Blackburn's December 17, 2013 statements.

**B.** *Mr. Blackburn could not possibly have read his* Miranda *rights and waiver and understood his rights and the full consequences of signing the waiver.*

The video of the *Miranda* rights portion of the interrogation shows that out of the minute and ten seconds between the hand-over of the form and the initialing and signing of the form, Mr. Blackburn looked down at the form for approximately 27 seconds.  (Ex. # 36 12:30:02-12:30:07, 12:30:10-12;30;14, 12:30:28-12:30:29, 12:30:55-12:31:12).  It is not clear whether he is reading the form or not.  In any case, at the same time either Agent Breen or Deputy Sabaugh is talking to him and he is responding to them.  (*Id.* at 12:30:02-12:31:12).  While a bit of what the officers talk to Mr. Blackburn about has to do with his rights, none of it referred to his various attorney-related rights or the fact that anything he said could be used against him.

The video shows Agent Breen interrupted Mr. Blackburn while he was looking down at the form.  (*Id.* 12:31:12).  The agent did not ask him if he had finished reading.  The agent just rushed Mr. Blackburn along to the table.  At the table, it appears that Mr. Blackburn spent his time initialing, printing his name and signing the form without reading it.  The initialing took about 20 seconds, (*id.* at 12:31:23-12;31;43), and the printing and signing about 14 seconds, (*id.* at 12:32:02-12;32:16), while Agent Breen hovered over Mr. Blackburn and chit-chatted about a Spanish version of the form.

Under these circumstances, it was just not possible for Mr. Blackburn, or anyone who was unfamiliar with the *Miranda* rights, as Mr. Blackburn was, to have read and understood the 114 words of the rights section and the 57 words of the waiver section.  (Ex. # 28).  This is so not

only because of the limited time afforded Mr. Blackburn, but also due to the officers' constant talking. It is next to impossible for anyone to simultaneously read and understand something and listen and respond appropriately to someone else. And the video evidences Mr. Blackburn's need for silence and more time. It appears that Mr. Blackburn was still trying to read the form when Agent Breen ushered him over to the table to get the form process over with. (Ex. # 36 12:31:12). According to the article Mr. Blackburn submitted to the court, most suspects, even under optimal conditions, cannot adequately process the average *Miranda* warning of 92 words. Richard Rogers, et. al., *An Analysis of Miranda warnings and Waivers: Comprehension and Coverage*, Law and Human Behavior, Vol, 31, No. 2, 185 (Apr. 2007) (Defense Ex. A). Mr. Blackburn's conditions were way far below optimal.

     **C.** *The supposed multi-task examples the government proffered say nothing about Mr. Blackburn's ability to read and understand the* Miranda *rights and waiver under the circumstances of his* Miranda *warning process.*

     The government proffered the procedure of Mr. Blackburn writing a description of what a photo depicted as an example of Mr. Blackburn multi-tasking. Those circumstances were markedly different from what Mr. Blackburn underwent in the rushed *Miranda* warning process. During the photo-writing process, either the officers gave Mr. Blackburn time to write without distraction or he wrote down what the officers told him to write down, as though he was taking dictation. (Ex. # 36 13:04:37-13:27:10, 15:53:28-16:01:03). That is a far cry from Mr. Blackburn reading and understanding under time pressure the previously unknown, abstract *Miranda* concepts while someone is often making comments unrelated to those concepts.

     It is difficult to see what point, except a prejudicial one, the government is trying to make with the submission of Mr. Blackburn's apology letter and e-mails. Over the course of about 8

minutes, Mr. Blackburn wrote the simple, 10-line letter in complete silence.  (Ex. # 29; Ex. # 36 14:30:20-14:38:20).  The e-mails do not by any means exhibit any sophistication at all, let alone enough sophistication to understand *Miranda* rights.  (Ex. ## 31-35).  The reference to "hard evidence," (Ex. # 35), exhibits no comprehension of *Miranda* rights.  The government's feeble multi-task proffers only prove it is grasping at straws.

