## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA

       Plaintiff,

  vs.                                NO. CR-14-00129 WJ

MICHAEL DAMEON BLACKBURN,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE
## OBTAINED IN VIOLATION OF THE FOURTH AND FIFTH AMENDMENTS

THIS MATTER comes before the Court following a hearing on Defendant's Motion to

Suppress Statements and Evidence Obtained in Violation of the Fourth and Fifth Amendments,

filed June 5, 2015 (**Doc. 30**).  In this motion, Defendant seeks to suppress all evidence, including

photographs that are purportedly child pornography as well as  Defendant's statements, which

law enforcement officers obtained as a result of what Defendant claims was an illegal entry into

and search of Defendant's home and his unintelligent waiver of his *Miranda* rights.[1]   Having

considered the evidence presented at the suppression hearing, the relevant pleadings and the

applicable law, the Court finds that Defendant's motion is without merit.  Accordingly,

Defendant's motion is DENIED.

### BACKGROUND

In November 2013, Homeland Securities Investigations in Albuquerque ("HSI") received

a lead from the Cyber Crimes Center in Washington, D.C. ("C3"), which is affiliated with HSI),

_____

[1] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

about a child pornography image showing M.M., a two-year old girl, depicting a nude adult male with his penis partially inserted into a toddler's vagina, which (based on metadata information) was taken in May 2013.  *See* Att. A (agent report).  Through metadata information, HSI Agent Ryan Breen confirmed the residence where the girl was living.  Over the next two months, agents conducted surveillance and interviewed the occupants in the apartment building, and learned that the tenants who lived in the suspected apartment where the abuse had taken place were different from the occupants currently living there.  Agents also learned that a couple with two toddler children had lived in that apartment in May 2013. On December 13, 2013, Agent Breen received additional information from C3 along with another child pornographic image showing similar GPS coordinates as the first image.  In the second image, a toddler female is shown with her legs lifted and with her vagina and anus spread for display to the camera, showing the toddler's face. Through further questioning at the apartment complex, and by showing a sanitized image of the child's face, Agent Breen ascertained who the child was and identified the Mitchells, and through a background check, agents identified the Mitchells' current residence in a townhome located on Wyoming Boulevard in the City of Albuquerque, Bernalillo County, New Mexico.

I.      **The Entry**

Many of the relevant facts are largely undisputed, except where noted, and are presented here in general before discussing more detailed facts in the context of the disputed legal issues. What is disputed is whether those facts support a finding that Defendant's constitutional rights were violated.  On December 17, 2013, seven agents from a joint task force approached the Mitchell's residence for the purpose of a "knock and talk" that was part of a child welfare check conducted by the Bernalillo County Sheriff's Office ("BCSO").  The task force included officials

from HSI, the BCSO, and the Albuquerque Police Department ("APD").[2]   According to Agent Breen's testimony, he and Detective Sabaugh were standing just outside the front  door, Agent Altamirano was standing to the left of the door, and other agents and officers waited by the vehicles in the parking lot.   A male subject wearing only shorts answered the door.  Detective Sabaugh and Agent Breen identified themselves as law enforcement and said they were there to conduct a welfare check on the children living in the home.

Defendant claims that the entry was warrantless and unsupported by exigent circumstances, but he Government contends that Defendant consented to the entry.   Thus, the question of whether Defendant consented to officers' entry is disputed.  Defendant argues that the officers' entry frightened Defendant because he is borderline intellectually disabled with a learning disorder, a reading level below sixth grade, and no arrest history.   Agent Breen testified that seven armed law enforcements entered the home and conducted a protective sweep to ensure that the house was secure.  Agent Breen stated that he was able to identify Defendant because of his body type as shown in the pictures.  He stayed with Defendant and Detective Sabaugh in the front room, and that two other agents went upstairs.

While in the residence the officers asked Defendant questions which included: where the children's parents were, how long he was living there, his relationship with the children and where he and the children slept in the house.   Defendant told the officers that he lived at the residence with the Mitchells along with two friends of the Mitchells (Franque Hantten and Keifer Orfield), and the Mitchells' two young children.[3]  The children's parents were out of town, and Defendant had been living with the family for months as the primary caregiver of the children.

---

[2]   At the hearing, Agent Breen explained that the task force was part of "SPEED," or "Sexual Predator Exploitation Enforcement Detail."  *See* Doc. 53 (Hrg. Transcript, or "Tr.") at 132.

[3]   The pleadings also refer to Ms. Hantten as "Hatten."  *Cmp.* Doc. 55 at 11 with Doc. 33 at 4.

Agent Morgan Langer also talked to Defendant and asked if he had an iPhone, which Defendant answered in the negative because he had recently sold it at a mall kiosk.

Detective Sabaugh testified at the hearing and stated that the two children came downstairs as the investigators spoke to the adults.  She observed a young girl, later identified as M.M. and her brother, A.M., come downstairs wearing only their diapers.  According to her testimony, the children's hair was matted and they looked like they had not bathed in a few days.  *See also* Sabaugh Rep't, Doc. 37-1.  Detective Sabaugh approached M.M. and asked if she wanted to go upstairs to get some clothes, and M.M. jumped into Sabaugh's arms despite her being a stranger.  *Id.*  She recognized the little girl from the pictures, and immediately suspected Defendant as being the male in the pictures because of his large belly.  Detective Sabaugh also spoke with Ms. Hantten, who said she had told the children's mother that she thought Defendant was abusing the children.  Ms. Hantten also talked to Agent Altamirano, saying that she thought the children had hypersexual behaviors, and that they were possibly being sexually abused by Defendant and that she had intended to call the New Mexico Department of Children, Youth and Families ("CYFD") later that week.[4]

Ms. Hantten told the agents that Defendant did have a cell phone, and Agent Altamirano went with Ms. Hantten to get Defendant's phone from the children's room which was also Defendant's bedroom.   Agent Altamirano took the phone downstairs and gave it to Agent Langer who was with Defendant at the time.  Agent Langer testified that he asked Defendant if it was his phone and Defendant said it was.  He then asked Defendant if he could search the phone

