IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                                No. CR 14-0129 WJ

MICHAEL DAMEON BLACKBURN,

    Defendant.

## MEMORANDUM OPINION AND ORDER MANDATING RESTITUTION

**THIS MATTER** comes before the Court following a restitution hearing on June 22, 2017 and upon the United States' Restitution Brief (**Doc. 83**), filed October 17, 2016, in which the United States requests restitution pursuant to 18 U.S.C. § 2259, on behalf of M.M. and A.M., who are the two child victims in this case. For the reasons that follow, the United States' request for restitution is **GRANTED**.

### BACKGROUND

The Court held a sentencing hearing on August 29, 2016. The Court did not impose a sentence at the time. On September 14, 2016, the Court overruled Defendant Michael Dameon Blackburn's sentencing memorandum and objection to the PSR. *See* Doc. 81. The Court concluded that Defendant's correctly-calculated Guidelines sentence is 1440 months or 120 years. On September 16, 2016, the Court ordered the United States or the United States Probation Office to provide the Court with additional documentation or testimony quantifying the victims' losses in this case in order to determine restitution. *See* Doc. 82. The Court was concerned with the United States' position that each victim in this case is entitled to $210,012.00 in restitution based upon a single study authored by the Centers for Disease Control and

Prevention that listed $210,012 as the average amount a six-year-old victim of abuse incurs in a lifetime (the "CDC Article").  While restitution is mandatory in this case, the Court found the restitution amount requested by the United States to be too speculative and not adequately supported by evidence in the record.  While the Court agreed with the United States that given the horrendous abuse inflicted upon the child victims in this case, they likely will require considerable psychological care and treatment throughout their lives; the Court took the view that the record in this case needed to be supplemented so that the Court has more than just a journal article to support an award of restitution for the two child victims in this case.  Accordingly, the Court ordered the United States or the United States Probation Office to provide the Court with additional documentation in support of the requested restitution awards in this case.

The United States filed a Restitution Brief (Doc. 83) on October 17, 2016.  Defendant filed a Response (Doc. 84) on November 9, 2016.  The United States filed a Reply (Doc. 85) on November 22, 2016.  The United States Probation Office subsequently filed Addenda to the PSR (Docs. 88, 96, 108, and 109).  The Court held a restitution hearing on June 22, 2017, during which the Court pronounced sentencing and entered an oral finding that the government met its burden of establishing the restitution amounts are proper.

## LEGAL STANDARD

The Mandatory Restitution for Sexual Exploitation of Children Act requires a district court to order restitution for the victims of sexually exploitative crimes committed against children.  *See* 18 U.S.C. § 2259.  Section 2259 requires the restitution order to direct the defendant to pay the "full amount of the victim's losses as determined by the court."  *Id.* at § 2259(b)(1).  The Code defines "victim" as "the individual harmed as a result of a commission of

a crime under this chapter, including, in the case of a victim who is under 18 years of age . . . the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court…" *Id.* at § 2259(c).  Under the Code, compensable losses include "medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense." *Id.* at § 2259(b)(3)(A)–(F).  The Government bears the burden of proving the propriety and amount of restitution by a preponderance of the evidence.  *See* 18 U.S.C. § 3664(e); *United States v. Julian*, 242 F.3d 1245, 1248 (10th Cir. 2001).

"Restitution is therefore proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Paroline v. United States*, 134 S. Ct. 1710, 1722 (2014). This means there must be a direct relation between the loss and the defendant's offense, reflecting "the bedrock principle that restitution should reflect the consequences of the defendant's own conduct." *Id.* at 1719, 1725.

"A court may not decline to issue [a restitution order due to] (i) the economic circumstances of the defendant; or (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." 2259(b)(4)(B)(ii) (alteration added).

"Of course, '[b]ecause the determination of an appropriate restitution amount is by nature an inexact science, § 2259 does not impose a requirement of causation approaching mathematical precision.'" *United States v. Chow*, 760 F. Supp. 2d 335, 340 (S.D.N.Y. 2010) (quoting *United*

*States v. Church,* 701 F.Supp.2d 814, 830–31 (W.D. Va. 2010) (internal quotation marks and citation omitted)).

"To establish a record sufficient to ensure effective appellate review of its restitution orders," the Court must make specific findings of fact supporting its calculation of the full amount of the damages to a victim which were proximately caused by the defendant's offense. *Church*, 701 F.Supp.2d at 832 (internal quotation marks omitted).

