```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3    _____
                                  )
 4    UNITED STATES OF AMERICA,    )   No. 14-CR-00129 WJ
                                   )
 5           Plaintiff,            )
                                   )   Pete V. Domenici U.S. Courthouse
 6        vs.                      )   Bonito Courtroom
                                   )   Albuquerque, New Mexico
 7    MICHAEL DAMEON BLACKBURN,     )   Monday, August 29, 2016
                                   )   1:30 P.M.
 8           Defendant.            )
      _____)

 9

10                  TRANSCRIPT OF PROCEEDINGS
                   SENTENCING HEARING, PART 1
11         BEFORE THE HONORABLE WILLIAM P. JOHNSON
                 UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    For the Plaintiff:   MARISA A. ONG
                           SHAMMARA HENDERSON
15                         UNITED STATES ATTORNEY'S OFFICE
                           District of New Mexico
16                         201 Third Street, N.W.
                           Albuquerque, New Mexico   87102
17
      For the Defendant:   MARGARET A. KATZE
18                         FEDERAL PUBLIC DEFENDER
                           District of New Mexico
19                         111 Lomas Blvd., NW, Suite 501
                           Albuquerque, New Mexico  87102
20

21    For U.S. Probation: SANDRA DAY

22    Reported by:        MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                          United States Court Reporter
22                        Phone:  (505)348-2334
23                        Email:  Mary_Loughran@nmcourt.fed.us

24        Proceedings recorded by mechanical stenography; transcript

25    produced by computer.
```

1                        I N D E X

2                                                    Page

3       ARGUMENT BY MS. KATZE ..............................3

4       RESPONSE BY MS. ONG ................................9

5       FURTHER ARGUMENT BY MS. KATZE .....................19

6       FURTHER RESPONSE BY MS. ONG .......................29

7   ALLOCUTION BY MRS. K.S. - M.M.'s ADOPTIVE MOTHER .....33

8

9                        *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (In Open Court at 1:43 P.M.)

2           THE COURT:  All right.  Let me call next United

3   States vs. Michael D. Blackburn, 14-cr-129.

4           Would counsel enter their appearances for the record.

5           MS. ONG:  Good afternoon, Your Honor.  Marisa Ong on

6   behalf of the United States.

7           MS. HENDERSON:  Good afternoon, Your Honor.  Shammara

8   Henderson on behalf of the United States.

9           MS. KATZE:  Margaret Katze for Mr. Blackburn.  Good

10  afternoon, Your Honor.

11          THE COURT:  As a preliminary matter, Ms. Katze, you

12  reviewed the Presentence Report with the Defendant?

13          MS. KATZE:  I did.

14          THE COURT:  There are a number of legal issues and

15  arguments that are raised, so I think what I'm going to do is

16  go ahead and hear argument on that.  So, Mr. Blackburn, you can

17  go ahead and just have a seat back at the defense table.

18          MS. KATZE:  Your Honor, so right now we're just going

19  to do the legal arguments?

20          THE COURT:  Yes.

21          MS. KATZE:  Okay.  Just briefly, because I believe

22  that I addressed these in my objections to the Presentence

23  Report, our first objection was to the enhancements under

24  §2G2.2(b)(5) and §4B1.5(b)(1).  It is our position that --

25          THE COURT:  And that's Paragraph, I think, 64 of the

1  Presence Report, and then 97 of the --

2          MS. KATZE:  Yes, I think you're correct, Your Honor.

3          So, it's our position that it's essentially double

4  counting.  I know that the Government in their Sentencing Memo

5  argued that the two enhancements serve different purposes, but

6  the truth is, they're both triggered by the exact same conduct,

7  and both enhancements punishing the exact same conduct.  So I

8  think that that's unfair double counting to apply both of those

9  enhancements.

10         And then our other objection was to the enhancement

11 of five levels based on distribution of those photographs per

12 receipt or expectation of receipt of a thing of value.  Merely

13 because somebody exchanges those photographs doesn't

14 automatically make it for a thing of value or an expectation

15 for a thing of value.  Certainly in this case, Mr. Blackburn

16 did it for other reasons.  We set forth what we think are

17 certainly more plausible reasons for the exchange, and

18 therefore, the five levels would not be appropriate.

19         So those are the objections to the Presence Report

20 that we made.  Other than that, Your Honor, there's basically a

21 request for a departure, a variance argument, and an argument

22 against the restitution.  Do you want to hear any of those at

23 this time, or shall we have the Government respond to those two

24 objections?

25         THE COURT:  You know, I'll hear them all at once, so

1    you may continue.  But I did have a question.

2            Again, bearing in mind what the U.S. Supreme Court

3    has said, that the starting place is to arrive at a correctly

4    calculated guideline sentence, but as far as the guideline

5    sentence, even if I sustain your objection to the five-level

6    enhancement in Paragraph 64, that five levels basically for a

7    pattern, and then sustain the objection in Paragraph 97 for

8    that five levels, then you are -- I mean, that's ten levels

9    that are coming off.  But you're still, in terms of a guideline

10   sentence, an advisory guideline sentence, you're still at an

11   offense level of 43, which under the Sentencing Guidelines is

12   life in prison.

13           MS. KATZE:  I recognize that, Your Honor.

14           THE COURT:  I just wanted to make sure --

15           MS. KATZE:  No, I recognize it, but let me explain to

16   you why I still think it's important.

17           First of all, as the Court said, we start from a

18   correctly calculated guideline, so I think it's important to

19   correctly calculate the guidelines.

20           Secondly, I am asking for a variance and a departure,

21   and I imagine psychologically asking the Court to vary or

22   depart from a Level 53 is different than asking the Court to

23   depart from a 43, just in fairness to the way we perceive

24   things.  So I do think it's important to address that, and then

25   to move from there.

1          So, do you want me to address the issue of

2   restitution?

3          THE COURT:  Whatever order you want to go in.

4          MS. KATZE:  Okay.  I'm going to skip to the

5   restitution order, or the restitution issue.

6          Originally my objection addressed restitution, two

7   different types of restitution.  Probation was originally

8   requesting restitution for apparently individuals identified

9   from other series who I guess have received civil judgments,

10  and generally it's been my experience that then they have

11  attorneys that represent them that try to collect on those

12  cases.

13         And then in the Presentence Report, Probation

14  indicated that there had been no requests for restitution on

15  behalf of M.M. and A.M.  So in my Sentencing Memo, I argued

16  against the restitution as set out by Probation.  Clearly I

17  think under Paroline, it would affect that decision.

18         However, then apparently the Government contacted

19  Probation and told Probation that -- or Probation maybe

20  themselves contacted the victims of those other series.  In any

21  case, I believe that it came from the Government saying that

22  the victims in those cases did not wish to seek restitution

23  anymore at this point, and that they believed that any

24  restitution that would be ordered by the Court should go to

25  A.M. and M.M.  And if that is correct, that that is the

1   Government's position now, I won't address the issue.  I won't

2   address any further the issue of the restitution originally

3   requested by Probation in the Presentence Report, which I did

4   address in my Sentencing Memo.

5          So I think where that leaves us now is the issue of

6   restitution for M.M. and A.M.  And in Probation's Addendum to

7   the Sentencing Memorandum where they address the fact that the

8   Government has indicated that the victims of those other series

9   are saying restitution should go to A.M. and M.M., Probation

10  continues to indicate that they have not received any requests

11  for restitution on behalf of M.M. and A.M.  And so my position

12  continues to be the same as it is in my Sentencing Memorandum.

