```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEW MEXICO

 3   _____
                            )
 4   UNITED STATES OF AMERICA,  )   No. 14-CR-00129 WJ
                                )
 5          Plaintiff,          )
                                )   Pete V. Domenici U.S. Courthouse
 6      vs.                     )   Bonito Courtroom
                                )   Albuquerque, New Mexico
 7   MICHAEL DAMEON BLACKBURN,   )   Thursday, June 22, 2017
                                )   1:30 P.M.
 8          Defendant.          )
     _____)
 9

10                   TRANSCRIPT OF PROCEEDINGS
                     SENTENCING HEARING, PART 2
11          BEFORE THE HONORABLE WILLIAM P. JOHNSON
                  UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:   MARISA A. ONG
                          SHAMMARA HENDERSON
15                        UNITED STATES ATTORNEY'S OFFICE
                          District of New Mexico
16                        201 Third Street, N.W.
                          Albuquerque, New Mexico   87102
17
     For the Defendant:   MARGARET A. KATZE
18                        FEDERAL PUBLIC DEFENDER
                          District of New Mexico
19                        111 Lomas Blvd., NW, Suite 501
                          Albuquerque, New Mexico  87102
20
21   For U.S. Probation: DANIELLE PADILLA

22   Reported by:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                          United States Court Reporter
23                        Phone:  (505)348-2334
                          Email:  Mary_Loughran@nmcourt.fed.us
24
        Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