 **D.** *Ms. Abeles's testimony strongly supports the conclusion that Mr. Blackburn did not knowingly and intelligently waive his* Miranda *rights.*

 As demonstrated above, even a person of average intelligence and processing skills would not be able to read and understand the form the officers gave Mr. Blackburn under the circumstances Mr. Blackburn was subject to.  Nonetheless, Ms. Abeles's testimony shows Mr. Blackburn was especially unfit to read and understand the *Miranda* rights and waiver consequences under those circumstances.  She testified he is a very slow processor.  He had to read passages over and over again and subvocalize to understand them.  (Tr. 81, 82, 85, 104-05, 113).  In a timed test, he scored in the bottom one percentile for processing speed and comprehension.  (Tr. 114).  The tests show Mr. Blackburn needs lots of time and no distractions to read and understand anything.  Mr. Blackburn had an extremely limited time and plenty of distractions during the *Miranda* process.  After viewing the video of that process, Ms. Abeles did not think Mr. Blackburn could have read or understood the words on the *Miranda* form.  (Tr. 86-87 107).  This is further proof Mr. Blackburn did not knowingly and intelligently waive his *Miranda* rights.

 **E.** *In light of all the deficiencies of the* Miranda *procedure in this case, the government has failed to meet its heavy burden to show Mr. Blackburn knowingly and intelligently waived his* Miranda *rights.*

In his motion to suppress, Mr. Blackburn detailed many other defects in Agent Breen's and Deputy Sabaugh's *Miranda*-warning tactics.  First, from the very beginning when Agent Breen refers to the form he handed to Mr. Blackburn as a "Waivers form," the officers signaled to Mr. Blackburn the assumption that he would talk to them.   Second, the officers never orally told Mr. Blackburn about the bulk of the required *Miranda* advice.  Third, when the officers did refer to a *Miranda* right they did so in an awkward, unclear way.  Fourth, Agent Breen misdescribed the ramifications of Mr. Blackburn signing the waiver form.  The agent skipped over the fact that Mr. Blackburn's signature indicated: his rights had been read and explained to him; he "fully" understood his rights; and he "freely and voluntarily" waived those rights.

Fifth, Mr. Blackburn indicated by his signature that his rights were read and explained to him, when in fact that had not happened, calling into doubt whether the other matters to which he attested were nonetheless true.  Sixth, neither officer obtained an oral assurance from Mr. Blackburn that he understood his rights, wished to waive them and was willing to talk to them.  At one point Agent Breen asked: "So you understand these?"  But he did not wait for an answer.  Seventh, after Mr. Blackburn signed the waiver form, Agent Breen evidenced dismissiveness towards the *Miranda* rights, saying "Now that silliness is out of the way."  This told Mr. Blackburn he really had no right to stop the interrogation at any time.  (Doc. 30 at 19-24).

For all of the above reasons, the government has not met its heavy burden to demonstrate Mr. Blackburn knowingly and intelligently waived his *Miranda* rights.  For that reason, this court must suppress all his statements during his police-station interrogation[3].

---

[3]  This court cannot suppress the physical evidence the government acquired by virtue of the *Miranda* violation.  *United States v. Patane*, 542 U.S. 630, 637-40 (2004).  The physical evidence the government acquired in this case should be suppressed because the government

**CONCLUSION**

For the reasons stated above and in his other pleadings, defendant Michael Dameon

Blackburn requests that this court suppress all evidence found in his cell phone, all statements he

made to officers on December 17, 2013, and all other evidence officers acquired as a result of

those statements and pursuant to all warrants issued in this case.

I HEREBY CERTIFY THAT on the
4th day of November, 2015, I filed
the foregoing electronically through the
CM/ECF system, which caused AUSA
Marissa Lizarraga to be served by electronic
means, as more fully reflected on the
Notice of Electronic Filing.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

_____*filed electronically*_____
Margaret A. Katze, AFPD
Attorney for Defendant

_____*filed electronically*_____

acquired them as the result of the officers' Fourth Amendment violations.