---

[4]   While Ms. Hantten did not testify at the hearing, Defendant's rights under the Confrontation Clause are not implicated, since that right attaches at the criminal trial, and not before.  *See Pennsylvania v. Ritchie,* 480 U.S. 39, 52 (the right to confrontation "is a trial right").  Further, Defendant presented Detective Sabaugh's report containing her conversation with Hantten to the reply brief, which also contains portions of her testimony.  Doc. 37-1.

and Defendant told him yes and signed  a "Consent to Search."  Doc. 33, Ex. 1.[5] Defendant

consented to a search of the phone orally and in writing.  An officer found on the phone a photo

of A.M. "posed in a sexual manner" and a photo of M.M. with her mouth touching the penis of a

man, whose body in the photo "appeared consistent with" Defendant's, according to Agent

Breen's report.   Doc. 30-2 at 11.  Officers arrested Defendant and transported him to the John

Price Law Enforcement Center for a formal interview.

      Meanwhile, the residence was cleared and secured until a search warrant could be

obtained.  Detective Sabaugh called CYFD so that the children could be taken into protective

custody and an investigation of suspected child abuse and exploitation could be initiated, since

she understood by that time that the children would not be remaining in that home pending the

outcome of the investigation.

## II.    The Interview

      Defendant was taken to an interview room at the police station and interviewed by Agent

Breen and Detective Sabaugh.  The three and one-half hour interview was videotaped.  This

videotape was made available at the hearing, and was reviewed by the Court several times

following the hearing.  To start with, Defendant claims that he waited in the interview room for

over three hours with only one offer of a cup of water in the interim.  However, the Government

states that Defendant was offered and provided bathroom breaks, water and food during his

detention.  There was certainly some delay between Defendant's arrival at the police station and

his interrogation, based on Agent Breen's initial apology for the delay when he entered the

interrogation room.  However, based on the Court's viewing of the tape, Defendant did not

appear to be in any discomfort or express any impatience with the process.

---

[5]  Exhibits referenced herein are those presented at the hearing.  *See* Doc. 51.

Before advising Defendant of his rights, Det. Sabaugh asked some biographical questions.  Defendant was handed a *Miranda* rights wavier form and was told he had to read it before he could be questioned.  Neither officer orally explained his *Miranda* rights.   Defendant contends that his Fifth Amendment rights were violated when the agents failed to orally advise him of his rights and failed to explain these rights.  In this motion, Defendant claims that the short time he was given to read and process the waiver form was insufficient for him to fully understand the waiver, given his intellectual and reading deficiencies.  As a result, he could not knowingly and intelligently waive his rights.

During his confession, Defendant made statements detailing his sexual assaults on both children (50 to 60 times with M.M. and 30 to 40 times with A.M.) and gave details about the sharing of such photos with others over the internet.   Defendant stated that he had signed a total of fourteen child pornography photos which he admitted to either producing or trading online. Defendant also answered questions about the photos of M.M. and A.M. that officers found on the cell phone which Defendant had admitted belonged to him.

Both Mr. Orfield and Ms. Hantten gave voluntary statements to the police.  Mr. Orfield was interviewed for two to three hours and subsequently testified at the suppression hearing.

## DISCUSSION

## I.      Entry Into House – Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In evaluating a claim that law enforcement has violated the Fourth Amendment—thus warranting suppression of evidence—it is important to remember that the lynchpin of the Fourth Amendment is reasonableness.  *See United States v. McHugh*, 639 F.3d 1250, 1260 (10th Cir.

2011) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Id*. at 404 (quotations omitted).[6]

A.     Consent to Enter

The Government contends that the Fourth Amendment was not implicated because Defendant gave his consent for agents to enter the home.  Defendant's consent  would eliminate the need for a warrant. *See Illinois v. Rodriguez,* 497 U.S. 177, 182 (1990) (Fourth Amendment's  prohibition against warrantless entry of person's home does not apply to situations in which voluntary consent has been obtained, either from individual whose property is searched, or from third party who possesses common authority over premises).  Agent Breen described his request to enter the home as a "knock and talk" for which permission was sought and required before the encounter could continue.  Detective Sabaugh explained the encounter as a child welfare check which required law enforcement to investigate reports of sexual abuse or physical abuse or neglect.  While Detective Sabaugh acknowledged that probable cause did not exist for a warrant at that point, she also testified that in a child welfare check, consent was needed to enter a home except when it was believed that a child was in danger; however, law enforcement could not be denied access to a child or children in such circumstances.   The Court need not determine whether entry into the home qualified as a "child welfare check" where consent may not have been required because, as Defendant correctly notes, the question is whether entry into the home was justified under the Fourth Amendment, not whether the encounter was authorized by state law.

---

[6]  In his motion to suppress, Defendant expected the Government would argue the existence of exigent circumstances to justify entry into the home. Doc. 30 at 8.  However, because the Government is relying on Defendant's consent to enter the home, no discussion of exigent circumstances is necessary.

Defendant argues that there was no consent to enter the home because none of the officer reports generated prior to the motion to suppress mentioned Defendant's consent to enter the home.  However, the fact that the consent is not noted in a report does not necessarily mean it did not occur.  Moreover, the Court is confident that regardless of what the reports indicated, Defendant would continue to argue that consent was never given.  As is happens, however, the Government's position that consent was given is supported by actual testimony.  First, Defendant Sabaugh's explanation for the lack of reference for consent in the report is reasonable: Sabaugh stated that Defendant's *refusal* to give consent would more likely have been included in the report.  Second, several individuals testified that Defendant told law enforcement that they could come into the home:  Agents Breen, Altamirano, Mr. Orfield, and Detective Sabaugh.   Finding for Defendant on this issue would require the Court to completely ignore this considerable amount of very credible testimony.[7]   Defendant also argues that Mr. Orfield's testimony is suspect because he had just woken up and was groggy.  In addition to the fact that several other individuals having heard the same thing, it is less likely that Mr. Orfield dreamed that Defendant gave his consent to the agents and more likely that the verbal consent had alerted Mr. Orfield from his slumber.