## DISCUSSION

At the outset, the Court finds there is no question M.M. and A.M. are victims as defined by the statute.[1] Defendant sexually abused both children and produced the child pornography images in which the victims are depicted, and he distributed the child pornography images over the internet. There is also no question the two child victims depicted in the child pornography in this case have suffered unmistakable harm. The questions the Court must decide are first, proximate causation and second, the proper amount of damages that will compensate the victims for their harm.

### I. Proximate Cause

In order to award restitution in this case, the government must show that Defendant's conduct proximately caused the losses for which the victims are seeking restitution. The Court finds that Defendant's horrific sexual abuse and the creation of child pornographic images of A.M. and M.M. was the proximate cause of the harm the two children suffered for which they now seek restitution. There is no dispute Defendant sexually abused A.M. and M.M. and there is no question that he produced the child pornography containing depictions of that abuse. Thus, any losses A.M. and M.M. suffered were directly caused by Defendant's conduct.

---

[1] A "victim" is defined as "the individual harmed as a result of a commission of a crime under [Chapter 110]." 18 U.S.C. § 2259(c).

4

Defendant's objections to the PSR Addenda and to the government's restitution request may be summed up as follows.  First, because M.M.'s and A.M.'s parents adopted them; the adoptions were intervening causes that should diminish the restitution order in this case.  Second, M.M. and A.M.'s biological parents neglected and abused them before Defendant did, so Defendant does not owe restitution for the entire cost of the children's medical and psychiatric needs.

The government argues there can be no question Defendant's conduct was the proximate cause of the children's medical and psychological injuries, notwithstanding the fact that their biological parents may have also abused and neglected them.

Having considered all of the evidence in the record and the testimony presented at the restitution hearing, the Court finds Defendant proximately caused the abuse that necessitated the expenses sought as restitution in this matter.  The Court rejects Defendant's preposterous argument that while Defendant's abuse "contributed to" the victims' need for foster care and treatment, there is no proof their adoptions are "directly related to that conduct." *See* Doc. 89, at 3.  Regardless of any neglect or abuse by M.M. and A.M.'s biological parents, Defendant's actions of sexually abusing both children on a nearly daily basis for nine months, and documenting and disseminating that abuse over the internet, caused significant and enduring harms that will last these children's lifetime.  In other words, but-for Defendant's abuse, M.M. and A.M. would not be where they are today.

At the restitution hearing, the government called its expert, clinical social worker Sueann G. Kenney-Noziska, MSW, LCSW, RPT-S, to opine on the childhood trauma experienced by M.M. and A.M.  Ms. Kenney-Noziska testified that based on her review of the facts of this case and in light of her professional experience, both A.M. and M.M. suffered numerous adverse

events at the hands of Defendant during their most formative years, and those events are directly traceable to Defendant's conduct. Ms. Kenney-Noziska has considerable experience, and the Court credits her expert testimony. She has been a licensed clinical social worker for over 20 years, and she works exclusively with severely traumatized children, including victims of child pornography. She has treated children similarly situated to A.M. and M.M.

Ms. Kenney-Noziska explained that using the Adverse Childhood Experiences Study ("ACES"), both children have at least an "A score" of 4. The ACES study is one of the most important pieces of trauma research in her field, which consists of a sample size of 17,000 children that have been followed for the past twenty years. The ACES study tracks the impact of childhood trauma across a lifespan, and makes numerous conclusions regarding the connection between childhood adverse impacts and long-term health and social welfare. Using the ACES study, a clinician can attribute an "A score" to a child based on a scale of one to ten considering the number of adverse childhood events, such as neglect and sexual abuse. Ms. Kenney-Noziska attributed, at a minimum, an "A Score" pursuant to the ACES study to both victims of four, which accounts for Defendant's sexual and physical abuse, and physical and emotional neglect.[2] Ms. Kenney-Noziska explained that a child with an "A Score" of four is twelve-times more likely to commit suicide than an average child and four times more likely to abuse drugs and alcohol.

Ms. Kenney-Noziska also explained that in her expert opinion, Defendant's conduct caused A.M. and M.M.'s injuries because of the particularly severe damage that results from recorded and disseminated sexual abuse as opposed to more isolated incidents of sexual abuse. Recorded and disseminated sexual abuse is particularly damaging in cases like this one where the

---

[2] It is not disputed that Defendant was both victims' primary caregiver for the approximately nine-month period during which the sexual abuse and production of child pornography took place.

victims are between the ages of zero and five, because that is the most critical phase of a child's brain development.  Young victims like A.M. and M.M., who were merely toddlers when the abuse occurred, are most susceptible to trauma because the trauma is not exclusively about memory but is rather about the way in which the victim's mental development has been irreparably harmed.  For example, brain studies using MRIs reveal an altered brain state on a child under the age of five who has experienced severe abuse like that suffered by A.M. and M.M.