13         I recognize that clearly the Court is authorized to

14  issue restitution in this case.  I absolutely recognize that,

15  and I'm not arguing that the Court doesn't have authority to do

16  that.  But what I am arguing is that if we look at the statute

17  and we look at the cases related to the statute, basically the

18  Government's request is completely speculative.

19         The Government has provided no documentation, no

20  reports, nothing for the Court to help the Court say that there

21  is something specifically victim related.  And the Tenth

22  Circuit was clear in saying that a District Court must support

23  any restitution order with findings of fact on the record.  And

24  we don't have that.  That has not been provided to us.

25         The Government is merely asking the Court -- based on

1  an article from the International Society for Prevention of

2  Child Abuse & Neglect Journal, they came up with this finding

3  that maybe over the lifetime of an individual who has been

4  abused, that it costs $210,000, and they go through the

5  breakdown of that.  And I address some of that specifically in

6  my Sentencing Memo.

7         For example, they talk about costs to pay for

8  criminal justice costs, and clearly the costs, using that

9  example, clearly those costs will only arise if the children,

10  in fact, get in trouble in the criminal justice system.  So

11  it's completely speculative, and that's exactly what the Tenth

12  Circuit has said we can't do.  And that's not what the statute

13  itself says.

14         So I think that especially in this situation -- in

15  Paroline, the Supreme Court case, it says that the Government

16  has the burden of demonstrating the victim's loss.  It's very

17  specific.  And I understand they're very young children, and at

18  this point they might not be able to -- there might not be

19  something.  But I think that any restitution order has to be,

20  not speculative, but has to be -- again, as I said, for the

21  Court to -- it has to be based on findings of fact in the

22  record.  So the Government has to provide the Court with some

23  kind of factual basis, some kind of record to meet their

24  burden, and it has to be specifically victim related.  So

25  that's the issue that I have on the restitution issue.

1          I guess the final two issues that -- if the Court

2    wants at this point the Government to, because those are the

3    more legally related arguments, if the Court wishes the

4    Government to address those, then I can talk about variance.

5          THE COURT:  Sure, that makes sense.

6          MS. ONG:  Good afternoon, Your Honor.

7          Regarding Ms. Katze's first objection to the PSR that

8    deals with the distribution of a thing of value, I actually

9    brought a case for the Court to consider, and I have provided

10   defense counsel with a copy.  If I could have permission to

11   publish that to the Court now.

12         THE COURT:  Sure.

13         MS. ONG:  This is United States v. Geiner, I believe

14   is how you pronounce it.  It's 498 F.3d 1104.  It's a published

15   case from 2007 from the Tenth Circuit.  I believe that this is

16   the seminal case out of the Tenth Circuit on this issue.

17         Now, in Geiner, we were dealing with a Defendant who

18   had a file-sharing program, and I think that the Court, just

19   from my past dealings with the Court, I think the Court is

20   familiar with that.  But those are basically programs such as

21   LimeWire, where you're downloading child pornography and then

22   you're making child pornography files available.  And what the

23   Court said here is, there's an issue of whether or not the

24   Defendant actually knows that he is distributing the child

25   porn.

1          What they ultimately found in Geiner was that the

2   five-level enhancement was properly applied even when the only

3   benefit that the Defendant was getting was a faster internet

4   connection.  And I'd just like to direct the Court to Page 1111

5   through 1112.  That's Page 8.

6          Basically, Ms. Katze was arguing that exchanging

7   child pornography for other child pornography doesn't

8   constitute a thing of value.  There the Tenth Circuit

9   explicitly said:  "A thing of value need not have objective

10  value, but may be something of value to Defendant as the

11  example in the application note to United States Sentencing

12  Guideline Section 2G2.2(b)(3)(B) illustrates.  For example, in

13  a case involving the bartering of child pornographic material,

14  the thing of value is the child pornographic material received

15  in exchange for other child pornographic material bartered in

16  consideration for the material received."

17         I think here in the record we have ample support for

18  that, and I'd like to direct the Court's attention to the

19  Defendant's videotaped confession that was admitted as an

20  exhibit at the suppression hearing.  The actual videotaped

21  interview was Exhibit 36, and the transcript of the interview

22  is Exhibit 38.  Those are already in the record.

23         And if the Court recalls, as Probation pointed out in

24  their Addendum, during that interview the Defendant explicitly

25  said that he was e-mailing with other people, sending them

1  child pornography, and that they were basically trading images.

2  He would send them an image, and then they would send him an

3  image.  So I think we have ample support here.  There's no

4  issue of whether or not the Defendant actually knew he was

5  distributing the child porn.  These are direct e-mails that

6  happened.

7         So our position is that that enhancement was

8  correctly applied, and I would ask the Court to rely basically

9  on the Defendant's own admission as to what he was doing to

10  overrule that objection.

11         Does the Court have any questions about that

12  enhancement?

13         THE COURT:  No.

14         MS. ONG:  All right.  Moving on to defense counsel's

15  second objection, that deals with the double counting that the

16  Court had just pointed out.  I have another case that I've

17  cited in my Sentencing Memo.  I provided defense counsel with a

18  copy, and I have a copy for the Court.

19         This case is United States V. Dowell.  It's a case

20  out of the Fourth Circuit.  This issue has not been raised

21  within the Tenth Circuit, but as I laid out in my Sentencing

22  Memorandum, every single court to have looked at this issue has

23  held that it is not impermissible double counting to have the

24  pattern of abuse enhancement from §2G -- I don't remember the

25  exact -- let's see here.  §2G2.2(b)(5), and the enhancement

1   under §4B1.5.

2           Basically, I think the Court can rely on the Fourth

3   Circuit's rationale in the Dowell case.  There what they said

4   is, it's not impermissible double counting because each

5   enhancement serves completely different sentencing goals.

6   Basically, what they said there is that §2G2.2(b)(5) provides

7   an enhancement per offense specific conduct as it relates to a

8   defendant's child pornography offenses, whereas §4B1.5(b)(1) is

9   located in Chapter 4 of the Guidelines under the provisions

10  covering career offenders and criminal livelihood.

11          The Court went on to say:  "This placement is

12  explained by the background commentary which states that

13  §4B1.5(b)(1) applies to offenders who present a continuing

14  danger to the public and is derived from Congressional

15  directives to ensure lengthy incarceration for offenders who

16  engage in a pattern of activity involving the sexual abuse and

17  exploitation of a minor."

18          As I stated, all of the cases that I was able to find

19  that address this issue are cited in my brief.  Every court to

20  have looked at this issue has all decided that it is not

21  impermissible double counting.

22          As the Court brought up with Ms. Katze, even if the

23  Court were to sustain both of the Defendant's objections, he's

24  still at a total offense level of 43.  His guideline range

25  remains the same.  And so what we're asking the Court to do is

1 make specific findings that each enhancement was properly

2 applied, but that even if the enhancements were not applied,

3 the Defendant would still be at the same total offense level

4 and that the Court would still sentence the Defendant to the

5 same sentence, whatever that may be.

6         THE COURT:  I have a question.  When you fill out --

7 ultimately after the sentence is pronounced, I fill out, or the

8 Administrative Office of the Courts has the Judgment and

9 Commitment form that has to be filled out, and it includes the

10 findings on what a Defendant's offense level is.  So is it -- I

11 mean, the Government's position with the enhancements applying,

12 the offense level Probation came up with is 58, and then you

13 take away three levels for acceptance of responsibility since

14 he entered into this plea agreement, which would take it down

15 to a 55 -- I'm sorry; a 53.  But the guidelines only go as high

16 as offense level 43.  So, is the Defendant's offense level

17 under either scenario offense level 43?