```
 1                    I N D E X

 2                                              Page

 3  ALLOCUTION BY MRS. C.C. - A.M.'s ADOPTIVE MOTHER ......5

 4  SENTENCING ..........................................82

 5     ARGUMENT BY MS. ONG FOR THE GOVERNMENT ...........82

 6     ARGUMENT BY MS. KATZE FOR THE DEFENSE ............89

 7     RULING BY THE COURT .............................100

 8

 9                   W I T N E S S

10  SUEANN KENNEY-NOZISKA

11     DIRECT EXAMINATION BY MS. ONG ....................16

12     VOIR DIRE EXAMINATION BY MS. KATZE ...............22

13     DIRECT EXAMINATION (Continued) BY MS. ONG ........35

14     CROSS-EXAMINATION BY MS. KATZE ...................56

15     REDIRECT EXAMINATION BY MS. ONG ..................77

16

17                   * * * * *

18

19

20

21

22

23

24

25
```

1    (In Open Court at 1:48 P.M.)

2            THE COURT:  Next, let me call United States vs.

3    Michael Blackburn, 14-CR-129.

4            Would counsel enter their appearances for the record.

5            MS. ONG:  Good afternoon, Your Honor.  Marissa Ong on

6    behalf of the United States.

7            MS. HENDERSON:  Good afternoon, Your Honor.  Shammara

8    Henderson on behalf of the United States.

9            MS. KATZE:  Margaret Katze for Mr. Blackburn.

10           THE COURT:  All right.  I know this is a hearing on

11   restitution and also sentencing.  I had previously entered an

12   order making the findings on Defendant's correctly calculated

13   guideline sentence, and there was a lot of argument regarding

14   the sentence heard from the victim's parent, and also

15   Mr. Blackburn spoke.  So as far as what remains to be done in

16   this case in terms of at this level, the District Court level,

17   is to proceed with this hearing on restitution and proceed to

18   sentencing.  Is that right?

19           MS. ONG:  That is correct, Your Honor.  At the last

20   hearing, A.M.'s parents, who is the other victim in this

21   case -- we have M.M. and A.M.  I believe that the Court heard

22   from M.M.'s adoptive parents.  Today A.M.'s parents are here,

23   and A.M.'s mother would like the chance to allocute.  So I

24   don't know if you want to do that now or after we have the --

25   the United States is planning on putting on evidence with

1    regard to restitution.

2           THE COURT:  Ms. Katze?  In other words, I would

3    agree, then, that it would be appropriate for allocution.  But

4    anything else from the Defendant's standpoint?

5           MS. KATZE:  I don't have an argument against A.M.'s

6    mother addressing the Court.  I do want to -- maybe if we do

7    that first, then I would just like to address a couple of

8    issues on the witnesses that Ms. Ong, and we talked about this,

9    that she is going to call.  I'd like to put on the record some

10   objections.

11          THE COURT:  All right, that's fine.  Then let's go

12   ahead and proceed with the allocution.

13          MS. ONG:  And, Your Honor, just for purposes of the

14   record, both M.M. and A.M.'s parents don't want their names

15   made public.  So for purposes of this hearing, we're just going

16   to refer to A.M.'s mother as C.C., and if it comes up with

17   regard to the restitution, M.M.'s mother as K.S.

18          THE COURT:  Okay.

19          MS. KATZE:  I understand they don't want to give

20   their names, but I note there are two people at the podium.

21   Just for purposes of the record, can we find a way to identify

22   them?

23          THE COURT:  Why don't we do this.  Do you want to do

24   a little sealed notice afterwards, where it's a sealed pleading

25   and it's not open to the public, but it identifies for purposes

1  of the record who the parents are?

2          MS. ONG:  Sure.  I'm happy to do that, Your Honor.  I

3  don't know if anyone from the press is here.  I know that last

4  time -- I just want to make sure that they're not publishing

5  anyone's names.  And I think it's J.C. and C.C.  Only C.C. is

6  planning on talking.

7          THE COURT:  Okay.

8          MRS. C.C.:  Hello.

9          THE COURT:  You may go ahead and proceed, ma'am.

10          MRS. C.C.:  Okay.  I'm nervous.  I've never spoke.

11          I am the adoptive mom of A.M., and since we have had

12  him -- it's been 18 months since he has lived with us.  We

13  actually had to go through a lot of extra training just to have

14  him, because of how severe he is.  We can't -- I don't know.  I

15  guess -- we couldn't come to the last one because we don't have

16  a sitter for him.  Nobody can watch him.  He's triggered by any

17  male around.  So if somebody is not trained in trauma, then

18  nobody can watch him.  I have older daughters that actually

19  help with it, and they're actually trained.  But with him, he's

20  actually not allowed to attend kindergarten without an I.E.P

21  stating that we have to have two trained trauma people to watch

22  him.  I'm sorry.

23          He has nightmares.  He was in preschool and his

24  teachers asked the kids all to draw pictures, and he can't draw

25  without drawing his trauma.  So he says, here's Uncle Michael

1  laying on me, here's Uncle Michael in the bathroom.  And he

2  shows it to his classroom.  So they had to stop making the kids

3  draw in the classroom.

4          Everything they do, they -- he goes out on the

5  playground, and they have to watch him because he will expose

6  himself.  He says, "This is what Uncle Michael did to me."  And

7  everything goes back to Uncle Michael.

8          He does remember his birth parents very well.  But

9  everything comes back to him.  If he sees a man with any kind

10  of facial hair, it triggers him.  He hides.  He'll self-harm

11  himself.  We get him to where he's stable for a week, and then

12  as soon as he's around a boy that's bigger than him, it's back

13  to square one with nightmares and trying to run away.

14          The thing that's just the worst is, he can't even go

15  to kindergarten.  They're just terrified to have him there,

16  because there's males around and there can't be a male teacher.

17  The boys in his classroom, we did not want him to victimize

18  them, because he has no idea, which we're trying to teach him.

19          He's extremely smart.  But everything he remembers is

20  all the trauma, and he remembers every single detail.  But the

21  teachers can't let him draw in the classroom anymore, at all,

22  because that's his mind, where it goes to.  That's how it helps

23  him, is drawing out what happened to him, and so he goes into

24  detail.  So he's left out of pretty much everything.

25          And we can't have anymore -- like, we can't have a

1  lot of gatherings because of our family.  We can't have males

2  around him, because he'll have nightmares for weeks if somebody

3  touches his shoulder or talks to him.  He has weeks where he

4  does okay as long as he's around mostly females and people that

5  are smaller than him, but it's -- he's extremely traumatized,

6  and he remembers every single thing.  He always remembers, and

7  he's terrified.  He's so scared that he's going to come get

8  him, he's going to hurt him.

9            So, that's all.

10           THE COURT:  Do you take him to therapy?

11           MRS. C.C.:  He is actually in five different

12 therapies.  He's in Sand Tray.  He has occupational therapy.

13 He has a psychiatrist.  He goes to Attachment Healing.  And we

14 have somebody coming to the house, and we have somebody

15 training all the staff at any school he goes to.  And, then,

16 we're actually in a home school, but they don't recommend that,

17 because we're trying to bring him out in public.  But he meets

18 every week with all of his therapists, so it's just nonstop,

19 constant therapy appointments.

20           They can't -- a lot of the medication -- they tried

21 giving him medication.  They have to give him medication to

22 sleep.  He will not sleep without it.  He has too many

23 nightmares.  And then we get him doing really well, and as soon

24 as he comes in contact with a male or somebody that represents

25 or looks like Michael, then he will have nightmares all night

1    and stop sleeping again.  It's another whole route.

2          But he does do a lot of therapies, and we're

3    trying -- they're actually recommending something even bigger

4    than what they can -- most people are almost stumped on what to

5    do with him, because his trauma, he remembers everything.  And

6    so -- and his IQ is extremely high, so he's very smart.

7          THE COURT:  Are the therapists indicating to you that

8    he's going to be in therapy -- that it's going to be a lifelong

9    process for him?

10         MRS. C.C.:  Oh, yeah.  Yes.  And right now, we're

11   doing -- we have to do tiny, little baby steps, just basic

12   steps with him to get him where he feels safe.  We're trying to

13   get him to attach correctly and not entertain.  He loves to

14   entertain males, because that's what he thinks he needs to do.

15   You see him dancing and doing stuff that most children, you

16   know, shouldn't do, and that's how he thinks he's going to be

17   safe that way.  So we're trying to teach him how to attach

18   correctly and how to feel safe, and we're doing little, tiny

19   baby steps.  Every single therapy, we're working on it.  So,

20   that's all.

21         Oh, yes.  I am one of the biggest people to forgive,

22   but it's not my place to forgive.  It's my son's.  And I don't

23   feel comfortable with having him out on the streets.  I have my

24   own family, we have a lot of children, and to know that

25   somebody like that could hurt them or my child again -- I just

1   want him put away as long as possible.

2           THE COURT:  I think you indicated you and your

3   husband adopted?

4           MRS. C.C.:  Yes.

5           THE COURT:  Well, you have to be certainly very

6   commended for that.

7           Is there anything else that you wanted to state?

8           MRS. C.C.:  No, I think I'm good.  Thank you.

9           THE COURT:  Thank you.

10          Ms. Katze, did you want to state the objections on

11  the record before we proceed with restitution?

12          MS. KATZE:  Yes, Your Honor.  And Ms. Ong can correct

13  me if I'm wrong, but I think she was intending to call M.M.'s

14  mother to swear to, or certify the expenses or letters that

15  have already been submitted to the Court.  I guess I would

16  state that if that's the evidence that's going to be -- if

17  that's the evidence that has already been presented, and

18  according to Ms. Ong there's no additional evidence with

19  respect to that, I think it would be our position that that

20  matter has been submitted and the Court has that evidence, and

21  the Court can review that evidence with all the rest of the

22  evidence to make a determination on it.

23          There's not additional evidence, so I guess I would

24  object to any further testimony or certifying to something

25  that's already been submitted and is before the Court.  That's

1    one issue.

2        The other issue is that I understand the Government

3    wants to call Ms. Kenney-Noziska, who is a social worker.

4    Again, it's my understanding that the purpose for calling her

5    is to call her as -- she has some expertise in the field, and

6    it's the Government's hope, I am guessing, that she will be

7    able to testify to the length of therapy or the cost of

8    therapy.

9        I would object to her being called as an expert in

10   that testimony, because she has never met the children, she's

11   never evaluated the children, she has never observed the

12   children, she's never treated the children.  And I think

13   regardless of the fact that the Court granted the Government's

14   request for her to have access to some court documents when I

15   was out of the office on medical leave, that's not sufficient

16   for her to be able to offer the Court an opinion on how much

17   treatment an individual would need, how much that would cost,

18   and for how long.  So I don't think that's an appropriate

19   person.

20       I understand the Government has the burden of showing

21   by a preponderance what that cost of restitution would be, and

22   under Paroline that Mr. Blackburn is the proximate cause of all

23   of that, but I think that a social worker who has had no

24   contact whatsoever with the victims and has no connection to

25   the case, other than having looked at some documents, that that

1    is not a legitimate expert to be called at this time, and I

2    would object to her testimony.

3              THE COURT:  Do you wish to respond?

4              MS. ONG:  Yes, Your Honor, just briefly.

5              As the Court is aware, we do bear the burden of

6    proving by a preponderance.  I think that Ms. Kenney -- her CV

7    has been submitted both to the Court and to defense counsel.  I

8    do plan on going through her background.  I think once the

9    Court hears all of her background, the Court is not going to

10   have any problems qualifying her as an expert.

11             We're going to be asking the Court to qualify her as

12   an expert in childhood trauma.  This is done routinely

13   throughout the country.  There are often situations where the

14   Court does not have available to it someone who has actually

15   evaluated defendants, and so the way that we are able to meet

16   our burden is by calling someone who is in the field who has

17   experience in the area to review the restitution requests that

18   are made.  And I believe that what she is going to say is that,

19   you know, the documents that she's reviewed comport with the

20   numbers in this case.

21             I think that it's helpful to the Court.  So, you

22   know, Ms. Katze is more than welcome to voir dire the witness

23   after I've laid the foundation, but I think that it's perfectly

24   proper to call her in this context.

25             With regard to Ms. Katze's first response, you know,

1    K.S., M.M.'s mother, she's not really wanting to testify.  The

2    reason why I was planning on actually calling her as a witness

3    is because in one of the pleadings, Ms. Katze challenged the

4    numbers that she submitted to the Court and basically said, oh,

5    these are just unsworn statements that are submitted, the Court

6    shouldn't rely on them.  And I believe at the last status

7    conference, Ms. Katze also made reference to being able to

8    cross-examine her on some of the documents.

9            So the only purpose of calling her is to authenticate

10   the documents that she provided to Probation, and I think that

11   it will make the record better when it goes up on appeal if she

12   has actually testified under oath.  And Ms. Katze is welcome to

13   cross-examine her.

14           THE COURT:  Why don't you do it this way.  Why don't

15   you make a tender.  And then if Ms. Katze wishes to

16   cross-examine the mother regarding what's in the tender, then

17   she has that option.

18           MS. KATZE:  Your Honor, if I may, we're not

19   questioning the authenticity of the request, it's more the

20   applicability, or whether it falls under the statute, in the

21   case of the interpreted statute.

22           So, I mean, she can go ahead and do that.  That's

23   fine.  Your idea, that's fine.  I just want to make clear that

24   I'm not alleging that she's making up receipts, or making up

25   numbers.  We're questioning the legitimacy of them as

1   restitution, not that she's --

2        THE COURT:  Okay.

3        MS. ONG:  And I think as long as the record is clear,

4   that she's waiving any type of challenge regarding that on

5   appeal, she's not going to challenge the authenticity of these

6   documents, she's not going to try to say later on that the

7   paystubs that were submitted by K.S. are defective in some way

8   because they weren't properly authenticated, then I have no

9   problem moving forward.

10       MS. KATZE:  I feel like it's a sufficiency issue, not

11  an authentication issue.

12       THE COURT:  You're not taking issue with the amount

13  of the request, or what the witness would testify as far as

14  expenses that she's incurred, you're saying that it is not the

15  type of expense that falls within the restitution statute for

16  an award of restitution?  Is that --

17       MS. KATZE:  I am taking issue with the amount and

18  that it doesn't fall within the statute.  I am not -- I will

19  not argue that those are falsified paystubs.  That is not an

20  argument that we will make.  It's whether or not it is an

21  appropriate or applicable amount under the statute, and the

22  case law interpreting the statute.  I am not questioning the

23  authentication.

24       MS. ONG:  And I would, just for purposes of the

25  record, note in Document 84 on Page 4, that is where Ms. Katze

1   basically said -- she made a challenge to our Exhibit 2, which

2   laid out a list of expenses, and said that the Court shouldn't

3   consider it because they're unsworn to.

4            So as long as she's now saying that she doesn't have

5   any challenge to the fact that the amounts that K.S. submitted

6   are not sworn to --

7            MS. KATZE:  Your Honor, yes, I'll withdraw my

8   objection that they weren't sworn to.  That does not mean that

9   I won't be able to argue that they are not justified or

10  sufficient or anything.  I will withdraw my objection as

11  correctly pointed out, that I objected to it not being sworn

12  to.

13           THE COURT:  Does that satisfy the United States?

14           MS. ONG:  It does, Your Honor.  I would -- if the

15  Court is okay with it, I just want to briefly kind of go

16  through what our position on restitution is, because it has

17  changed.

18           At one point, we didn't have any documentation from

19  A.M.'s parents, so I'd just like to give a brief overview to

20  the Court before I call my first witness.

21           THE COURT:  That's fine.

22           MS. ONG:  As the Court is well aware, we have to

23  prove restitution by a preponderance.  The ultimate issue here

24  in this case is going to be causation.  The Tenth Circuit has

25  said that causation is a factual issue for this Court to

1  resolve.  That's cited in our briefs.

2         When this does go up on appeal, this Court's factual

3  findings are going to be reviewed for clear error, and so we

4  are asking the Court, with regard to any restitution order that

5  is put in place, that the Court make specific factual findings

6  that the Defendant was, in fact, the proximate cause of the

7  loss that we're requesting.

8         Just so that we're clear, we are now withdrawing our

9  request for any expenses related to M.M.'s education.  So our

10  restitution request now comports in line with Probation's

11  assessment, which is laid out on Page 2 of the 4th Addendum,

12  which is Document 96.  We're basically asking for $286,800 for

13  M.M.  This includes K.S.'s lost wages, costs for therapy, and

14  costs for psychiatry.  With regard to A.M., we are requesting

15  $144,000, and that is with regard to his psychotherapy and

16  psychiatry costs that he is going to incur.

17         So, just so it's clear, the only restitution that

18  we're seeking is the restitution that Probation laid out.  They

19  have a nice little chart that clearly identifies it.  And I

20  think that's it.

21         THE COURT:  Okay.  Why don't you call the witness and

22  go ahead.  I'll let you voir dire after the witness takes the

23  stand and I hear her training and background.

24         MS. ONG:  The United States calls Ms. Sueann

25  Kenney-Noziska.

 1          MR. GARCIA:  Please raise your right hand, ma'am.

 2          (SUEANN KENNEY-NOZISKA, GOVERNMENT WITNESS, SWORN)

 3          MR. GARCIA:  Please have a seat and state your full

 4   name, and please spell your last name.

 5          THE WITNESS:  My first name is Sueann, and my last

 6   name is Kenney-Noziska.  It's spelled K-e-n-n-e-y hyphen

 7   N-o-z-i-s-k-a.

 8                        DIRECT EXAMINATION

 9   BY MS. ONG:

10   Q.   Good afternoon.  For purposes of the hearing, I'm going to

11   refer to you as Ms. Kenney.  Is that all right with you?

12   A.   Yes.

13   Q.   All right.  Ms. Kenney, I wanted to go through some of

14   your background.  I know that you have a lot of experience in

15   the mental health field, but I want to start with your

16   education.  Can you please tell me about whatever degrees you

17   currently hold?

18   A.   I have my bachelor's degree in psychology that I earned

19   from the University of South Dakota.  I have a master's in

20   social work that I obtained from San Diego State University.  I

21   have a specialized Certificate in Play Therapy which I received

22   from the University of California in San Diego.  And I also

23   possess clinical licenses to practice as at psychotherapist, as

24   a clinical social worker, in the state of New Mexico, in the

25   state of California, and in the state of South Dakota.

1   Q.    All right.  And can you break down for me -- you said that

2   you have a specialized certificate.  Can you tell me what that

3   is and what kind of training you have to undergo in order to

4   receive that?

5   A.    So, the specialized Certificate in Play Therapy allowed me

6   the opportunity to get education, continuing education,

7   specific to working with very young children using a modality

8   of therapy called Play Therapy.  That certificate was 150 hours

9   of coursework.  And then I used that, in addition with my

10  clinical supervision, to then become a Registered Play

11  Therapist Supervisor, which is a secondary credential.  So

12  underneath my license as a clinical social worker, it's a

13  secondary credential that recognizes my expertise as a play

14  therapist when I'm working with children, adolescents and their

15  families.

16  Q.    You testified to some of the licenses that you hold as a

17  clinical worker.  Can you go into detail about those and what

18  you had to undergo in order to receive those?

19  A.    In general, the licensing requirements, in terms of your

20  education and your supervision and your number of hours, is

21  pretty consistent across the states.  So it required about

22  3,000 hours of clinical experience where I was supervised, and

23  it also required that I have a master's degree, and then I had

24  to pass licensing exams in the different areas.  California had

25  its own licensing exam.  It was both a written exam, and then I

1    had to go before an oral board and respond to questions about a

2    case.  In New Mexico and in South Dakota, it's a National

3    Social Work Licensing Exam.

4    Q.    And what does that license allow you to do?