B.      Consent Was Not Coerced

Defendant contends that if consent was given, it was coerced and that the absence of consent is consistent with the officers' "heavy-handed" intimidating approach.

Whether voluntary consent was given is a question of fact determined by the totality of the circumstances.  *United States v. Pikyavit*, 527 F.3d 1126, 1130 (10th Cir. 2008).  The

---

[7]   In the reply, Defendant describes the testimony of the Government's witnesses as "not credible" with regard to Defendant's consent to enter the home.  *See, e.g.,* Doc. 61 at 2(referring to testifying officers and Mr. Orfield) & 3 (referring to Mr. Orfield's testimony).  However, credibility of witnesses is ultimately for the Court to decide as fact finder.  *See U.S. v. Pearson,* 203 F.3d 1243 (credibility is determined by the trial judge, and can be assessed with or without a hearing).

government must "proffer clear and positive testimony that consent was unequivocal and specific and freely given. Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *United States v. Zubia Melendez,* 263 F.3d 1155, 1162 (10th Cir. 2001) (quotations omitted).  The burden is on the Government to prove that Defendant consented to the officers' entry. *U.S. v. Harrison,* 639 F.3d 1273, 1278 (10th Cir. 2011) (to justify entry, burden is on government to prove the consent was not coerced).   There was no evidence or testimony presented at the hearing to suggest that Defendant's consent to enter the home was coerced.  Mr. Orfield, a non-law enforcement witness with no motive to lie, testified that he heard Defendant give consent to officers to enter the residence.  Mr. Orfield also stated that he felt free to leave at all times; that law enforcement was "very calm, very polite," and compared the questioning and conversations with law enforcement officers to "talking to friends."  Tr. at 157, 170, 184.  The Court finds the testimony of Mr. Orfield to be very credible.

Simply stated, there was no evidence or testimony that anyone in the home felt that the officers' presence was unwelcome. Agent Breen testified that all the individuals in the resident were free to leave at any time.  There was no testimony that Defendant or any of the individuals at the residence asked the officers if they could leave, or told the officers that they did not wish to speak to them.

Defendant offers numerous arguments to show that consent must have been coerced, but none have merit under the circumstances and some do not merit serious discussion.   First, Defendant relies on *Bumper v. North Carolina* to argue that Defendant's consent to enter the house was involuntary is disingenuous.  391 U.S. 543 (1968).  In *Bumper,* the officer claimed he had a non-existent warrant to search defendant's home.  *Id.,* 548-49.  No such thing happened here, since there was no evidence or testimony offered at the hearing to suggest that Defendant's

9

consent was an acquiescence based on a misrepresentation by any one of the officers who sought entry into the house.

Defendant also argues that the number of officers (seven in all) would have been sufficiently intimidating to prevent any individual from refusing entry. Defendant was rousted from bed at 7:15 in the morning, which Defendant claims is "an hour that would cause fear and confusion." Doc. 55 at 8. Defendant was wearing only shorts, thereby feeling especially vulnerable combined with the officers' use of an aggressive tone. *See U.S. v. Harrison,* 639 F.3d 1273, 1278 (10th Cir. 2011) (officer's use of aggressive tone could be considered in totality of circumstances). Of course if Defendant felt vulnerable because he was shirtless, he could have put on a shirt before he opened the door.

When considering these factors offered by Defendant in light of the testimony elicited at the hearing, there is nothing in the record to suggest coercion of consent even when all the factors are considered together. Agent Breen testified that while seven agents were part of the joint task force, only he and Detective Sabaugh stood in front of the door, and Agent Altamirano stood to the left of the door in front of the windows, which she was covering for officer safety. Other agents and officers remained by the vehicles in the parking lot. Hrg. Tr. at 33:17-25. Defendant also injects sheer speculation into the mix by arguing it was "doubtless" that Deputy Sabaugh "delivered her apparent ultimatum with the conviction of someone who believed, as she did, that she had the right to enter whether or not Mr. Blackburn consented." Doc. 55 at 8. The Court need not consider such speculative assumptions. Despite the fact that Defendant's attorney had ample opportunity to elicit any evidence of coerciveness on the part of the officers on the house entry, no such testimony or evidence was presented.[8] Finally, without deciding

---

[8]   The Court uses the phrase "ample opportunity" quite literally, since the hearing on the motion to suppress took over 10 hours and spanned more than a full day. See Doc. 51 (Clerk's Min.).

whether there is any time of day for a "knock and talk" that would elicit minimal confusion on the part of a home resident, the Court finds that the time was not particularly early and there was no evidence presented at the hearing that would suggest the choice of time was selected in order to instill "fear and confusion." There are no facts here that are comparable to those in *U.S. v. Quintero,* on which Defendant relies for the proposition that his consent was coerced. 648 F.3d 660, 670 (8th Cir. 2011). The "knock and talk" in *Quintero* was conducted at 10:35 p.m. and was comprised of six individuals (three officers, two security guards and the hotel manager); and one officer misrepresented his identity at the hotel room door. Once inside the house, the officers commanded Defendant's girlfriend to get dressed and come into the hallway, "and took several minutes to repeatedly badger her for consent to search the room in the face of her hesitation," despite her repeated statements indicating her fear. 648 F.3d at 669.