Moreover, when sexual abuse is recorded and spread throughout the darkest channels of the internet, the victims are never able to obtain any true closure, because there is no way to recall or remove the damaging images.  Ms. Kenney-Noziska testified that victims of child pornography never feel fully safe for the rest of their lives, thus the victims require much longer treatment than victims of standard sexual abuse.  In sum, even considering any abuse and neglect by the biological parents, M.M. and A.M. will likely require ongoing treatment and therapies for the rest of their lives because they were the direct victims of Defendant's conduct.

During cross-examination, defense counsel suggested that prolonged therapies could be the reason A.M. and M.M. have prevalent memories of Defendant's abuse.  Defense counsel pointed to a number of studies that imply victims of sexual abuse respond well to six to twelve therapy sessions, rather than ongoing treatment for a period of twelve years.  However, Ms. Kenney-Noziska pointed out those studies are outdated and she explained the sample sizes for those studies do not accurately reflect the type of abuse A.M. and M.M. suffered because they dealt with children who experienced short-term, singular trauma (for example, one isolated event of sexual abuse).  In this case, the children experienced numerous forms of abuse over the course of nine months, which explains their need for prolonged and complex treatment.  Furthermore,

unlike the children in the studies Defendant relies upon where the memories of the abuse were repressed and then came out during therapy, the victims here *do* recall in vivid detail much of Defendant's horrific abuse.  The victims' harm in this case encompasses much more than memories of what the Defendant did; instead, his abuse permanently altered their brain development.

The Court also agrees with the government that under the plain terms of 18 U.S.C. § 2259, the fact that M.M. and A.M. are in the care of parents who chose to adopt them has no bearing on whether they are entitled to the "full amount of the victim's losses." *See* 18 U.S.C. §§ 2259(c), (b)(3)(A)–(F).  The only issue before the Court is Defendant's conduct and how that conduct contributed to losses incurred by AM and MM pursuant to § 2259.  *See id.*  At the hearing, the Court heard testimony that makes it clear A.M. and M.M. have suffered tremendous harms as a result of Defendant's abuse.  The biological parents' abuse does not diminish the restitution here.  As Ms. Kenney-Noziska explained, children who undergo daily sexual abuse at a very young age are on a different spectrum and require a unique set of ongoing therapies as a result of such systemic sexual abuse.

Further, the Court finds that M.M.'s adoptive mother, K.S., is no longer to maintain employment or to foster other children because of M.M.'s unique needs, which were proximately caused by the Defendant.  K.S. stated that she needs to be available full-time should M.M. suffer an episode requiring immediate attention.  K.S. is also no longer able to take in other foster children for which she would receive payment.  The Court concludes that even if K.S.'s costs were incurred because of her compassionate decision to adopt M.M., she incurred those costs on behalf of M.M. and because of the consequences of Defendant's conduct.  K.S.'s lost wages are documented in the record before the Court, and it is certainly foreseeable that the parent of a

victim will incur costs as a result of the victim's suffering.  "[S]ection 2259 is phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse. In enacting section 2259, it is clear that Congress intended to provide victims of sexual abuse with expansive relief for the *full* amount of ... [their] losses[.]"  *United States v. Evers*, 669 F.3d 645, 656 (6th Cir. 2012) (internal citations and quotation marks omitted) (alterations and emphasis in original).

Finally, the concerns regarding proximate cause that arise in many child pornography cases are not present here.  This case does not involve a defendant who is one of many end-users of the child pornography; rather, Defendant is the actual abuser of the victims and the producer of the child pornography.  Moreover, the young victims claiming restitution here are not third-party victims but are the actual subjects of the child pornography.[3] *See United States v. Osman*, 853 F.3d 1184, 1190 (11th Cir. 2017) (when a defendant is the perpetrator of the abuse himself, :[i]t is undisputed [that the defendant] triggered the 'causal process' underlying any losses suffered by [the victim] because he perpetrated the abuse, produced the child-pornography images of her, and disseminated them).  The Court concludes Defendant's horrific abuse caused the mental trauma for which A.M. and M.M. now seek treatment. Therefore, § 2259 mandates that a restitution award be made.