18         MS. ONG:  I think it becomes offense level 43, and

19 that's because under the Guidelines, Chapter 5, Part A, the

20 Comment Note 2 of the Guidelines basically states:  "In the

21 rare circumstances where the total offense level exceeds 43,

22 the offense level becomes 43."

23         THE COURT:  Becomes 43, okay.  That's what I thought.

24 I just wanted to make sure.

25         MS. ONG:  Either way, we get to the same place.  But

1   I do believe that it is important for the record that -- I

2   believe that these enhancements were correctly applied, and I

3   think it's worth noting that Defendant's total offense level,

4   even after his acceptance, is 10 levels off the chart.  And I

5   think that further supports our request to the Court to

6   ultimately sentence the Defendant to 120 years in this case.

7            So, that's all I have on --

8            THE COURT:  That was another thing.  Again, that's

9   based on the statute; correct?  Because typically the

10  Guidelines would say life -- I mean, for all practical

11  purposes, it's the same.

12           MS. ONG:  That's correct, Your Honor.  So whenever a

13  defendant's guideline sentence is life and a statute doesn't

14  explicitly allow for a life sentence, then what the Guidelines

15  direct the Court to do is stack the counts and run them

16  consecutive.  And that's how we get to the 120 years in this

17  case.

18           So, we do believe that both of those enhancements

19  were properly applied.  We'd ask the Court to overrule

20  Defendant's objections.

21           Now, with regard to the restitution, what happened in

22  this case, Your Honor, is I tried to reach out to every single

23  attorney that is representing a known victim who has

24  outstanding restitution requests.  I don't believe that I spoke

25  to every single one of them, but every single attorney that I

1   did speak to told me in light of the fact that we have live

2   victims in this case, they were going to forgo their

3   restitution requests, because they felt it more appropriate

4   that the Court order restitution for the actual live victims in

5   this case.

6            We have the burden of proving by a preponderance any

7   type of restitution.  I know that defense counsel brought up

8   Paroline.  Frankly, Paroline is inapplicable to this case.

9   Paroline dealt with a situation where a Defendant possessed an

10  image of a victim that he had absolutely no involvement in

11  producing himself.  Here, the Defendant actually produced well

12  over -- I think according to his own statement, he approximated

13  over 500 videos and images of these children.  We know that

14  they've been widely disseminated.  They were ultimately found

15  in another country.  That's how this whole investigation

16  started.

17           And so I don't think we have any issues of whether or

18  not the Defendant proximately caused the harm to the victims in

19  this case, and that's what Paroline dealt with, whether or not

20  the Defendant who only possesses an image was the proximate

21  cause; how much.

22           Now, with regard to the actual amount that we are

23  asking for, M.M.'s adoptive parents are here, and I know that

24  they're planning on addressing the Court.  I think that they

25  can speak to some of the medical issues that M.M. has had, to

1   some of the counseling that she's having to undergo, and there

2   are factors that aren't even laid out in the CDC study that I

3   think they're going to speak to the Court about.

4          Basically, because of this case, they're

5   contemplating relocating out of the state of New Mexico in

6   order to keep M.M. safe.  Both of her adoptive parents are

7   lifetime residents of this state, but because of everything

8   they've had to deal with regarding this case, they're

9   contemplating moving.  And I don't believe that the actual

10  number that we're asking for is speculative.  The CDC study

11  that's attached to our memorandum goes into a lot of detail

12  about where those figures come from.

13         Now, Ms. Katze brought up, basically, a criminal

14  justice cost.  Okay, fine.  Let's hope that neither of these

15  victims ever have to deal with the criminal justice system, and

16  let's take that number out of it.  Then we're still looking at

17  $203,265.  And basically, what that deals with are short-term

18  health care costs, long-term health care costs, productivity

19  losses, child welfare costs, and special education costs.  I

20  don't think you need an expert to get up and testify that

21  because of the amount of abuse that these children have

22  undergone, they're going to deal with every single one of those

23  things.  So this is actually a set figure.  I think it's a

24  conservative number.

25         The CDC study basically lays out that when it made

1   this determination, the median age they were dealing with of a

2   victim was six years old.  In this case, we're dealing with two

3   toddlers who were two years old at the time that this happened.

4   So I don't believe that that's a speculative number at all.  I

5   think that the Court can rely on the findings in this CDC study

6   and also find that they apply directly to the victims in this

7   case.

8          Now, under 18 U.S.C. 3664(d)(5), the Court actually

9   has ninety days after a sentencing hearing to determine the

10  issue of restitution.  So if the Court feels that there is more

11  information that needs to be supplemented into the record,

12  we're happy to provide the Court with that.  But I know that

13  M.M.'s parents are going to speak not only to what they've been

14  able to observe with M.M., but they actually early on had a lot

15  of dealings with A.M., as well, and I believe that they're

16  going to address those with the Court, what they were able to

17  observe with regard to A.M. and his behavior and his foster

18  care placement.

19         There is no doubt that both of these minors should

20  be -- need counseling, and will continue to need that.  One of

21  the things that I expect the Court to hear about is that

22  because of the long abuse that M.M. had to endure from the

23  Defendant, she may not be able -- her reproductive organs may

24  actually be permanently disfigured.  So, I mean, even looking

25  down the road, we can say, well, if she ever wants to adopt

1    children, that's a cost that was proximately caused by the

2    Defendant's abuse in this case.

3            So it is difficult to ascertain these numbers.

4    There's no magic number.  But I think that this study goes into

5    as much detail as we can possibly know about how much a victim

6    of child abuse -- about the cost that they actually face.  And

7    I think that it's completely appropriate for the Court to rely

8    on it and to find that the costs that are incurred in this

9    study are costs that both A.M. and M.M. will endure for the

10   rest of their life.

11           THE COURT:  I was going to -- as I mentioned to

12   Counsel earlier, I didn't start looking at this file until the

13   weekend.  Obviously this is a case, given the magnitude of it,

14   that is going up to the Tenth Circuit.  There's suppression

15   issues.  The ruling I made in denying the motion to suppress,

16   that's going to be a part of the appeal.  There's an issue on

17   the enhancement, an issue of first impression in the Tenth

18   Circuit, so I've got to rule on that.  And the same with the

19   restitution.  So I'm going to hear today all the argument, I'm

20   going to hear the victim impact statements, I'll hear -- all

21   that will remain will be for me to pronounce sentence.

22           But I'll do a separate written on restitution.  If I

23   determine that -- clearly the Victim's Mandatory Restitution

24   Act is applicable in this case, so I do have to rule on the

25   restitution.  If I feel that I need more -- as you alluded to,

1  I can keep it open for ninety days, so I'll do a request for

2  supplemental briefing or authority if I determine I need it.

3          MS. ONG:  And Your Honor, just to point this out,

4  because I think defense counsel alluded to it, there have been

5  no actual restitution requests from either M.M. or A.M.  As I

6  stated, M.M.'s adoptive parents are here, and I expect that

7  you'll hear from them.

8          With regard to A.M., we have tried to reach out to

9  the foster parents.  We've been unable to get in contact with

10  them.  But I don't think that that precludes A.M. from being

11  able to receive restitution in this case.  The fact that his

12  parents have not made a specific request for restitution

13  doesn't mean that he's not entitled to it.  So our position

14  would be that given what's in the record in terms of the abuse,

15  there's no doubt that the Defendant was the proximate cause of

16  the abuse, that the Court can still order restitution for A.M.