5    A.    It allows me to practice independently as a therapist.  So

6    it means that I have the ability to complete psychosocial

7    diagnostic assessments on individuals, that I have the ability

8    to form treatment plans, and then to engage in therapy to help

9    people meet those treatment goals.

10   Q.    Can you tell me a little bit about your clinical

11   experience?

12   A.    I have been doing clinical social work since about 1998.

13   So actually being a therapist since 1998.  Before that, I

14   worked in the field doing other things.  I worked for Child

15   Protective Services.  I worked in a domestic violence shelter.

16   I worked in a residential treatment center.

17        And then after I received my master's degree, I started

18   working as a therapist.  I worked for the Department of Mental

19   Health in Southern California for ten years.  The scope of the

20   work that I did was with the most severely and traumatized

21   abused and neglected children and teens in the city that I was

22   working in.

23        In 2008, I relocated to Las Cruces, New Mexico, and opened

24   my private practice.  I work exclusively with traumatized kids

25   and teens, ages 2 up to age 18.

1  Q.    And are you published?

2  A.    I am published.

3  Q.    Can you tell me about some of your publications?

4  A.    I have different publications probably dating back to the

5  early to mid 2000s.  Some of them are on using play therapy in

6  treatment with children, but the bulk of them are on working

7  with kids that have been sexually abused.  I wrote a

8  publication that was utilized to help play therapists

9  understand the sexual abuse literature and how to apply that to

10  treatment.

11      I have written a chapter in an edited book that actually

12  talked about using a strength-based approach in treatment with

13  abused and traumatized children.  And then as recently as 2015,

14  I have a chapter in an edited book, and it's on working with

15  sexually abused children and their families.

16  Q.    Do you do any trainings?

17  A.    Yes.

18  Q.    Can you tell me about some of the trainings that you

19  conduct?

20  A.    I have been brought in and hired to be a presenter in a

21  training, and a trainer, across the United States as well as

22  internationally.  I've presented in Hong Kong, in Tokyo, in

23  London.  I present at most of the major child abuse conferences

24  throughout the United States.

25      So, for example, the National Child Abuse Symposium, which

1   is in Huntsville, Alabama; for the Child Abuse and Family

2   Violence Summit in Oregon; for the Crimes Against Children

3   Conference, which is in Dallas.  So I'm brought in to either do

4   half-day trainings, full-day trainings, or week-long trainings

5   to teach other therapists how to work with sexually traumatized

6   and abused children.

7   Q.   Are you familiar with the National Center for Missing &

8   Exploited Children?

9   A.   Yes, I am.

10  Q.   Do you work in conjunction with them at all?

11  A.   I do.

12  Q.   Can you explain what that entails?

13  A.   Through NCMEC, the National Center for Missing & Exploited

14  Children, they actually have providers that they select

15  throughout the United States that they work with when there are

16  child abduction cases or missing children cases.

17       A couple of years ago, one of their employees was sitting

18  in the audience that I was presenting at, and when she returned

19  to NCMEC, she requested that they reach out to me so that I

20  could become one of their providers that provides consultation.

21  So they brought me in to actually obtain in-depth training at

22  NCMEC on working with sexually exploited children, children who

23  are victims of sexual abuse imagery, also known as child

24  pornography, and then I'm available to provide consultation on

25  cases.

1  Q.   Can you tell me about your experience with the Child

2  Advocacy Center?

3  A.    In July of 2015, our community in Las Cruces received some

4  funding to open a full Children's Advocacy Center.  That's the

5  best practice for intervening with child abuse cases.  It's

6  where we conduct forensic interviews, we can do the forensic

7  medical exam there, we have law enforcement, CYFD, people from

8  the District Attorney's office that can be co-housed there, and

9  then there's a mental health component where we actually do

10  assessments and treatment.

11     The CAC, or Children's Advocacy Center, brought me on

12  board to help open that mental health component and set that up

13  so that it met the standards for treatment across the United

14  States, and also so that it met the scope of the grant.  So I

15  assumed the position of clinical director of our CAC, and I did

16  that from April 1st of 2016 until April 1st of 2017.

17  Q.   How many years -- I know you testified that you began

18  actually treating patients in 1998.  Is that right?

19  A.   That's correct.

20  Q.   And have you treated patients throughout that entire

21  timeframe?

22  A.   Yes.

23  Q.   Have you ever treated -- have you ever had any clients who

24  were victims of child pornography offenses?

25  A.   Yes.

1   Q.   Are you familiar with the, I guess, payments, the kind of

2   standard payments that each session would cost on average in

3   New Mexico for a certain type of treatment?

4   A.   Yes.

5   Q.   Let me see here.  Have you ever been recognized as an

6   expert in court before?

7   A.   Yes.

8   Q.   Can you tell me about that?

9   A.   I have been recognized as an expert in court in both

10  criminal cases involving childhood sexual abuse or childhood

11  trauma, and then also in family court for the Children, Youth

12  and Families Department.

13          MS. ONG:  Your Honor, at this time I would move to

14  qualify Ms. Kenney as an expert in child trauma.

15          MS. KATZE:  Your Honor, I'll voir dire.

16          THE COURT:  Go ahead.

17                    VOIR DIRE EXAMINATION

18  BY MS. KATZE:

19  Q.   Ms. Kenney, does the social work field recognize

20  specialties?

21  A.   Yes.

22  Q.   How is that recognized?  Do you get certified or licensed?

23  A.   You get licensed, and there's different layers of

24  certification.  You can -- a person can get their master's in

25  social work and work in different capacities without getting

1  any kind of clinical license, or even without getting -- I

2  think in New Mexico they're called LMSWs, which is Licensed

3  Master's in Social Work.  So there's different levels that you

4  can then use to specialize.

5  Q.   Here is my question.  I have a master's in social work,

6  also, and I just wasn't aware -- like, for example, I know on

7  your resumé, you have a certificate, a specialized Certificate

8  In Play Therapy.  Right?

9  A.   Yes.

10 Q.   And I know sometimes like in the legal community, there

11 are certain tests that lawyers can take, and in certain

12 jurisdictions they can be recognized as a specialist in labor

13 law, or a specialist in criminal law.

14       So I'm just wondering, in the social work field, is there

15 some kind of recognition that you would be an expert in

16 childhood trauma work?  Is there some kind of a specialization

17 process?  Is there something other than -- like, here you went

18 to a particular program where you were certified and you got a

19 specialized certification.  I don't know, was that clear?

20 A.   I think it's clear.  I'll try to answer what I think

21 you're asking.

22       You can get certified for certain trainings.  Like EMDR

23 Eye Movement Desensitization and Reprocessing, and then that

24 comes with a certification that then allows you to use EMDR.

25       I know that there are trauma certificates that are

1   available.  There is one through TLC, which is the Trauma and

2   Learning Center.  I did not go through their program.  So there

3   are other specializations that you can get as a social worker.

4   Q.    And then can a social worker advertise themselves as a

5   specialist in an area?  Is that just something you can call

6   yourself, or do you have to somehow be authorized by like the

7   National Association of Social Workers?  Can you just say, I,

8   Ms. Kenney, am a specialist expert in child sexual abuse trauma

9   work?

10  A.    It doesn't have to be approved by the NASW, the National

11  Association for Social Workers, but ethically, I'm not allowed

12  to misrepresent the work that I do.  So I'm not allowed to say

13  that I specialize in something if I'm not able to show that I

14  actually specialize in it.

15  Q.    Okay.  And so let me -- so it would be fair to say that

16  you don't have a certificate or a -- well, we'll say a

17  certificate or a license in child sexual assault?

18  A.    No.

19  Q.    At the end of your direct testimony, Ms. Ong was asking if

20  you had been an expert before, been qualified as an expert.

21  A.    Yes.

22  Q.    And you said, yes, and you said in criminal cases and in

23  family court cases.

24  A.    Yes.

25  Q.    And so, how many criminal cases?

1  A.    I don't have the exact number.

2  Q.    More or less.

3  A.    Twenty-five to thirty.

4  Q.    Okay.  And were those in State court or Federal court?

5  A.    State court.

6  Q.    And in those 25 to 30 cases, did you testify for the

7  prosecution or the defense?

8  A.    In all but one, I testified for the prosecution.  In one

9  case, I testified for the defense.

10 Q.    And in the case where you testified for the defense, were

11 you testifying that a child who had claimed to be sexually

12 assaulted, in your opinion, you thought had not been?

13 A.    No.  I can't even testify to whether or not a child has or

14 has not been sexually assaulted.  I honestly am not -- I still

15 do not understand why they called me as an expert.  What I

16 testified to was the dynamics of sexual abuse and why

17 disclosures are delayed, and why disclosures come out in bits

18 and pieces.

19 Q.    Okay.  That was your defense testimony?

20 A.    Yes.

21 Q.    Okay.  And then in all the other cases, it was for the

22 Government?

23 A.    Yes.

24 Q.    So this is your first time testifying federally?

25 A.    Yes, it is.

1  Q.    And is the Government paying you to testify today?

2  A.    Yes.

3  Q.    And they had you review records, as well; is that correct?

4  A.    Yes.

5  Q.    So how many hours are you billing the Government for your

6  overall work, your testimony and your review, and how much do

7  you charge them?

8  A.    I do not have my contract in front of me, so -- and I

9  haven't billed anything yet, so I can't answer that question.

10  Unless somebody has a copy of my contract.

11  Q.    Okay.  So you don't know what you charged them when they

12  asked if you would be willing to work for the Government?

13  A.    I can ballpark what I believe my fees are.  When I do

14  record reviews, it's $100 an hour.  When I do face-to-face

15  meetings or pretrial interviews, it's $200 an hour.  And then

16  actual time on the stand is $300 an hour.

17  Q.    And then you had to travel from Las Cruces?

18  A.    Yes.

19  Q.    I assume the Government is paying you to travel here?

20  A.    Yes.

21  Q.    Okay.  So, you mentioned when you were going through your

22  fees face-to-face.

23  A.    Yes.

24  Q.    And I guess, would that be evaluating an individual or

25  treatment of an individual?  Is that the -- when you said

1  face-to-face, $200 an hour.

2  A.    No.  That is when I meet with, for example, the attorney.

3  Q.    The lawyer?

4  A.    Yeah.

5  Q.    Okay.  You indicated on direct exam that you do see

6  patients or clients, that you actually treat people; is that

7  right?

8  A.    Yes.

9  Q.    Because I know you talked about the trainings, and I

10  watched a couple of your YouTube videos.  But with respect to

11  actually treating people, you treat children?

12  A.    Yes.

13  Q.    And so if somebody comes in and tells you that a parent or

14  a guardian or the Court, or whatever, says, we suspect that

15  this child has been sexually assaulted, what's the first thing

16  you do?  Do you do some kind of intake, some kind of

17  evaluation?

18  A.    Yes.  The first step is an assessment.

19  Q.    And what does that involve?

20  A.    It involves getting a packet completed by the caregiver

21  regarding the history, the full history.  So developmental

22  history, academic history, mental health history.  It also

23  involves using standardized measures.  For example, something

24  such as the Trauma Symptom Checklist or the Trauma Symptom

25  Checklist for Young Children.  And then a face-to-face clinical

1    interview.

2    Q.    Okay.  So it sounds pretty thorough, an in-depth --

3    A.    Yes.

4    Q.    -- face-to-face meeting.  So in this particular case with

5    respect to A.M. and M.M., the victims, you did not do that

6    assessment --

7    A.    No, I did not.

8    Q.    -- is that right?  In fact, you've never met them?

9    A.    No.

10   Q.    Never seen them?

11   A.    No.

12   Q.    And so I think it's fair to say, then, that you haven't

13   observed them?

14   A.    That's correct.

15   Q.    Or treated them?

16   A.    That's correct.

17   Q.    So you're being asked, or you were asked by the Government

18   to come to court and give an opinion on how much treatment -- I

19   guess I'm assuming from Ms. Ong's question that she would

20   intend to ask you what's the average fee for treatment.  I'm

21   assuming that's one of the things that she's asked you to talk

22   about?

23   A.    Yes.

24   Q.    And the other, I would assume, in the formula is how many

25   hours -- how many years one would expect to have treatment?

1    A.    Yes.

2    Q.    And she's asking you to do that on two individuals, two

3    victims, who you don't know at all?

4    A.    That's correct.

5    Q.    You've reviewed some documents that the Court allowed you

6    to see?

7    A.    That's correct.

8    Q.    But it sounds like compared to what you usually look at,

9    it's fairly limited?

10    A.    It depends on what I'm -- what my role is.  If I'm the

11    clinician, I would do a full, thorough assessment.  When I'm

12    called as an expert, I may not be testifying about my

13    individual child's treatment.  I might be just educating the

14    jury or the Court on sexual abuse dynamics, or what the

15    research says the long-term impact of adverse childhood

16    experiences is.

17        So in those situations, the fact that I'm not the

18    therapist allows me to be a little less -- or impartial,

19    because as a therapist, typically you advocate for your client,

20    whereas when they bring me in as an expert for cases that

21    aren't mine, it allows me to speak objectively to what we know

22    about trauma and the impact on individuals.

23    Q.    How many clients have you actually treated, would you say,

24    since 1998 when you got out of school?

25    A.    Thousands.

1   Q.   Thousands of people?

2   A.   Yes.

3   Q.   Sounds like the majority of them may be children and

4   adolescents?

5   A.   Yes.

6   Q.   And I would assume that it's a good practice to treat each

7   one like an individual; right?

8   A.   Yes.

9   Q.   There's no cookie-cutter formula?

10  A.   That's correct.

11  Q.   And people, not only in your evaluation, but people

12  respond differently to treatment; correct?

13  A.   That's correct.

14  Q.   And if you're a way better therapist than I am, our

15  results could be different?

16  A.   That's correct.

17  Q.   And even before that, because it's an imperfect science,

18  we might both evaluate an individual very differently --

19  A.   That's also correct.

20  Q.   -- correct?  And think that one treatment is more

21  appropriate than another type of treatment?

22  A.   Yes.

23  Q.   So when you do the actual treatment -- you explained the

24  assessment.  If your relationship is going to be ongoing at

25  that point, you then tailor a treatment to that individual?

 1   A.   Yes.

 2            MS. KATZE:  Your Honor, may I have just a moment,

 3   please?

 4            THE COURT:  Sure.

 5            MS. KATZE:  Your Honor, I have no further questions

 6   with respect to voir diring the witness at this time.  If this

 7   is the appropriate time to do so, I would renew my objection,

 8   if I may be heard briefly on that.

 9            THE COURT:  Yes, briefly.

10            MS. KATZE:  I absolutely recognize that Ms. Kenney

11   has a lot of experience, is published, is educated.  I don't

12   question that.  What I question is her ability to offer

13   relevant expertise in this case.

14            As she conceded, everybody is an individual.  Every

15   child is an individual.  And the children have actually been

16   treated, and continue to be treated by people who have done

17   exactly the assessment that Ms. Kenney suggested that she, as

18   an expert, would do.  And as she explained, she would tailor

19   individual treatment and therapy to that person and how

20   different people respond.

21            I recognize that based on her experience, she could

22   look at some papers and give us an idea.  I just don't think

23   that that's going to be enough for the Government to meet their

24   burden of proving the restitution, given her complete lack of

25   connection to the case, to either of the children.  So I would

1    re-assert my objection to Ms. Kenney testifying as an expert in

2    this context.  Thank you.

3              THE COURT:  I've got a couple of questions.  The

4    first one is, the answer is obvious, but I'm not sure you were

5    previously asked this.  If you were, then I just overlooked it.

6              In a question by Ms. Ong, you had testified that you

7    have treated children who were the victims of child

8    pornography.  Is that right?

9              THE WITNESS:  Yes, that's correct.

10             THE COURT:  And along those same lines, would I be

11   correct in assuming that you had extensive experience also

12   treating children who have been the victims of hands-on actual

13   sexual abuse and sexual assault?

14             THE WITNESS:  Yes.

15             THE COURT:  You have a private clinical practice?

16             THE WITNESS:  Yes.

17             THE COURT:  And you indicated that you are billing --

18   you charge professionally for your time; correct?

19             THE WITNESS:  Yes.

20             THE COURT:  Along those same lines, are you familiar

21   with the fees that are charged by therapists, professionals in

22   your profession, what they typically charge as far as fees and

23   what's considered reasonable as far as those type of treatment

24   fees for services?

25             THE WITNESS:  Yes, yes.

 1          THE COURT:  Let's see.  There was something else I

 2  was going to ask you.

 3          Now, it's obvious that you are not treating the child

 4  victims in this case.

 5          THE WITNESS:  That's correct.

 6          THE COURT:  Do you have a general idea or an overview

 7  of the abuse that these two children, toddlers at the time,

 8  went through?

 9          THE WITNESS:  Yes.

10          THE COURT:  And just, if you would -- did the United

11  States provide you with some kind of overview or documents so

12  that you were able to inform yourself on the abuse that these

13  children went through?

14          THE WITNESS:  Yes.

15          THE COURT:  And what were either the documents or the

16  information?

17          MS. ONG:  Your Honor, I was planning on going through

18  those specifically.  I was going to wait until she was

19  qualified as an expert.  I just wanted the Court to be aware

20  that I'm planning on having her lay out everything that she

21  reviewed.

22          THE COURT:  That's fine.

23          Then let me note that the Rules of Evidence -- this

24  is a post-conviction matter.  It's a sentencing.  It relates to

25  restitution.  The Rules of Evidence don't apply in this type of

1  hearing, but they are informative and illustrative for purposes

2  of the ruling that I'm required to make.

3         Let me start with Evidence Rule 702.  It's Testimony

4  by Expert Witnesses.  And it starts off:  "A witness who is

5  qualified as an expert by knowledge, skill, experience,

6  training or education may testify in the form of an opinion or

7  otherwise."  Let me just stop there.

8         Obviously the witness, in terms of her field as a

9  clinical psychologist, she's licensed in three states and she

10  has extensive experience in a clinical setting treating

11  childhood victims, not only of child pornography, but actually

12  of sexual assault, abusive sexual contact.  So she is certainly

13  extremely well qualified to offer expert opinion in the area of

14  childhood trauma.

15         Now, part of Rule 702 says:  "If the expert's

16  scientific, technical, or otherwise specialized knowledge will

17  help the trier of fact to understand the evidence or to

18  determine a fact in issue."  Now, this is not a jury trial, so

19  I'm essentially the trier of fact, and if we were dealing with

20  the issue of what is a reasonable attorney's fee, I wouldn't

21  need any expert testimony, because I have some familiarity from

22  the standpoint I was once in private practice, and then I've

23  got almost 23 years of judicial experience having to deal with

24  attorney's fees and reasonableness of attorney's fees.

25         I'm not a psychologist.  I'm not a clinical -- I

1   don't practice in a clinical setting.  So I'm not particularly

2   familiar with the fees and the reasonableness of charges that

3   professionals such as Ms. Kenney charge for therapy services.

4   So this type of testimony from her will assist me in arriving

5   at a decision on this restitution claim by the United States,

6   as well as the objections that have been raised to it by the

7   Defendant.  So clearly her testimony will assist me in that

8   regard on restitution.

9          So for those reasons, I will allow her to give her

10  expert opinion testimony, and Defendant's objections are

11  overruled.

12         So now you may proceed with the rest of the

13  testimony.

14         MS. ONG:  Thank you, Your Honor.

15                DIRECT EXAMINATION (Continued)

16  BY MS. ONG:

17  Q.   All right.  Ms. Kenney, kind of picking up where the Court

18  left off, the Court was asking you about some of the documents

19  that you've had an opportunity to review here in court today.

20  Did you and I meet this morning prior to you testifying today?

21  A.   Yes.

22  Q.   And did we go through those documents together?

23  A.   Yes.

24  Q.   All right.  And so, do you have a copy of those documents

25  in front of you?

1   A.    I do.

2   Q.    All right.  Did you review Document 1 in this case, the

3   Criminal Complaint?

4   A.    Yes.