There was no evidence presented at the hearing that such forceful tactics occurred here, and Defendant's reliance on *Quintero* is useful only for contrast. Defendant contends that whether he consented to the home entry should be based on a "totality of circumstances" and not Mr. Orfield's observation that the officers were "very calm" and "very polite is not a sufficient basis to find that consent was given to enter the home. Doc. 61 at 3. The Court's analysis here is indeed based on a "totality of circumstances" and is not premised solely on Mr. Orfield's observations of the officers' conduct in the home. The officers' entry into Defendant's home does not implicate the Fourth Amendment because consent to enter was voluntary. *See United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005) (a consensual encounter between an individual and police officers, even inside a home, does not implicate the Fourth Amendment);

C.     Scope of Search

Defendant next contends that the officers' unconsented-to protective sweep violated the Fourth Amendment, arguing that the sweep went far beyond any consent for the officers to conduct a child welfare check.  However, as the Government notes, every law enforcement witness who testified stated they immediately suspected that Defendant was the individual who was molesting at least one child in that home.  This happened relatively quickly because the female child, M.M., came down the stairs as soon as law enforcement entered the residence. This suspicion was based on the fact that each witness had viewed two child pornography photographs: one depicting a heavy set Caucasian male attempting to penetrate a female toddler and another pornographic picture of the toddler that showed her face.[9]  Each witness identified A.M. as the victim from those photographs; and each witness believed Defendant matched the physical description of the male in those pictures.  Both Agent Breen and Detective Sabaugh testified that they could identify Defendant from his body type as pictured in the original pictures.  Agent Breen stated that the belly shown in the pictures "distends and almost covers the penis" and that this physique was "similar in build to the Defendant."Hrg. Tr., Doc. 53 at 39:  8-13.

Thus, as soon as law enforcement entered the home and saw M.M., they had the right to temporarily detain Defendant.  *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (an investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime) (quotations and citations omitted)); Hrg. Tr. at 39:10-13. The protective sweep did not extend beyond a search of the house to determine if the house was secure, if the number of people inside the apartment were accounted for, and that no weapons were easily accessible.  Defendant makes much of the fact that Agent Breen couldn't remember 100%

---

[9]  These photographs were admitted as Government's Exhibits 48 and 49 at the hearing.

whether Detective Sabaugh actually asked for permission to do the sweep, but he did appear to recollect that Detective Sabaugh asked Defendant if he would mind checking to see who was in the apartment.   Hrg. Tr. at 36: 5-10.

Having suspected Defendant as the adult in the child pornography pictures, the officers were justified in conducting a protective sweep. The evidence and testimony indicates that the sweep was limited to assuring officer safety.   Agent Breen testified that the house was *not* searched, but rather the officers looked "for places that a person could hide, or for easily accessible weapons." Hrg. Tr. at 36: 7-12.  It was during this sweep that officers discovered A.M. (the second child) asleep in a bed upstairs. Hrg. Tr. at 41:1-4.  In fact, pains were taken to preserve the scene and hold off on conducting a search of the house until a search warrant was obtained.  Hrg.Tr. at 163:7-10.   There was no evidence presented that Defendant or anyone else in the home, was upset by the protective sweep. *Id.* at 37-38.  Accordingly, the officers' entry into the house and the protective sweep was justified under the circumstances underlying the purpose behind the officers' presence in the home, and did not violate Defendant's Fourth Amendment rights.

## II.      Whether Defendant's Phone was Obtained by Illegal Seizure

Defendant contends that law enforcement violated his Fourth Amendment rights when Agent Altamirano seized his cell phone without any exigent circumstances.  Additionally, Defendant contends  that Ms. Hantten had no authority to hand over Defendant's cell phone to Agent Altamirano.

### A.      Illegal Seizure of Cell Phone

Defendant points out that the "plain view" doctrine requires that an officer have a lawful right of access to the object at issue and that because the officers had no warrant to enter the

house, they cannot rely on the "plain view" doctrine. *See U.S. v. McLevain,* 310 F.3d 434, 443 (6th Cir. 2002) (quoting *Coolidge v. New Hampshire,* 403 U.S. 445, 468 (1971)). This argument, however, fails because the officers had a lawful right to be in the house based on Defendant's consent to enter the home.

Defendant also argues that Ms. Hantten was only a co-tenant and did not have actual authority to invite Agent Altamirano up the stairs and into Defendant's room to seize his phone and further that she had no authority to consent to Agent Altamirano's entry into the room that Defendant shared with the two children. However, because Ms. Hantten was not asked by any of the agents to procure Defendant's phone, the question is not so much whether Ms. Hantten had "authority" to enter Defendant's bedroom, but rather whether Agent Altamirano unlawfully seized the phone. The answer is "no" for several reasons. First, none of the testimony suggests that Ms. Hantten was acting as, or in concert with, a government agent, and so the Fourth Amendment is not implicated on that basis. *See U.S. v. Poe,* 556 F.3d 1113, 1123 (10th Cir. 2009). Agent Altamirano testified that she merely followed Ms. Hantten, who went upstairs, "hung a left into the kids' bedroom, and . . . grabbed a cellphone. Doc. 54 (Hrg. Tr.) at 250:1-6.[10] Agent Altamirano testified that she did not know at the time that it was Defendant's room because A.M. was sleeping in the room and so the room appeared to be the children's room. She also stated that she did not remember exactly where Ms. Hantten found the phone or whether it was plugged in. Hrg. Tr. at 69:21-25.

Second, at the point where Agent Altamirano realized that Defendant's physical description matched that of the assailant in the pornographic images, and Ms. Hantten told her that she suspected Defendant was abusing the children, probable cause existed to seize the

---

[10]   Doc. 54 is the second volume of the hearing transcript, the pages of which continue from the first volume (Doc. 53).

phone.  *See U.S. v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999) ("[a] police officer may

properly seize evidence of a crime without a warrant if: (1) the officer was lawfully in a position

from which to view the object seized in plain view; (2) the object's incriminating character was

immediately apparent—i.e., the officer had probable cause to believe the object was contraband

or evidence of a crime; and (3) the officer had a lawful right of access to the object itself.").

Defendant's consent gave the officers a lawful right of access, and Agent Altamirano did not

obtain the cell phone from an illegal search of the house, but rather obtained the phone from Ms.

Hantten.

What happened immediately afterward dispels any notion of illegal seizure.  As soon as

Agent Altamirano received the phone from Ms. Hantten, she took it downstairs to Agent Langer

who was speaking with Defendant.   Defendant was asked if the phone was his, to which he

replied yes; and Defendant then gave both verbal and written consent for law enforcement to

search  the phone.  These facts are not contradicted.  The Tenth Circuit determines the

voluntariness of a consent to search under the "totality of the circumstances, with the

government bearing the burden of proof."  *U.S. v. Zapata*, 997 F.2d 751, 758 (10th Cir.1993).