## II.   Amount of Restitution

The Court next turns to whether the Government has met its burden of establishing, by a preponderance of the evidence, the amount of the victims' losses proximately caused by Defendant's conduct.  Though it is extremely difficult to quantify the harm suffered by these two young children, the Court finds the United States has established by a preponderance of the

---

[3] M.M.'s mother is also claiming restitution for lost wages as a result of being M.M.'s adoptive parent, and the Court notes lost wages are recoverable under 18 U.S.C. § 2259(b)(3)(D).

evidence that M.M. should be awarded restitution of $286,800 and A.M. should be awarded restitution of $144,000.

The United States amended its previous request for restitution in the amount of $210,012 to its current request of $144,000 for A.M.[4]  For M.M., the United States asks the Court to award $286,800, for a total of $430,800 for both child victims.  The Court agrees with the United States and concludes the restitution figures presented are not speculative and are sufficiently tied to the evidence.  At the hearing, Defense counsel stated she is not contesting the authenticity of the documentation for the lost wages and medical treatments, but she is challenging the amounts as speculative.  For the reasons that follow, the Court agrees with the government that the restitution amounts are not speculative.

A. Victim M.M.

The Court finds the government has established by a preponderance of the evidence that M.M.'s psychotherapy expenses amount to $57,600 over the next twelve years and her psychiatry and medication management expenses are $18,000 over the next twelve years. M.M.'s therapy costs $200 per hour-long session and her medication management costs $125 per thirty-minute session.  M.M. is currently participating in biweekly psychotherapy sessions and medication management once per month. Ms. Kenney-Noziska testified that in her 20 years of experience as a clinical social worker treating similar victims, M.M. needs the treatment she is presently receiving and as a conservative estimate, she will need such treatment for at least the next twelve years.  Furthermore, Ms. Kenney-Noziska stated the costs of M.M.'s treatment are reasonable.  In fact, Ms. Kenney-Noziska opined that she would expect M.M. to need additional

---

[4] The government explained that its original request of $210,012 for A.M. was taken from the figure set forth in the CDC Article because the government had been unable to make contact with A.M.'s adoptive family.  Since that time, the government has been able to communicate with A.M.'s family and has documented A.M.'s anticipated medication and psychiatry costs at $144,000.  Hence, the government amended its previous request to the current requested amount of $144,000.

10

therapy in the future to account for five unique triggers that occur over the course of a victim's lifespan. Those triggers are: when the victim reaches puberty, begins a consensual sexual relationship, enters into an emotionally committed relationship, has a baby of her own, and when the victim's child reaches the same age as M.M. when she was abused.

There is also evidence in the record from Leah Bauwers, MA, LMFT, who was M.M.'s primary treating therapist upon her removal from Defendant's custody and her placement into foster care at La Familia Namaste. Ms. Bauwers has been a licensed child therapist for 25 years and has an expertise in childhood complex developmental trauma and how such trauma affects attachment, bonding, and growth. She remained M.M's therapist until her adoption. Defendant questions the probative value of Ms. Bauwers' statements because she no longer treats M.M., but the Court easily dispenses of this concern because Ms. Bauwers treated M.M. during a critical timeframe; beginning immediately from when she was removed from Defendant's custody and until she was placed with her adoptive parents. Thus, Ms. Bauwers has firsthand knowledge of M.M.'s trauma and the needs she will require because she remained her therapist through the acute trauma phase. Her statements directly link M.M.'s treatment needs to the trauma caused by Defendant. Moreover, Ms. Bauwers explains that although M.M. is functioning well in a caring environment, her neurological trauma-based experiences are life-altering and have caused brain dysfunctions. M.M. will require ongoing psychological services and protective environments well into adulthood.

Next, Defendant questions whether M.M.'s mother has incurred lost wages due to M.M.'s medical and psychological needs. Defendant points out that M.M. is doing well in school, is making friends, does not need IEP services, and attends playdates with other children. Defendant also takes the position that K.S.'s decision to adopt M.M. is the cause of her losing

the ability to foster more than one child at a time, and is the cause of the State of New Mexico no longer paying for M.M.'s treatments. The Court easily rejects this argument, as it is the Defendant who set in motion the chain of events that led to K.S.'s lost income and that led to K.S. paying for M.M's treatments. Had Defendant not been abusing M.M. in the first place, M.M. would not need foster care or treatment, and K.S. would have continued to foster more than one child at a time.