17  whether or not he's formally made a request for it.

18          THE COURT:  I'll let you respond, Ms. Katze.

19          Are you done on the restitution issue?

20          MS. ONG:  Yes, Your Honor.

21          THE COURT:  Okay.  Go ahead, Ms. Katze.

22          MS. KATZE:  I just wanted to say one thing with

23  respect to the restitution argument.  The Government is saying

24  that it's not speculative, but just saying it's not speculative

25  doesn't make it not speculative.  They still have given the

1  Court no facts upon which to base a restitution order.  And a

2  study is not victim specific enough.

3          I realize that obviously there may be some

4  speculation, but I think it has to be based on something

5  specific, and a current costs and a projection of that.  So I

6  just wanted to make that point.

7          Do you want me to now address --

8          THE COURT:  Sure, let's go into -- we know in terms

9  of the guideline sentence, whether the enhancements apply or

10  not, the guideline sentence for the Defendant is life in

11  prison.  So let's go now to the next matters in your Sentencing

12  Memorandum.

13          MS. KATZE:  Okay.  Thank you.

14          So, the Government is requesting a sentence of 120

15  years, which as the Court pointed out is tantamount to a life

16  sentence.  I want to go over the reasons why I think the Court

17  should consider giving a sentence less than life in prison.

18          One thing I'll just address first is our departure

19  issues under §5K2.16, Disclosure not Motivated by Imminent

20  Uncovering.  Now, I recognize that this is maybe not a classic

21  case that falls under this provision, because this isn't a

22  situation where Mr. Blackburn came forward and reported his

23  abuse.  But I do think that this departure section still

24  applies given what did happen in this case, how fully

25  cooperative Mr. Blackburn was to the extent that he talked

1  about things that law enforcement did not know and would not

2  have uncovered that then ended up being used against him as far

3  as number of images, types of images.

4        Also, based on information that he gave them and his

5  cooperation with letting them look at his electronics and

6  identifying where some things came from, law enforcement was

7  able to identify other people who were involved in the

8  distribution of child pornography.  Whether they followed up on

9  that or what they did about it is another situation.

10        And I'm not suggesting that a §5K cooperation

11  agreement applies, but I think that because of the fact that he

12  was so forthcoming with that information -- and it was a lot of

13  information that the Government didn't have, and because the

14  children were so young, might never have had.  Hopefully that's

15  something that can be helpful to the Government and to law

16  enforcement.

17        So apart from that, Your Honor, absolutely

18  recognizing that this is just an absolutely horrible, horrific,

19  heartbreaking case -- to even think of something like that

20  being done to young children is without a doubt one of the most

21  heartbreaking cases that we see, and I recognize that.  But I

22  think there still has to be a distinction between the

23  heartbreak of this case, and a case where somebody is killed, a

24  life is taken.  There has to be a distinction between that

25  conduct.  And I think if there's not, then I think we create

1   something troubling or problematic as far as the message to

2   people, as far as the deterrent effect.  There becomes a lot

3   less deterrent for other conduct if, in fact, this conduct is

4   punished the same as an intentional killing.

5           I think if Congress had wanted this conduct, as

6   horrible as it is, to be punished by a life sentence, Congress

7   would have done so.  But, in fact, none of the charges that

8   Mr. Blackburn pled guilty to carried more than a 30-year

9   mandatory sentence.  And it is only because of combining the

10  charges, even though it's all the same conduct, but combining

11  them and stacking those charges that we would even come up to

12  something that would come up to 120 years.

13          I also would add to that just the idea of the

14  possibility of release.  To give an individual, specifically

15  Mr. Blackburn, something that he has to live for and a reason

16  for him to try to reform his ways.  I think in sentencing

17  somebody to life, we take away the chance of rehabilitation and

18  we take away the chance for somebody, too, to change their

19  ways.

20          Also, you know, we have the battle of the studies.

21  The Government provided a study that says one thing, and I

22  found a study that I thought was very persuasive that showed

23  that the recidivism rate among sex offenders actually decreases

24  with age, and if the Court were to agree to give him a

25  sentence, Mr. Blackburn a sentence of less than life, he would

1  still be a substantially older man when he got out of prison,

2  and I think that the evidence is that sex offender recidivism

3  and sex offender conduct does substantially decrease when we're

4  talking about older individuals.

5          And I also think as far as the idea of the prospect

6  of any release, even when he's an older man, if there's still a

7  concern about the fact that he could still be a sex offender,

8  obviously there's sex offender registration, there's lengthy,

9  probably rest of his lifetime supervised release that he could

10  be on.  I think as I said in my Sentencing Memo, there are

11  things that Probation could do to -- ways that they could

12  fashion supervised release so that they would address any

13  possible risk or danger to the community.

14          I think specifically in this case, Mr. Blackburn is

15  30 years old, he has no prior criminal history, and there's no

16  evidence that he's a predator, that he's a predator in search

17  of children.  This is particularly more situational.  And under

18  §4248, when Mr. Blackburn is released, if the Government

19  believes that he is a dangerous sex offender, there are civil

20  proceedings that are specifically in place to address that, to

21  have a hearing to determine his dangerousness to be in the

22  community.  And if they can show at that time when he's an

23  older man, and contrary to studies, that he still presents a

24  serious danger to the community, he can be civilly committed.

25          It seems that it's more appropriate to make that

1  judgment that a man in his 60s or 70s is a danger when he's in

2  his 60s or 70s.  How we can say a man who is 30 and has no

3  criminal history, that there's no way that he can be

4  rehabilitated and that he can't have treatment, and that we

5  can't find a way for him to be released, it doesn't seem fair.

6  It doesn't seem appropriate.  And §4248 would be the way to

7  address that.

8            Now, kind of going backwards to talk about

9  Mr. Blackburn's life, again, he had a horribly sad life of

10  abuse and abandonment.  And I don't share that with the Court

11  as an excuse for what Mr. Blackburn did.  It's not an excuse,

12  and he doesn't see it as an excuse.  But it is -- I think it

13  gives maybe some insight, and I think that it's something that

14  the Court needs to take into consideration when making a

15  sentence that is sufficient, but not greater than necessary to

16  accomplish the goals of §3553.

17            So, Mr. Blackburn lived with his biological mother

18  until he was five years old.  He never knew his biological

19  father, but he knew that his biological father was an alcoholic

20  and had served time in prison.  His mother had a string of

21  boyfriends, one of whom sexually abused him.  When he was

22  actually -- when he was born, his mother was using cocaine and

23  marijuana.

24            So at the age of five, she just got rid of him.

25  Literally got rid of him and gave him to her sister, who lived

1    in another state.  So she completely abandoned him.  So, first

2    obviously abandoned by his father, and then completely

3    abandoned by his mother who at this point never saw him again.

4         But before she got rid of him, she was extremely

5    physically abusive towards him, and I laid out all those

6    things.  Burning him with a cigarette lighter, scraping his arm

7    with a knife, pushing his hand in broken glass, hitting him

8    with a belt, punching him, hitting him with an electric cord.

9    And all of this is before he was five years old.  And the

10   sexual abuse by her boyfriend, all before he's five years old.

11        Now he gets just sent to his aunt's house, and

12   unfortunately, to some degree, it kind of went from bad to

13   worse.  His aunt was extremely physically abusive to him.

14   Lighting him on fire, hitting him, trying to drown him.  And

15   again he experiences sexual assault.