5   Q.    Did you review Document 33, the Government's Response to

6   Defendant's Motion to Suppress?

7   A.    Yes.

8   Q.    Did you review a portion of Document 72, which is the PSR,

9   that portion being the Offense Conduct and the Victim Impact

10  Statements?

11  A.    Yes.

12  Q.    Did you review Document 77, the United States Sentencing

13  Memorandum?

14  A.    Yes.

15  Q.    Did you review Document 83, the United States Restitution

16  Brief?

17  A.    Yes.

18  Q.    Did you review Document 88, the 3rd Addendum to the PSR?

19  A.    Yes.

20  Q.    Did you review Document 96, the 4th Addendum to the PSR?

21  A.    Yes.

22  Q.    And did you review Document 108, the 5th Addendum to the

23  PSR?

24  A.    Yes.

25  Q.    Based on your review of those documents, do you feel that

1   you have an accurate understanding of the facts in this case;

2   basically, the criminal conduct that led to the prosecution of

3   Mr. Blackburn?

4   A.   Yes.

5   Q.   And in those documents, did it lay out some of the

6   evidence that was uncovered in addition to the Defendant's own

7   admissions about what he did in this case?

8   A.   Yes.

9   Q.   All right.  So having had an opportunity to review some of

10  those documents -- and they include letters from a therapist

11  who is seeing M.M.  They also include letters from A.M.'s

12  parents about some of the current -- M.M. and A.M.'s parents

13  about some of the current therapies that they're undergoing.

14  Is that right?

15  A.   That's correct.

16  Q.   All right.  So just based on your review of the facts of

17  this case, have you had clients who have undergone similar

18  traumas as the victims in this case?

19  A.   Yes.

20  Q.   And have you treated them for that abuse that they

21  underwent?

22  A.   Yes.

23  Q.   Okay.  And so can you explain to the Court what some of

24  those different treatments entail.

25  A.   Again, depending on the needs of the individual clients

1    and their ages, having some type of trauma treatment.

2    Outpatient psychotherapy.  It could be in-home services working

3    with children and their family systems.  Attachment type work

4    where you work with, if you have a viable caregiver -- so, for

5    example, an adoptive parent, working on the parent-child

6    attachment for young children, because of the impact that

7    trauma has between children in particular when they're 0 to 5,

8    those critical years of brain development.

9        A lot of times there's needs in terms of speech or sensory

10   integration, so occupational therapy services would be an

11   adjunct service.  Speech and language services.  Sometimes kids

12   need physical therapy.  Sometimes kids do need psychotropic

13   medications and they need to see a psychiatrist.

14       Other services could include behavior modification.  We

15   also look at the educational environment, whether that's a

16   preschool or Head Start, or a public school, making sure kids

17   have IEPs and get services that meet their needs.

18   Q.   All right.  And just going back real quick, I know that we

19   went through the documents that you reviewed.  You didn't

20   review all of those this morning?  You had access to them prior

21   to this morning?

22   A.   Yes.

23   Q.   All right.  And did you do any additional research in

24   preparation for your testimony here today?

25   A.   I did.

1   Q.   Can you tell the Court some of the things that you

2   researched specifically to testify in this case?

3   A.   The things that I researched specifically, a lot of them

4   have to do with the Adverse Childhood Experiences Study, and I

5   can talk a little bit about what that is and why it's so

6   important in understanding the impact of trauma across

7   somebody's life span.  This is originally the work of Felitti

8   and Anda, and it's work that's been replicated for over 20

9   years now.

10       I also looked at information specific to the impact of

11  being the victim of child pornography or child abuse images on

12  individuals, and how that also is something that gets revisited

13  across the life span.

14       I looked at research that talks about the neurobiology of

15  trauma, which basically means that we now know through hard

16  science that when children are traumatized, that it actually

17  impacts the way our brain forms and develops, and then the way

18  we then function for the rest of our life.

19       And the other thing I looked at, of course, is the impact

20  of childhood sexual abuse and the short and long-term

21  consequences of that.

22  Q.   So is there a different treatment plan, from a clinical

23  perspective, that gets put into place for someone who is the

24  victim of sexual abuse versus someone who is the victim of

25  sexual abuse that is recorded and disseminated?

1   A.    Yes.

2   Q.    And what is the reason for that?

3   A.    The reason that there's a difference is because although

4   sexual abuse is a unique trauma in and of itself, because it

5   has characteristics that we don't see in other types of

6   traumatic experiences, the addition of the child abuse imagery

7   or child pornography, there is no resolution or true closure

8   for that, because once those images are out there, they cannot

9   be recalled.  So it affects that child and that child's

10  family's right to privacy and their ability to feel like

11  they're safe for the rest of their life.

12  Q.    So just taking your own experience into account, on

13  average would you say that victims of child pornography undergo

14  treatment longer than someone who is just -- and I know that

15  each case is different, but just pulling from your own

16  experience, do victims of child pornography usually have to

17  undergo longer periods of treatment versus someone who was the

18  victim of sexual abuse that was not recorded and disseminated?

19  A.    Yes.

20  Q.    And I know when I was asking you about some of the things

21  that you reviewed, you talked about the Adverse Childhood

22  Experiences Study.  Can you explain to the Court what that is?

23  A.    The Adverse Childhood Experiences Study, what we commonly

24  refer to as the ACEs study, is one of the most important pieces

25  of research that's ever come out in the field of just trauma in

1  general.  It's a study that started back in 1995.  It's a

2  longitudinal study, and the sample size is over 17,000 people.

3  Longitudinal means that they have actually followed these

4  17,000 people for the past 20 years.  So as opposed to another

5  type of study that says, oh, we're going to look at 300 people

6  and then we're going to follow them in six months and see how

7  they're doing, they actually have this huge sample size and

8  they've been following these people for two decades.

9      What the study has uncovered is the connection between our

10  long-term health and social welfare, emotional well-being, and

11  the connection that that has to do with adverse experiences

12  that an individual has from age 0 to age 18.

13  Q.  And is there any type of score that came out of the study

14  that allows you to assess victims of childhood trauma?

15  A.  Yes.  The ACE Score is a very simple scoring system.  It's

16  0 to 10.  So, there's 10 categories of ACEs, and basically,

17  your ACE score is going to reflect the number of these adverse

18  experiences that you've had from birth to age 18.

19      So, there's three categories of abuse.  There's physical

20  abuse, sexual abuse, and emotional abuse.  There's two

21  categories of neglect, physical neglect and emotional neglect.

22  And then there's five areas of household dysfunction, and those

23  include being in a single parent home, being in a home where

24  there's domestic violence, being in a home where there's

25  substance abuse, being in a home where there is an incarcerated

1    household member, and being in a home where there's untreated

2    mental health problems.  So, basically, an ACE score would be

3    how many of those experiences you've had before the age of 18.

4    Q.   Based on your review of the facts in this case, and I know

5    that you're not privy to every single thing that happened to

6    A.M. and M.M. in their childhood, but based on your review of

7    the sexual abuse that the Defendant perpetrated on them, do you

8    have an opinion as to what their ACE score is?

9    A.   Just based on the things that I know were perpetrated by

10   the Defendant, there's clearly sexual abuse, there's some

11   physical abuse, emotional abuse, and then neglect.  So I would

12   estimate, at minimum, just with that, each of these children

13   have an ACE score of four.

14        So then what that means for them, from now until they die,

15   compared to a child that has an ACE score of zero, children

16   that have an ACE score of four are twice as likely to be

17   smokers, seven times more likely to be alcoholics, ten times

18   more likely to ingest street drugs, and twelve times more

19   likely to attempt suicide over their life span.

20   Q.   And is it the belief in the clinical community that some

21   of the treatments that you can provide these victims with will

22   help minimize that in the future?

23   A.   Yes.  It would be hoped that with multi-disciplinary

24   services, not even mental health services, but meeting their

25   medical and their educational needs, and their job training

1   needs, and social skills, and relationship building stuff, that

2   in some way we could remediate some of those risks, or

3   intervene in a way that can actually help kids overcome some of

4   that damage that was caused in early childhood.

5   Q.   All right.  I want to -- I know you had a chance to review

6   some of the documents in this case.  I want to turn your

7   attention to one of the letters that was provided by A.M.'s

8   parents.  That's Document 96-1, which means that it's Exhibit 1

9   of Document 96.  In it, A.M.'s parents detailed some of the

10  different kinds of therapies that he's currently undergoing.

11  So I just kind of want to break that down.

12       One of the therapies is Attachment Healing.  Are you

13  familiar with that?

14  A.   I am.

15  Q.   Can you explain what Attachment Healing Therapy is?

16  A.   Attachment Healing Therapy works in the parent-child dyad.

17  So, it's trying to undo some of the relational damage that's

18  done when children are exposed to neglectful or abusive

19  parenting, in particular in their early childhood, ages 0 to 3

20  or 0 to 5.

21  Q.   All right.  And I think that the Probation Officer, in

22  speaking with another clinician, basically assessed the average

23  cost of that as $200.  Does that comport with your

24  understanding of how much a single session of Attachment

25  Healing Therapy would be?

1    A.    Yes.

2    Q.    Is it fair to say that there could be a range --

3    A.    Yes.

4    Q.    -- with regard to the cost?

5    A.    Yes.

6    Q.    Per your estimate, what would be the appropriate range for

7    that specific type of therapy?

8    A.    It depends on where you're living.  For New Mexico,

9    anywhere from $150 to I would say as high as $250 an hour per

10   session.

11   Q.    And when you are talking about therapy, you know, is there

12   a difference -- well, I guess we're going through some of the

13   differences.  But the therapies that we're talking about, are

14   those specialized therapies?

15   A.    Yes.

16   Q.    And so on average, do those cost more?

17   A.    Yes.

18   Q.    All right.  One of the other therapies that they talked

19   about is that he's currently undergoing Sand Tray Therapy.  Are

20   you familiar with that?

21   A.    I am.

22   Q.    And can you explain what that is?

23   A.    Sand Tray Therapy, it's along the expressive modality.  So

24   it's in some ways parallel to using, like, Play Therapy or Art

25   Therapy.  What Sand Tray Therapy does is it allows children,

1   when they don't have the words to express what's happened to

2   them, to use images and miniatures that they then use in a sand

3   tray as a way to project their understanding of what's happened

4   to them.  And then through those images, the therapist can try

5   to help to rework that trauma in a way that's more meaningful

6   and accurate.

7   Q.   And again, I think the Probation Officer assessed that the

8   average cost of that type of therapy per session would be $200.

9   Does that comport with your experience of how much a single

10  session would cost?

11  A.   Yes.

12  Q.   Same thing here, is there a potential range that could

13  apply?

14  A.   Yes.

15  Q.   And that $200 falls within what you would expect it may

16  cost here in New Mexico?

17  A.   Yes.

18  Q.   All right.  They also said that A.M. is currently

19  undergoing occupational therapy.  Are you familiar with that?

20  A.   Yes.

21  Q.   What is occupational therapy?

22  A.   Occupational therapy deals with the sensory dysregulation

23  that we often see in children that have a history of abuse and

24  trauma.  That means an individual can be hypersensitive to

25  sounds or sights or odors, or even under respond.  So

1  occupational therapy helps to retrain that individual so that

2  when they're intaking information from their environment, that

3  they respond appropriately, versus over- or under-responding.

4  Q.   The Probation Officer assessed an average cost of $200 for

5  a single session of occupational therapy.  Does that comport

6  with your experience of how much that session would cost?

7  A.   Yes.

8  Q.   It also states that A.M. is currently undergoing speech

9  therapy.  Can you explain what that is?

10 A.   The speech therapy can help with a number of different

11 things.  It can build vocabulary.  Especially if children come

12 from a neglectful environment, a lot of times their language

13 development is delayed.  So it can help try to bring children

14 closer to their developmental level.  It can work on

15 articulation or pronunciation issues that children might have.

16 Q.   The Probation Officer assessed an average cost of $200 per

17 session for that type of therapy.  Does that comport with your

18 training and experience of how much a single session of speech

19 therapy would cost?

20 A.   Yes.

21 Q.   All right.  I believe that A.M.'s parents also reported

22 that in addition to these five different types of therapies,

23 he's also seeing a psychiatrist once a month.

24 A.   Yes.

25 Q.   So, you're familiar with the facts of this case and with

1    the sexual abuse that A.M. went through at the hands of the

2    Defendant.  Based on your review of that, do you have an

3    opinion as to whether or not it's appropriate for him to be

4    attending all of these therapies in addition to a psychiatrist?

5    A.   Yes.  It's my opinion that these are probably very

6    necessary for children that have a young -- young children that

7    have a history of trauma.

8    Q.   Have you recommended this level of extensive therapy in

9    the past to clients that you've treated?

10   A.   Yes.

11   Q.   Okay.  I believe the Probation Officer made these

12   assessments and basically is accounting for 12 years' worth of

13   therapy.  For someone who has undergone the sexual abuse that

14   A.M. has, do you have an opinion as to whether he will need to

15   continue receiving this type of therapy for at least the next

16   12 years?

17   A.   Yes.

18   Q.   And what is your opinion?

19   A.   Based on what I've seen in my practice, and what I know

20   about the research, and what the ACEs study tells us, it's

21   going to be longer than 12 years.

22   Q.   So 12 years is a conservative estimate for how long he's

23   going to need to undergo this level of mental health

24   participation?

25   A.   Yes.

1  Q.    All right.  Let's see here.  According to another one of

2  the letters that was -- or, according to that same letter

3  submitted by A.M.'s parents, they said that he has been

4  diagnosed with severe PTSD and RAD.  Are you familiar with both

5  of those diagnoses?

6  A.    Yes.

7  Q.    What is PTSD?

8  A.    PTSD is Post-Traumatic Stress Disorder.  It's

9  characterized by symptom clusters, such as intrusion.  So that

10  could be flashbacks or nightmares being triggered.  A symptom

11  category of avoidance, which is, I don't want to talk about it,

12  I want to avoid all the thoughts, I want to avoid any type of

13  memory.  A symptom cluster of hyperarousal, and that's the

14  inability to fall asleep.  That is the exaggerated startle

15  response, the psychomotor agitation.

16        And then there's a cluster of symptoms related to

17  distortions in either your emotional state or in your

18  cognition.  So basically, what that means is that your mood is

19  unstable as a result of the PTSD and/or your thoughts about who

20  you are, or the safety of the world, or why things happen to

21  you, are distorted.  They're incorrect.

22  Q.    And are you surprised, based on your experience, that A.M.

23  has been diagnosed with those disorders?

24  A.    No.

25  Q.    The different types of therapies that we just went

1  through, are those designed to help treat that?

2  A.    The Sand Tray, the medication, and the Attachment and

3  Healing are meant to treat specifically those mental health

4  symptoms.   The other services, the occupational therapy and the

5  speech and language, are adjunctive services that are meant to

6  remediate other things, such as the speech and language

7  difficulties, and the dysregulation from sensory stimuli.

8  Q.    All right.   I want to move now -- we've been talking about

9  A.M.   Now I want to move to M.M.

10       I believe some of the documents that you reviewed kind of

11  go through the treatment that M.M. is currently undergoing, and

12  I want to direct your attention to Document 88, Exhibit 1,

13  which is a letter from Leah Brouwers, who was treating M.M. for

14  a period of time.   Do you recall reviewing that document?

15  A.    Yes.

16  Q.    Let me just ask you, what was your opinion just regarding

17  this letter in general?

18  A.    I was really impressed when I read it.   It seems like this

19  child is in really good hands.   A lot of the things that she's

20  either recommending or that she's doing are consistent and in

21  line with what we know about the best standards for treatment

22  of childhood trauma and abuse.

23  Q.    So you would concur with the recommendations that

24  Ms. Brouwers laid out in her letter?

25  A.    Yes.

1   Q.   In Document 88, which is the 3rd Addendum to the PSR, it

2   kind of breaks down future costs for M.M., and I believe that

3   the Probation Office spoke with Julia Padilla, who is a

4   psychiatry technician with La Familia-Namaste, and she

5   estimated that the psychotherapy sessions that M.M. is

6   undergoing on average would cost $200 per sixty minute session.

7        Based on what you know about M.M. and the treatment that

8   she's receiving, does that $200 number comport with your

9   experience with regard to how much those therapies would cost?

10  A.   Yes.

11  Q.   She also detailed the cost of medication management, so I

12  would assume -- I guess we haven't really fleshed this out.

13  But in a lot of these cases, you undergo therapy, and I believe

14  you did say that sometimes it's actually necessary for victims

15  of childhood trauma to take medication.  Is that fair?

16  A.   Yes.

17  Q.   And what are those medications?  What's the purpose of

18  them?

19  A.   It's going to depend based on the individual.  Typically

20  the standard of practice is, you try therapy first, because

21  it's a less intrusive intervention.  When you start looking at

22  taking medication, it's much more intrusive, especially for

23  young children.

24       So if we know that therapy and adjunctive services alone

25  are not making the progress that's necessary, then we would

1  have a psychiatrist do an evaluation.  So that medication could

2  be for sleep, it could be for mood stability, it could be for

3  emotional outbursts or aggression, things along those lines.

4  Q.   And I believe that it was reported that for M.M., the cost

5  of her medication management is $125 per 30-minute session.

6  Does that number comport with your experience as to how much it

7  would cost for a 30-minute session?

8  A.   Yes.

9  Q.   It also states that M.M. is currently participating in

10  biweekly psychotherapy sessions and medication management once

11  a month.  Based on what you know about M.M. and the sexual

12  abuse that she suffered, does that appear to be an appropriate

13  course of action with regard to her therapy.

14  A.   Yes.

15  Q.   And I believe you testified -- or, would you be surprised

16  if in the future, they need to increase the amount of therapy?

17  A.   No.

18  Q.   All right.  And so going off of that, every single person

19  that you see is different, but can you explain to the Court

20  from your experience treating young children who have undergone

21  similar trauma as the victims in this case, throughout the

22  course of their life, what are going to be some of the

23  potential triggers that may send them back to therapy, even

24  past the age of 18?

25  A.   In regards specifically to sexual abuse?

1   Q.    Yes.

2   A.    Okay.  Again, every person is different.  There's lots of

3   things that could happen that could trigger an individual.

4   However, what the research talks to us and helps us understand

5   is that when kids have been sexually victimized, there are five

6   generally consistent timeframes that, as they get older and

7   they're addressing different developmental tasks, issues

8   related to their sexual trauma can resurface.  Those five

9   milestones are actually all connected either with sexuality,

10  sexual development, intimacy, or child carrying.

11      And so -- and this is the work of Jan Hindman.  The first

12  potential milestone is puberty.  Even if a child has

13  successfully completed treatment for sexual trauma that

14  occurred at a younger age, when they hit puberty, it's possible

15  that because puberty is about your body developing sexually,

16  that that could trigger a need to come back into treatment.  So

17  puberty is the first.  The second potential developmental

18  milestone that could cause sexual abuse to resurface is when

19  that individual victim starts to engage in consensual sexual

20  contact.  So they're dating.

21      The third is being in a committed relationship, or being

22  married.  Some sort of long-term relationship, because that has

23  a component of intimacy, but it also has a component of trust.

24  The fourth is when the victim has a baby, and the fifth is when

25  their child turns the same age that they were when their sexual

1    abuse happened.