The "government must show that there was no duress or coercion, express or implied, that the

consent was unequivocal and specific, and that it was freely and intelligently given."  *Id.*

(quoting *U.S. v. Nicholson*, 983 F.2d 983, 988 (10th Cir.1993)).  Here, three witnesses (Agents

Langer, Altamirano, and Mr. Orfield) all heard and saw Defendant consent to the search of his

phone.  Each witness testified that Defendant appeared calm and cooperative throughout this

entire process, and Orefield stated that law enforcement was calm and courteous throughout the

encounter.  Based on these facts, the Government has met its burden of establishing that

Defendant voluntarily consented to a search of his phone.

B.     Inevitable Discovery

The Government contends that even if there was any defect either with the phone coming into Agent Altamirano's possession or with Defendant's consent to search, the inevitable discovery exception applies here. Under this exception, illegally obtained evidence may be admitted if it "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (citation omitted).

After law enforcement conducted a protected sweep of the home and spoke with those living there, the house was secured until both state and federal search warrants were obtained. *See* Ex. 1 to Doc. 58 (Govt's Post-Hrg Brf.)  The warrants specifically requested that law enforcement be allowed to seize and search any "smartphones."  *See* Ex. 2 to Doc. 58.   Thus, the Government contends that the phone inevitably would have been discovered during the search later that day, and that measures were taken while the officers were at the residence to secure the residence while the warrants were being obtained.  Defendant contends that the inevitable discovery doctrine cannot apply to this situation because the officers would not have had sufficient probable cause to request a warrant without the benefit of Defendant's admissions and information about what was on the phone.  On this issue, the Court must determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *U.S. v. Christy,* 739 F.3d 534, 541 (10th Cir. 2014).  Factors which the Court may consider are:

> (1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search;

(2) the strength of the showing of probable cause at the time the search occurred;

(3) whether a warrant ultimately was obtained, albeit after the illegal entry; and

(4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Christy,* 739 at 541 (citing factors set forth in *U.S. v. Souza,* 223 F.3d 1197, 1204 (10th Cir. 2000) ("*Souza* factors").  In this case, law enforcement realized almost immediately on entering the residence that Defendant and the two children in the home matched the physical descriptions of the adult and child shown in the photographs.  Ms. Hantten had expressed her concerns to Agent Altamirano about what she believed was Defendant's abuse of the children.  At that point, there was a basis to believe that Defendant was the perpetrator of child abuse that was taking place in that residence, and thus there was enough information on which to base a request for a search warrant for the residence.[11]  Immediately after officers escorted Defendant out of the living room, efforts were made to preserve and secure evidence in the home while search warrants were obtained.  Hrg. Tr., Doc. 54 at 63-64:15-16.   No search of the home was conducted before the warrants were obtained, nor did anyone observe anyone from the BCSO or the APD searching any part of the home during that time.  Doc. 54 at 64:14-20.  These facts and testimony (which the Court finds to be credible) support a finding under the *Souza* factors, that probable cause existed for a search warrant of the home even without Defendant's statements regarding the phone contents.  A search of the home pursuant to a warrant would certainly have uncovered the phone, and with it, its contents.

---

[11]  Defendant points out that Agent Breen and Detective Sabaugh did not seek to obtain warrants until after the officers found what they believed to be child pornography on Defendant's.  *See* Doc. 55 at 21.  However, this fact is not dispositive of whether officers would have had probable cause to seek the warrants without the information from the phone.

Defendant also attempts to discount the inevitable discovery exception on the grounds that the Government has waived reliance on this exception.  Defendant is correct that the Government did not raise this issue in the initial briefing, but the issue has not been waived because the Court inquired into this issue at the hearing, and allowed the parties to address it in the supplemental briefing.  Hrg. Tr. at 365:25-366:1-15.   The Government relied on the inevitable discovery exception in its post-hearing brief and the Defendant was afforded ample notice and opportunity to respond to this argument.  Accordingly,  the Court finds that the Government has not waived this inevitable discovery argument.  *See U.S. v. Sitlington,* 527 Fed.Appx. 788, 792 n.1 (10th Cir. 2013) (inevitable discovery exception not waived where, although the issue was not raised in district court, both parties argued the issue on appeal, and thus parties were afforded a fair opportunity to develop the factual record).

Defendant also argues that Mr. Blackburn's consent cannot purge the taint of the officers' illegal seizure of his cell phone.  Under *Brown v. Illinois,* 422 U.S. 590, 603 (1975), there are three factors to consider when considering whether the Government has shown that evidence is sufficiently attenuated from the illegal conduct to purge the illegality's taint: (1) temporal proximity; (2) the presence of intervening circumstances;  (3) the purpose and flagrancy of the police misconduct.  *See also U.S.  v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001).   These factors are not relevant here because there is no illegal taint to purge:  evidence found on Defendant's phone would have been discovered a few hours later after a search was conducted pursuant to a valid search warrant.

Defendant distinguishes what he contends is the illegal seizure of his phone with the situation in *U.S. v. Gordon,* in which a government agent *legally* seized a firearm unlawfully possessed by a felon, but kept it a few minutes longer than was necessary to "stabilize the

situation and eliminate the risk of immediate harm."  741 F.3d 64, 72 (10th Cir. 2014).

However, the court concluded that the extended seizure was a *de minimis* intrusion on

defendant's rights and could not justify suppression of the shotgun as evidence, and also applied

the "curative remedy of inevitable discovery."  *Id.* at 74.  Defendant contrasts that case with the

facts in the instant case, in that Defendant's phone was illegally seized, that the seizure was not

*de minimis* because of the private nature of information on cell phones, and that a search warrant

was needed in order to search the phone.  Doc. 61 at 6.  *See Riley v. Calif.,* 134 S.Ct. 2473, 2488-

91 (2014) (noting the sensitivity of information on cell phone and finding a phone search

requires a search warrant).  However, *Gordon* is not applicable here.  First, Defendant clearly

and unequivocally consented to the search of his phone.  Second, even if the consent was invalid

because the phone was illegally seized, the Court has determined that enough probable cause

existed to obtain a search warrant a few hours later even without Defendant's admissions

regarding the phone contents—at which point, the inevitable discovery doctrine would apply, as

it did in *Riley*.