Lost income is specifically listed as one of the enumerated costs under 18 U.S.C. § 2259(b)(3)(D). The government has provided documentation that since taking custody of M.M., K.S. is no longer able to work and she is no longer able to care for additional foster children because of the time and resources required to adequately care for M.M.[5] Ms. Bauwers also stated that K.S. must be available for M.M. in each social environment to support her development, which makes it very difficult for K.S. to be employed. K.S. provided the probation office with copies of paystubs from January 2009 to November 2016, as supporting documentation to establish her salary history and to demonstrate lost income in the future. Therefore, as a conservative estimate, the Court orders restitution for lost wages in the amount of $2,200 per month ($26,400 per year). Lost wages over the course of eight years as requested by K.S. comes to a grand total of $211,200. The Court finds K.S.'s lost wages are attributable to Defendant's conduct and are adequately supported by her pay stubs and salary history and the statements from Ms. Bauwers.

---

[5] More specifically, K.S. has been a foster parent for the past eight years. She was earning $2,200 per child per month. K.S. used to take in two sibling groups of two to three children at any one time. Consistently, K.S. was earning on average between $4,400 and $4,800 per month. Since M.M. has been in her care, K.S. stated she is only allowed one child in her home plus any short-term placements and can earn up to $2,200 per month. K.S. is unable to have more than one child in her home due to M.M.'s ongoing issues. K.S. stopped receiving compensation for M.M. once the adoption was final. Accordingly, K.S.'s earning potential decreased by half or more since the placement of M.M into her care.

The Court also finds that despite the evidence that M.M. is progressing well in school and making positive leaps socially, she will continue to struggle with the effects of Defendant's abuse for the rest of her life. She requires continuous monitoring for "triggers" and proper boundaries as she can still revert back to trauma-based behaviors. This requires constant care from her mother K.S., and the Court therefore finds K.S. is not able to work full-time in order to adequately care for M.M. Ms. Bauwers' testimony amply supports this. Thus, the government has proven K.S.'s lost income of $211,200.

B. <u>Victim A.M.</u>

The Court further finds the government has established by a preponderance of the evidence that A.M.'s actual and anticipated medication and psychiatry costs are $144,000. A.M. is participating in five (5) therapy sessions per week at $200 per session. He has a diagnosis of severe Post-Traumatic Stress Disorder and Reactive Attachment Disorder. He is receiving Attachment Healing Therapy, Sand Tray Therapy, Occupational Therapy, Speech Therapy, and he sees a psychiatrist once per month. Ms. Kenney-Noziska testified that based on her expertise and in her experience treating such patients, a cost of $200 per session is average. She opined that each of these therapies is necessary for at least the next twelve years, and the sum of $144,000 is a conservative estimate of the costs of A.M.'s treatment.

At the hearing, A.M.'s adoptive mother, C.C., explained that A.M. continues to suffer severely as a result of Defendant's abuse. For example, he cannot be around men without reverting back to a trauma state. He cannot hear the name Michael without going into a state of panic. He cannot sleep without medication, and recalls horrific details of the abuse. He cannot go to Kindergarten without IEP services because he is unable to be around male staff and he repeatedly draws pictures of the Defendant hurting him. C.C. cannot allow others to care for

A.M. unless they have been trained in how to care for a traumatized child. A.M. cannot usually be touched, and continues to live in constant fear that the Defendant will harm him. At the young age of five, the child essentially struggles to make it through each day. The government has met its burden to prove that Defendant's conduct proximately caused A.M.'s harm, and the restitution amount of $144,000 is not speculative and is adequately supported by the record.

## CONCLUSION

The Court recognizes that no amount of monetary compensation will ever fully repair the horrors the child victims experienced at the hands of the Defendant. Moreover, since the Defendant is indigent and will be serving a life sentence, the victims will never receive any restitution other than nominal amounts the Bureau of Prisons might take out of the Defendant's inmate account at the facility where he is designated to serve his sentence. There is ample evidence in the record supporting the amount of restitution sought by the government. A.M. and M.M. have suffered unimaginable harm as a result of Defendant's conduct, and will likely continue to suffer such harm for the rest of their lives. **IT IS THEREFORE ORDERED** that Defendant Michael Dameon Blackburn shall pay restitution to the child victims as follows: **$286,800 for M.M. and $144,000 for A.M.**

_____
UNITED STATES DISTRICT JUDGE