16        He gets removed from the house, and then he's in a

17   residential treatment facility, in group homes and foster care,

18   and they had literally minimal contact with him.  Like the

19   first few months that he's there, they had contact with him,

20   and then she has a pass to pick him up on Christmas, and just

21   doesn't show up.  He's a young kid.  The aunt calls up and

22   explains that she's become pregnant by another man, and that

23   she's going to go live with this other man, and she has

24   absolutely nothing to do with Michael after that.

25        He tries to kill himself a number of times.  Taking

1   rat poisoning, cutting himself, a number of suicide attempts.

2   And that's by the time he's 13 years old.  He's diagnosed with

3   severe depression.  At the age of 13, it's noted that he sees

4   no reason to live at all.

5          He gets treatment.  He's prescribed a number of

6   medications for his depression, for anxiety.  While he's in the

7   residential treatment facility, he's found to be a slow

8   learner; a learning disability.  The Court knows from the

9   suppression motion that he has trouble reading and processing

10  quickly with a lot of external stimulation and people

11  interrupting him.  At the age of 14, he's found to have the

12  language skills of an 8 year old.

13         And then there were issues where there would be the

14  potential for him to be adopted.  A man who the facility

15  thought was actually his father and who described himself as

16  his uncle came back into his life briefly and said he was going

17  to adopt him, and that never happened.

18         And then finally, when he's 18 years old, he has to

19  get put out of the residential treatment facility.  He doesn't

20  really have any skills, so to speak, to -- I mean, life skills,

21  in general, and skills to support himself.  And now he doesn't

22  have insurance and he's not getting medication.  So that's a

23  little bit of a view on what Michael Blackburn's life was.

24         I think the Court knows how extremely remorseful and

25  sorry Mr. Blackburn is.  He, again, gave a very detailed

1   confession to law enforcement.  He described himself as being

2   evil and that he was glad that he had gotten caught and that he

3   was stopped, because despite the abuse, he did care for the

4   children.

5           And actually, some of the Government's witnesses

6   specifically said in their statements that Michael -- even

7   though living in the house were the two parents whose parental

8   rights were terminated, who were obviously extremely neglectful

9   of their children, the two parents were in the house, it was

10  Michael Blackburn who was taking care of the children as far as

11  feeding them and taking care of them.  I'm not saying that he

12  should get a reward for that, but I think the fact is that he

13  did care for the children and does feel completely remorseful

14  and horrible about the pain that he has caused them and what he

15  did to their life.

16          I would ask the Court -- I have suggested in our

17  Sentencing Memo that the Court could give Mr. Blackburn a

18  lengthy period of time in prison, and I think that that would

19  be appropriate to accomplish all the sentencing goals of §3553.

20          I know Mr. Blackburn wishes to address the Court.  Do

21  you want him to address the Court now?

22          THE COURT:  Why don't we wait and let him go at the

23  end, and I'll give you and him the last word.

24          MS. KATZE:  Okay.  I just have two more things that I

25  want to say, and I can bring it back up at the end.

1    He's asking for a recommendation to be able to serve

2  his sentence at FCI Tucson, or another facility that has a

3  sexual offender dedicated wing/program/treatment.  And then

4  here's --

5    THE COURT:  Is FCI Tucson one where sex offenders --

6    MS. KATZE:  I believe there is a program there.

7    MS. DAY:  We have several different lists, Your

8  Honor, I apologize.

9    THE COURT:  That's fine.  We can come back to that.

10 You can go ahead and look.

11   MS. DAY:  Thank you.

12   MS. KATZE:  The last thing that I wanted to say, you

13 know, is when it comes to child sex abuse, I think we all want

14 to know, how does it happen?  Why does somebody do something

15 like that?  It's so horrible.  Is there a way that we can

16 understand how that happened so that maybe we can figure out

17 how to prevent it in the future, or intervene?  You know, what

18 do we do?

19   I think that very few studies really get to talk to

20 and look at somebody who has sexually abused children, and for

21 what it's worth, Mr. Blackburn is willing to participate in a

22 study, or be the subject of a study.  He's very -- you know,

23 he's open and he's willing to talk and help.  Because he said,

24 if there's anything he could do -- he knows he can't undo what

25 he did to those children, but if there's anything that he could

1   do to help people figure out why this happened.  And it may not

2   be a universal thing, but if in studying him and what he did

3   would in any way help us figure out how this happens, why this

4   happens, and what we can do, he's willing to do that.

5            THE COURT:  Okay.

6            MS. ONG:  Your Honor, first I want to just briefly

7   address defense counsel's argument for a departure under

8   §5K2.16.  I don't believe a departure is warranted, and this is

9   why.  That provision explicitly states:  "This provision does

10  not apply where the motivating factor is the defendant's

11  knowledge that discovery of the offense is likely or imminent,

12  or where the defendant's disclosure occurs in connection with

13  the investigation or prosecution of the defendant for a related

14  conduct."

15           That's exactly the situation we have here.

16  Mr. Blackburn did not walk into the police department and turn

17  himself in.  Law enforcement showed up at his door.  At that

18  point, he knew the jig was up, and so he agreed to talk to them

19  and tell them what they were going to find anyway.  What was

20  uncovered on his phone and on the computer, what was recovered

21  in his e-mails, frankly, we would have found that whether

22  Mr. Blackburn had told us about it or not.  So I don't believe

23  that a departure is warranted under that provision.

24           I want to just quickly address a few of the arguments

25  that defense counsel made, and then I want to turn it over to

1   M.M.'s parents, because I think that they can give the Court an

2   idea of what Defendant's conduct really did in this case much

3   better than I'm able to do.

4          But first of all, I think defense counsel brought up

5   the fact that if the Defendant was supposed to receive a life

6   sentence, that the statute would call for it.  Well, §2251, the

7   statute of conviction, does allow for a life sentence, and

8   that's basically if the Defendant has two prior convictions.

9          In this case, we know that Defendant assaulted and

10  filmed these children over 500 times.  So just because he

11  hadn't been caught before, I think that his conduct still falls

12  within that realm.  The unit of prosecution for a production

13  case, it's one video.  Here we know that he did this at least

14  500 times.  So I think that even Congress -- you know, the fact

15  that if you have two prior convictions, in that instance the

16  Court is allowed to actually impose a life sentence, supports

17  our request for a 120-year sentence in this case.

18         Defense counsel tried to argue that there's no

19  evidence that Mr. Blackburn is a predator.  That kind of blew

20  my mind, because I think everything in this case says the

21  contrary.  What Mr. Blackburn told us in his interview is that

22  he couldn't control himself.  We know that he abused at least

23  one other child when he was a teenager.  We know from the

24  suppression hearing that he was at least threatening to abuse

25  his own son.  I would redirect the Court to Exhibits 31 through

1   35 that were introduced at the suppression hearing.  Those are

2   basically e-mails from the Defendant to the mother of his child

3   where he's basically making threats that he would abuse his own

4   son if he had the opportunity.

5          So he's absolutely a predator, and if he has an

6   opportunity to abuse a child again, there's no doubt that he'll

7   take it.  I don't think that he can control himself, and that's

8   what he told law enforcement himself.

9          Now, of course how he got to that point, there's no

10  doubt that there had to be some bad stuff that happened to him

11  in his early childhood, but what the Court should be concerned

12  about now is protecting the public from Defendant's future

13  crimes.

14         The Court is well aware of the egregious facts of

15  this case.  I'm not going to sit here and recount them.  The

16  Court sat through a two-day suppression hearing.  I think that

17  the PSR, Paragraphs 13 through 39, clearly lay out the offense

18  conduct.  I address some of it in my brief.