2         So those are just potential milestones that are pretty

3    consistent for individuals that are survivors of sexual trauma.

4    Q.    In your own experience, have you been able to see this

5    actually play out with clients that you treat?

6    A.    I have seen it play out.  I've been in Las Cruces since

7    2008 with my practice, and so I've actually had the opportunity

8    of kids that I treated when they were younger, that were done

9    with treatment and seemed to be doing well, end up resurfacing

10   when they hit adolescence.

11   Q.    So again, just going back to the numbers in this case, the

12   Probation Officer made estimates, and I think that they were

13   saying this for the next 12 years.  I think you testified with

14   regard to M.M. that you consider that to be a pretty

15   conservative estimate, with regard to how long A.M. -- I don't

16   know if I said A.M.; I meant to be talking about A.M. -- that

17   you thought that was a conservative estimate as to how long he

18   will have to be in therapy.  Is that right?

19   A.    That's right.

20   Q.    Does the same go for M.M.?

21   A.    Yes.

22   Q.    So you wouldn't be surprised if they had to continue

23   therapy well beyond 12 years from now?

24   A.    That's correct.

25   Q.    In total for the next 12 years for M.M., Probation

1   believes that $57,600 is an appropriate amount to request for

2   psychotherapy costs for the next 12 years.  Does that number

3   comport with your experience of how much it would cost to treat

4   M.M. for 12 years' worth of psychotherapy?

5   A.   Yes.

6   Q.   And also with regard to M.M., the Probation Officer

7   assessed a number of $18,000 for psychiatry and medication

8   management for 12 years.  Does that number comport with your

9   experience as to how much it will cost to treat M.M. for

10  psychiatry and medication management for the next 12 years?

11  A.   Yes.

12  Q.   With regard to A.M., in total, the Probation Officer

13  assessed for both therapy and psychotherapy -- I think we

14  already kind of broke down the cost for A.M.  But in total, the

15  Probation Officer assessed a number of $144,000 for the next 12

16  years for A.M.'s therapy and psychotherapy.  Does that number

17  comport with your experience as to how much it would cost to

18  treat A.M. for the next 12 years?

19  A.   Yes.

20  Q.   In your opinion, are these conservative estimates, or do

21  you have any opinion about that?

22  A.   I believe they're conservative estimates.

23  Q.   So very likely it could cost a lot more?

24  A.   Yes.

25          MS. ONG:  Your Honor, may I have a moment?

1          THE COURT:  Sure.

2   BY MS. ONG:

3   Q.   All right.  Ms. Kenney, you've had a chance to review some

4   of the facts in this case with regard to the sexual abuse that

5   the Defendant perpetrated on these young children.  One of the

6   components that's present in this case is that there may have

7   been neglect or even sexual abuse by someone other than the

8   Defendant.  Even taking that into consideration -- or, do you

9   have any opinion, as to the extent of the Defendant's abuse,

10  how that affects the treatment that they need regardless of any

11  other trauma that they've undergone?

12  A.   Just based on the things I know from the Defendant, with

13  that ACE score of four and the fact that there's child abuse

14  imagery involved, the needs of these children is going to be

15  great throughout their lifetime, even if they didn't have any

16  other types of traumatic experiences.

17  Q.   And would that be the same even if they did have other

18  types of traumatic experiences?

19  A.   Yes.

20  Q.   Now, I know that when Ms. Katze was voir diring you, she

21  was asking you, you know, you didn't actually see these

22  victims, you didn't actually treat them.  Why is it that you

23  can testify regarding the facts that you know given your

24  experience and background, in this case even though you have

25  not actually treated the victims here?

1    A.    I think a couple of things.  It's similar to when people

2    bring me in to train and to teach other therapists how to work

3    with traumatized kids.  It's not because I'm actually doing the

4    work, it's because I have the knowledge and the expertise so

5    that they can then use that in their work.  So it's sort of a

6    similar situation.

7          But the other thing is, it removes my role as a therapist

8    to advocate for my clients.  So that is part of what I do when

9    I actually see the clients, whereas when they're not my

10   clients, I don't have to worry about doing that advocacy piece

11   and I don't have that therapeutic alliance as any way to kind

12   of skew my recommendations.

13   Q.    And I believe you had testified that it allows you to be

14   more objective; is that correct?

15   A.    Yes.

16            MS. ONG:  Your Honor, I pass the witness.

17                       CROSS-EXAMINATION

18   BY MS. KATZE:

19   Q.    I'm just going to go a little bit backwards.  You just

20   said that you felt comfortable offering an opinion on such a

21   serious matter in a case where you've never seen anybody

22   involved in the case or talked to them because you felt that

23   you could be objective; is that right?

24   A.    Yes.

25   Q.    And you feel that you can be objective when, in

1    preparation for your expert testimony, you only spoke to the

2    prosecutor; correct?

3    A.    That is correct.

4    Q.    You didn't speak to me, the defense attorney; correct?

5    A.    That's correct.

6    Q.    And the material that you reviewed seems very

7    prosecution-oriented.  You got the Government's response to my

8    suppression motion; right?

9    A.    Yes.

10   Q.    You didn't get my suppression motion?

11   A.    I don't think so.

12   Q.    You got the Government's Sentencing Memo, you did not get

13   my Sentencing Memo?

14   A.    That's correct.

15   Q.    But you feel that even though all your information was

16   one-sided, that you could be objective?

17   A.    I'm basing my recommendations not just on what I read from

18   the prosecution, but I'm also basing it on the research that we

19   use throughout the trauma treatment field.

20   Q.    But you will agree that you were limited in the

21   information that you got in this particular case; is that

22   correct?

23   A.    Yes.

24   Q.    And as you already testified to, therapy treatment is

25   really individualized?

1   A.   Yes.

2   Q.   And that's the whole benefit of it, isn't it, that it is

3   tailored to the individual?

4   A.   Yes.

5   Q.   Let me step back one more step.  You were asked -- I guess

6   it wasn't exactly like this, but whether you could parse out

7   the abuse by Michael Blackburn versus the sexual abuse by a

8   biological parent and the negligence by a biological parent.

9   And you didn't actually say that you thought you could break it

10  down and say, this percentage of the child's suffering now is

11  due to this, and this is due to this; right?

12  A.   That's right.

13  Q.   Would it be fair to say -- and I believe this was in the

14  material that you got to review.  I think it was actually in

15  Counselor Brouwers' letter.  She talked about, for M.M., that

16  she was suffering due to a lifelong pattern of abuse and

17  neglect.  Did you see the letter.

18  A.   I did see the letter.  I do have the letter.

19  Q.   She referred to that, and so clearly she's referring to

20  the neglect and abuse by the biological parents, because

21  Mr. Blackburn was in her life for, I think, nine months.  So I

22  think that the therapist recognized that there was other abuse

23  to the children.  Not minimizing what Mr. Blackburn did, but

24  they were sadly the victims of other physical abuse, correct,

25  from your review the material?

1   A.   Yes.

2   Q.   And neglect.  The children were taken away from their

3   parents; right?  Are you aware of the fact that they've been

4   adopted?

5   A.   Yes.

6   Q.   So they were taken away from their biological parents --

7   A.   Yes.

8   Q.   -- because their neglect and abuse was extreme enough that

9   they would be taken away?

10  A.   I'm assuming that's correct.  I didn't review any of

11  those.

12  Q.   Do you have any experience with termination of parental

13  rights?

14  A.   Yes.

15  Q.   And you would agree that it's a hurdle to actually

16  terminate parental rights?

17  A.   Yes, it is.

18  Q.   And I'm sure that there are sometimes that providers wish

19  that the rights would be terminated way sooner?

20  A.   Yes.

21  Q.   But the system's emphasis is on reunification, isn't it?

22  A.   It is.

23  Q.   So in this particular case, the parents' rights, parental

24  rights, were terminated and they've been legally adopted; is

25  that correct?

1  A.   Yes.

2  Q.   And just one more thing about Counselor Brouwers.  You

3  indicated that you were impressed with the letter and her

4  treatment.  But she is no longer treating M.M., is she?

5  A.   I don't know.

6  Q.   Backing up a little further, you talked about triggers in

7  the context of sort of psychosexual development, that there

8  would be certain psychosexual milestones, puberty, first

9  intimate sexual relations, and that those could be triggers to

10  individuals who had suffered childhood sexual abuse at a young

11  age?

12  A.   Yes.

13  Q.   Let me ask you a question, or for your opinion as an

14  expert on whether you think this is a trigger.  If every time

15  somebody out there looks at a picture, a pornographic picture

16  of a child, and then the child and the family is notified every

17  time for the rest of their life, do you think that would be an

18  unhealthy trigger?

19  A.   It depends on the family and their situations.  For some

20  families and victims, they don't want to know about that.  For

21  others victims, they do want to know about that.  So I would

22  defer to what that particular family would want.

23  Q.   Let me ask you, the families that say they want to know

24  about it, have you treated anybody in that situation?

25  A.   Yes.

1   Q.   And so ongoing, over the years, when they get notified,

2   hey, in Holland your picture came up, in Florida your picture

3   came up, do you, as a therapist, do you find that that has a

4   therapeutic benefit for them, to continually hear that someone

5   has looked at those pictures?

6   A.   For the family that I have in mind, it actually was

7   something -- for this particular family, knowing that it was

8   out there, then they would bring that in and talk with me about

9   their emotions about it, and then how do we explain this to our

10  older children.  What is the likelihood -- like, how do we

11  protect our child?  Because every time they're in front of a

12  computer, we're scared that an image is going to pop up.

13  Q.   So why is it helpful for them to be notified for the rest

14  of their lives that someone looked at that?

15  A.   Because for this particular family, it allowed them at

16  least to make informed decisions about how to move forward.

17  Q.   And do you think that they would be unable to make those

18  informed decisions if, let's say, they found out one time?  Do

19  you think it's helpful that they find out every time year after

20  year after year?

21  A.   For this particular family, or in general?

22  Q.   Is this the only one?  I guess I'm asking in general.  To

23  see, it sounds like a huge trigger.  I understand victims'

24  rights and why they have the notification, but from a

25  therapeutic standpoint, to me it seems really unhealthy.  And I

1  was wondering for you, as an expert, if that's a trigger, every

2  time they get notified of that.

3  A.   It could be a trigger.

4  Q.   So, absolutely no question horrific abuse, and the

5  children need to heal and be treated.  I have sort of a general

6  question.  Is it ever appropriate, therapeutically appropriate,

7  to do less therapy than more therapy?

8  A.   If it's what's clinically indicated.

9  Q.   And why would it be clinically indicated to do less

10 therapy?

11 A.   For me as a clinician, and the standard, we look at a

12 number of different things.  So we're going to look at how the

13 child's functioning, how they're doing across the board, the

14 child's report on how they think they're doing, the caregiver's

15 report.  If we have collateral information, so for example,

16 information from the school about how they're doing.  And then

17 looking at the trajectory of stresses.

18      So, for example, if it's a criminal case and this is a

19 child that's going to have to do a video deposition or have to

20 testify, even if some of the symptoms have gotten better and

21 their functioning is improved, if we know that this big

22 stressor is around the bend, we're not going to reduce

23 treatment or terminate treatment.

24      But if we take all of those factors together, symptoms

25 have been reduced, coping is better, functioning is better, and

1    it's been stable for a period of time, three to six months, not

2    just, oh, we have two good weeks, then we'd hold a discussion

3    about, do we reduce sessions, do we pull out one of the

4    services, do we start seeing the child once every other week,

5    do we look at -- depending on the needs, can we do a straight

6    termination.  Let's do eight weeks of termination and closure,

7    and have the child be done with treatment, except when they

8    have to come back in for checkups.  It's kind of a long answer.

9    Q.   No, I guess my question sort of related to my prior

10   question about triggers.  I'm just wondering if in the array of

11   therapeutic responses, is meeting with a child five times a

12   week and talking about the horrible abuse that they've been

13   through -- maybe for some people, I understand, maybe that

14   helps work it through, and that helps healing and grieving.

15   Would you agree everyone heals and grieves differently?

16   A.   Yes.

17   Q.   So I'm just wondering, that kind of intensive therapeutic

18   intervention, does that have a negative impact on people, ever?

19   In that same sense, like I'm saying, as a victim, you keep

20   getting a call that your picture is showing up, does it not

21   sometimes allow people to move on from the tragedy and the

22   trauma?

23   A.   I am not sure what you're asking me.

24   Q.   Well, I guess -- let me try to say it another way.

25        So, clearly horrible trauma.  An individual needs to be

1   treated.  But does treatment -- is it always appropriate that

2   the treatment is five times a week for 12 years?  Is that

3   always the best thing for the individual?  Is less treatment

4   maybe better?

5   A.   Less treatment could be better.

6   Q.   I'm going to ask you -- because I was trying to do some

7   research on the idea of, well, is more treatment better.  I was

8   thinking in other contexts, like if you have relationship

9   counseling, I don't know if one time a week is good, or is five

10  times a week better, do we save more marriages that way.

11  Obviously for some people, in some treatment, therapy is

12  important.

13      And the other thing I was wondering, because the children

14  were so young, they were under three years old during this

15  abuse, so I looked at, and I'd ask you, have you done any

16  research on whether the younger the victim is, are they more

17  likely to have less memory of it?  I know that A.M.'s mom

18  testified here today that it sounds like according to her,

19  memories are very present.  I'm wondering in the cognitive

20  development, are the memories really present?  Do the memories

21  get reinforced from super frequent treatment?

22  A.   Memories can be stored differently.  Well, trauma memories

23  are stored differently, anyway, and that's what we know from

24  the neurosciences.  So they're stored much more as fragments

25  and body sensations, not necessarily with a language component

1   to them.

2       Treatment helps us to give language for those traumatic

3   experiences.  So with young children, especially preverbal

4   trauma, it's going to be remembered in their body with them not

5   even having a context for understanding it.

6   Q.   So I found -- this is actually called Child Physical and

7   Sexual Abuse Guidelines for Treatment.  It's a little bit old.

8   It's from 2003.  But it's put out by the U.S. Department of

9   Justice.  And it talks about sexual abuse and it talks about

10  different treatment modalities, and you actually mentioned some

11  of them.

12      And so I just wanted to go over a couple of them with you,

13  because in this report from the DOJ, they talk about like an

14  estimated time that would be appropriate to conduct that

15  therapy.  I just want to see if you're familiar with the study.

16      So, are you familiar with cognitive processing therapy?

17  A.   Yes.

18  Q.   Can you just briefly tell us what that is?  Because I know

19  it's related to PTSD and you talked about PTSD.

20          MS. ONG:  Your Honor, I'm sorry, can I just see what

21  that study is called?

22          MS. KATZE:  I'm sorry.  Here, I can give you that.

23          MS. ONG:  Thank you.

24  BY MS. KATZE:

25  Q.   Cognitive processing therapy.  Just briefly, what is it?

1    A.    It's basically helping people put words to their traumatic

2    experiences.  Reprocessing trauma or other stressors in a way

3    that's more accurate and meaningful.

4    Q.    Okay.  And that's a modality to treat sexual abuse trauma

5    sufferers; right?

6    A.    I don't use it.  Actually, I'd like a copy of the report

7    so I can see it, because it's not anything that I looked at.

8    And part of that is because it's from 2003, so it's 14 years

9    old, and we have much more current information in the field

10   now.  So it would be helpful for me to see it.

11   Q.    Okay.  Well, I guess the way I'd like to do this is just

12   ask you if you know the modality, and then, for example,

13   cognitive processing therapy, they indicate the duration of

14   treatment is 12 to 16 sessions.  Is that something you're

15   familiar with?

16   A.    I am familiar with that.

17   Q.    The next modality you actually mentioned, you brought up,

18   Eye Movement Desensitization and Reprocessing.  What is that?

19   A.    EMDR is a -- because traumatic memories are stored

20   differently, they're stored as fragments, they don't have a

21   language component to them.  They're stored in the right

22   hemisphere of the brain.  And in order to get them integrated

23   so that they have language, EMDR requires that an individual

24   pay attention to a stimuli.  Usually it's a finger going across

25   the person's body and their eyes are following it while they're

1  recalling their traumatic memory.  Because that way it allows

2  the sensory fragments, sounds, smells, sensations, to be pulled

3  out of the right hemisphere, and then they're reprocessing it

4  with words and now it gets stored as a more coherent narrative.

5  It helps reduce flashbacks and intrusion.

6  Q.   And the DOJ report says that the duration of that

7  treatment is two or three sessions.

8       Are you familiar with Resilience Peer Training

9  Intervention?

10 A.   No.

11 Q.   Do you know a Dr. John Fantuzzo?

12 A.   No.

13 Q.   So, this is a school-based intervention for young abused

14 children that's based on an ecological model and uses competent

15 peers and parent helpers to increase the children's social

16 competence.  Another treatment modality that they suggest is 20

17 play sessions over an eight-week period with booster and

18 follow-up sessions.

19      Another article on that is on Focused -- well, let me ask

20 you, are you familiar with Focused Cognitive Behavioral

21 Therapy?

22 A.   TF-CBT, Trauma-Focused Cognitive Behavior Therapy?

23 Q.   Yes.

24 A.   Absolutely I am with familiar with it.

25 Q.   Okay.  They talk about short-term treatments typically

1   provided in 12 to 18 sessions of 50 to 90 minutes.  Is that

2   something you practice?

3   A.    No, it is not, although I am trained to do TF-CBT.

4   Q.    You are?

5   A.    Yes.

6   Q.    So from what I read, that treatment should be

7   trauma-focused and directive; is that correct?

8   A.    Yes.

9   Q.    And treatments that are open-ended and just supportive

10  have been shown to be less effective?

11  A.    Yes.

12  Q.    And again, in the DOJ report with respect to that

13  treatment modality, they say 12 to 16 sessions.

14  A.    And that is incorrect.

15  Q.    You have a different opinion than the report?

16  A.    The researchers, the founders of the model of TF-CBT will

17  say, when they do the research studies -- and so here's the

18  breakdown.  If I were to do TF-CBT with fidelity, I would do

19  the 12 to 20 sessions, or whatever it is, and then I would give

20  my standardized measure, and then I'd be able to say, look,

21  their trauma symptoms are better.  Those kids in the research

22  study, they're not done with treatment, they're just done with

23  the study.  Those kids actually stay in treatment, and they

24  process different parts of their trauma.

25        So to say that -- so it can be delivered with fidelity,

1  which means you hold to that model.  The minute you deviate

2  from that manual, you're no longer doing TF-CBT.  So if I did

3  it with fidelity, the post-traumatic symptoms probably would

4  get better, but it doesn't mean that the child doesn't need

5  continued treatment.

6        Cohen, Mannarino and Deblinger, and the other people that

7  research it, they actually talk about that.  In fact, I just

8  went through another two-and-a-half day intensive training on

9  TF-CBT, and that was one of the issues that got brought up.

10 Even the trainer who has done research said, oh, no, I still

11 continue to see those kids, because they still have needs.  But

12 for the purpose of the studies and the model, what we're saying

13 is, you can reduce some of the PTSD symptoms.  So it's --

14 Q.   In keeping -- I'm sorry.  In keeping with the way that

15 TF-CBT is set out; is that correct?

16 A.   Yes.

17 Q.   Because I have another thing from the Child Welfare

18 Information Gateway, it's something that's a part of the

19 Children's Bureau that Congress ordered, and it says a very

20 similar thing to what I had just read to you about the

21 short-term treatment typically provided is 12 to 18 sessions,

22 and that didn't talk about the study, per se.

23       Let me ask you about Trauma-Focused Integrative Eclectic

24 Therapy.  Do you know that?

25 A.   No.

1  Q.   That's a psychosocial intervention dealing with both the

2  child and the child's relationship and living context with

3  respect to sexual assault.  In that particular therapy in the

4  DOJ report, it says that the duration of therapy is variable,