Thus, Defendant's Fourth Amendment rights were not violated based on the officers'

entry into home, the protective sweep or the seizure/search of Defendant's cell phone.[12]

## III.   Whether Defendant was Advised of, and Understood Rights Under *Miranda*

Defendant raises a Fifth Amendment claim in contending that he did not knowingly and

intelligently waive his *Miranda* rights.  Defendant claims that he could not possibly have had

ample time to read these rights, understood them and understand the consequences of waiving

them, given his processing difficulties.

---

[12]   Defendant also argues that the Government has not met its burden to prove a purging of the taint of the officers'
illegal conduct, *see* Doc. 55 at 15-17, but because the Court has concluded that this conduct was not unlawful, there
is no need to address this argument.

In order for a *Miranda* waiver to be effective, it must be made "voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir. 2004). This means that the waiver must be the "product of free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It also means that the waiver must be made "with a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon it." *Id.*; *see also United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002). When a defendant claims that a statement was obtained in violation of *Miranda*, the Government has the burden of proving, by a preponderance of the evidence, that a valid waiver was executed. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Whether a person is in custody for *Miranda* purposes is an objective determination. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). It is undisputed that Defendant was in legal custody when he made his statement to law enforcement and that he made these statements voluntarily. He had been formally arrested and he would have understood that he was about to elicit potentially incriminating statements about his sexual abuse of the children.

The relevant portions of the videotaped confession, admitted as Exhibit 36 at the hearing, shows Defendant being given the form, looking down at the form and then signing the form, with Defendant looking down at the form for about half a minute. Defendant claims that during this entire time, either Agent Breen or Deputy Sabaugh is talking to him and he is responding, which made it even more difficult to concentrate on the *Miranda* warning. Defendant argues that he was rushed through the process while Agent Breen "hovered over" him and spoke about a Spanish version of the form. Doc. 55 at 23. Defendant contends that such circumstances render it impossible for anyone who is unfamiliar with *Miranda* rights to have read and understood the

wording of those rights in so short an amount of time, much less someone like Defendant who had reading and processing difficulties.

A.    Ms. Abeles' Testimony

At the hearing, Vivian Abeles, a learning disability specialist, testified that Defendant is a "slow processor visually" and that he had to read passages over again and subvocalize them in order to understand them.  Hrg. Tr. at 81, 82, 85, 104-05.  Ms. Abeles administered an intelligence measure test and a test assessing Defendant's reading comprehension, and viewed a portion of Defendant's videotaped confession.   Ms. Abeles opined that Defendant did not have sufficient time to read or understand the words on the *Miranda* form.  *Id.* at 86-87, 107.   She testified that Defendant scored average on Verbal Comprehension, on Perceptual Reasoning and on the General Ability Index, but scored worst on the Processing Speed Index.  *Id.* at 101:15-20.  Ms. Abeles opined that time pressure and lack of previous familiarity with a subject could affect Defendant's comprehension.   Hrg. Tr. at 98-101.

On cross-examination, the Government raised issues concerning not only Ms. Abeles' qualifications, but also the reliability of Ms. Abeles' evaluation.  While there was no Daubert challenge raised by the Government, the Court still has the obligation to carry out its gate-keeping role under Rule 702.  The Court does so here, considering Ms. Abeles' qualifications, the reliability of her testimony and also the weight that should be afforded to that testimony.  The Court agrees with the Government that the issues it raised are of some concern when considering the weight to afford Ms. Abeles' testimony.   For example, Ms. Abeles administered all the tests to Mr. Blackburn within 3.5 hours on the same morning and had never given these tests to someone in a prison setting.  While she opined that Defendant should have had more time to process the *Miranda* form in order to understand it, Ms. Abeles had no opinion whether

Defendant's current situation (being charged with crimes that could potentially get him a life sentence in jail) gave him an incentive to do poorly on a test.  This meant that she did not consider any incentive Defendant may have had to perform poorly.  Hrg. Tr. at 102-103.

Ms. Abeles did not ask Defendant any questions regarding familiarity with *Miranda,* since it would be reasonable to assume that some familiarity may translate into less time being needed to understand the *Miranda* concepts.  *See* Hrg. Tr. at 106-107:24-5.  Ms. Abeles was not asked to perform, and did not perform, a diagnostic evaluation which would have involved exploring "many more things" with Defendant.  Hrg. Tr. at 109:15.  Instead, Ms. Abeles was asked to do an intelligence measure and an assessment of Defendant's reading comprehension. *Id.* at 96:21-22 ("I was not asked to do a diagnostic evaluation. I was asked to give tests"); 111:17-23.  In trying to get an indication of ascertaining Defendant's reading level, Ms. Abeles administered a Silent Reading which is meant to determine whether an individual has developed, or is developing the ability to silently read with comprehension.  *Id.* at 103:1-5.  Ms. Abeles acknowledged that she administered this test to Defendant, who was a few days shy of turning 30, even though the test manufacturer for this test recommends the test for individuals up to age 25. *Id.* at 103:1-5.

Ms. Abeles could not say that Defendant has a serious processing issue based on the two tests she administered.  She stated that she was not asked to perform a diagnostic evaluation and had she been asked to do so, she would have explored further, including asking for background information.  *Id.* at 96:21-22; 112:1-6.  However, Ms. Abeles stated that she could not agree or disagree as to whether a diagnostic evaluation would have given her a fuller picture of Defendant's abilities.  *Id.* at 96:5-9.

     B.    <u>Defendant's Confession</u>

In addition to considering all the evidence presented at the hearing, including Ms.