19         The one thing I can say is, you know, I've worked on

20  these child exploitation cases for five years now, and today I

21  actually have hope, and that's because of M.M.'s foster

22  parents.  Ms. Henderson and I have had the opportunity to sit

23  down and talk to them, and they truly are angels among us.

24         What they do is, they basically take in high-risk

25  foster children and provide a home for them.  And I think that

1  they'll touch on this a little bit, but basically, in this

2  case, they received M.M. right away, right after the abuse, and

3  that's not typically what happens.  Usually a child goes to one

4  foster care parent, and then when that's not working out,

5  they're kind of the last resort.

6           So I think that they can tell you that in comparison

7  to some of the other children that they've had to foster, M.M.

8  was in the worst condition that a child could be, which is

9  exactly what you would expect.  I think that they're going to

10  tell you a little bit about what they had to undergo in the

11  early days of caring for her, what they still have to deal with

12  today, but if that little girl has a chance, it's with them.

13  So that's definitely a good thing.  I'm so happy that people

14  like them exist.

15           But that should not discount from what the Defendant

16  did in this case.  He is absolutely a danger.  And one of the

17  main reasons why we're asking -- well, we believe all the §3553

18  factors support a sentence of 120 years, and I clearly laid

19  that out in my Sentencing Memorandum, but I don't want M.M.'s

20  parents to ever have to worry about Mr. Blackburn again.  I

21  want them to know that he's put away for good, and they can

22  move on with their lives.  And I think given everything that

23  M.M. had to endure, everything that A.M. had to endure, that's

24  what the child victims in this case deserve.  And if ever there

25  was a case where an effective life sentence was warranted, this

1   is it.

2           I don't believe that there are any mitigating factors

3   strong enough to support the Court varying or departing, and we

4   are asking the Court to impose a 120-year sentence.  You know,

5   the fact that Defendant is sorry, frankly it's just not enough.

6           So I'd like to give, now, M.M.'s parents an

7   opportunity to speak.  And just so the Court is aware, in order

8   to protect the identity of M.M., I'm not going to have the

9   Court actually put their names in the public record.  They're

10  concerned about people finding out who they are.  I can tell

11  you that they've actually legally changed M.M.'s name, and so

12  for that reason, we're just going to refer to them as M.M.'s

13  adoptive parents, if the Court is all right with that.

14          THE COURT:  Sure.

15          MS. DAY:  Your Honor, Tucson does have a residential

16  program for sex offenders.

17          THE COURT:  It does?

18          MS. DAY:  Yes.

19          THE COURT:  Okay.

20          MS. ONG:  Your Honor, before they speak, they

21  actually brought a picture that they wanted me to show you.

22  I've showed it to defense counsel.  And so if you're all right,

23  I'll just furnish it to the Court now.

24          THE COURT:  Yes.  You all may proceed.

25          MRS. K.S.:  Good afternoon, Your Honor.  Never in my

1    wildest dreams did I ever imagine I'd be standing in front of a

2    Federal Judge.  Never in all my life did I ever imagine that I

3    would be adopting a child.

4            On December 17th, we were called and asked if we

5    could take a child on emergency.  We were told that this child

6    was probably a feral child.  As standard practice in our

7    family, seeing as I do have other children in the home, we

8    always have a family meeting to make sure that that is okay.

9    We usually have a few days to make a decision, a few days to

10   read over the file, a few days to make sure that it's an

11   appropriate fit for us.  We did not have that that day.  I

12   talked to my children briefly, and they said, absolutely, go

13   get her.

14           I went down to CYFD by myself.  He had to stay home

15   with our kids.  I saw A.M. being taken out with his foster

16   parents, who I know, and he was very distraught, very checked

17   out, very disassociated, not knowing what was going on.  It was

18   the most heartbreaking thing I'd ever seen, I thought.

19           About 30 minutes later, here comes this beautiful

20   girl in the same manner.  She was almost three years old and

21   had no vocabulary.  She couldn't talk.  She had no idea who I

22   was, whether I was safe, whether I was going to harm her, feed

23   her, nothing.

24           We drove home that day, and she was so exhausted,

25   like I've never seen a child.  We didn't even make it out of

1   the parking lot -- she was crying and crying, but was not

2   asking for anyone.  Just crying.  Most kids that we get ask for

3   mom and dad, foster parents, anyone that's taken care of them.

4   This little girl had no one to cry for, except for her brother.

5   She fell asleep before we ever got to the interstate.

6        I took her home and I fed her.  It was like the first

7   meal she'd ever had.  She did not know how to sit at a table.

8   She did not know how to use utensils.  She did not know how to

9   use the restroom.  She could not communicate in a strange home

10  with us.  It was a very long few days.

11       She could not use the bathroom, because she was so

12  damaged.  Some of this my husband does not know.  I took a lot

13  of this on because it's very hard for a man to understand, let

14  alone any of us.  But to be firsthand victims, we were.  We

15  were impacted as much as M.M. was.

16       Over the next couple of weeks, I had to take her to

17  the doctor twice because she could not urinate from the damage.

18  I had to sit with her and help her so that she could urinate on

19  her own.  She had to go in the bathtub, or wherever.  I was

20  told at that time that she may not be able to have kids.  I

21  just thought how horrific that is.  How horrific.  I was told

22  that, too, but I was blessed with two biological children.  I

23  can't imagine the pain that she may go through.

24       After that, we began intensive therapy, intensive

25  visits.  We did sibling visits.  We did sibling counseling.  We

1    even had A.M. in our house numerous times to try to integrate

2    them together as siblings.  It was very evident from the

3    beginning that they could not be siblings.  They acted out.

4    They hurt each other.  They would try to sexually pose

5    themselves with each other.  We could not even use a cellphone.

6    They didn't know what a cellphone was, except to take pictures.

7    If a cellphone was seen, they would start posing and wanting to

8    take their clothes off.  If we were in public, they would want

9    to do that.  It was evident that the damage was so more than we

10   could ever imagine.

11          Therapy.  Lots of reading, which you could tell she

12   had not been read to.  The Defendant said that he took care of

13   them.  I disagree with that.  I do not believe he ever read a

14   book to them.  I do not believe he ever played ball with them,

15   let alone did a puzzle with them, because M.M. had no idea how

16   to do that, and neither did A.M.  We had to teach them basic

17   childhood things that they should have already known prior to

18   coming into my house.  All the other children that I've had

19   that have been in horrific circumstances come knowing the

20   basics.  They did not.

21          M.M. began to slowly vocalize.  M.M. started -- they

22   said that, you know, they didn't go to anyone, tell anyone what

23   was happening.  Well, M.M. had no vocabulary at almost three.

24   She had 15 words that you couldn't even understand.  So she

25   didn't have a voice until we taught her words.  Then she

1   started making the disclosures, and believe me, she would talk

2   freely.  And the horrific, horrific things that came out of

3   her, I never imagined in all my life to hear.

4          But I want to share one thing that I think was the

5   most important thing for me to hear from her.  It was the

6   hardest thing I ever heard.  I was rocking her before bedtime,

7   and she started crying.  I asked her why, and she said:  "All

8   those times I cried, and I begged and I begged for my brother

9   to help me, and he wouldn't."  Well, how could her two-year-old

10  be her shining armor?  At two years old, she wanted him to be

11  her protector.  She's 11 months older than him.  That's the

12  only person she had.  The only person.  Mr. Blackburn did not

13  take care of those children.  I don't care what they said.  She

14  would not have been crying for her brother to take care of her.