5  generally over a period of months.

6       And then I think this is your area of expertise,

7  Trauma-Focused Play Therapy?

8  A.   Yes.

9  Q.   In Trauma-Focused Play Therapy, according to this report,

10 it says the duration of treatment is variable, generally over a

11 period of months.  It just strikes me that that's substantially

12 less than 12 years of doing this intensive treatment, and so

13 I'm again wondering whether, is it in an individual's best

14 interests that we keep doing that?  All these accepted

15 modalities don't seem to be recommending the intensity of

16 treatment for the extensive time period.

17 A.   So, here's what we need to know about those studies.  The

18 research samples for those studies are pretty much unrealistic

19 cases.  So, for example, kids that participate in these

20 research studies generally have one type of trauma.  It's

21 usually something that is more short-term.

22      They rule out for all kinds of things.  So, for example,

23 not only can this child just have sexual abuse, they couldn't

24 ever have been neglected or physically abused or had any

25 adverse childhood experience.  They rule out for substance

1  abuse.  So if there's any substance abuse in the family, we

2  can't have them in the study.  They do not see CYFD kids,

3  because those kids are the complex trauma.

4      So if you were to take my caseload, I don't even think

5  there would be a single kid I see right now that would even

6  qualify for a research study, because the kids that I see are

7  kids that have polyvictimization.  They are the victims of more

8  than one type of trauma.  So their trauma is complex trauma,

9  and the treatment for complex trauma is different.

10 Q.   So you're saying there aren't studies that address people

11 suffering from complex trauma, that across the board studies

12 would only -- I'm not following you.

13 A.   A lot of the studies are not true clinical samples.  So

14 this is the breakdown.  These treatment modalities are

15 efficacious, which means in an ideal setting, in a research

16 setting when everything is controlled for, we know that people

17 get better.

18      Now, whether or not they're effective, do they work in the

19 real world when we're talking about complex trauma, we're

20 talking about neglect, physical abuse, emotional abuse,

21 childhood sexual abuse, child abuse imagery, multi-problem

22 families, changing caregivers, are they really effective, the

23 jury is still out on that.

24 Q.   How often do people just have one issue?  Does everybody

25 in your field agree with you that -- it sounds like the entire

1   research in the treatment field is flawed because it's not

2   based on any -- so it doesn't sound like it's a scientific

3   field, because how is anything peer reviewed and tested?

4   A.   Well, that's one of the things that we are getting better

5   at.  You have to start somewhere.  It's estimated that by the

6   time stuff gets studied in a research setting and then it gets

7   rolled out and it's actually used in the field, it takes about

8   17 to 20 years.  And so, again, one of those breakdowns is the

9   sample that they're actually studying, and then the information

10  that doesn't get published in the study, and then who their

11  control group is.

12       So, for example, a lot of the control groups for our

13  evidence-based treatments are wait groups, wait lists.

14  Basically what that means is, we took 300 sexually abused kids

15  and we randomly assigned them to one of two treatments.  One is

16  TF-CBT, so they get a round of treatment, and the other is the

17  wait list.  They get nothing.  And then they say, okay, now

18  when we study them, we take the kids that got TF-CBT, and they

19  actually do better than the kids that didn't get anything.

20  That's like me rescuing 500 people in the desert and saying,

21  250 of you get water, and 250 of you don't get anything.

22  Q.   Let me ask you a question.  A lot of your testimony, since

23  you have no personal knowledge of the case, you said I did

24  research, it's based on research.  So this research that all

25  your opinions have been based on, is this 17 to 20 years old?

1  Is it the flawed research that you're talking about right now?

2  A.   No, because the research that I'm referring to talks about

3  the impact of trauma.  It's not talking about specific models

4  as being effective in trauma treatment.  So there are two

5  different types of research.

6  Q.   So the field is farther along as far as figuring out the

7  impact of trauma, but not how to treat that impact?

8  A.   Yes.

9  Q.   So that's troubling, right, because we're here trying to

10 figure out what's the course of treatment for someone, how long

11 do they need that, and there's not really any, apparently

12 according to you, any research or scholarship that would

13 educate us on that.

14 A.   We do have information, but it's also insufficient to

15 answer the needs of kids that have complex trauma.  There was

16 actually an expert panel that convened to do a meta-analysis, a

17 review of what we know about treatment of complex trauma.

18 These are things like childhood sexual abuse, the

19 polyvictimization.  And what the experts agreed on is the way

20 treatment should look, that it should be sequenced and

21 phase-based.  The very first part of treatment is stabilization

22 and some symptom reduction, and then the second phase of

23 treatment is the actual trauma narration and reprocessing.

24     But what the experts did not agree upon is how long

25 treatment needs to be.  In general, because of the relationship

1    damage that's done in interpersonal trauma, which basically

2    means the person who is supposed to be taking care of you is

3    actually the source of trauma, because of that relationship

4    damage, it's illogical to think that you can repair somebody's

5    relationship damage in ten sessions if it took you three to

6    five years of abuse and maltreatment to get there.

7    Q.   Let me ask you about another treatment that you talked

8    about, or you talked about that you had read about the

9    diagnosis of Attachment Disorder.

10   A.   Yes.

11   Q.   And I think it was A.A. that got diagnosed with that; is

12   that correct?  Not A.A.; I'm sorry.  A.M.

13   A.   Yes, Reactive Attachment Disorder.

14   Q.   Right, okay.  So is it a fair shorthand to say that that

15   happens when somebody has come from a life of no love, that

16   they don't have love from their parents?

17   A.   That's definitely one of the things that contributes to

18   it.

19   Q.   And that same study of modality said that the duration of

20   treatment was variable, generally over a period of months.

21        Let me ask you about another study.  Again, because I was

22   looking into the idea, do people forget under a certain age.

23   And I was trying to -- I found some research that said that

24   children under three -- people have very little memories of

25   what happened to them under three years old.  And I'll get to

1   that in one second.

2       This is a report on child abuse, and the major findings

3   were that both sexual and nonsexual abuse were subject to

4   periods of forgetting, and that the most frequently reported

5   factor related to recall was being in therapy.  So that just

6   sort of seemed like it reinforced my thought, that that is

7   what -- that what was the most common thing that brought up

8   recall was being in therapy.

9       One other study, this is written by Linda Meyer Williams,

10  this is Recall of Childhood Trauma: A Prospective Study of

11  Women's Memories of Child Sexual Abuse.  And here:  "129 women

12  with previously documented histories of sexual victimization in

13  childhood were interviewed and asked detailed questions about

14  their abuse histories to answer the question, 'Do people

15  actually forget traumatic events such as child sexual abuse,

16  and if so, how common is such forgetting?'

17      "A large portion of the women (38%) did not recall the

18  abuse that had been reported 17 years earlier.  Women who were

19  younger at the time of the abuse and those who were molested by

20  someone they knew were more likely to have no recall of the

21  abuse."

22      And then one other thing.  This does sort of a survey of

23  the studies, and they say:  "The majority of studies from the

24  experimental psychology literature suggest that adult memories

25  for any events before the age of three years are rare and they

1   attribute such childhood amnesia to developmental processes and

2   immaturity of the nervous system."

3        Is that something you're familiar with?

4   A.   What year is that?

5   Q.   The studies that they're referring to, there are a bunch

6   of them.  It looks like they go from the fifties through the

7   nineties.  This report, itself, is from 1994.

8   A.   That information is outdated, and the reason for that

9   is --

10  Q.   So if I said it was from 2014, would you have a different

11  response?

12  A.   Well, I think the results would be different, because we

13  know now different things about the impact to the brain from

14  early childhood trauma.  So, this is all the neuroscientific

15  studies.  In fact, kids are more vulnerable to the effects of

16  trauma between the ages of 0 to 5, more specifically 0 to 3.

17  And I'm not talking about concrete memories, I'm talking about

18  the impact that it has on their brain development and then

19  their neurobiological functioning.

20       So what happens is, during those critical timeframes for

21  the brain to development, when a child is in a neglectful or an

22  abusive or traumatic environment, it alters the way their body

23  responds to stress.  They have an adrenaline rush that goes

24  over the brain.  They have neurotransmitters that form at the

25  base of the brain that don't work correctly, and then those

1  neurotransmitters later on are what help regulate our body and

2  our brain.  And then the parts of the brain that do form aren't

3  formed correctly, and then what is formed doesn't function the

4  way that it's supposed to.

5       And so all of the research that was done throughout the

6  nineties where they've actually done functional MRIs and PET

7  scans, you can see the difference between the brain scan of a

8  child who wasn't --

9  Q.  Do you have a specific study that you could refer me to?

10 A.  What I can refer you to is the work of Dr. Bruce Perry.

11 Q.  P-e-r-r-y?

12 A.  Yes.  And the work of Bessel van der Kolk.

13 Q.  Can you spell that?

14 A.  Bessel is B-e-s-s-e-l, and van der Kolk is v-a-n, next

15 word d-e-r, and next word, K-o-l-k.

16 Q.  Okay.  Thank you very much.

17          THE COURT:  Is there any redirect?

18          MS. ONG:  Just briefly, Your Honor.

19                    REDIRECT EXAMINATION

20 BY MS. ONG:

21 Q.  All right, Ms. Kenney, I just want to briefly go over some

22 of the stuff that Ms. Katze asked you about on

23 cross-examination.

24      She asked you if you had spoken to the defense.  Did

25 anyone from the defense -- did Ms. Katze or anyone from her

1    office reach out to speak to you prior to coming here today?

2    A.    No.

3    Q.    She also asked you about the documents that you had

4    reviewed, and I'm just going to -- I think she only mentioned

5    the Government pleadings, but in addition to those pleadings,

6    you also reviewed portions of the PSR and the 3rd Addendum to

7    the PSR, the 4th Addendum, the 5th Addendum, and the 6th

8    Addendum; is that correct?

9    A.    I don't know if I did the 6th Addendum.  I think I just

10   did the 5th.

11   Q.    I think you only got to the 5th, yeah.  There was a 6th,

12   but it had nothing of relevance, so I think you're correct.

13   Yes, the 5th Addendum, Document 108.

14   A.    Yes.

15   Q.    Okay.  I just want to quickly go through this, but I think

16   she was talking about some of the additional trauma that A.M.

17   and M.M. may have received by parental neglect.  You did have

18   an opportunity to go through the PSR, and I believe in the PSR

19   it lays out that for the nine months that the Defendant was

20   living with their parents, he was their primary caregiver.  Do

21   you recall that?

22   A.    I do recall that.

23   Q.    All right.  And so if they were undergoing any neglect at

24   that time, it would be as a result of him?

25   A.    That's my understanding.

1    Q.    Okay.  And then just briefly going back to the -- I just

2    have it written here as A-4.  I don't know, is it the access

3    scale?  I have too many notes.

4          The A score -- I'm sorry.  Not that, but the scale that we

5    got from the Adverse Childhood Experience Study.  You had

6    assessed them at a Level 4; is that right?

7    A.    Yes, just based on the information that I have about the

8    Defendant's case.

9    Q.    And so why are they at A-4?

10   A.    Because based on what I read, they, at his hands, suffered

11   physical abuse, emotional abuse and psychological abuse, and at

12   least one form of neglect.

13   Q.    Okay.  And so having them both at A-4 -- we already went

14   through all the different treatments that they're currently

15   undergoing.  Someone who is an A-4 on that scale, are all of

16   those treatments conducive to somebody who is at that level?

17   Would all of those be treatments that you would recommend for a

18   child that was at the A-4 -- I don't want to say it

19   incorrectly.  It's a scale?

20   A.    Yes.  They have an A-4 score, yes.  It seems like they

21   would be appropriate treatments and necessary treatments.

22   Q.    And I know that Ms. Katze went through a lot of research

23   with you.  I just want to clarify.  I think the study that she

24   had was from 2003, and then she was going through some other

25   studies.  How much has psychology evolved in the last 20 years?

1   A.   Leaps and bounds.

2   Q.   So research that we had 20 years ago may not necessarily

3   be correct today?

4   A.   That's right.

5   Q.   All right.  And she also made a lot to do about, you know,

6   is less treatment better, are we imposing too much treatment on

7   victims.  That's at least what I gathered.

8        From the facts that you've reviewed in this case, is the

9   level of treatment that A.M. and M.M. are currently undergoing,

10  in your professional opinion, appropriate?

11  A.   Yes.

12  Q.   Why?

13  A.   Based on the complexity of their needs and the fact that

14  their trauma is interpersonal in nature, it happened at a very

15  young age, the more services we can get in the sooner, the

16  better the prognosis is going to be.  So there's nothing that

17  leads me to believe that they're receiving inadequate treatment

18  or not enough treatment or too much treatment.

19  Q.   All right.  And I think she also talked to you about how,

20  you know, it's more likely that victims who undergo trauma at a

21  young age are not likely to recall the abuse.  Do you recall

22  that line of questioning?

23  A.   Yes.

24  Q.   From the facts that you've reviewed in this case, we know

25  that both the children here have memories of the actual abuse.

1   A.   That's my understanding.

2   Q.   Okay.  And so in a circumstance where you know that the

3   young child actually remembers what happened to them, are you

4   going to take a different treatment course than perhaps someone

5   who the memories are suppressed and they don't currently

6   remember the abuse?

7   A.   Yes.

8   Q.   And in the circumstance where a child actually remembers

9   the abuse, is it fair to say that they're probably going to

10  have to undergo more extensive treatment?

11  A.   Probably.

12  Q.   I think some of the studies that Ms. Katze was referring

13  to, you pointed out that in a lot of those there's only one

14  type of trauma that they are basically trying to study?

15  A.   Yes.  At least early on in some of that research, when we

16  were looking at the evidence-based treatment movement through

17  the mental health field, a lot of those studies were samples

18  that were not real life.  It's not what we really see in our

19  practice.

20  Q.   And here in this case, how many different types of trauma

21  did you identify?

22  A.   Four, at least, just from the adverse childhood

23  experience.

24  Q.   So at least four.  So those studies are not relevant to

25  the issue that we have here today?

1   A.    Not the studies that would say that the treatment needs of

2   these types of children could be remediated in 12 sessions or a

3   couple months of treatment.

4   Q.    All right.  And just to be clear, how many years

5   experience do you have treating children who have undergone

6   similar sexual abuse?

7   A.    As a therapist, almost 20.

8   Q.    Twenty years.  And you stated that based on your review,

9   the treatment that they are currently undergoing and the

10  estimated future therapies that they will have to undergo is

11  appropriate in your professional opinion?

12  A.    Yes.

13              MS. ONG:  I have no further questions.

14              THE COURT:  May the witness be excused?

15              MS. ONG:  Yes, Your Honor.

16              THE COURT:  Thank you.  You may step down.

17              I'd like to take a break, and then I'll come back and

18  I'll hear any additional argument on this.  And then we'll move

19  into sentencing.

20  (Recess was held at 3:53 P.M.)

21  (In Open Court at 4:25 P.M.)

22              THE COURT:  All right, Ms. Ong, I'll let you go

23  first.

24              MS. ONG:  Thank you, Your Honor.

25              I think we've already been over the actual

1  sentencing.  I'm sure the Court is well aware, we are asking

2  the Court to impose a sentence, the guideline sentence, of 120

3  years in this case.

4          With regard to the restitution issue, the Court heard

5  from Ms. Kenney.  I think that it's obvious from her testimony

6  that she has a lot of experience in this field.  She's been

7  published.  She goes around both nationally and internationally

8  presenting on these types of topics.  Her testimony directly

9  supports the assessments that Probation has made with regard to

10 any therapy or psychiatry for A.M. and M.M.

11         And just before I go any further, I would like to

12 thank Danielle Padilla from the Probation Office.  I know that

13 she put a ton of work into this case, and I think that all of

14 the addendums, where she laid out all the documents, she should

15 be commended for that, because I know it wasn't easy to track

16 down all of these documents.

17         What Ms. Kenney testified to is that the average rate

18 of $200 per session for each of the different types of

19 therapies that both A.M. and M.M. are undergoing comports with

20 her understanding of the normal price that you pay for those

21 types of sessions.  She also testified that she agrees with the

22 current treatment plans that they're under, and she actually

23 testified that 12 years is a very conservative estimate for how

24 long these children will need to be in therapy.  So I think

25 that the United States has clearly met its burden of showing

1    that those numbers are correct.

2              With regard to the causation challenge that Ms. Katze

3    is arguing, I believe she's trying to argue that because there

4    was neglect or any other abuse by the parents, the Court should

5    take that into consideration with regard to the amount.  Our

6    response to that is simple.  The Defendant was the primary

7    caregiver of these children for at least ten months.  I believe

8    that he -- in the PSR, Paragraph 26, it says that he began

9    living with them in March of 2013, and law enforcement arrested

10   him in December of 2013.

11             They also -- in Paragraph 34, when the parents were

12   interviewed, they said that they were unaware that the abuse

13   was going on, that the Defendant was the primary caregiver.

14   One of the counts that he pled to, he admitted that he was the

15   primary caregiver.  So if there's any neglect that's going on,

16   it's at his hands.

17             I mean, certainly the parents were neglectful by

18   leaving their children with him, but during that timeframe, he

19   was the primary caregiver of the children, and I think that the

20   extent of the sexual trauma that they suffered at his hands --

21   you know, I'm not going to get into all the gritty details.

22   The Court is well aware of them.  But the extent of it on an

23   almost daily basis for nine months is certainly the proximate

24   cause of them having to seek these therapies.

25             And just with regard to that, Ms. Kenney testified

1  that based on her review of the Defendant's actions alone, that

2  those kids would score as an A-4, and that based on her

3  experience regardless of any other trauma that they would have

4  undergone, all of the current therapies that they are seeking

5  are appropriate and would be needed.  And that assessment is

6  based solely on the conduct that she was aware that the

7  Defendant perpetrated on the young victims.

8          So I think that the Court has ample evidence in front

9  of it to find that the Defendant was not only the proximate

10 cause of the sexual abuse, but also the need for the current

11 therapy that they're undergoing.

12         With regard to the lost wages that we are requesting,

13 in the 4th Addendum to the PSR, which is Document 96, the

14 Probation Office attached all of the records that were received

15 by K.S. with regard to the income that she was receiving by

16 taking in additional foster children, and I think it shows

17 basically what was happening before December 2013, and then

18 what's happened since then.

19         Basically, what the Probation Officer did, which is

20 laid out on Page 2 of Document 88, is they took those numbers

21 and they made a conservative estimate that K.S. has lost wages

22 in the amount of $2,200 per month, which equals out to $26,400

23 per year, and they estimated lost wages for a period of eight

24 years.

25         Now, Ms. Katze is trying to argue that there was some

1  sort of intervening cause because the children were adopted in

2  this case.  Frankly, I just -- that doesn't make any sense to

3  me.  Had the Defendant not been sexually molesting the

4  children, they never would have been put into CYFD custody,

5  they never would have been placed in the foster homes that they

6  currently are in, and K.S. would have continued to receive more

7  than one foster child at the time.  So I think that the

8  Defendant is the proximate cause of her lost wages.

9        The simple fact that they decided to adopt her is not

10  an intervening cause at all.  I think that the way that courts

11  look at this is, it's a but for analysis.  So, but for the