Abeles' testimony, the Court has also reviewed Defendant's videotaped confession.

Voluntariness is determined from the totality of the circumstances.  *Clanton v. Cooper*,

129 F.3d 1147, 1158 (10th Cir. 1997).  Accordingly, the Court should examine several factors,

including:

> (1) the defendant's age, intelligence, and education; (2) the length of the
> detention and interrogation; (3) the length and nature of the questioning;
> (4) whether the defendant was advised of his constitutional rights; and (5)
> whether the defendant was subjected to or threatened with any physical
> punishment.

*U.S. v. Lugo,* 170 F.3d 996, 1004 (10th Cir. 1999). "No single factor is determinative." *Id.*

Defendant suggests that his statements were not voluntarily because (a) his handcuffs were "too-

tight," (b) he was in a "small locked interview room from which he could not leave" and in

which he was isolated without a family member or advocate," and (4) during his wait of over

three hours he had only one brief contact with a human (an officer) to get a cup of water.[13]  Doc.

55 at 18.  These facts do not describe the actual conditions of the interrogation that took place,

based on testimony and videotape of the confession.  Defendant was not held in handcuffs, was

allowed the opportunity to take restroom and water breaks when needed, and he never objected

or sought to leave the interrogation room—all of which shows the non-coercive atmosphere

which existed.

On entering the interrogation room, Agent Breen and Detective Sabaugh apologized for

the wait and made it very clear to Defendant from the outset that he did not have to talk to them,

nor would he have to continue talking to them if he changed his mind.  There was no indication

either verbally or from his demeanor that Defendant felt uncomfortable or pressured into doing

so.  Here, the video of Defendant's interview clearly shows Defendant being given a *Miranda*

---

[13]   There is no issue here regarding any request for counsel as an "advocate."

form, his review of the form, and his signing of the form.  Defendant argues that the *Miranda*

warnings were deficient because the officers did not orally read the rights on the form and in

addition alleges that he is borderline intellectually disabled and has difficulty with reading

comprehension.  In addition, Defendant contends that neither officer read explained the rights to

him or asked whether he "fully" understood them and waived them.  Defendant also makes much

of the fact that after he signed the form, Agent Breen stated: "Now that silliness is out of the

way."  When asked about this statement, Agent Breen conceded that it was "a poor turn of

phrase."  While Agent Breen's comment may indeed have been an unfortunate choice of words,

this statement cannot form a basis for invalidating Defendant's *Miranda* waiver because at that

point he had already waived those rights.  Hrg. Tr. at 62:17-25.

       The officers' failure to *orally* read Defendant his rights does not constitute a *Miranda*

violation because there is no legal requirement that officers orally advise a suspect of his

*Miranda* rights.  In fact, there is no requirement as to the precise manner in which police

communicate the required warnings to one suspected of a crime, as long as that individual can

read and understand the written waiver form.  *Bell v. United States*, 382 F.2d 985, 987 (9th

Cir.1967); *see also U.S. v. Coleman*, 524 F.2d 593, 594 (10th Cir.1975); *U.S. v. Sledge*, 546 F.2d

1120, 1122 (4th Cir. 1977); *U.S. v. Bailey*, 468 F.2d 652, 659–660 (5th Cir. 1972); *U.S. v.*

*Alexander*, 441 F.2d 403, 404 (3d Cir. 1971); *U.S. v. Van Dusen*, 431F.2d 1278, 1280 (1st Cir.

1970); *U.S. v. Johnson*, 426 F.2d 1112, 1115 (7th Cir. 1970); *U.S. v. Osterburg*, 423 F.2d 704

(9th Cir.1970).

       Defendant's principal argument against the legality of his confession is premised on his

low reading comprehension.  However, this argument depends on the strength accorded to Ms.

Abeles' testimony, which the Court finds should be given minimal weight, for the following

reasons: (1) Ms. Abeles spent only three and half hours with Defendant; (2) her primary experience deals with individuals under the age of twenty-five; (3) she has never tested anyone in a prison setting before and she admitted that could have an effect on Defendant's performance on the tests; (4) she did not conduct any type of clinical or diagnostic interview of Defendant; (5) she did not review any material about Defendant prior to administering the tests; and (6) despite knowing Defendant was almost thirty, she gave him a test which she acknowledged should only be given to individuals under the age of twenty-five. Also, as the Government observes, by Ms. Abeles' own admission, her tests only account for what Defendant's comprehension was on the day she actually administered the tests, which was two years after the date of the videotaped confession. Finally, Ms. Abeles viewed only a limited portion of the videotaped confession, and did not see any portions of the interview where Defendant was actually multi-tasking by writing things down while listening to the agent. Hrg. Tr. at 106:9-21.

The Court's own review of the confession indicates a voluntary, knowing and intelligent waiver. Testimony was presented at the hearing that the *Miranda* statement of rights was geared to a seventh grade reading level. Defendant did not appear to be having difficulty understanding what he was reading and there was no point when Defendant ever asked to clarify any of the information. Ms. Abeles testified that Defendant "would probably be able to read high-level high school" unless he was not prepared for what he was going to be reading. Hrg. Tr. at 84:1-5. Ms. Abeles, however, would have no basis to give an opinion on Defendant's lack of familiarity with *Miranda* because she had made no inquiry into the matter. Moreover, Ms. Abeles' opinion regarding Defendant's processing difficulties under time pressure, even if true, has little significance here. Neither Agent Breen nor Detective Sabaugh at any time employed any time pressure tactics or rushed Defendant in any way while he was reading the *Miranda* waiver form.

While Agent Breen spoke to Defendant while he was reading, it was not constant and certainly did not appear to distract Defendant.