15         You know, she talks about not wanting to take his

16  life away from him.  Well, unfortunately, he's already taken

17  away two lives.  These children will have to be monitored for

18  the rest of their lives.  I refer to keeping M.M. in a bubble.

19  She will not be allowed to do normal functioning things like

20  other children.  She cannot.  She is at high risk for this type

21  of thing to happen again.  She knows no boundaries.  She was

22  not taught boundaries because of the horrific things that were

23  done to her and her brother.

24         We talk about restitution.  You know, we're all

25  speculating.  Every day I wake up and I wonder what my day's

1  going to bring.  Last night it brought me a full night of sleep

2  in a week.  Why?  Because M.M. has nightmares numerous times.

3          As far as restitution, there's no way of putting a

4  dollar figure on it.  I would like the money to be used to make

5  sure that she is educated to help out other children, to make

6  sure that if she needs to be in a smaller class because she's

7  not doing well in a class of 20, 25 or 30, I can get her the

8  education that she needs to be a better person, to be able to

9  sustain a life as an adult.  We all wonder if that will be

10 possible.  None of us will know.  I may not even know.

11         I hope that you do give him a 120-year sentence.  I

12 do need to know he is locked up forever.  I need to know that,

13 because at my age, I never expected to be a parent of a child

14 again.  My children are almost grown, as you can tell.  My

15 children are stepping into our shoes.  That was a decision that

16 we made when adoption came about.  It was nothing we took

17 lightly.  My children said:  "If anything happens to you, Mom

18 or Dad, we are here."

19         I cannot leave any more pressure on my children to

20 know that he may be released in 30 or 40 years, and that my

21 children will have to step up and take the place of me.  I

22 cannot do that.  It's not fair to them, and it's not fair to

23 M.M.

24         As far as being reformed, I don't believe that he can

25 be.  I think that he will always be a predator and be unsafe

1  for us in society.  He is a predator.  He is a predator.  I

2  also am -- he can still do those things behind bars and be an

3  advocate as a remorse.  He can continue to do that.  It doesn't

4  matter if he has a chance of coming out or not, those are

5  things that he should do anyway to be remorseful for this.  It

6  should not impact the sentence at all.

7          Again, I don't know what all you would like to hear

8  from me, because this is three years of a horrific nightmare, a

9  horrific nightmare, and it's ongoing to this day.  Poor M.M.

10  has so much anxiety, her mind is like racing through a freeway

11  constantly.  We try to take her to an appropriate-aged movie,

12  and she can't even sustain an hour-and-a-half to watch a Disney

13  movie because her anxiety is so sky high.  Her eating habits

14  are still so sky high.  I hear the defense say that he fed

15  them, and I'm not so sure that he fed them appropriately, or if

16  he didn't make them perform to get food, because eating is a

17  horrific part of our day.  Constantly begging for food, needing

18  to make sure she's going to have food without being told that

19  she had to do something.

20          There are so many things.  Ongoing therapy for our

21  family, for her, for us.  There are so many impacts of this,

22  and day by day we have to take it.  Today so far is a good day,

23  but I haven't picked her up from school.  I work hand-in-hand

24  with the school.  I cannot be employed because I never know

25  when that phone is going to ring for me to come and get her.

1   She cannot sustain the day at school.  For me to be here this

2   afternoon with him is so hard because if anything happens at

3   school, where do we go?  There's not us for backup.

4           I just wish that I could speak so much more clearer

5   to you so that you could have an understanding.  A.M. and M.M.

6   will never be able to have a relationship.  Ever.  And to me,

7   that's horrific, too, to not have your sibling.  But we don't

8   feel it will ever be in the best interests of the children.

9   (A discussion was held off the record.)

10          MRS. K.S.:  She's asking us to talk about what it's

11  like to have them together.  We would try playgrounds, and A.M.

12  would knock her off the swing set.  A.M. would grab her around

13  the neck and throw her down.  His aggressions were so sky high.

14  I worry for him in the future.  I'm not so sure that he's not

15  going to be in the court system later in life.  I pray that he

16  can find peace in him to do that.

17          When they were together, they had nightmares.  A.M.

18  constantly would wake up during the night -- this is reported

19  through meetings we were in with the other foster parents.  He

20  would wake up terrified.  Michael's going to come get you and

21  me and he's going to hurt us.  Michael is going to kill you.

22  Michael is going to hurt me.  He even became very adamant about

23  the things that he would do sexually once he also learned how

24  to talk.  These children had no voices to talk when we got

25  them.  Again, just huge, huge violence from A.M.

1          M.M. was definitely a victim, and she would be timid,

2   and she would tuck herself away so that she didn't have to deal

3   with it.  They would check out.  I've heard of it.  I've had

4   training about how they check out and disassociate, but until

5   you see a child of two or three disassociate because you were

6   changing their diaper and doing a basic need for them, you can

7   never understand it.

8          A.M. used to just scream when I would have to change

9   his diaper.  Scream, as if I was causing horrific pain to him.

10  This happened numerous times, and I finally had to say that I

11  just -- it was not in the best interests of the children to be

12  together, that A.M. was not welcome to stay in our home.  It

13  was not in the best interests of M.M. or A.M.

14          It's not in the best interests of the children to be

15  triggered by each other.  After we would have visits, the

16  nightmares would be the most horrific.  The behaviors at school

17  would be the most horrific.  The yelling at me would be

18  horrific.  The sometimes hitting.  A.M. is definitely a lot

19  more violent than M.M., and I think that is going to be M.M.'s

20  saving grace, is that she can find, somewhat, calmness.  I

21  don't know how well it's going to sustain her in her adulthood,

22  but all I can say is that every day, once we get up, it is a

23  challenge to get to the end of the day, and it is an even

24  bigger challenge to get through the night.

25          A.M., we have not seen him in probably a year, and

1   M.M. does still ask about him.  And I do have to tell her why,

2   and that's a very hard thing to say.  Very hard thing.  We use

3   pictures, we talk frankly, we talk appropriately, but to truly

4   understand why she can't be with the one person that she felt

5   could protect her, and did protect her at times.

6            A.M. also has horrific eating habits.  A.M. also has

7   huge post-traumatic stress, as does M.M.  The eating issues,

8   they're very much parallel, both of them.  When we would go

9   into meetings and kind of compare notes, even to the times they

10  woke at night, they were very parallel.  It was almost eerie,

11  as if they were twins, and they're not.  They're 11 months

12  apart.

13           MR. K.S.:  The screaming at night.

14           MRS. K.S.:  Yes, the screening at night, the times

15  waking up at night, the same type of allegations were coming

16  out of both of our mouths at the same time.

17           So it was definitely nothing we had ever encountered

18  firsthand.  It's definitely, for the agency that we were with,

19  very rare for them to take a child so victimized right out of

20  the home.  And it was a really tough case for all of us at the

21  agency, and it continues to still be.

22           THE COURT:  Is M.M. -- is there still CYFD?  Are they

23  still involved with M.M.?

24           MRS. K.S.:  Not with CYFD, no, Your Honor.  We have

25  adopted her.  But we will have ongoing therapy for the rest of

1   her life.  And again, ongoing therapy for us, ongoing therapy

2   for our family as needed.

3          THE COURT:  A.M., is he in a stable foster placement?

4          MRS. K.S.:  In my opinion, Your Honor?

5          THE COURT:  In other words, is he so difficult where

6   they're having to rotate him around?