12  Defendant's sexual abuse of the children, they never would have

13  been placed in K.S.'s care and she would have continued with

14  the regular placements that she was taking in at that time.

15        I'd also note that as the Probation Officer stated,

16  those estimates are conservative estimates.  Eight years is a

17  conservative estimate.  In all likelihood, she will probably

18  continue to lose income for more time than that.  But I think

19  that the records, if the Court relies on the documents from

20  La Familia-Namaste that K.S. provided, provide sufficient

21  support for the figures that are laid out by Probation in

22  Document 88.

23        So, you know, these restitution cases are always

24  difficult for a variety of reasons.  I think that the case law

25  is kind of all over the place.  I'm sure that Ms. Katze is

1   going to talk about Paroline.  I think we already touched on

2   this at the last hearing.  Paroline dealt with situations where

3   you have offenders who are removed.  It's basically the

4   possessors of child pornography that was perpetrated by someone

5   else and produced by someone else.  Here we have the actual

6   Defendant who was the producer, himself.  So the issues that

7   Paroline set out to resolve are just inapplicable to this case.

8          I think that in the cases that we've cited, the

9   courts are unanimous.  In cases such as this where the

10  Defendant is the actual perpetrator, with regard to proximate

11  cause, it's a much easier case because you know that it was the

12  Defendant who was actually sexually abusing the children and he

13  actually shared the photos of them.

14         So, we do believe -- you know, even aside from that,

15  any restitution order that the Court puts in place, in all

16  likelihood they're never going to see any of this money.  The

17  Defendant doesn't have any money.  I think that as a matter of

18  principle, because of the egregious nature of the abuse, it's

19  important from a principle perspective that there be a

20  significant restitution award.

21         THE COURT:  As I read the statute, the economic

22  circumstances of the Defendant are not relevant.

23         MS. ONG:  That's correct, Your Honor.  I think that's

24  absolutely laid out in 18 U.S.C. 2259.  I guess my point is,

25  we've spent all this time and resources fighting about all of

1  this, and at the end of the day, whatever restitution order the

2  Court puts in place, these victims are not really ever going to

3  see any of that money.

4         So I would urge the Court, if the Court does have any

5  concerns about the amount, to err on the side of caution.  We

6  do believe that everything we're asking for is completely

7  appropriate and sanctioned by the law, but we really want to

8  make sure that the restitution order is going to be upheld on

9  appeal.  I think that we've provided the Court with all of the

10 evidence that it needs in order for it to survive appellate

11 review.  But, you know, more than anything, it's just a matter

12 of principle, because in reality, they're not going to see any

13 of this money.

14        So it's our position that the amounts laid out on

15 Page 2 of Document 96 are appropriate, that the Court has all

16 the documentation and evidence it needs to make the appropriate

17 findings.  I don't know if the court is planning on actually

18 stating its findings with regard to restitution today.

19 Certainly we're hoping that the Court will sentence the

20 Defendant today.  But if the court feels that it needs

21 additional time to review any of Ms. Kenney's testimony or

22 anything that happened here, the Court has ninety days after

23 the judgment is entered to finalize restitution.

24        And so, unless the Court has any additional questions

25 for me, thank you.

 1              THE COURT:  Ms. Katze.

 2              MS. KATZE:  Your Honor, the Government asked for 120

 3   years, and we ask for a sentence of 504 months for all the

 4   reasons that we previously argued in our Sentencing Memo, as

 5   well as in Sentencing Hearing Part 1.

 6              So I think that the issues here with respect to

 7   restitution -- one thing I want to make clear, I understand why

 8   Ms. Ong would like to try to diminish the importance of

 9   Paroline.  But it's a Supreme Court case that's directly on

10   point and controlling in this case.  The case is very clear

11   that the Defendant, and in this case, Mr. Blackburn, should be

12   liable for the consequences of his own conduct and not the

13   conduct of others.  What we don't agree upon is, what is the

14   conduct of others, or how much that goes into the equation.

15              Again, Ms. Ong would like the Court to believe that

16   if you use a but for equation, that but for Mr. Blackburn's

17   abuse, the children wouldn't need the services.  Well,

18   absolutely.  I do not argue that.  But what I argue is, there

19   are other contributing factors.  It is not just Mr. Blackburn.

20              It's in the Presentence Report that the biological

21   father sexually abused M.M.  It is crystal clear in the

22   Presentence Report that the parents were neglectful.  Yes,

23   Mr. Blackburn was neglectful in the nine months that they

24   allowed him to be the caretaker to the point that he was able

25   to sexually abuse those children and they, according to them,

1   had no idea whatsoever, but those children had two, and almost

2   three years of their life that those parents were so

3   neglectful.

4          Those parents were so neglectful and abusive that

5   their parental rights were terminated, and you heard the

6   Government's expert say what a hurdle that is to have parental

7   rights terminated.  So clearly the abuse and the neglect was

8   substantial from the parents.  I'm not saying that the abuse

9   was not --

10          THE COURT:  Let's assume that there was abuse from

11   the biological parents.  And again, their parental rights were

12   terminated, and honestly, they should have been prosecuted,

13   although they would have had to have been prosecuted in state

14   court, because based on the record before me, there was nothing

15   to give rise to federal court jurisdiction.  But under the

16   causation analysis, wouldn't Mr. Blackburn's conduct be the

17   independent intervening cause?

18          MS. KATZE:  No, Your Honor.  There's no way to say

19   that.  Even the Government's expert said, there's no way to

20   parse that out.  You can't say -- and here's why we can't say

21   that.  If we had exemplary parents who did nothing but love

22   their children and care for their children, and Mr. Blackburn

23   still sexually assaulted them, yes.  That's a straight

24   causation.

25          But when we have an end product, the children, who

1   have been damaged, and injured, and hurt, we have to look at,

2   okay, what caused that damage, that injury, that hurt.

3   Mr. Blackburn did, no argument.  But we can't deny that it's

4   the conglomeration of the abuse and the neglect and the hurt

5   that caused it.

6           THE COURT:  Isn't it also restitution is joint and

7   several?  So if you're saying part of it should be the parents,

8   the biological parents, then if you apply -- well, I don't

9   know.  That's in civil.

10          MS. KATZE:  I was going to say, I don't think that's

11  necessarily the case, because I think Paroline controls and

12  Paroline is very clear.  And I realize that kind of puts an

13  onus on the Court, because the Court -- I don't know if it

14  sounds like a math equation, but the Defendant should be liable

15  for the consequences of his own conduct, not the conduct of

16  others.

17          So I guess the question is, where would that leave

18  the Court?  Do you have to say, okay, well, Mr. Blackburn was

19  60 percent responsible, each parent was 20 percent responsible,

20  therefore if I think the total restitution is this,

21  Mr. Blackburn would pay 60 percent.  I don't know that that's

22  necessarily the answer, but that's certainly an approach,

23  because I think it recognizes the fact that the natural parents

24  contributed to the outcome, and the treatable outcome.

25          And again, not in any way arguing that that excuses

1   or dismisses Mr. Blackburn's conduct.  His conduct is

2   reprehensible and the cause of their pain and suffering, but

3   not the only cause.  And I think the Supreme Court law is clear

4   that we have to look at everything.  We can't just say, oh,

5   this was horrible what Mr. Blackburn did, therefore we don't

6   have to give a legal analysis under Paroline and we don't have

7   to figure out if there's contribution.  It was horrible,

8   therefore it's all his restitution.  That's not the law.  Your

9   Honor, I think that's the issue of the natural parents and the

10  contribution.

11          The next issue is, as Ms. Ong stated, as far as

12  restitution with respect to reimbursement for treatment and

13  counseling, and also lost wages, I realize this isn't a popular

14  argument to make, because we have somebody who's been sexually

15  abusive, and we have two sets of parents who lovingly adopted

16  children.  I recognize that.

17          But still, we can't let the awfulness of what

18  Mr. Blackburn did, we can't let the awfulness of his conduct

19  blind us to the law.  We still have the law to look at, and we

20  still have to look and see, why would the parents be paying for

21  the counseling.  When the children were in foster care, the

22  State was paying for their counseling, one.

23          THE COURT:  Well, the State could have made a request

24  for restitution, could they not?

25          MS. KATZE:  I don't know that they could have,

1   necessarily.  I don't know that they --

2           THE COURT:  Well, I just recently -- it's funny, I've

3   been dealing with restitution a lot lately.  Although this was

4   a civil case, you may recall the Metropolitan Courthouse case.

5   I got a media request wanting to know all this.  So I made a

6   ruling, after giving notice to everybody, and nobody objected,

7   that it was public information.  But clearly the State of New

8   Mexico was the victim there.

9           And in terms of the restitution payments that were

10  made, there were over $2 million in restitution payments made

11  on that case, but it all went to the State of New Mexico,

12  because the taxpayers of the State were the ones that were out

13  the money, or the State was out of the money that was in that

14  public corruption case.

15          So if the children were still in foster care, and

16  CYFD had total responsibility for all the bills paid, I don't

17  see why, if CYFD wanted to seek restitution, why CYFD wouldn't

18  be entitled to it, or the State.

19          MS. KATZE:  I don't know that they would be.  But the

20  point is, that's not the issue that we have here right now.  We

21  have the issue of the adoptive parents saying, here's these

22  treatments costs and we should be reimbursed for them.

23          THE COURT:  Well, if the biological parents' rights

24  had not been terminated, would you object if the biological

25  parents were seeking restitution?

1          MS. KATZE:  Well, I think it would depend on the

2   scenario, right, of what had happened.  Was anybody paying for

3   treatment and counseling for the children, what was the

4   situation as far as treatment costs and payment and insurance.

5          THE COURT:  But the victims here were, you know,

6   infant children -- or toddlers.  I'm sorry; toddlers at the

7   time.  They're older now.  They're the victims.  But obviously

8   if restitution -- again, theoretically speaking, if restitution

9   was collected and the Clerk's office is going to send a

10  restitution payment, you don't send it to a minor child.

11  Somebody is the guardian or custodian for that child.

12         MS. KATZE:  I understand that if you did order it, it

13  would go to the parents in place of the children while they're

14  minor children.

15         THE COURT:  So what difference does it make that they

16  have adoptive parents?

17         MS. KATZE:  Because our argument is that their

18  counseling was being paid for by the State.  They got adopted,

19  and now the counseling is not being paid for.  The adoption is

20  the intervening event.  Same thing -- well, let me just say one

21  more thing about counseling.

22         I think from the Government's expert, it's clear

23  that -- I'm not arguing that the children don't need

24  counseling.  Of course they need counseling.  But it's so

25  speculative and prospective that we don't know.  It's possible

1   they might need counseling for 20 years.  It's also possible

2   that it's in their best interests that within the next couple

3   of years, the counseling seriously drops off.

4         I strongly believe in the idea of this constant

5   explosion therapy of the triggers, of keeping something so

6   present, trauma so present in somebody's mind that they don't

7   get past it.  I'm not arguing that people get no therapy.  I'm

8   saying to assume that intensive therapy is always the best way

9   to go, I think, is -- obviously Ms. Kenney has an interest in

10  making that argument.  It's her field.  It's her business.  I

11  just don't know that we can say that that is in the best

12  interests of the child, and that you can make that decision

13  now, and that as a result of the Government putting on

14  Ms. Kenney, that they met their burden of proving that that

15  would, in fact, be the cost in the future.  So that's the

16  counseling.

17        Your Honor, the second thing is the lost wages.

18  Basically, not getting the money that they would have gotten

19  because they would have taken more foster children.  They made

20  a decision to adopt the child knowing that the child was high

21  needs, and it's wonderful that they did that, but I feel

22  certain that they didn't do that not knowing that now they're

23  not going to be able to get $2,000 a month for having more

24  children in their house.  They made that decision.  And there

25  is no evidence that they can't get work in the house, or even

1   outside the house.

2          Probation reported that M.M. is doing well.  She's

3   doing well in school.  She doesn't even have an IEP, she's

4   doing that well.  They reported that she goes to play dates,

5   that she has friends.  I'm glad to hear she's doing well.  And

6   I can totally appreciate that her mom is super protective of

7   her and does want to be available, but we don't have any

8   evidence to indicate that her mother does have to be available

9   24 hours a day, 7 days a week, that that is actually true.  So

10  I think requesting lost wages the way they have, for the amount

11  of time they have, I don't think is appropriate and would fall

12  under the statute.

13         Your Honor, if I may have just one moment.

14         Just one last thing about the Reactive Attachment

15  Disorder.  We provided information in our pleadings that we

16  filed, and Ms. Kenney agreed with that, that the Reactive

17  Attachment Disorder comes from lack of love in your life.  So

18  obviously Mr. Blackburn contributed to the lack of love in his

19  life, although oddly, I will just tell you, as an aside, from

20  witnesses that we spoke to, there were some other sort of

21  transient people who lived in the house, and despite the abuse,

22  they said that the only person who did show care and love to

23  the children was Michael Blackburn.  But I'm not asking you to

24  reward him for that.  But that comes from parents who were not

25  showing love to their children.

1          So, Your Honor, based on those arguments, I am

2    asking -- and more specifically, it's laid out more completely

3    in our Sentencing Memo and in our subsequent pleadings that we

4    filed in response to the Government's responses, and in

5    response to Probation's addendums.  That is our argument.

6          I have one last request, Your Honor.  If you would

7    make a recommendation that Mr. Blackburn be allowed to serve

8    his sentence in FCI Tucson.

9          THE COURT:  Refresh my memory, again.  There have

10   been a lot of pleadings filed in this case.  Did you take a

11   position at all on the amount of restitution that you thought

12   was appropriate?

13         MS. KATZE:  I don't think we ever said specifically

14   this should be the amount.  I know that there were some amounts

15   as we went along that have since been resolved, as far as like

16   schooling.  Everybody agreed that's not appropriate.

17   Prospective criminal justice costs, we agreed those weren't.  I

18   don't think -- I'd have to look at my pleadings, and I can

19   contact the Court and Ms. Ong.

20         THE COURT:  That's fine.

21         MS. KATZE:  I just don't -- I think you're right.  I

22   don't remember saying we think this is appropriate.

23         THE COURT:  Okay.  I do have a question for Ms. Ong.

24         As we were going through the analysis here, if the

25   children were in CYFD custody, or even maybe at some point,

1    either now or later, if they qualify for Social Security

2    disability, I mean, if a Government agency is covering some of

3    these costs, the Government agency could request status as a

4    victim to collect restitution; right?

5              MS. ONG:  That's correct.  And I think specifically

6    in this case, if you look at 18 U.S.C. 2259(b)(4)(A)(ii), it

7    says:  "The issuance of a restitution order under this section

8    is mandatory.  The fact that a victim has, or is entitled to,

9    receive compensation for his or her injuries from the proceeds

10   of insurance or any other source."  So I think the statute is

11   clear.  It doesn't matter if the State has paid for stuff,

12   they're still entitled.  I think the Court is correct.  And if

13   I could just briefly respond to some of Ms. Katze's arguments.

14             With regard to the causation factor, with any type of

15   neglect or abuse that the parents perpetrated on the children,

16   what the Court has heard today is that all of these estimates

17   are extremely conservative estimates of what the actual cost is

18   going to be.  And so I think that the Court could find that the

19   requested costs are appropriate because there is evidence that

20   more than likely they're going to have to receive treatment for

21   an even longer period of time than the 12 years that we're

22   taking into account.  So any type of causation that the parents

23   may have contributed to in them needing therapy has already

24   been factored into the equation by the Court making a very

25   conservative estimate with regard to what the cost of therapy

1    is here.

2         Then just taking Ms. Katze's second argument

3    regarding the intervening cause to its logical conclusion, I

4    mean, under that theory, if we look at §2259, one of the things

5    that you can request are attorney's fees.  If you take her

6    argument at face value, then basically, if I'm a victim who's

7    entitled to hire an attorney in this context, because I'm

8    making the decision to hire the attorney and, therefore, taking

9    that cost on myself, that's an intervening cause.  So I think

10   that if you look at the plain language of the statute, taking

11   her argument to its logical extreme just doesn't make any

12   sense.

13        I mean, some of the other things here.  Necessary

14   transportation.  Temporary housing.  Child care.  You know,

15   okay, because I'm making an active decision to put my child in

16   child care rather than taking them to the courthouse to be

17   present at the hearing, that's something that I'm intentionally

18   doing, a cost that I'm intentionally incurring on myself, and

19   so therefore, it's an intervening cause.  I mean, that's

20   basically what she's arguing.  So I think that if you look at

21   the plain language of the statute, it completely contradicts

22   that argument.  I just wanted to point that out to the Court.

23        THE COURT:  One last question to you.  Obviously the

24   biological parents abandoned these children.  They left them

25   with Mr. Blackburn to the horrible detriment of these children.

1   I'm aware no one is disputing that the parental rights to the

2   biological children were terminated.

3           Where else in the record is there -- do you agree

4   there is something in the record regarding what Ms. Katze said

5   about the biological parents abusing, sexually abusing the --

6           MS. ONG:  In the PSR, there is a paragraph.

7           THE COURT:  It's in the PSR?  That's fine.  I just

8   wanted to nail that down.

9           MS. ONG:  It's in the PSR, Your Honor.

10          And just one last point.  I know that Mr. Blackburn

11  is asking for a designation to Tucson.  I think this came up at

12  the last hearing, but I just wanted to remind the Court that

13  K.S. actually made a request to the Court that you not

14  recommend that designation because she has a lot of family that

15  lives in Tucson, and that upsets her.  So I just wanted to

16  bring that to the Court's attention.

17          THE COURT:  All right.  Ms. Katze, I'll ask you and

18  Mr. Blackburn to come up to the podium.

19          Is there anything else?

20          MS. KATZE:  No, Your Honor, just that if K.S.'s

21  family isn't in the Federal prison in Tucson, I would hope that

22  wouldn't be an issue.

23          THE COURT:  I can't remember if I said this at the

24  previous hearing, but if not, I'll formally accept the plea

25  agreement that's in this case.

1     We had an earlier hearing on what the guideline

2   sentence would be.  I'll note -- and again, I'm going to quote.

3   This is Document 81 at Page 2.  I was referencing the

4   sentencing table, and I said:  "The highest offense level in

5   the sentencing table is 43, and the guideline sentence for a

6   Defendant with an offense level 43 is life in prison regardless

7   of the criminal history category."

8     And then I go on to state:  "If the Court were to

9   sustain the two objections to the Presentence Investigation

10  Report previously raised by the Defendant, his offense level

11  would still be 43, criminal history category 1, which results

12  in a guideline sentence of life in prison."

13    Now, ultimately I made the finding that the

14  Defendant's correctly calculated guideline sentence is 1440

15  months, or 120 years, but I'll note that even if I had

16  sustained the Defendant's objections, the guideline sentence

17  would be offense level 43, which is still life in prison.

18    So in order to get to a sentence of 504 months or, if

19  my math is right, that's 42 years, there would have to be a