Detective Sabaugh testified that she had interviewed individuals with learning disabilities before Defendant's interview, and found him to be "very articulate."   He was able to explain to her different technology and websites he used, and corrected her when she said something wrong.  Hrg. Tr. at 309-10; 119 (Det. Sabaugh).  The Court finds Detective Sabaugh's testimony to be credible and borne out by the videotape and other evidence.  Agent Breen testified that when he showed Defendant different pictures that were printed from his phone, Defendant appeared to be able to multi-task because he was able to discuss what he was seeing in the image and then write what it was at the same time.  Hrg. Tr. at 118-19.  The videotaped interview bears out Agent Breen's testimony, showing Agent Breen was speaking to Defendant and asking him questions and showing him photographs while Defendant responded to those questions and wrote information on the pictures.   Defendant distinguishes this multi-tasking from focusing on reading and understanding *Miranda* concepts under a time constraint, but given that there was no evidence of a time constraint exerted by the agents on Defendant, the Court finds little distinction in the type of multi-tasking taking place.

Based on the totality of this evidence and the testimony presented at the hearing, and notwithstanding Ms. Abeles' testimony, the Court finds that Defendant's learning disability did not prevent Defendant from knowingly and intelligently waiving his *Miranda* rights.  Defendant knew how to set up e-mail accounts and websites, and he engaged in lengthy written exchanges with others online.  He clearly knew how to read and write, based on his ability to articulate himself in writing during the interview and on certain exhibits admitted at the hearing, such as his letter to the Mitchells (Govt's Ex. 29) and the texted conversation with the mother of his own

son (Govt's Ex. 35).[14]  Accordingly, the Court concludes that Defendant's *Miranda* waiver was voluntary, knowing and intelligent.

C.     Remedy

The remedy for Fourth Amendment violations as a result of an illegal search requires the exclusion of evidence and witnesses discovered as a result of that search, under the "fruit of the poisonous tree" doctrine.  *Oregon v. Elstad,* 470 U.S. 298 (1985).  Defendant contends that Defendant's statements should be suppressed because he had already given incriminating statements at home before he was read his *Miranda* rights, and there was no break between the time of his statements at home and the time he signed the waiver form.  Defendant's contentions on this claim are based on the Fourth Amendment, since Defendant claims those incriminating statements were made as a result of an illegal search of his home.  In the above discussion, the Court found that the phone search was legal, and even if there was any illegality surrounding Defendant's statements about his cell phone contents, there is no illegal taint that requires purging under *Brown*, as Defendant urges, because the phone would have been found, seized and searched after search warrants were obtained.

However, Defendant's contention that his *Miranda* waiver was deficient arises under the Fifth Amendment, which prohibits use by the prosecution in its case in chief only of *compelled* testimony.  *Elstad,* 470 U.S. at 306-07 (failure to administer *Miranda* warnings creates a presumption of compulsion, and unwarned statements that are otherwise voluntary under the Fifth Amendment must be excluded from evidence).   This means that even assuming there is some deficiency with Defendant's *Miranda* waiver, the remedy for this deficiency would not require exclusion of evidence obtained as a result of that confession because the "fruit of the

---

[14]  Defendant's texted statements to the mother of his child in Exhibit 35 also indicates that Defendant has some concept of the criminal justice system, as he tells the mother she can call the FBI on him because she has no hard evidence.

poisonous tree" doctrine applies to Fourth Amendment violations. *See Wong Sun v. U.S.,* 371

U.S. 471, 484 (1963).  Since Defendant's *Miranda* waiver argument is based on a Fifth

Amendment violation, evidence obtained as a result of the confession could still be used by the

prosecution as long as the statement was made voluntarily:

> [A] failure to administer *Miranda* warnings, without more, does not automatically
> require suppression of the "fruits" of the uncounseled statement. . . . Where the
> uncounseled statement is voluntary, and thus not a product of "inherently coercive
> police tactics or methods offensive to due process". . . there is no fifth amendment
> violation and the "fruits" may be admissible in the Government's case in chief.

*U.S. v. McCurdy*, 40 F.3d 1111, 1117 (10th Cir. 1994) (citation omitted).[15]  The Court has

already determined that Defendant's confession was voluntarily made and that there was no

evidence on coercion on the part of any officer involved when Defendant made those statements.

Any deficiency in the *Miranda* warning would require only the exclusion of Defendant's

statements, and not to any evidence obtained as a result of the confession.

## CONCLUSION

In sum, the Court finds and concludes that Defendant gave consent for law enforcement

to enter the home.  Upon entering the home and recognizing  M.M. and Defendant from his body

type in the photographs, the officers conducted a protective sweep that was justified under the

circumstances underlying the purpose behind the officers' presence in the home, and which did

not violate Defendant's Fourth Amendment rights.

The Court finds and concludes that Defendant's phone was not illegally seized.  Even

assuming *arguendo* that the phone was seized in violation of Defendant's Fourth Amendment

rights, the inevitable discovery exception applies here because the phone would have been found

---

[15]   *See also U.S. v. Patane*, 542 U.S. 630 (2004) (officers' failure to give Miranda warnings in conjunction with
restraining-order arrest did not require suppression of weapon at firearms trial, since weapon was recovered based
on defendant's voluntary statement that he possessed it); *U.S. v. Carter*, 884 F.2d 368 (8th Cir. 1989) (concluding
that confession must be suppressed where officers did not Mirandize defendant until after they had induced him to
turn over incriminating evidence and to make incriminating statements; and where there was no break in time
between defendant's unwarned confession, his receipt of Miranda warnings and his second confession).

in the later search conducted after law enforcement obtained search warrants for the home.  The Court also finds and concludes that law enforcement would have had probable cause to obtain a warrant to search the house even without Defendant's admissions to the officers concerning the phone contents.

Finally, the Court finds and concludes that Defendant was advised of, and understood his rights under *Miranda* and that his waiver was voluntary, knowing and intelligent.  Even assuming that Defendant's *Miranda* warning was procedurally deficient, the appropriate remedy would be only the exclusion of statements made during the confession and would not extend to any evidence obtained as a result of the confession.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Statements and Evidence Obtained in Violation of the Fourth and Fifth Amendments **(Doc. 30)** is hereby denied for reasons stated in this Memorandum Opinion and Order.

_____

UNITED STATES DISTRICT JUDGE