7          MRS. K.S.:  I do not feel he is in the best

8   placement, no.  I feel that he is going to have a much tougher

9   life in a lot of ways.

10          THE COURT:  Sir, is there anything that you wanted to

11   say?

12          MR. K.S.:  All I can say is the nightmares, the

13   sounds of the screaming, I've never heard like that before.

14   It's just a horrific, horrific sound.

15          MRS. K.S.:  And almost three years later, they're

16   still not going away.  The anxiety that she leave our side is

17   horrific.  To go to the grocery store without her is hard.

18          And she touched base that we want to move, because we

19   never know who we're going to encounter that may recognize her.

20   We know it's been three years, but you see she definitely

21   stands out.  There are family members around that we don't

22   know.  We never know when someone could be around that might

23   recognize her.

24          And unfortunately, that's going to go anywhere where

25   we go, because of social media and the internet.  And we

1   already know that, you know, this is ongoing, this is being

2   distributed now, and it will never end.  You know, we always

3   told our children that once you put something on the internet,

4   you can't take it back.  We always believed that.  But never in

5   our wildest dreams did we understand that, until now.  Those

6   images are never going away.  Those 500 plus images are not

7   going away.  Another reason why he cannot be released.

8           THE COURT:  Well, thank you.  Anything else?

9           MR. K.S.:  No.  Just thank you for letting us

10  approach you.

11          MRS. K.S.:  Thank you.

12          THE COURT:  Thank you.  Thank you for being there for

13  the child.

14          MS. ONG:  And Your Honor, the picture that I provided

15  is actually a picture from the adoption that they had.

16          THE COURT:  I recognize Judge Parnall.

17          Is there anything else that the United States wants

18  to present?

19          MS. ONG:  Your Honor, there was one thing that I

20  wanted to say that I forgot to say.

21          Defense counsel basically said that a life sentence

22  should be reserved only for someone who has taken another

23  person's life.  To me, I'm more worried about Mr. Blackburn

24  being back out on the streets than I would be about someone who

25  has committed a murder.  What he did effectively was take away

1  those two children's lives, so I think that he is much more of

2  a danger, and I think that this Court should impose a 120-year

3  sentence.

4          And also, I think there was a couple of references

5  where M.M.'s mother was speaking and she kind of let slip some

6  of the minors' names.  I would just ask that in the record,

7  that they be documented as M.M. and A.M., and their first names

8  not be used.

9          THE COURT:  Sure.  I'll instruct the Court Reporter

10  that if a transcript is made of this proceeding, that the

11  children's names just be referred to by their initials.

12          MS. ONG:  And then just one more thing.  With regard

13  to the Defendant's placement, M.M.'s parents did tell me that

14  they have a lot of family in Arizona, and they're not

15  comfortable with the Defendant being placed in Arizona, so they

16  would object to that placement.

17          THE COURT:  Well, ultimately it will be for the

18  Federal Bureau of Prisons to designate.

19          MS. HENDERSON:  I apologize, Your Honor.  One of the

20  things that was noted is that one of the family members is

21  actually a corrections officer in Arizona, and so they're

22  actually concerned about actual familial contact with him in

23  corrections.

24          THE COURT:  Okay.  Ms. Katze.

25          MS. KATZE:  Your Honor, we would still ask that the

1   Court make a recommendation to FCI Tucson.  It sounds like

2   Probation has confirmed that there is a sex offender program

3   there, and Mr. Blackburn would like to briefly address the

4   Court.

5            THE DEFENDANT:  I just want to thank you for whatever

6   you do give me, because I know you're going to give me a very

7   deserving sentence.  No matter if it's life, or if it's what my

8   attorney is asking for, I accept it, because I realize what

9   I've done is very horrific.  I can't fix what I've destroyed,

10  but I feel that I can change it by continuing to take

11  responsibility for these evil acts that I've done, and by

12  continuing to change the evil within me through my personal

13  relationship with Jesus Christ, our Lord and Savior.

14           Like Ms. Katze said, I had a rough upcoming.  But I

15  don't hold that anymore.  I've forgiven that person for what

16  they have done to me.  I've forgiven my mother, I've forgiven

17  my Aunt, because that's what my religion believes I should do.

18  And that's the only way I have peace in my heart.

19           On a more positive note, I've graduated high school.

20  I've attended Job Corp. in Morganfield, Kentucky.  I got my

21  plumbing apprenticeship, and I attended an Advanced Technology

22  Institute in Norfolk, Virginia, where I obtained my CDL Class A

23  and drove tractor-trailers for companies.

24           No matter what the sentencing is, some of my biggest

25  goals are to lose the weight, because I know the only way to

1   change this evil stuff is to change appearance in and out to

2   where I feel better, because I know that's one of the main

3   steps that causes a person like me to do better, or do worse.

4   And I want to do better.  Even if I'm locked away for the rest

5   of my life, I want to help people not do this again, because it

6   is the worst thing that can happen.

7           Can I have one moment, please?

8   (A discussion was held off the record.)

9           THE DEFENDANT:  Basically, if I do get 504 months, a

10  few things that I have as a goal, which is far-fetched, I know,

11  is working in the oil fields or the automotive industry, or

12  even owning a restaurant.

13          So, I thank you for your time and for giving me a

14  chance to say my peace.

15          THE COURT:  Certainly.

16          Is there anything else, Ms. Katze, from the defense?

17          MS. KATZE:  Your Honor, I think that's it.  I think

18  that we've made our record with respect to the restitution

19  issue and what the objections to restitution are, what the

20  statute specifically allows the Court to issue restitution for.

21  So, yes, that's it.

22          THE COURT:  Anything else from the United States?

23          MS. ONG:  Not from the United States, Your Honor.

24          THE COURT:  Okay.  What I'm going to do is, I'll

25  issue a written decision on the findings that I'm required to

1   make, and then what will be left is for me to pronounce

2   sentence.

3          Once those orders come out, contact Mr. Garcia and

4   find -- I'm sorry.  It's Ms. Ong now; right?

5          MS. ONG:  Correct, Ms. Ong.

6          THE COURT:  Ms. Ong, if you would talk to the child's

7   adoptive parents and find out when it would be convenient for

8   them to be present, and if it's convenient for counsel, then

9   I'll set the time, and then I'll go ahead and pronounce

10  sentence at that time.

11         All right, thank you.  We'll be in recess.

12  (Proceedings adjourned at 3:06 P.M.)

13                          * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3   _____
                                 )
4   UNITED STATES OF AMERICA,    )
                                 )
5            Plaintiff,           )
                                 )
6       vs.                      )    No. 14-CR-00129 WJ
                                 )
7   MICHAEL DAMEON BLACKBURN,     )
                                 )    SENTENCING HEARING, PART 1
8            Defendant.          )
    _____)
9

10            CERTIFICATE OF OFFICIAL COURT REPORTER

11       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12   Official Realtime Court Reporter, in and for the United States

13   District Court for the District of New Mexico, do hereby

14   certify that pursuant to Section 753, Title 28, United States

15   Code, that the foregoing is a true and correct transcript of

16   the stenographically reported proceedings held in the

17   above-entitled matter on Monday, August 29, 2016, and that the

18   transcript page format is in conformance with the regulations

19   of the Judicial Conference of the United States.

20   Dated this 7th day of August, 2017.

21

22   _____
     MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23   FEDERAL OFFICIAL COURT REPORTER
     333 Lomas Boulevard, Northwest
24   Albuquerque, New Mexico  87102
     Phone:  (505)348-2334
25   Email:  Mary_Loughran@nmcourt.fed.us
```