20  downward variance.  As far as any kind of departure under the

21  guidelines, I don't think there is any that would allow a

22  departure analysis.  So that's what the guideline sentence is.

23    Now, ultimately the controlling statute for purposes

24  of sentencing is 18 United States Code Section 3553(a)(1)-(7),

25  and it says, Imposition of a Sentence.  And then Subparagraph A

1    is, "Factors to be considered in imposing a sentence."

2            The statute states:  "The Court shall impose a

3    sentence sufficient, but not greater than necessary to comply

4    with the purposes set forth in Paragraph 2 of this subsection.

5    The Court, in determining the particular sentence to be

6    imposed, shall consider, (1) the nature and circumstances of

7    the offense" -- or offenses, in this case -- "and the history

8    and characteristics of the Defendant; (2) the need for the

9    sentence imposed, (A) to reflect the seriousness of the

10   offense, to promote respect for the law, and to provide just

11   punishment for the offense; (B) to afford adequate deterrence

12   to criminal conduct; (C) to protect the public from further

13   crimes of the Defendant; and (D) to provide the Defendant with

14   needed educational or vocational training, medical care, or

15   other correctional treatment in the most effective manner."

16           And then Paragraph 3 is the kinds of sentences

17   available.  Paragraph 4 is the kinds of sentences available and

18   the sentencing range established.  And then it goes on to talk

19   about the Sentencing Commission and what the Sentencing

20   Commission has promulgated, and obviously I've considered that.

21           Number 6 is:  "The need to avoid unwarranted sentence

22   disparities among defendants with similar records who have been

23   found guilty of similar conduct."  And 7:  "The need to provide

24   restitution to victims."

25           Now, let me just go in reverse.  Restitution, again,

1  that's mandatory in this case, and I'm going to touch on that

2  later, but obviously I've considered the statute on restitution

3  and evidence, and the arguments that were advanced on what are

4  the appropriate amounts of restitution.

5          (6):  "The need to avoid unwarranted sentence

6  disparities among defendants with similar records who have been

7  found guilty of similar conduct."  As a general rule, a

8  guideline sentence satisfies that, but if that was totally

9  controlling, then you could never do a downward variance or an

10 upward variance.

11         The factor, or the subfactor about providing the

12 Defendant with needed educational or vocational training,

13 medical care, or other correctional treatment in the most

14 effective manner, to me that really doesn't come into play.  So

15 it's the earlier part of the statute that really is what I'm

16 focusing on.

17         Now, the nature and circumstances of the offenses and

18 the history and characteristics of the Defendant.  I'm not

19 going to -- I was the Judge and I heard all the evidence from

20 the suppression hearing.  I didn't look at all the photographs,

21 but I looked at the two that were introduced at the suppression

22 hearing, and to say that those photographs were disturbing is a

23 gross underestimate.

24         In the Government's Sentencing Memorandum, beginning

25 on Page 5, Page 6, Page 7, there's a very accurate description

1  of the nature and circumstances of these offenses, and I'm not

2  going to repeat, but I'll reference the description.  It's in

3  Document No. 77.

4           I'll note that if you look at the five offenses that

5  the Defendant pled guilty to in this plea agreement, Count 1 is

6  distribution of child pornography in violation of 18 United

7  States Code Section 2252(a)(2).  The statutory, just singly for

8  that offense, the statutory range of incarceration under the

9  statute is 50 to 20 years.

10          Count 2, receipt of child pornography in violation of

11  18 United States Code Section 2252(a)(2), the statutory range

12  of incarceration singly for that count is 5 to 20 years.

13          Count 3, possession of child pornography in violation

14  of 18 United States Code Section 2252(a)(4)(B), in terms of the

15  statutory range, it's not more than 20 years.

16          Count 4, production of child pornography in violation

17  of 18 United States Code Section 2251(a), the range for that

18  single count is 15 to 30 years.

19          And Count 5, production of child pornography by

20  custodian in violation of 18 United States Code Section

21  2251(B), the statutory range for that count is 15 to 30 years.

22          Now, these references to the statutory terms of

23  incarceration, they don't take into account any grouping rules,

24  they don't take into account any of the guideline

25  characteristic enhancements that were applied by the Probation

1    Office, but obviously when you consider the nature and

2    circumstances of the offenses in this case, these are serious

3    offenses.

4         In terms of the criminal conduct exhibited by the

5    Defendant towards these toddlers, I'll just say this.  I've

6    been a Judge in this Court for 15 and a half years, so I've

7    dealt with a number of child pornography cases and sexual abuse

8    cases.  Before that, I was a State District Judge for seven and

9    a half years and I did a lot of CYFD cases and I had to

10   terminate a number of parents' parental rights because of abuse

11   and neglect.  So I've seen a lot.  But in terms of the abuse,

12   the sexual abuse on these children, and then the counts of

13   child pornography that are in the indictment, this is about the

14   worst I've ever seen.

15        Now, in terms of the need for the sentence imposed to

16   reflect the seriousness of the offense, I've already discussed

17   that.  To promote respect for the law, to provide just

18   punishment for the offense, that sentencing factor, in my view,

19   based on the conduct of the Defendant in this case, that

20   supports a sentence of life in prison.

21        Subsection B, to afford adequate deterrence to

22   criminal conduct.  You know, from presiding over this child

23   pornography case and others, in the internet, I don't know how

24   else to describe it, but there is a segment of the internet,

25   I'll analogize it to a medieval dungeon, but there is the

1  sharing of these child pornographic images.  It's horrendous.

2  And for the children that are portrayed in this, the

3  consequences can be lifelong.  So from the deterrent component,

4  to deter this type of horrendous criminal conduct, that factor,

5  a life sentence, that factor supports -- or that goal of

6  sentencing supports a life sentence.

7       To protect the public from further crimes of the

8  Defendant.  I'll reference an earlier -- I believe it was at

9  the sentencing hearing that the Government introduced Exhibits

10  31, 32, 33, 34 and 35.  These were text messages that the

11  Defendant -- that went back and forth between the Defendant and

12  his ex-wife regarding the Defendant's own minor child, and I'm

13  not going to repeat it, the language in there is horrendous,

14  but the threats that the Defendant made to his own minor child

15  suggests that there's a strong need to protect the public from

16  further crimes of the Defendant.  And therefore, that goal of

17  sentencing supports a life sentence.

18       And then, again, I've already touched on Subfactor D

19  and the other sentencing factors, so I go back to the fact that

20  the requirement that I have is that the Court shall impose a

21  sentence sufficient, but not greater than necessary to satisfy

22  the goals of sentencing.

23       So I will find that a guideline sentence of 120 years

24  is a sentence that is sufficient, but not greater than

25  necessary to satisfy the goals of sentencing.

1          Alternatively, if on appeal my overruling of the

2    objections that were made earlier at that sentencing, and if it

3    turns out that the Defendant's, instead of 120 years, the

4    Defendant's guideline offense level should be offense level 43,

5    category 1, then alternatively I will find that offense level

6    43, category 1, a sentence of life is a sentence that is

7    sufficient but not greater than necessary to satisfy the goals

8    of sentencing.

9          For purposes of any kind of departure analysis, I do

10   not find that there is anything out there that would take this

11   Defendant out of the heartland of cases that would warrant any

12   kind of departure.  I don't even think there's any departure

13   analysis under the guidelines that would be applicable to this

14   Defendant, and obviously I do not believe a downward variance

15   to a sentence of 42 years is warranted.

16          So as to each of Counts 1, 2 and 3 of the Indictment,

17   the Defendant is committed to the custody of the Bureau of

18   Prisons for a term of 240 months.  As to Counts 4 and 5, the

19   Defendant is committed to the custody of the Bureau of Prisons

20   for a term of 360 months.  Those terms shall run consecutive to

21   each other for a total term of incarceration of 1440 months, or

22   120 years.

23          I do recommend the Defendant participate in the

24   Bureau of Prisons' sex offender program.  I'll note the

25   Defendant's requested designation to Tucson.  I'll note that

1   one of the child victim's parents expressed concern over any

2   designation to Arizona.  Considering -- I'm not going to make

3   any recommendation towards designation, other than that the

4   Bureau of Prisons designate the Defendant to the appropriate

5   facility taking into account security concerns, but also

6   considering the nature of these horrendous offenses, a sentence

7   where there are other sex offenders, because obviously there

8   are certain types of facilities where if the Defendant were

9   placed at, he would be potentially subject to being a victim or

10  attacked by other defendants.

11          I'm also going to make the recommendation -- well,

12  since I'm imposing a life sentence, I'm not going to impose

13  conditions of supervised release, other than to note that if

14  there were conditions of supervised release to be imposed, they

15  would be a lifetime of supervision.  In the event that the

16  conviction or the sentence is reversed to where conditions of

17  release would be appropriate, then I would impose those at the

18  appropriate time.

19          In terms of additional recommendations to the Bureau

20  of Prisons, I recommend that the Bureau of Prisons prevent the

21  Defendant from ever contacting the child victims, and that

22  would extend for all the Defendant's life.  So that would be

23  not only when the victims are children, but when they become

24  adults.  And I also recommend that the Bureau of Prisons make

25  sure it monitors the Defendant so that he does not have any

1  contact with any other minor -- any type of contact whatsoever

2  with any other type of minor children, including his own

3  biological child.

4        And I'll also recommend, considering the nature of

5  these offenses, that the Bureau of Prisons not allow the

6  Defendant to have any internet access, or if the Bureau of

7  Prisons does, that any internet access be closely monitored.

8        Now, I'm not going to impose any fine in this case

9  because, again, I think restitution is more important than a

10  fine.  I do have to impose a Special Penalty Assessment of $100

11  as to each count of conviction for a total penalty assessment

12  of $500, and I'm required to state that it's due immediately.

13        The Defendant is subject to the provisions of the

14  Justice for Victims of Trafficking Act of 2015.  That does

15  require the Court to assess an amount of $5,000 on any indigent

16  person convicted of an offense under 18 U.S. Code Chapter 77,

17  109a, 110, 117, or Section 274 of the Immigration and

18  Nationality Act.  If there's a finding of indigency, then I'm

19  not required to impose that $5,000 assessment.  I will make the

20  finding that the Defendant is indigent, and therefore, that

21  $5,000 assessment will not be imposed.

22        Now, regarding restitution.  It is mandatory in this

23  case, and under Section 2259, it does state, first, that

24  restitution is proper to the extent of Defendant's offense

25  conduct that proximately caused the victims' loss.  And it also

1 states -- and I'm recognizing, as was noted, that the

2 likelihood that the victims will ever receive anything other

3 than maybe nominal amounts, that that's the likelihood, but the

4 statute basically says:  "The Court may not decline to issue an

5 order under this section because of the economic circumstances

6 of the Defendant."

7          Now, I am going to enter -- I'll have to make

8 findings of fact and conclusions of law based on the evidence

9 that was presented and the arguments, but I will, as a

10 preliminary matter, I'll find that the Government has met its

11 burden by a preponderance of the evidence that justifies the

12 total restitution amount of $430,800.  I'll detail the findings

13 on that in a subsequent decision.  Given the Defendant's

14 status, his indigency status, and the huge sum of restitution,

15 any interest will be waived on the restitution.

16          Finally, I must advise -- or well, I'll note,

17 pursuant to the plea agreement -- and what I'm going to do is,

18 I flagged that.  The Defendant entered into a conditional

19 appeal, and in Paragraph 23 of his plea agreement, it states

20 this:

21          "The Defendant is aware that 28 United States Code

22 1291 and 18 United States Code Section 3742 afford a Defendant

23 the right to appeal a conviction and the sentence imposed.

24 Acknowledging that, the Defendant knowingly waives the right to

25 appeal the Defendant's convictions, including any fine, terms

1  of supervised release, as well as any order of restitution

2  entered by the Court.  In addition, the Defendant agrees to

3  waive any collateral attack to the Defendant's convictions,

4  including any fine, pursuant to 28 United States Code Sections

5  2241, 2255, or any other extraordinary writ, except on the

6  issue of defense counsel's ineffective assistance."

7         It then states:  "The Defendant reserves the right to

8  appeal the Court's ruling on his motion to suppress as stated

9  and referenced in Paragraph 22, and also reserves the right to

10  appeal the sentence of imprisonment that he receives in this

11  case."

12         So finally, I must advise the Defendant that within

13  14 days of the entry of the judgment in this case, you have the

14  right to appeal the matters that you reserved or preserved in

15  your plea agreement.  You also have the right to apply for

16  leave to appeal in forma pauperis if you're unable to pay for

17  the cost of an appeal.

18         All right, is there anything else from the United

19  States on this matter?

20         MS. ONG:  Yes, Your Honor, just briefly.  I just

21  wanted to clarify some of the Court's findings.

22         With regard to the Court's alternative finding, I

23  believe that the Court stated that even if it had not -- if it

24  had granted the Defendant's objections with regard to where the

25  Defendant would fall in the guidelines, that you would impose a

1   sentence of life.  I know this is kind of a technicality, but I

2   think technically that because the statute of conviction

3   doesn't allow for a life sentence, it would still be a 120 year

4   sentence.

5          THE COURT:  I agree with you, but as I recall the

6   pleadings, Ms. Katze argued that even if I sustained the

7   objection, the guideline offense level would be 43, which on

8   the sentencing table is a sentence of life in prison.

9          MS. ONG:  That's correct.  And under Chapter 5 of the

10  guidelines, if the sentence is life, but the statute of

11  conviction does not allow for life, then the Court stacks the

12  counts.  So I just wanted to clarify that you would impose a

13  sentence of 120 years.

14         THE COURT:  Yes, but what I was saying is, if this

15  comes back and the guideline sentence is what Ms. Katze argued,

16  it's still life.  In other words --

17         MS. ONG:  It would be the same sentence that the

18  Court is imposing today.

19         THE COURT:  Exactly.  But I agree.  I mean, again, I

20  went through the analysis, I agreed with the Government that

21  the guideline sentence is 120 years.  That's what the judgment

22  is going to reflect.

23         MS. ONG:  All right.  Thank you, Your Honor.

24         And then with regard to the supervised release, I do

25  believe that even if the Court is imposing a high sentence,

1   under the statute, supervised release is mandatory.  So I would

2   just ask the Court to actually impose supervised release.  I

3   think that under the statute, the Court has to impose at least

4   five years.  I think the Court said it would impose lifetime.

5                THE COURT:  Do you agree with that?

6                MS. KATZE:  I don't have my statute book with me, and

7   I haven't had a client get life.

8                MS. ONG:  I'm only just bringing this up because I

9   don't want them to argue later on that there were any types of

10  defects with the Court's sentence.

11               THE COURT:  I always thought that it was kind of an

12  exercise in futility in a life sentence to impose terms of

13  supervised release, but if I have to impose supervised release,

14  then it would be a supervised release for a term of life as to

15  each count, each of the five counts, to run concurrent.

16               There's the standard conditions of supervision,

17  including the standard sex offender conditions adopted by the

18  District of New Mexico on November 17, 2011.  There's also

19  mandatory conditions.  And then the Defendant must comply with

20  the special conditions imposed in Attachment A.

21               I've already covered the restitution, but I do need

22  to say this.  Again, on restitution, recognizing the

23  Defendant's indigent and will be incarcerated, Probation has

24  recommended restitution to be paid in monthly installments of

25  $200 or 20% of the Defendant's monthly income, whichever is

1   greater.  I'll reflect that in the Judgment, recognizing that

2   at most the restitution will probably be whatever is in the

3   Defendant's inmate account.  I think the Bureau of Prisons

4   deducts part of that.  But I am required to put a restitution

5   amount.

6          And I think that's it.  Does that address the

7   Government's concerns?

8          MS. ONG:  Yes, Your Honor.  I just have two other

9   points to bring up.  I know the Court waived this anyway, but

10  the Trafficking Act was passed in 2015.  The Defendant's crimes

11  were committed in 2013.  So I think technically that wouldn't

12  apply to him.

13         THE COURT:  I'll make a finding that it would not

14  apply.  If it did apply, the $5,000 assessment would be waived

15  because he's indigent.

16         MS. ONG:  Thank you, Your Honor.  And then just the

17  last point, I know that the Court basically imposed a condition

18  that the Defendant not have any internet access when he's at

19  BOP.

20         THE COURT:  Those weren't conditions, those were

21  recommendations to the Bureau of Prisons.  Like any

22  recommendations, they're free to accept or reject them.

23         MS. ONG:  All right.  I understand that that's a

24  recommendation, but is that recommendation just based on the

25  fact that all of the Defendant's crimes were basically

1    committed on the internet, that he used the internet to

2    facilitate the crimes that he's pled guilty to?

3            THE COURT:  Correct, that's the reason for the

4    recommendations.

5            Ms. Katze, anything else from you?

6            MS. KATZE:  Just one thing.  Was there a

7    recommendation to the Bureau of Prisons that he not be allowed

8    to write to his son?  Because I'd like to address that.

9            THE COURT:  Well, the Presentence Report indicates

10   that the custodial parent has an order of protection.

11           MS. KATZE:  I think that no longer exists.  And I

12   have spoken to the custodial parent, and she is okay with him

13   writing letters to the son.  He's obviously never going to have

14   access to his son, he's never going to see him, but I know that

15   in his obviously completely bleak future, that was one thing

16   that he wanted to do.  And I spoke to her, and she said she

17   would be fine with him writing letters.

18           THE COURT:  Here is my recommendation to the Bureau

19   of Prisons.  Again, once the son becomes an adult, then it's up

20   to the son whether or not he wishes any contact from his

21   father.

22           I'll recommend that the Bureau of Prisons determine

23   whether the custodial parent objects.  If the custodial parent

24   does not wish any contact by the Defendant to the biological

25   child, then the custodial parent's wishes should control.  That

1   would be my recommendation.  But I'm not the one -- it's up to

2   the Bureau of Prisons.

3             MS. KATZE:  Okay.  Thank you.

4             THE COURT:  Anything else?

5             MS. KATZE:  No, Your Honor.

6             MS. ONG:  No, Your Honor.

7             THE COURT:  All right.  We're in recess.

8   (Proceedings adjourned at 5:24 P.M.)

9                         * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEW MEXICO

3  _____
                                   )
4  UNITED STATES OF AMERICA,       )
                                   )
5            Plaintiff,            )
                                   )
6       vs.                        )    No. 14-CR-00129 WJ
                                   )
7  MICHAEL DAMEON BLACKBURN,        )
                                   )    SENTENCING HEARING, PART 2
8            Defendant.            )
   _____)

9

10    CERTIFICATE OF OFFICIAL COURT REPORTER

11       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12  Official Realtime Court Reporter, in and for the United States

13  District Court for the District of New Mexico, do hereby

14  certify that pursuant to Section 753, Title 28, United States

15  Code, that the foregoing is a true and correct transcript of

16  the stenographically reported proceedings held in the

17  above-entitled matter on Thursday, June 22, 2017, and that the

18  transcript page format is in conformance with the regulations

19  of the Judicial Conference of the United States.

20  Dated this 7th day of August, 2017.

21

22  _____
   MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23  FEDERAL OFFICIAL COURT REPORTER
   333 Lomas Boulevard, Northwest
24  Albuquerque, New Mexico  87102
   Phone:  (505)348-2334
25  Email:  Mary_Loughran@nmcourt.fed.us